## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK
    c/o National Student Legal Defense
    Network
    1701 Rhode Island Ave, N.W.
    Washington, D.C. 20036

JULLIANA SAMSON
    c/o National Student Legal Defense
    Network
    1701 Rhode Island Ave, N.W.
    Washington, D.C. 20036

DIANA RAMOS
    c/o National Student Legal Defense
    Network
    1701 Rhode Island Ave, N.W.
    Washington, D.C. 20036

CATHERINE HOLLINGSWORTH
    c/o National Student Legal Defense
    Network
    1701 Rhode Island Ave, N.W.
    Washington, D.C. 20036

MAZON, INC.: A JEWISH RESPONSE TO
HUNGER
    15303 Ventura Blvd., Suite 1100
    Sherman Oaks, CA 91403, *and*

ELECTRONIC PRIVACY INFORMATION
CENTER,
    1519 New Hampshire Ave, N.W
    Washington, DC 20036, and

        *Plaintiffs*,

        v.

Civil Action No. 1:25-cv-01650

BROOKE L. ROLLINS, in her official
capacity as U.S. Secretary of Agriculture,
    1400 Independence Avenue, SW
    Washington, DC 20250,

U.S. DEPARTMENT OF AGRICULTURE,
    1400 Independence Avenue, SW
    Washington, DC 20250,

JAMES C. MILLER, in his official capacity
as Administrator of the Food and Nutrition
Service,
    1320 Braddock Place
    Alexandria, VA 22314, *and*

FOOD AND NUTRITION SERVICE,
    1320 Braddock Place
    Alexandria, VA 22314,

        *Defendants.*

## INTRODUCTION

1.    For decades, federal law has struck a careful and critical balance between the
government's legitimate need to obtain and manage sensitive, highly personal information and
the longstanding and growing need to protect individual privacy. Through laws like the Privacy
Act of 1974, the Paperwork Reduction Act of 1980, and the E-Government Act of 2002, among
others,[1] Congress and the Executive Branch have crafted policies designed to balance these
needs and protect the privacy of the American people. This urgent lawsuit challenges the U.S.
Department of Agriculture's circumvention of those polices. Specifically, Plaintiffs allege that

---

[1] Other examples include: the Federal Information Security Modernization Act of 2014
(amending the Federal Information Security Management Act of 2022), 44 U.S.C. § 3541, the
Trade Secrets Act, 18 U.S.C. § 1905, the Children's Online Privacy Protection Act of 1998, 15
U.S.C. § 6501, the Social Security Number Fraud Prevention Act of 2018, P.L. 115-59, OMB
Memoranda M-01-05, M-03-22, M-06-16, M-10,22, M-10-23, M-11-02, M-13-13, M-13-20, M-
14-04, M-14-06, M-16-04, M-16-14, M-16-24, 17-06, 17-09, 17-12, 18-02 & 21-04.

Defendants acted unlawfully by initiating a collection of information of tens of millions of SNAP applicants and recipients without complying with the requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act.

2.     Privacy risks are especially profound for vulnerable populations, whose participation in social benefit programs requires frequent interactions with local, state, and federal government agencies. The manifestation of those risks as invasions of privacy and the attendant harms are "particularly acute" among poor communities, "in light of the resulting economic and social consequences and the low likelihood that they will be able to bear the costs associated with remedying those harms." Mary Madden, Michele Gilman, Karen Levy, & Alice Marwick, *Privacy, Poverty, and Big Data: A Matrix of Vulnerabilities for Poor Americans*, 54 Wash. U. L. Rev. 53, 55 (2017).

3.     Federal privacy laws contain a common through-line. When any federal agency collects, maintains, uses, or discloses sensitive information, federal law requires it to provide the public with information about, and an opportunity to comment on, the agency's activities, purposes, and safeguards. The goal here is clear: given the inherent risks that novel (and even routine) uses of personal data impose, individuals have a right (i) to know what information the government maintains or intends to collect; and (ii) to make recommendations on each federal data collection, use, and disclosure.

4.     This urgent litigation seeks to ensure that the government is not exploiting our most vulnerable citizens by disregarding longstanding privacy protections, depriving the public of critical information regarding data collection and protections, and eviscerating the public's right to comment on the mass collection and consolidation by the federal government of

sensitive, personal data of tens of millions of individuals who rely on federal food assistance benefits.

## **BACKGROUND**

5.      The Supplemental Nutrition Assistance Program ("SNAP") is the nation's largest nutrition assistance program available to low-income households. In February 2025, SNAP served over 42 million people in over 22 million households nationwide.[2] SNAP operates as a federal-state partnership, where the federal government pays 100% of food benefits and shares administrative costs with the states.

6.      At the federal level, SNAP is administered by the U.S. Department of Agriculture, though its sub-agency, the Food and Nutrition Service. States, meanwhile, are responsible for program administration, including certifying applicant households and issuing benefits. As a result, states—and their vendors—maintain substantial amounts of highly personal financial, medical, housing, tax, and other information regarding SNAP applicants and recipients, and their dependents. *See* 7 U.S.C. § 2014(c)–(e) (detailing the components of income, exclusions to income, and deductions to income that must be documented).

7.      The information maintained by states to administer SNAP is precisely the sort of information that federal privacy laws are designed to protect. But on May 6, 2025, the U.S. Department of Agriculture and the nascent Department of Government Efficiency ("DOGE") initiated a sweeping and unprecedented demand that over five years of state SNAP data be

---

[2] *SNAP Data Tables*, U.S. Dep't of Agric, https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (last visited May 16, 2025); *Supplemental Nutrition Assistance Program (SNAP)*, U.S. Dep't of Agric, https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap (last visited May 15, 2025).

turned over under threat of both legal action and withholding of funds for non-compliance—and they did so without following procedures enshrined in federal privacy laws.

8.    This lawsuit poses an urgent and straightforward question: must these government agencies comply with the substantial body of federal law that puts certain informational, substantive, and procedural requirements onto the agencies *before* demanding, collecting, maintaining, and/or using state SNAP data? As alleged herein, the answer is clearly: yes.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under federal law, namely the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706, the Privacy Act, 5 U.S.C. § 552a, and the Paperwork Reduction Act, 44 U.S.C. §§ 3506-3507.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(e)(1)(A) and 1391(e)(1)(B) because one or more Defendants are officers and agencies of the United States and reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

11.    Plaintiff Namod Pallek is an undergraduate student at the University of California, Berkeley. Since January 2024, he has been enrolled in CalFresh, the California-administered SNAP program. To receive CalFresh benefits, Mr. Pallek submitted sensitive personal information to the California Department of Social Services. Mr. Pallek resides in Berkeley, California.

12.    Plaintiff Julliana Samson is also an undergraduate student at the University of California, Berkeley. She has been enrolled in CalFresh since August 2024. To receive CalFresh

benefits, Ms. Samson submitted sensitive personal information to the California Department of Social Services. Ms. Samson resides in Berkeley, California.

13.     Plaintiff Diana Ramos receives, and has been receiving, SNAP benefits through New York since March 2020. From 2013 until January 2020, she was enrolled in and received benefits through Florida's SNAP program. To receive these benefits, Ms. Ramos submitted sensitive personal information to both the Florida Department of Children and Families and the New York Office of Temporary and Disability Assistance. Ms. Ramos resides in New York, New York.

14.     Plaintiff Catherine Hollingsworth receives, and has been receiving, SNAP benefits in Alaska since 2002. To receive these benefits, Ms. Hollingsworth has submitted sensitive personal information to Alaska's Division of Public Assistance. Ms. Hollingsworth currently resides in Wasilla, Alaska.

15.     The term "Individual Plaintiffs" shall hereinafter refer to Plaintiffs Pallek, Samson, Ramos, and Hollingsworth.

16.     Plaintiff MAZON, Inc.: A Jewish Response to Hunger ("MAZON") is a faith-based nonprofit organization incorporated in Massachusetts, and headquartered in Los Angeles, California, dedicated to fighting hunger among people of all faiths and backgrounds across the country. SNAP plays a critical role in MAZON's anti-hunger advocacy, which prioritizes educating the anti-hunger community and service providers who directly interface with SNAP applicants and recipients.

17.     Plaintiff Electronic Privacy Information Center ("EPIC") is a public interest research center incorporated in Washington, D.C. devoted to securing the right to privacy in the digital age. Among its activities, EPIC engages in advocacy, research, and public education

about the collection, use, retention, and transfer of personal information by federal agencies, including large-scale databases and mass surveillance programs. EPIC also engages in research, advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP.

18.     Defendant U.S. Department of Agriculture is a cabinet-level agency within the executive branch of the United States that manages and regulates food, agricultural production, and natural resources. The U.S. Department of Agriculture oversees and houses other agencies, including the Food and Nutrition Service, and is headquartered in Washington, D.C.

19.     Defendant Brooke L. Rollins is the Secretary of Agriculture, the highest-ranking official of the USDA. Rollins is the Secretary of Agriculture, the highest-ranking official of the U.S. Department of Agriculture. *See* 7 U.S.C. § 2202. Secretary Rollins is sued in her official capacity.

20.     Defendant Food and Nutrition Service is an agency established by, and housed within, the USDA. It is headquartered in Alexandria, Virginia. FNS administers SNAP, a federally funded program to provide food benefits to low-income households.

21.     Defendant James C. Miller is the Administrator of FNS. Administrator Miller has the authority to administer FNS, including SNAP. *See* 7 U.S.C. § 2013; 7 C.F.R. § 2.57. Administrator Miller is sued in his official capacity.

22.     Defendants U.S. Department of Agriculture, Secretary Rollins, FNS, and Administrator Miller are collectively referred to herein as "USDA."

## LEGAL FRAMEWORK

**I.    Federal Law Creates Numerous Safeguards to Protect Personal Data.**

    **A.  Privacy Act**

23.    The Privacy Act governs the federal government's handling of personal information and aims to balance two competing needs: the government's need, in some circumstances, for sensitive, personal information and the risks associated with the government collecting and maintaining this information. Accordingly, the Act broadly both "regulates the collection, maintenance, use, and dissemination of information by" federal agencies, Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, and gives agencies "detailed instructions for managing their records." *Doe v. Chao*, 540 U.S. 614, 618 (2004).

24.    Among these instructions, and as is relevant here, the Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. §§ 552a(a)(3), (e)–(f).

25.    When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records").

26.    This notice, commonly referred to as a System of Records Notice ("SORN"), must identify, *inter alia*, the name and location of the system; the categories of individuals on whom records are maintained in the system; the purpose for which information about an individual is collected; the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of records; and the procedures by which individuals can request notification of and access to information pertaining to them. *Id.* § 552a(e)(4).

27.    Each SORN provides the public with information regarding the relevant system of records, which is a necessary precondition for an individual to exercise their right to "gain access" to records that are "contained in the system." 5 U.S.C. § 552a(d)(1).

28.    At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

29.    Thus, *before* an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment at least 30 days in advance. The Privacy Act establishes a similar notice and comment requirement for the establishment or revision of a data match with other federal, state, or local government entities. 5 U.S.C. § 552a(e)(12).

30.    As evidence of the importance of the SORN and the need to safeguard individual privacy, the Privacy Act also requires that agencies proposing to establish or significantly change a system of records must also provide "advance notice" to specified Congressional committees and the Office of Management and Budget "in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." *Id.* § 552a(r).

31.    Finally, to protect the security of individuals, the Privacy Act requires agencies to implement both human (*i.e.*, conduct and training provisions) and technical (*i.e.*, administrative and physical) safeguards regarding any systems of records. *Id.* § 552a(e)(9)–(10). Such requirements, including "penalties for noncompliance," *id.* § 552a(e)(9), are designed to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552a(e)(10).

### B. Paperwork Reduction Act

32.     Whereas the Privacy Act aims to protect individual privacy by governing how agencies maintain, collect, use, or disseminate personal information, a separate federal law—the Paperwork Reduction Act ("PRA")—governs how agencies collect information from the public and to "ensure the greatest possible public benefit" from the collection and use of such information. 44 U.S.C. § 3501(2); *see also*, *e.g.*, *id.* § 3501(4) (referencing the goal of improving the quality and use of information to strengthen accountability and openness in government); *id.* § 3504(11) (noting the goal of improving the responsibility and accountability of federal agencies to the public for implementing the information collection review process and other policies and guidelines set forth by law).

33.     In enumerating the PRA's purposes, Congress specifically cited the need to ensure that both "privacy and confidentiality" and the "security of information" were being managed "consistent with applicable laws, . . . including, [the Privacy Act]." 44 U.S.C. § 3501(8).

34.     The PRA applies when federal agencies obtain facts or opinions from more than ten non-federal actors, including individuals, corporations, and state and local governments. *See* 44 U.S.C. § 3502; *see also* 5 C.F.R. § 1320.3(c). The PRA covers mandatory and voluntary collections of information.

35.     Like the Privacy Act, the PRA establishes standards to ensure that agencies are meeting the letter and spirit of the law. For instance, prior to initiating a covered information collection, the PRA requires that an agency's Chief Information Officer conduct an "independent" review—using statutorily delineated steps—to "evaluate fairly" whether the proposed collection should proceed. 44 U.S.C. §§ 3506(c)(1), 3507(a).

36.     Further, as with the Privacy Act, the PRA also requires the agency to publish information regarding the collection, including a "description of the need for the information," the "proposed use of the information," "a description of the likely respondents and proposed frequency of response" to the information collection, "an estimate of the burden that shall result" from the information collection, and "notice that comments may be submitted" regarding the collection. 44 U.S.C. § 3507(a)(1)(D).

37.     In addition, prior to conducting a covered collection, an agency must provide both a 60-day notice in the Federal Register seeking public comment and, separately, "consult with members of the public and affected agencies" about the collection. *Id.* § 3506(c)(2)(A). The agency may not conduct or sponsor the collection of information without "evaluat[ing] the public comments received in response to the 60-day notice and consultation requirements. *Id.* § 3507(a)(1)(B).

38.     Before conducting a covered collection, the agency must also certify to the Director of the Office of Management and Budget ("OMB") that the collection is, *inter alia*, "necessary for the proper performance" of the agency's functions. *Id*. § 3506(c)(3). An agency may proceed with the data collection only after the Director of OMB has approved the proposed collection and issued a control number to be displayed on the collection of information. *Id*. § 3506(c). The Director may only issue such an approval after providing another 30 days for the public to comment on the proposed collection (with limited exceptions). *Id*. § 3507(b).

### C.    E-Government Act

39.     With provisions expressly designed to "ensure sufficient protections for the privacy of personal information," the E-Government Act of 2002 requires federal agencies to conduct a Privacy Impact Assessment ("PIA") before initiating a collection of information using

11

information technology in certain circumstances. Pub. L. No. 107-347, § 208(b)(1)(A)–(B), 116 Stat. 2899, 2921-22 (2002).

40.    The Privacy Impact Assessment must address what information will be collected, why, its intended use, with whom it will be shared, what notice and what opportunities for consent individuals will be given, and how the information will be secured. The Assessment also specifically requires the agency to state whether it is creating a system of records under the Privacy Act. *Id*. § 208(b)(2)(B)(ii)(I)–(VII).

41.    Once a Privacy Impact Assessment is completed, an agency is required to ensure the review and approval of the Assessment by the Chief Information Officer or her equivalent. *Id.* § 208(b)(1)(B). The agency is then directed to make the PIA "publicly available" through one of several means. *Id.*  Agencies must also conduct a PIA for ongoing collections, as deemed appropriate by the Director of OMB. *Id.* § 208(b)(3)(C).

## II.    The Supplemental Nutrition Assistance Program: A Federal-State Collaboration

42.    SNAP is the nation's largest nutrition assistance program available to low-income households. In February 2025, SNAP served over 42 million people in over 22 million households nationwide.[3]

43.    SNAP applicants and recipients are among our economically vulnerable citizens, with income and resources so limited as to restrict their ability to buy food and meet their other most basic needs. "Households turn to SNAP when they are in distress."[4] For example, in 2024 the Government Accountability Office ("GAO") estimated that approximately 23% of college

---

[3] *SNAP Data Tables*, *supra* note 2; Supplemental Nutrition Assistance Program (SNAP), *supra* note 2.
[4] Elizabeth Cox, et al**.**, *Beyond hunger: The role of SNAP in alleviating financial strain for low-income households*, Brookings (June 20, 2024), https://www.brookings.edu/articles/beyond-hunger-the-role-of-snap-in-alleviating-financial-strain-for-low-income-households/.

students experienced food insecurity in 2020. In the context of postsecondary education, food insecurity among college students may lead to decreased academic performance, symptoms of depression and anxiety, and other negative mental health indicators. Food insecurity also has been found to have an inverse relationship on college completion.[5]

44.    Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet" and "increasing [their] food purchasing power." 7 U.S.C. § 2011. The Program is authorized by the Food and Nutrition Act of 2008, codified at 7 U.S.C. § 2011 *et seq.*, and the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 4001(a), 122 Stat. 1853, formerly the Food Stamp Act.

45.    SNAP is available to all persons who fall within income and asset restrictions, subject to additional non-financial criteria related to factors such as work and immigration status. Individuals receive monthly benefits that can be used to buy food at authorized retailers via electronic benefit transfer ("EBT").[6]

46.    SNAP operates through a federal/state partnership. At the federal level, SNAP is administered by the U.S. Department of Agriculture, through FNS, which is responsible for establishing nationwide eligibility processes, benefit levels, and administrative rules. 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3(a). USDA, in turn, is responsible for overseeing each state's administration of the Program, including, among other things, reviewing and approving each

---

[5] Julia A. Wolfson, Noura Insolera, Alicia Cohen & Cindy W. Leung, *The Effect of Food Insecurity During College on Graduation and Type of Degree Attained: Evidence from a Nationally Representative Longitudinal Survey*, 25(2) Pub. Health Nutrition 389, 394-96 (July, 29, 2021), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/4048E0A71FB2CB5B6B7C984AC1AE5F9E/S1368980021003104a.pdf/the-effect-of-food-insecurity-during-college-on-graduation-and-type-of-degree-attained-evidence-from-a-nationally-representative-longitudinal-survey.pdf.

[6] Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report*, U.S. Dep't of Agric. 6 (June 2024), https://ers.usda.gov/sites/default/files/_laserfiche/publications/109314/EIB-274.pdf?v=1308.

state's plan of operations, reviewing any major changes in Program design, and taking action to address state noncompliance. *Id.* § 2020(a)(4), (d)-(e), (g).

47.     States, meanwhile, are responsible for day-to-day administration, including determining eligibility issuing benefits, and ensuring program integrity in the issuance of benefits. 7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4. States typically contract with vendors ("EBT Vendors") to issue benefits through EBT systems that allow SNAP recipients to use debit cards to buy food at grocery stores and other authorized retailers.

48.     Because states certify eligibility and issue benefits, they retain sensitive personal data on SNAP applicants and recipients including their Social Security number, date of birth, address, employment status, citizenship status, income, resources, and more. 7 C.F.R. § 273.2(f). States also collect and maintain additional information about some individuals including, but not limited to, their health, educational status, history of substance abuse treatment, paternity, and history of child support payments. 7 U.S.C. § 2015(e), (l)-(o).

49.     In recognition of the sensitive nature of the information collected, federal law requires states to establish "safeguards which prohibit [its] use or disclosure," with limited statutorily express exceptions. 7 U.S.C. § 2020(e)(8). Although the statute requires that the "safeguards" permit certain disclosures to "persons directly connected with the administration or enforcement" of SNAP, nothing in the SNAP statute or its implementing regulations permits USDA to avoid the requirements of the Privacy Act, the PRA, the e-Government Act, or any other federal privacy law.

50.     Congress enacted provisions directed at rooting out fraud or abuse in the SNAP program. Yet even these provisions are carefully limited to protect data privacy. For instance, in 2018, Congress directed USDA to "establish an interstate data system," called the National

Accuracy Clearinghouse ("NAC") to ensure individuals do not receive SNAP benefits from more than one state at a time. 7 U.S.C. § 2020(x)(2)(A). Although states may be required to provide data to the NAC, such information must be narrowly tailored to achieving the goals of the NAC. 7 U.S.C. § 2020(x)(2)(B) (limiting the provision of "such information as is necessary" to achieve the purposes of the NAC). Moreover, any information provided to the NAC is also subject to data protection, including with respect to retention period, anonymity for especially vulnerable individuals, and security standards. *Id.* § 2020(x)(2)(C).

51.    In 2022, USDA promulgated an Interim Final Rule to create the NAC. *See* Supplemental Nutrition Assistance Program: Requirement for Interstate Data Matching To Prevent Duplicate Issuances, 87 Fed. Reg. 59,633 (Oct. 3, 2022) ("NAC IFR"). The NAC went live in 2024. *SNAP National Accuracy Clearinghouse (NAC)*, U.S. Dep't of Agric., https://www.fns.usda.gov/snap/nac (last visited May 16, 2025).

52.    In the NAC IFR, USDA repeatedly acknowledged the importance of data privacy and the need to comply with the Privacy Act and the PRA. 87 Fed. Reg. at 59,638 (noting compliance with the Privacy Act); *id.* at 59,639 (noting the expectation that states "take preventative measures to ensure the privacy and protection of vulnerable individuals"); *id.* at 59,642 (discussing the importance of privacy protections and establishing system limitations to "safeguard information submitted" in connection with SNAP administration); *id.* at 59,644 (confirming the applicability of the PRA and establishing an OMB Control Number). And in 2023, FNS published notice of a new SORN and invited public comment. Privacy Act; Proposed New System of Records, 88 Fed. Reg. 11,403 (Feb. 23, 2023) (citing 5 U.S.C. §§ 552a(e)(4), (11)).

## FACTUAL ALLEGATIONS

### III.    USDA's Unlawful Demands for State SNAP Data

53.    On March 20, 2025, President Trump signed an Executive Order titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," which calls on agencies to "remov[e] unnecessary barriers" to ensure "unfettered access to comprehensive data from all State programs" in furtherance of the Administration's goals. Executive Order 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025). The Executive Order does not—and cannot—excuse agencies from acting "consistent with law." *Id.*

54.    Purportedly in response to the Executive Order, USDA and FNS have taken steps to demand that states and their EBT vendors provide sensitive data regarding SNAP applicants and recipients.

55.    On May 5, 2025, Fidelity Information Services ("FIS"), an EBT Vendor used by over 20 states, sent a letter to its state clients informing them that FIS had been contacted by both USDA and its "DOGE team" regarding the Executive Order and FIS's role as a processor of EBT transactions.

56.    The following day, USDA published a letter addressed to SNAP State Agency Directors ("Data Collection Letter"), evoking the Executive Order, and asserting that USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP." *FNS Data Sharing Guidance*, U.S. Dep't of Agric. 1 (May 6, 2025), https://www.fns.usda.gov/sites/default/files/resource-files/fns-data-sharing-guidance5.6-V6-050625.pdf. According to the letter, providing USDA "unfettered access" is the "only way" for USDA to "eliminate bureaucratic duplication and inefficiencies" and ferret out "overpayments and fraud." *Id.*

57.     The Data Collection Letter states that USDA and FNS are legally authorized to obtain SNAP data from State agencies and their contractors and will be working with EBT Vendors to "consolidate SNAP data." *Id.* The letter then instructs all states that they are "require[d] . . . to submit at least the following data to FNS," which expressly includes highly sensitive, personal information regarding both SNAP applicants and recipients:

- Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

*Id.* at 2.

58.     The Data Collection Letter ends with a warning: "Failure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. [§] 2020(g)." *Id.*

59.     A press release the same day announced that FNS "will require States to make certain all records associated with [SNAP] benefits and allotments are shared with the federal government."[7] Secretary Rollins was quoted as saying that "President Trump is rightfully requiring the federal government to have access to all programs it funds and SNAP is no exception." Finally, the press release noted that FNS would, "for the first time," have access to "the data long only held by States and . . . Electronic Benefits Transfer (EBT) processors."

---

[7] *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds*, U.S. Dep't of Agric. (May 6, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/05/06/secretary-rollins-requires-states-provide-records-snap-benefits-ensure-lawful-use-federal-funds.

60.     On May 9, 2025, three days after the Data Collection Letter, FIS contacted its state clients, indicating that it understood itself to be "required to disclose" the requested data, that "FIS intends to fully cooperate with USDA," and provided a date certain by which states must provide consent to disclosure.[8]

61.     Another EBT payment processor, Conduent, which is reportedly used by 18 states, indicated in a May 13, 2025 statement to National Public Radio that it was "communicating directly with [its] clients" regarding USDA's request.[9]

62.     Press reports reveal that other states are complying with the Data Collection Letter. For example, Alaska has already turned over the personal information of over 70,000 Alaskans.[10] And Iowa will reportedly be complying as well: turning over the personal data of roughly 259,300 Iowans to Defendants.[11]

***USDA's Actions Violate Numerous Federal Laws***

63.     By publishing, causing to be published, and/or implementing the Data Collection Letter, Defendants have violated numerous federal laws.

64.     Defendants, in violation of the Privacy Act, have not published a SORN or other notice in the Federal Register, depriving Plaintiffs and the public of the information required to be contained therein and the opportunity for comment.

---

[8] Jude Joffe-Block, *Privacy Advocates Urge States Not to Comply with USDA Requests for Food Stamp Data*, NPR (May 13, 2025), https://www.npr.org/2025/05/13/nx-s1-5397208/doge-snap-usda-privacy.

[9] Joffe-Block, *supra* note 8.

[10] James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, ALASKA BEACON (May 15, 2025), https://alaskabeacon.com/2025/05/15/alaska-gives-food-stamp-recipients-personal-information-to-federal-officials/.

[11] Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, IOWA STARTING LINE (May 16, 2025), https://iowastartingline.com/2025/05/16/iowa-hands-over-personal-data-trump-federal-governmentto-deliver-snap-recipient-data-to-the-federal-government/.

65.    Defendants have violated the Paperwork Reduction Act by failing to comply with the PRA's procedural and informational requirements:

    a.    On information and belief, USDA's Chief Information Officer has not conducted an independent review of the collection prior to issuing the Data Collection Letter, including by evaluating the agency's need for the information and creating a plan for its use, 44 U.S.C. § 3506(c)(1);

    b.    Defendants have not provided a 60-day notice in the Federal Register seeking public comment on the collection of information demanded by the Data Collection Letter, *id.* § 3506(c)(2)(A);

    c.    On information and belief, Defendants have not submitted the collection described in the Data Collection Letter to the Director of OMB for approval, *id.* §§ 3506(c)(2)(B), 3507, nor has a control number been issued, *id.* § 3506(c)(1)(B); and

    d.    In issuing the Data Collection Letter, Defendants failed both to display a control number or to inform recipients that they cannot be penalized for failure to respond without a control number, *id.* § 3506(c)(1)(B).

66.    Defendants have also failed to conduct and publish a Privacy Impact Assessment before initiating this new collection of information, in violation of the E-Government Act.

67.    Defendants have violated numerous components of the Administrative Procedure Act, including failures to consider the privacy implications of the Data Collection Letter, to engage in reasoned decision-making, to adequately explain why existing fraud and benefit duplication systems—including the NAC—were insufficient, and to explain why the collection contemplated by the Data Collection Letter is necessary for the proper performance of USDA's functions.

**USDA's Unlawful Data Collection Harms Plaintiffs**

68.     Defendants' actions and inactions have harmed Plaintiffs.

69.     Mr. Pallek, an incoming senior at the University of California, Berkeley, most recently began receiving CalFresh benefits in January 2024. To receive these benefits, he was required to provide highly sensitive personal information—including his Social Security number, a copy of his passport, W-2 forms, federal tax returns, detailed school financial aid award information, and his housing agreement—to the California Department of Social Services

70.     Mr. Pallek, a dedicated student, critically depends on SNAP to secure the nutritious meals essential for his academic achievement. Mr. Pallek fears the harms that could be caused by the collection and misuse of his personal data.

71.     Ms. Samson, an incoming senior at the University of California, Berkeley, began receiving CalFresh benefits in August 2024. To receive these benefits, she was required to provide highly sensitive personal information—including her Social Security number, a copy of her California driver's license, W-2 forms, federal tax returns, detailed school financial aid award information, and her housing agreement—to the California Department of Social Services.

72.     Ms. Samson, a dedicated student, critically depends on SNAP to secure the nutritious meals essential for her academic achievement. Ms. Samson fears the harms that could be caused by the collection and misuse of her personal data.

73.     Ms. Hollingsworth first enrolled in SNAP in or around 1997 while living in New Mexico. When she moved to Alaska in 2002, she submitted a new application for SNAP benefits. To obtain SNAP benefits, Ms. Hollingsworth has provided sensitive personal information including her birth certificate, driver's license, bank statements, her lease and HUD paperwork, and medical receipts including a list of her prescriptions.

74.    On May 15, 2025, the same day of that the press reported that Alaska "has turned over the personal information of roughly 70,000 Alaskans," Ms. Hollingsworth received the first of five data phishing calls (this one from an individual pretending to be from her bank). The calls continued until at least May 17, 2025. Ms. Hollingsworth fears the harms that could be caused by the collection and misuse of her personal data.

75.    Ms. Ramos first enrolled in SNAP twenty years ago in Tennessee. After relocating to Florida and experiencing job loss and homelessness, she reapplied for SNAP, remaining in Florida's SNAP program from 2013 to January 2020. When she moved to New York in 2020, she submitted another application for SNAP benefits.

76.    To obtain SNAP benefits, Ms. Ramos provided sensitive personal information, including at least her Social Security number and a copy of her state-issued ID. To recertify for SNAP benefits, she also shared her bank account number with the Florida Department of Children and Families.

77.    Ms. Ramos has also been victimized by identity theft, which has made her vigilant about the security of her personal information. For example, she is well-aware of the practice of "skimming" SNAP benefits—a form of theft involving data stolen from EBT cards. As a result, Ms. Ramos meticulously protects her EBT card use, limiting purchases to large grocery stores or trusted retailers to safeguard her information.

78.    As a community leader committed to addressing food insecurity in New York City, Ms. Ramos relies on publicly available information to educate her community and increase SNAP participation.

79.    Individual Plaintiffs have suffered immediate and ongoing harms by virtue of being deprived of the information that USDA is required to disclose under the Privacy Act. For

instance, Individual Plaintiffs and UCSA members do not know the purposes for which USDA is collecting data sought via the Data Collection Letter, how it will be maintaining that data, USDA's policies and practices regarding storage, retrievability, access, retention, and disposal of that data, or the procedures whereby any individual Plaintiff can request to be notified if these records contain information pertaining to such individual.

80.    Individual Plaintiffs also suffer immediate and ongoing harms by virtue of being deprived of the information that USDA is required to disclose under the Paperwork Reduction Act. For instance, Individual Plaintiffs and UCSA members do not know whether USDA has met its statutory obligations to comply with that Act.

81.    Individual Plaintiffs have also been deprived of a right to comment on USDA's collection of data via the Data Collection Letter, and subsequent maintenance of that data, and the right to have those comments considered by USDA as part of its collection and maintenance of information.

82.    MAZON is a national nonprofit organization incorporated in Massachusetts and headquartered in Los Angeles, CA. MAZON's mission is to end hunger and its causes through advocacy, providing grants and educational support to other organizations, analyzing data to advance policy solutions, and educating service providers, the anti-hunger community, and the Jewish community.

83.    MAZON is a small organization with only 25 employees. Because hunger is both pervasive and persistent in the United States, and because it impacts different communities differently, to meet its mission, MAZON must carefully determine how to allocate its finite human and financial resources.

84.     SNAP is a critical component of MAZON's advocacy work. MAZON closely follows programmatic developments at the federal and state levels, regularly comments on regulations proposed by USDA, and mobilizes partners to submit comments in rulemaking proceedings.

85.     For years, one of MAZON's top priorities has been to ensure all eligible SNAP recipients obtain SNAP benefits. To do so, MAZON directly supports service providers who work to increase SNAP enrollment, providing educational materials and regular updates on state and federal changes to SNAP. MAZON also works with these providers to identify and combat barriers to enrollment for populations experiencing hunger. The service providers in MAZON's network include providers that directly work to assist in applying for and receiving SNAP.

86.     The Data Collection Letter has directly impacted MAZON's core activities.

87.     First, Defendants' failure to provide information about, publish notice regarding, and invite comment on the collection announced in the Data Collection Letter has denied MAZON key information and an opportunity to comment on the data collection, explain why collecting SNAP data could have a chilling effect on Program participation, and offer potential alternative solutions to USDA's policy goals.

88.     Second, MAZON has been forced to alter educational materials and shift priorities in its work with other organizations. These shifts are necessary to address the significant uncertainties surrounding the Data Collection Letter, including USDA's failure to specify (i) precisely what data it is collecting; (ii) its purposes for collecting that data; and (iii) the safeguards that will be placed around the data.

89.     For example, for years MAZON partnered with service providers who work with elderly individuals, including veterans, who are already reluctant to apply for SNAP due to the

need to provide sensitive personal information to the government. MAZON has developed

materials to reassure people that the information they provide will be seen only by those

reviewing their application and only for purposes of determining their eligibility. As a result of

the Data Collection Letter, MAZON has already begun to alter its educational materials,

webinars, and briefings for partners working to enroll individuals, including this community of

people, at a cost of time and money.

90.    Third, in the days following the publication of the Data Collection Letter,

MAZON decided to continue its "Challah for Hunger" program, which is designed to engage

students in anti-hunger work including SNAP enrollment, even though it was previously taking

steps to sunset that program. With so many SNAP applicants, including college students, hesitant

to share their personal data with the county or state government, MAZON believes that Challah

for Hunger will be critical to combatting the chilling effect it expects the Data Collection Letter

to have on SNAP enrollment. Although MAZON planned to dedicate its Challah for Hunger

staff leader to other projects, she will have to continue spending a significant amount of her time

on that program and the program itself will need new materials, training and focus.

91.    Since the Collection Letter was released, MAZON has been forced to divert its

limited resources away from other priorities to inform partners, update educational materials, and

alter its advocacy approach. MAZON will be unable to pursue new initiatives it had planned, like

a focus on hunger in the immigrant farmworker community.

92.    EPIC's mission is to secure the fundamental right to privacy in the digital age for

all people through advocacy, research, and litigation. Among other activities, EPIC monitors,

analyzes, and educates the public about the collection, use, retention, and transfer of personal

information by federal agencies. EPIC routinely comments on proposed agency actions related to information databases and mobilizes its partners to do the same.

93.    For decades, EPIC has relied extensively on information provided by agencies through the statutorily required procedures and informational rights set forth in the Privacy Act, the Paperwork Reduction Act, and the E-Government Act. EPIC depends on this public information to inform its research, advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP.

94.    EPIC is harmed by Defendants' unlawful collection of SNAP data—announced via the Data Collection Letter—without providing information about the collection, maintenance, and use of information that is required by statute.

95.    EPIC has been denied statutorily guaranteed opportunities to comment on USDA's proposal, to raise the privacy and security risks attendant to the federal government housing such a large volume of personal information from so many individuals, and to offer potential solutions to safeguard sensitive personal information in a manner that could be constructive to Defendants' policy goals.

96.    Because of Defendants' failure to provide information in the manner required by statute, EPIC must divert resources to more burdensome methods of research and information gathering, including time-intensive FOIA requests, and likely litigation, to obtain timely access to relevant records.

## CLAIMS FOR RELIEF

### Count I – Violation of APA (Privacy Act)
### [By All Plaintiffs]

97.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98.     The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

99.     The Data Collection Letter, and actions USDA has taken to collect this data from states and vendors, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

100.    As set forth in paragraphs 23-31, *supra*, the Privacy Act establishes a right to information and sets strict procedural requirements before an agency can create or revise a system of records and collect individuals' data. 5 U.S.C. § 552a(e).

101.    By issuing the Data Collection Letter, and creating an obligation for entities to provide data, without publishing a notice required by 5 U.S.C. § 552a(e), USDA failed to comply with the Privacy Act's informational and procedural requirements.

102.    USDA's actions violate the Privacy Act and are therefore not in accordance with law in violation of the APA.

### Count II – Violation of APA (Paperwork Reduction Act)<br>[By All Plaintiffs]

103.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

104.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

105.    The Data Collection Letter, and actions USDA has taken to collect this data from states and vendors, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

26

106.    As set forth in paragraphs 32-38, *supra*, the Paperwork Reduction Act establishes a right to information, 44 U.S.C. § 3507(a)(1)(D), and sets strict procedural requirements before an agency may initiate a "collection of information" from non-federal actors, including states and their vendors. *See* 44 U.S.C. § 3501 *et seq*.

107.    The Data Collection Letter constitutes a "collection of information" because it obtains or solicits answers to identical questions posed to 10 or more persons.

108.    By issuing the Data Collection Letter, and creating an obligation for entities to provide data, without comporting with the procedural and informational requirements contained in 44 U.S.C §§ 3506–3507, USDA failed to comply with the Paperwork Reduction Act.

109.    As alleged herein, USDA's actions violate the Paperwork Reduction Act and are therefore not in accordance with law in violation of the APA.

## Count III – Violation of APA (Arbitrary and Capricious)
### [By Individual Plaintiffs and MAZON]

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

112.    The Data Collection Letter, and actions USDA has taken to collect this data from states and vendors, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

113.    USDA has failed to consider the privacy implications of consolidating and obtaining state SNAP data; whether, and how, the data they are requesting will allow them to fulfill their intended purpose of stopping waste, fraud, or abuse; and the various ways this

unprecedented action departs from the longstanding structure of the SNAP program and language of the SNAP Act.

114.    USDA failed to engage in reasoned decision-making before requesting, for the first time, vast swathes of SNAP applicant and participant data from states and their vendors, when states and local SNAP agencies, not USDA, have responsibility to combat overissuances and fraud in SNAP; when USDA is ill-equipped to detect and enforce recipients' eligibility fraud; when Congress provided USDA oversight authorities that do not include the novel demand reflected in the Data Collection Letter; and when USDA's recent creation of an anti-fraud program (the NAC) did not require states to turn data over to USDA. Defendants have also failed to provide an adequate explanation for why the NAC does not adequately achieve USDA's stated policy goals. USDA has also failed to explain why the collection is "necessary for the proper performance" of its functions, as they are required to certify to the Director of OMB under the PRA. USDA has also failed to adequately explain how the Data Collection Letter is consistent with the SNAP Act.

115.    USDA's actions, as alleged herein, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of § 706 of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.    Declare that USDA acted unlawfully by initiating a collection of information of SNAP applicants and recipients without complying with the requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

b.    Declare that USDA's actions were arbitrary and capricious;

28

c.  Enjoin each Defendant from collecting or receiving information on SNAP applicants and recipients from states, districts, territories, or vendors prior to complying with requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

d.  Enjoin each Defendant such that any future collection of information about SNAP applicants and recipients will occur only in accordance with the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

e.  Enjoin USDA from initiating noncompliance procedures under 7 U.S.C § 2020(g) for failure to comply with the Data Collection Letter;

f.  Order the impoundment, disgorgement, and destruction of all copies of any personal information that has already been unlawfully collected by or disclosed to USDA pursuant to the Data Collection Letter;

g.  Grant any temporary, preliminary, or permanent injunctive relief necessary to protect the privacy and security of information collected by Defendants pursuant to the Data Collection Letter;

h.  Award Plaintiffs their costs and attorneys' fees for this action; and

i.  Grant any other relief as this Court deems appropriate.

Dated: May 22, 2025

Respectfully Submitted,


Deana El-Mallawany*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org


JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos &
Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos &
Hollingsworth*

*/s/ Daniel A Zibel*
Daniel A. Zibel (D.C. Bar No. 491377)
Madeline Wiseman (D.C. Bar No. 90031948)
Melissa Padilla (D.C. Bar No. 90018065)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
Email: dan@defendstudents.org
        madeline@defendstudents.org
        melissa@defendstudents.org

*Counsel for Plaintiffs*

John L. Davisson, D.C. Bar #1531914
Sara Geoghegan, D.C. Bar #90007340
Kabbas Azhar, D.C. Bar #90027866
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org
        geoghegan@epic.org
        azhar@epic.org

*Counsel for EPIC*


*Motion for Admission for Pro Hac Vice
Forthcoming