**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NAMOD PALLEK *et al.*

        *Plaintiffs*,

        *v.*

BROOKE L. ROLLINS, in her official
capacity as U.S. Secretary of Agriculture, *et
al.*

        *Defendants.*

Civil Action No. 1:25-cv-01650-JMC

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

STATUTORY FRAMEWORK................................................................................................. 2

    The Supplemental Nutrition Assistance Program.................................................................... 2

    The Privacy Act ..................................................................................................................... 4

    The Paperwork Reduction Act............................................................................................... 6

FACTS ..................................................................................................................................... 7

PLAINTIFFS ........................................................................................................................... 9

LEGAL STANDARD............................................................................................................. 11

ARGUMENT ......................................................................................................................... 12

    I.    Plaintiffs Have Standing to Challenge USDA's Data Collection Letter. ........................ 12

        A.    USDA's unlawful collection of Individual Plaintiffs' sensitive private information causes them concrete, cognizable injuries. .......................................................................... 13

        B.    Plaintiffs are injured by USDA's denial of the information they are entitled to by statute. .................................................................................................................................. 15

        C.    Individual Plaintiffs are harmed by the deprivation of their right to comment on and influence decisions made about USDA's handling of their data. ......................................... 18

        D.    MAZON has suffered a distinct injury to its anti-hunger mission............................... 19

    II.    Plaintiffs Have Established a Likelihood of Success on the Merits. .............................. 21

        A.    The Data Collection Letter constitutes a final agency action. ...................................... 21

        B.    USDA failed to publish or revise a SORN as required by the Privacy Act................. 23

        C.    USDA sponsored a collection without complying with the PRA................................. 24

D.    The Data Collection Letter is arbitrary and capricious because USDA failed to consider the scheme set up by Congress or explain its authority. ...................................................... 24

III.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief. ............................. 26

A.    The Individual Plaintiffs are irreparably harmed by USDA's unauthorized collection of their private information. ................................................................................................. 27

B.    Plaintiffs are irreparably harmed by USDA's denial of information vital to an ongoing debate. .................................................................................................................................. 29

C.    MAZON's anti-hunger mission faces immediate irreparable harm because the unlawful, unexplained Data Collection Letter will cause distrust in SNAP. ........................ 31

IV.    The Balance of Equities and Public Interest Favor Granting a Temporary Restraining Order…….. .................................................................................................................................. 32

CONCLUSION ............................................................................................................................ 33

# TABLE OF AUTHORITIES

**CASES**……………………………………………………………………..……Page No(s).

*Albright v. United States*,
    732 F.2d 181 (D.C. Cir. 1984) ................................................................ 15

*\*All. for Retired Ams. v. Bessent*,
    No. 25-cv-0313, 2025 WL 740401 (D.D.C. Mar. 7, 2025) ......................................... 13, 14, 27

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*,
    No. 25-cv-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025).................................. 14, 23

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
    No. 25-cv-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ................................... 13

*Am. Fed'n of Tchrs. v. Bessent*,
    No. 25-cv-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025) ............................................ 13, 23

*Am. Soc. For Prevention of Cruelty to Animals v. Fedl Entm't Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) ................................................................ 15

*Barrick Goldstrike Mines Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000) ................................................................ 22

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................... 21, 22

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974).................................................................... 24

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................ 32

*Center for Biological Diversity v. U.S. Int'l Development Finance Corp.*,
    585 F. Supp. 3d 63 (D.D.C. 2022) ......................................................... 15

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................... 11

*Ciba-Geigy Corp. v. U.S.E.P.A.*,
    801 F.2d 430 (D.C. Cir. 1986) ........................................................... 22

*Cresote Council v. Johnson*,
    555 F. Supp. 2d 36 (D.D.C. 2008) ........................................................ 32

*D.A.M. v. Barr*,
   474 F. Supp. 3d 45 (D.D.C. 2020) ................................................................. 11

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ............................................................................................ 24

*Doctors for Am. v. Off. of Personnel Mgt.*,
   __ F. Supp. 3d __, No. 25-cv-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025); ............ 30

*Doe v. Chao*,
   540 U.S. 614 (2004) ........................................................................................... 5

*Dole v. United Steelworkers of Am.*,
   494 U.S. 26 (1990) ............................................................................................. 6

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
   416 F. Supp. 2d 30 (D.D.C. 2006) .................................................................. 29

*Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ......................................................................... 12

*F.C.C. v. Fox TV Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................................... 24

*FEC v. Akins*,
   524 U.S. 11 (1998) ........................................................................................... 15

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ......................................................................................... 19

*Friends of Animals v. Jewell*,
   824 F.3d 1033 (D.C. Cir. 2016) ....................................................................... 15

*Hall v. Johnson*,
   599 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................... 11

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ......................................................................................... 20

*Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*,
   912 F.2d 1525 (D.C. Cir. 1990) ....................................................................... 22

*Hirschfeld v. Stone*,
   193 F.R.D. 175 (S.D.N.Y. 2000) ..................................................................... 27

*Hosp. Staffing Sols., LLC v. Reyes,*
    736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................ 27

*Hum. Touch DC, Inc. v. Merriweather,*
    No. 15-cv-00741 (APM), 2015 WL 12564166 (D.D.C. May 26, 2015) ................................ 27

*Ipsen Biopharmaceuticals, Inc. v. Azar,*
    943 F.3d 953 (D.C. Cir. 2019) ........................................................ 22

*League of United Latin Am. Citizens v. Exec. Off. of the Pres.,*
    No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ...................... 20

*\*League of Women Voters of United States v. Harrington,*
    560 F. Supp. 3d 177 (D.D.C. 2021) .................................... 24, 26, 29, 31

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998) ........................................................ 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................ 12

*Med Imaging & Tech All. v. Libr. of Cong.,*
    103 F.4th 830 (D.C. Cir. 2024) ........................................................ 21

*Michigan v. EPA,*
    576 U.S. 743 (2015) ........................................................ 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................ 26

*Mulhern v. Gates,*
    525 F. Supp. 2d 174 (D.D.C. 2007) ........................................................ 15

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C 2009) ........................................................ 32

*Narragansett Indian Tribal Historic Preservation Off. v. FERC,*
    949 F.3d 8 (D.C. Cir. 2020) ........................................................ 13

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................ 21

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
    170 F. Supp. 3d 6 (D.D.C. 2016) ........................................................ 12

*Nguyen v. U.S. Dep't of Homeland Sec.*,
  460 F. Supp. 3d 27 (D.D.C. 2020) .............................................................. 12

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
  930 F.3d 519 (D.C. Cir. 2019) .................................................................... 27

*Open Cmties. Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ............................................................ 32

*Payne Enters., Inc. v. United States*,
  837 F.2d 486 (D.C. Cir. 1988) .................................................................... 29

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) .................................................................... 11

*Roberts v. Austin*,
  632 F.2d 1202 (5th Cir. 1980) .................................................................... 13

*Sackett v. EPA*,
  566 U.S. 120 (2012) .................................................................................... 22

*Silver v. IRS*,
  531 F. Supp. 3d 346 (D.D.C. 2021) ............................................................ 12

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................................... 19

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021 ............................................................................... 12, 13

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ............................................................................... 21, 22

*\*United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*,
  288 F. Supp. 3d 99 (D.D.C. 2017) ......................................................... 6, 16

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
  530 F.3d 925 (D.C. Cir. 2008) .................................................................... 23

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................... 26, 29

**Statutes**

44 U.S.C. § 3501 ................................................................................................. 1, 6, 7

44 U.S.C. § 3502 ................................................................................................. 6, 24

44 U.S.C. § 3506 ................................................................................................. *passim*

44 U.S.C. § 3507 ................................................................................. 7, 16, 18, 24

5 U.S.C. § 552a ................................................................................................. *passim*

5 U.S.C. § 704 ................................................................................................. 21

5 U.S.C. § 706 ................................................................................................. 21

7 U.S.C. § 2011 ................................................................................................. 2

7 U.S.C. § 2013 ................................................................................................. 3

7 U.S.C. § 2015 ................................................................................................. 4

7 U.S.C. § 2020 ................................................................................................. *passim*

7 U.S.C. § 2025 ................................................................................................. 25

Pub. L. No. 93-579 ................................................................................................. 4, 5

**Regulations**

7 C.F.R. § 271.3 ................................................................................................. 3

7 C.F.R. § 271.4 ................................................................................................. 3

7 C.F.R. § 273.2 ................................................................................................. 4

7 C.F.R. § 275.12 ................................................................................................. 14

7 C.F.R. § Part 275 ................................................................................................. 25

86 Fed. Reg. 44,575 (Aug. 13, 2021) ................................................................. 25

**Other**

Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal government* .......... 9

Center for Budget and Policy Priorities, *The Supplemental Nutrition Assistance Program (SNAP)* .................................................................................................................................... 3

Executive Order 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025). .................................................... 7

James Brooks, *Alaska gives food stamp recipients' personal information to federal officials* ...... 9

Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report* ................................................................................................................ 3

Jude Joffe-Block & Stephen Fowler, *Lawsuit challenges USDA demand for food stamp data as some states prepare to comply* ........................................................................................... 9

Jude Joffe-Block, *USDA, DOGE demand states hand over personal data about food stamp recipients* .......................................................................................................................... 30

S. Rep. No. 104-8 ....................................................................................................................... 17

Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government* ................. 9

## INTRODUCTION

This case concerns the executive branch's attempt to round up the sensitive personal data of tens of millions of economically vulnerable Americans with callous indifference for the mandatory privacy protections enshrined in federal law.

For decades, federal laws have guaranteed Americans a right to know what information the government collects and maintains about them, why it is being collected, and how it is being maintained. Federal agencies are required to create and publicize a process for individuals to obtain copies of information maintained and contest its contents. Individuals and organizations also have an unambiguous right to inform the federal government on collection and data maintenance policies, via numerous public comment processes that must be completed *before* the government initiates a collection or creates or modifies a data system. *See generally* 5 U.S.C. § 552a (Privacy Act); 44 U.S.C. § 3501 *et seq*. (Paperwork Reduction Act, or "PRA").

Disregarding these laws and more,[1] on May 6, 2025, the Food and Nutrition Service, a component of the United States Department of Agriculture, (collectively with defendants Brooke Rollins and James Miller, "USDA"), sent a letter (the "Data Collection Letter")[2] ordering states to disclose five-and-and-half years of highly sensitive personal information about individuals who have applied for and received food benefits through the Supplemental Nutrition Assistance Program ("SNAP" or "Program"). SNAP, formerly known as Food Stamps, is a federal-state partnership that provides food assistance benefits to tens of millions of Americans.

---

[1] For example, although the Complaint does not assert a claim under the E-Government Act of 2002, the Complaint sets forth in detail how the USDA has disregarded the Privacy Impact Assessment required by that statute. Compl. ¶¶ 39–41 & 66.

[2] A copy of the Data Collection Letter is attached to the contemporaneously filed Declaration of Nicole Schneidman ("Schneidman Decl.") at Exh. B, and is also available at https://bit.ly/4kvCLKG. *See also* Compl. ¶ 56.

States handle day-to-day operations of SNAP and therefore maintain copious highly sensitive information and data about benefit applicants and recipients. In the Data Collection Letter, USDA requires states to release and/or authorize the release of this data to USDA and threatens legal action and fund withholding for noncompliance. Meanwhile, USDA has done *nothing* to afford Plaintiffs' their rights to information and participation under the Privacy Act and PRA. The Data Collection Letter is contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

Plaintiffs—four individuals whose data is demanded in the Data Collection Letter, an organization that works to prevent hunger and promote access to SNAP, and an organization dedicated to electronic privacy and government accountability—seek a Temporary Restraining Order enjoining USDA from enforcing the Data Collection Letter; directing USDA to inform states and electronic benefit transfer ("EBT") processors, *see* Compl. ¶ 45, that any and all data collection pursuant to the Data Collection Letter has been paused; and barring the collection, review, or maintenance of data submitted pursuant to the Data Collection Letter, as described more fully in the accompanying motion.

## STATUTORY FRAMEWORK

### The Supplemental Nutrition Assistance Program

Enacted to "alleviate . . . hunger and malnutrition," 7 U.S.C. § 2011, SNAP enables tens of millions of low-income households nationwide to increase their food purchasing power each year. The Program is authorized by the Food and Nutrition Act of 2008, codified at 7 U.S.C. § 2011 *et seq.*, and the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §

4001(a), 122 Stat. 1853, formerly the Food Stamp Act.[3] SNAP is available to all individuals and households who fall within income and asset restrictions, subject to additional non-financial criteria such as work and immigration status. Individuals and households receive monthly benefits that can be used to buy food at authorized retailers via EBT.[4]

SNAP was designed by Congress as a federal-state partnership. At the federal level, USDA establishes nationwide eligibility standards, benefit levels, and administrative rules. 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3(a). States are responsible for day-to-day administration, including determining eligibility, issuing benefits, and ensuring program integrity. 7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4. States typically contract with vendors ("EBT Vendors") to issue benefits through EBT systems that allow SNAP recipients to use debit cards to buy food at grocery stores and other authorized retailers. USDA, in turn, is responsible for overseeing each state's administration of the Program, including reviewing and approving each state's plan of operations, reviewing major changes in Program design, and taking action to address state noncompliance. *Id.* § 2020(a)(4), (d)-(e), (g). Some states create their own names for SNAP; for example, Plaintiffs Namod Pallek and Julliana Samson rely on "CalFresh" benefits in California.

Because states certify eligibility and issue benefits, they collect and maintain sensitive personal information of SNAP applicants and recipients including their Social Security numbers,

---

[3] According to the nonpartisan Center for Budget and Policy Priorities: "Nearly 62 percent of SNAP participants are in families with children, and nearly 37 percent are in households with older adults or people with disabilities. After unemployment insurance, SNAP is the most responsive federal program that provides additional assistance during and after economic downturns." Center for Budget and Policy Priorities, *The Supplemental Nutrition Assistance Program (SNAP)* (June 2022), https://www.cbpp.org/sites/default/files/policybasics-SNAP-6-9-22.pdf.

[4] Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report*, U.S. Dep't of Agric. 6 (June 2024), https://ers.usda.gov/sites/default/files/_laserfiche/publications/109314/EIB-274.pdf?v=1308.

dates of birth, addresses, employment status, citizenship status, income, resources, and more. 7

C.F.R. § 273.2(f). States also collect and maintain additional information about some individuals

including, but not limited to, their health, educational status, history of substance abuse

treatment, paternity, and history of child support payments. 7 U.S.C. § 2015(e), (l)-(o). States are

required to establish "safeguards which prohibit the use or disclosure" of the information they

obtain. Exceptions to the default posture of nondisclosure are explicitly set forth in statute. *See* 7

U.S.C. §§ 2020(a)(3) & 2020(e)(8). But even the broadest of those exceptions are subject to

strict limitations; for example, the exception granting USDA authority to "inspect[] and audit"

state records may only be done "subject to data and security protocols agreed to by the State

agency and Secretary." 7 U.S.C. § 2020(a). By regulation, quality control reviews of state SNAP

administration are conducted by states, with USDA providing limited monitoring of those state

reviews. *See infra* at 25-26.

Nowhere does the statute contemplate wholesale data collection by the federal

government without regard to federal privacy law.

**The Privacy Act**

Recognizing that "the privacy of an individual is directly affected by the collection,

maintenance, use, and dissemination of personal information by Federal agencies," Congress

enacted the Privacy Act to "regulate the collection, maintenance, use, and dissemination of

information by such agencies." Pub. L. No. 93-579, §2(a)(1), (5), 88 Stat. 1896, 1896 (1974).

The Privacy Act provides "safeguards for an individual against an invasion of personal privacy

by requiring Federal agencies … to … collect, maintain, use, or disseminate any record of

identifiable personal information in a manner that assures that such action is for a necessary and

lawful purpose [and] that adequate safeguards are provided to prevent misuse of such

4

information." *Id.* § 2(b)(4). *See also Doe v. Chao*, 540 U.S. 614, 618 (2004) (noting that the Privacy Act gives agencies "detailed instructions for managing their records").

Among those safeguards, the Privacy Act requires agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. §§ 552a(a)(3), (e)–(f). When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records"). This notice, commonly referred to as a System of Records Notice ("SORN"), must identify, *inter alia*, the name and location of the system; the categories of individuals whose records are maintained in the system; the purpose for which information about an individual is collected; the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of records; and the procedures by which individuals can request notification of and access to information pertaining to them. *Id.* § 552a(e)(4).

At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id.* § 552a(e)(11). Thus, *before* an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment. The Privacy Act establishes a similar notice and comment requirement for the establishment or revision of a data matching program with other federal, state, or local government entities. 5 U.S.C. § 552a(e)(12).

The Privacy Act also affords individuals substantive rights to "gain access" to their own information maintained by an agency in a system of records. 5 U.S.C. § 552a(d).

Finally, to protect the security of individuals, the Privacy Act requires agencies to implement both human (*i.e.*, conduct and training provisions) and technical (*i.e.*, administrative and physical) safeguards regarding any systems of records. *Id.* § 552a(e)(9)-(10). Such requirements, including "penalties for noncompliance," *id.* § 552a(e)(9), are designed to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552a(e)(10). *See also id.* § 552a(e)(2) (requiring agencies that maintain a system of records to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs[.]").

**The Paperwork Reduction Act**

The Paperwork Reduction Act ("PRA") sets standards for federal agencies collecting information from the public. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990) (noting that the PRA "was enacted in response to one of the less auspicious aspects of the enormous growth of our federal bureaucracy: its seemingly insatiable appetite for data"); *United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*, 288 F. Supp. 3d 99, 102 (D.D.C. 2017) (outlining the history and need for the PRA).

The PRA establishes the legal framework that governs the executive branch of the federal government when it collects information from non-federal actors, including state governments. *See* 44 U.S.C. §§ 3501 *et seq.* It applies to agencies initiating a "collection of information," *id.* § 3506(a), which includes, "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for . . . identical reporting or recordkeeping requirements imposed on ten or more persons," including states. 44 U.S.C. §§ 3502(3), 10. The PRA is specifically designed

6

to "strengthen decisionmaking, accountability, and openness in Government," to ensure the Government's "collection, maintenance, [and] use" of information is consistent with laws including the Privacy Act, and to "improve the responsibility and accountability" of federal agencies to the public. 44 U.S.C. §§ 3501(4), (8), (11).

Like the Privacy Act, the PRA is organized around a set of procedural requirements that agencies must follow prior to collecting information. *Id.* § 3507(a) (providing that "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection" it complies with detailed procedural requirements). Among these requirements, the PRA obligates agencies to: (1) provide a 60-day notice in the Federal Register seeking public comment, (2) submit the proposed collection to the Director of the Office of Management and Budget (OMB) with a certification that the collection is, among other things, "necessary for the proper performance" of the agency's functions, and (3) proceed with the collection only after receiving OMB approval and a control number to display (with limited exceptions). *Id.* § 3506(c).[5]

## FACTS

On March 20, 2025, President Trump signed an Executive Order titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," which calls on agencies to "remov[e] unnecessary barriers" to ensure "unfettered access to comprehensive data from all State programs" in furtherance of the Administration's goals. Executive Order 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025). The Executive Order constrains the heads of agencies to take only those steps that are "consistent with law." *Id.*

---

[5] The Director of the OMB may only approve a collection after providing another 30 days for the public to comment on the proposed collection (with limited exceptions). *Id.* § 3507(b).

On May 5, 2025, Fidelity Information Services, LLC ("FIS"), an EBT Vendor used by over 20 states, sent a letter to its state clients informing them that FIS had been contacted by both USDA and its "DOGE team" regarding the Executive Order and FIS's role as a processor of EBT transactions. Schneidman Decl. Exh. A, Ltr. From P. Gupta (FIS) to State Partners Re: Notice of Comm with U.S. Dep't of Agric. and its Assigned Dep't of Gvt Efficiency Team (May 5, 2025) (hereinafter "FIS Letter").

The next day, USDA sent and published the Data Collection Letter, which is addressed to SNAP State Agency Directors. The Data Collection Letter invokes the Executive Order and asserts that USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP." Data Collection Letter at 1. According to the Letter, providing USDA "unfettered access" is the "only way" to "eliminate 'bureaucratic duplication and inefficiency'" and ferret out "overpayments and fraud." *Id.*

The Data Collection Letter states that USDA and FNS are legally authorized to obtain SNAP data from State agencies and their contractors and will be working with EBT Vendors to "consolidate SNAP data." *Id.* The letter instructs all states "to submit at least the following data to FNS," which expressly includes highly sensitive personal information regarding both SNAP applicants and recipients from January 1, 2020 to the present:

1.  Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

2.  Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

*Id.* at 2. The Data Collection Letter ends with a warning: "Failure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. [§] 2020(g)." *Id.*

8

USDA has not published any notices in the Federal Register regarding the Data Collection Letter, the creation of a new system of records, or the revision of an existing system of records. It has published neither a new nor a revised SORN. Neither Plaintiffs nor any members of the public have been given the opportunity to comment on USDA's Data Collection.

According to press reports, at least four states—Alaska, Arkansas, Iowa, and Ohio—have already complied or indicated their intent to comply with the Data Collection Letter.[6] The full extent of state compliance is unknown.

### PLAINTIFFS

Four of the plaintiffs in this lawsuit are individuals directly affected by USDA's actions. Plaintiff Catherine Hollingsworth is a SNAP recipient in Alaska, a state that has reportedly already turned over its data to USDA. Declaration of Catherine Hollingsworth ("Hollingsworth Decl.") ¶ 2; *see supra* n.6. Plaintiffs Namod Pallek and Julliana Samson are SNAP recipients and students at the University of California, Berkeley. Declaration of Namod Pallek ("Pallek Decl.") ¶¶ 2-3; Declaration of Jullianna Samson ("Samson Decl.") ¶¶ 2-3. Plaintiff Diana Ramos is a SNAP recipient in New York, New York, and also received SNAP benefits in Florida, during a period subject to the Data Collection Letter. Declaration of Diana Ramos ("Ramos Decl.") ¶¶ 2-

---

[6] James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, ALASKA BEACON (May 15, 2025), https://alaskabeacon.com/2025/05/15/alaska-gives-food-stamp-recipients-personal-information-to-federal-officials/; Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal* government, ARKANSAS ADVOCATE (May 22, 2025), https://arkansasadvocate.com/2025/05/22/arkansas-shares-certain-snap-applicant-numbers-with-federal-government; Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, IOWA STARTING LINE (May 16, 2025), https://iowastartingline.com/2025/05/16/iowa-hands-over-personal-data-trump-federal-governmentto-deliver-snap-recipient-data-to-the-federal-government/; Jude Joffe-Block & Stephen Fowler, *Lawsuit challenges USDA demand for food stamp data as some states prepare to comply*, NATIONAL PUBLIC RADIO (May 22, 2025), https://www.npr.org/2025/05/22/nx-s1-5407994/usda-doge-snap-nutrition-privacy.

3.[7] Each of the Individual Plaintiffs rely on SNAP benefits to purchase healthy food that they otherwise cannot afford. Hollingsworth Decl. ¶¶ 5, 7-8; Pallek Decl. ¶ 4; Samson Decl. ¶ 4; Ramos Decl. ¶¶ 8-9.

Each Individual Plaintiff has submitted detailed information to receive and retain SNAP benefits, without ever being told that the data would be provided *en masse* to the federal government. *See* Hollingsworth Decl. ¶ 4; Pallek Decl. ¶¶ 3, 5; Samson Decl. ¶¶ 3, 5; Ramos Decl. ¶¶ 2-4. Each feels vulnerable and exposed, and—if given the opportunity required by law—would comment on how the government collects and maintains their information to help address their injuries. Hollingsworth Decl. ¶¶ 7, 9-10; Pallek Decl. ¶¶ 5-6; Samson Decl. ¶¶ 5-6; Ramos Decl. ¶ 10. Each Individual Plaintiff would also use this information to assess whether they want to gain access to the records maintained by USDA, yet they lack information sufficient to exercise their statutory right of access and inspection. *See* Hollingsworth Decl. ¶ 9 (citing experience with inaccuracies in government systems); Pallek Decl. ¶ 5; Samson Decl. ¶ 6; Ramos Decl. ¶ 10; 5 U.S.C. § 552a(e)(4)(G)–(H); *id.* §552a(f).

MAZON: A Jewish Response to Hunger ("MAZON") advocates to end hunger, including by expanding participation in SNAP. Declaration of Abby Leibman ("Leibman Decl.") ¶¶ 3-7. MAZON monitors federal and state policy changes related to SNAP, regularly submits public comments, and partners with providers who work directly to enroll more people in SNAP. *Id.* ¶¶ 8, 9, 13. As part of its work to identify and reduce barriers to participation in SNAP, MAZON has worked for decades to identify and counteract barriers to SNAP enrollment, including for

---

[7] Plaintiffs Hollingsworth, Pallek, Samson, and Ramos are collectively referred to as the "Individual Plaintiffs." Plaintiffs MAZON: A Jewish Response to Hunger and EPIC are collectively referred to as the "Organizational Plaintiffs."

elderly individuals, immigrants, and single mothers, including those fleeing domestic violence. *Id.* ¶¶ 6, 13.

EPIC's mission is to secure the fundamental right to privacy in the digital age. Declaration of Alan Butler ("Butler Decl.") ¶ 4. Central to its mission is oversight of government activities, including those that impact individual privacy. *Id.* ¶ 6. EPIC relies on information made public by federal agencies to monitor how the government is handling individuals' personal information. *Id.* ¶¶ 9-12. EPIC uses this information to inform policy debates, submit public comments, and educate the public. *Id.* ¶¶ 10, 14. EPIC also conducts research, advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP. *Id.* ¶¶ 7-8.

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions."). Because the pending motion seeks to enjoin government action, "the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge USDA's Data Collection Letter.

To be entitled to a temporary restraining order, a plaintiff must demonstrate a "substantial likelihood of standing." *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020) (quoting *Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). For standing, a plaintiff must show (1) an injury in fact, (2) a "causal connection" between the injury and the defendant's actions, and (3) a likelihood that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "[A]n injury in fact" is "an invasion of a legally protected interest which is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). "[V]arious intangible harms," like the harm from disclosure of private information, are concrete where they have a "close historical or common-law analogue." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021). Plaintiffs satisfy that requirement.[8]

As to Plaintiffs' procedural claims, the standing "requirements are modified somewhat." *Silver v. IRS*, 531 F. Supp. 3d 346, 356 (D.D.C. 2021) (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 11 (D.D.C. 2016)). In such cases, parties must show both "(1) that their procedural right has been violated, and (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest." *Id.* at 357. With procedural claims, courts apply a "relaxed redressability requirement," meaning that instead of "establishing that compelling the agency to follow the correct procedure *would* lead to a substantive result that favors the [plaintiff's] concrete interests, the [plaintiff] need only show

---

[8] Plaintiffs only need establish that one Plaintiff has standing with respect to each Defendant for each claim to proceed. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n. 9 (1977).

that its concrete interests *could* be better protected." *Narragansett Indian Tribal Historic Preservation Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis in original).

   **A.    USDA's unlawful collection of Individual Plaintiffs' sensitive private information causes them concrete, cognizable injuries.**

   The actual or imminent disclosure of Individual Plaintiffs' private information concretely harms Individual Plaintiffs in a way that is "traditionally recognized as providing a basis for lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The Supreme Court has recognized that "[v]arious intangible harms can be . . . concrete." *Id.* at 425. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"—including "disclosure of private information." *Id.* Ms. Hollingsworth receives SNAP in Alaska, a state that has publicly stated its actual or intended compliance with USDA's unlawful demand. *See* Hollingsworth Decl. ¶¶ 2, 4; *see also supra* n.6. Other Plaintiffs cannot be certain whether or when the states that hold their data will capitulate to the government's unlawful demand. *See* Pallek Decl. ¶ 3 (data to California); Samson Decl. ¶ 3 (data to California); Ramos Decl. ¶¶ 2-4 (data to Florida and New York).

   The mishandling and improper disclosure of personal data "has a close relationship with the harm asserted in a tort of intrusion upon seclusion." *See, e.g.*, *All. for Retired Ams. v. Bessent*, No. 25-cv-0313, 2025 WL 740401, at *15–17 (D.D.C. Mar. 7, 2025); *Am. Fed'n of Tchrs. v. Bessent*, No. 25-cv-0430, 2025 WL 895326, at *7–13 (D. Md. Mar. 24, 2025); *Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-0596, 2025 WL 868953, at *35–43 (D. Md. Mar. 20, 2025). Through the statutes that created SNAP, Congress created a reasonable expectation of privacy in the information and records submitted to obtain benefits. *Cf. Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (concluding that participants in Food

Stamps "possess[ed] a legitimate expectation that the[ir] [personal] information [would] be kept confidential"); *see also, e.g.*, 7 C.F.R. § 275.12 ("Personal interviews shall be conducted in a manner that respects the rights, privacy, and dignity of the participants."). States are required to establish "safeguards which prohibit the use or disclosure" of the information they obtain as part of SNAP applications. 7 U.S.C. § 2020(e)(8). Although there are narrow exceptions related to "inspection and audit," *id.* § 2020(a)(3)(B)(i), the statute does not contemplate the wholesale collection of individual data by the federal government. *See also infra* at 25 (discussing USDA's limitations on its "quality control" system). Individual Plaintiffs provided substantial amounts of information about themselves—in some cases overcoming significant privacy concerns[9]— because they needed help affording food. Individual Plaintiffs never expected their information would be dumped into a federal database for undefined purposes. *See* Hollingsworth Decl. ¶¶ 6, 10; Pallek Decl. ¶¶ 5-6; Samson Decl. ¶¶ 5-6; Ramos Decl. ¶¶ 5-6; *All. for Retired Ams. v. Bessent*, 2025 WL 740401, at *16 (finding it "entirely reasonable" for people to rely on "explicit statutory protections").

Individual Plaintiffs' injuries are concrete in at least two other ways. First, "the tort of 'breach of confidence'"—*i.e.*, for the unconsented disclosures of personal information in breach of confidence—can serve as a common-law analogue for a harm inflicted by a statutory violation," including the Privacy Act. *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-339 (JDB), 2025 WL 1129227, at *9 (D.D.C. Apr. 16, 2025) (quoting *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). Likewise, USDA has

---

[9] Individual Plaintiffs are not alone in their fears. *See, e.g.*, Leibman Decl. ¶¶ 8, 13 (mixed-status families, elderly people, and single mothers fleeing domestic violence); Anderson Decl. ¶¶ 9-11 (elderly people and mixed-status families); Elzinga Decl. ¶¶ 7-9 (mixed-status and refugee families); Machicote Decl. ¶ 6 (English-language learners).

also caused Individual Plaintiffs emotional distress—another common law tort that can serve as

the basis for an "adverse effect" under the Privacy Act. *See Doe v. Chao*, 540 U.S. 614 (2004);

*Albright v. United States*, 732 F.2d 181, 186 (D.C. Cir. 1984) (holding that "emotional trauma

alone is sufficient to qualify as an 'adverse effect' under [the Privacy Act]"); *Mulhern v. Gates*,

525 F. Supp. 2d 174, 184 n.13 (D.D.C. 2007) (holding that allegations that a disclosure caused

an individual "to experience emotional distress [are] sufficient to establish an 'adverse effect' of

the sort required to confer standing").

### B. Plaintiffs are injured by USDA's denial of the information they are entitled to by statute.

By circumventing the Privacy Act and PRA's disclosure procedures, USDA has deprived

Plaintiffs of information that the Privacy Act and the PRA require it to disclose, impeding

Plaintiffs' right to participate in a public process.

A plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which

must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Am. Soc.*

*For Prevention of Cruelty to Animals v. Fedl Entm't Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011).

Informational injuries can be predicated on statutes—like both the Privacy Act and the PRA—

that require the release of information as part of notice and comment procedures. *See Friends of*

*Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (concluding that the statute "clearly

creates a right to information upon which a claim of informational standing may be predicated");

*Center for Biological Diversity v. U.S. Int'l Development Finance Corp.*, 585 F. Supp. 3d 63, 71-

72 (D.D.C. 2022) (finding standing where plaintiff alleged a right to information, a denial of that

right, and a resulting deprivation of "meaningful participation" in a governmental process). In

addition to establishing a statutory right to information, Plaintiffs must also show that the denial

of such information causes them to suffer the type of harm Congress sought to prevent by requiring disclosure. *United to Protect Democracy*, 288 F. Supp. 3d at 105.

Plaintiffs have adequately alleged statutory rights to information under both the Privacy Act and the PRA. *See* Compl. ¶¶ 23–31(Privacy Act); *id.* ¶¶ 32–38 (PRA). The Privacy Act mandates procedures when an agency collects or maintains personally identifiable information, requires notice in the Federal Register when an agency establishes or revises a system of records, and further requires a new or revised SORN setting forth nine pieces of information. 5 U.S.C. § 552a(a), (e)(4). The PRA similarly requires an agency to provide public notice with certain information prior to conducting or sponsoring a collection. 44 U.S.C. § 3507(a)(1)(D). Defendants have taken none of these actions.

Plaintiffs can also show that these deprivations under the Privacy Act and PRA are causing them to suffer harms of the type that Congress sought to prevent when requiring disclosure. The Privacy Act is designed to give all "interested persons"—including the Organizational Plaintiffs—the information necessary to meaningfully participate in the decision-making process of any agency that maintains a system of records.[10] *See* 5 U.S.C. §§ 552a(e)(4), (11). Section 552a(e)(4) is further designed to give individuals knowledge of a system of records that contains information about them so that they can exercise their rights to inspect and challenge the contents, as they are entitled to do under section 552a(d). The PRA requires information "concerning the government's data collection efforts" be made available in order for the public—including all Plaintiffs—to "hold the government to account." *Protect Democracy*, 288 F. Supp. 3d at 107; *see also id.* at 105-106 & n.3 (holding that organizations can predicate an

---

[10] This word choice, which differs from "individuals" used elsewhere in the statute, reflects Congress's judgment that soliciting input from the broader public is necessary to achieve the purpose of the Privacy Act.

informational injury on the PRA given its aims of "openness in Government and society" and "improving responsibility and accountability 'to the public'"). Congress actively sought to increase public participation when it adopted the PRA—noting that "[e]ffective public comment at the front end of decision processes is particularly beneficial." S. Rep. No. 104-8, at 14 (1995).

The Plaintiffs' harms are precisely the sort contemplated. Individual Plaintiffs are recipients of SNAP whose data is being collected and whose rights of participation, access, and inspection are rendered non-existent due to the USDA's failure to disclose. Further, they have had no opportunity to participate in a public process determining how their data is being collected, used, and maintained.

MAZON's mission is to end hunger through governmental advocacy, grantmaking, educational support, and data analysis. Leibman Decl. ¶¶ 3-7. SNAP is a priority advocacy area for MAZON. *Id.* ¶ 7. MAZON regularly tracks the Federal Register, comments on proposed actions that could chill SNAP participation or stigmatize or penalize SNAP recipients, and mobilizes partners to do the same.[11] *Id.* ¶ 8. Its comments have been successful in influencing the scope and impact of regulations. *Id.* ¶ 11. MAZON also offers numerous forms of support to organizations that guide individuals through the SNAP application process and help them secure benefits. *Id.* ¶¶ 3, 9, 13.  In addition to providing educational resources and policy updates, MAZON partners with service providers to identify and address obstacles that prevent eligible individuals from applying for and participating in SNAP. *Id.* ¶¶ 9, 13. Without knowing what

---

[11] For example, in 2018 MAZON submitted a comment opposing the expansion of the "public charge" rule, acknowledging that families were disenrolling in SNAP out of fear that their participation would negatively affect immigration proceedings for themselves or family members. Leibman Decl. ¶ 8. In December 2022, MAZON submitted a formal comment regarding USDA's interstate data matching effort, raising concerns that it could be used to stigmatize and penalize SNAP recipients. *Id.*

data USDA is collecting, for what use(s), who will have access to it, and how it will be safeguarded, MAZON is unable to provide reliable guidance to its partners and has been forced to divert resources from other pressing priorities. *Id.* ¶¶ 12-15.

For decades, EPIC has made extensive use of public notices and records concerning the collection, use, retention, and transfer of personal information by federal agencies. Butler Decl. ¶¶ 6, 9-12. EPIC routinely monitors, analyzes, comments on, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies, including specifically about SNAP. *Id.* ¶¶ 6-7. By establishing a system of records without timely publishing information required by the Privacy Act and the PRA, EPIC cannot fulfill its mission to ensure that the information is being handled in a legally compliant manner. *Id.* ¶¶ 9-21. As a result, EPIC must divert its limited resources to more burdensome methods of information gathering. *Id.* ¶¶ 17, 21, 25. Because of USDA's secrecy around its data collection, neither EPIC—nor organizations like it—will be able to educate the public or inform the policy debates surrounding that collection. *Id.* ¶¶ 9-21. This is particularly important in the context of information privacy—the security of which was an express "purpose" of the PRA. 44 U.S.C. § 3501(8).

These harms are of the sort Congress contemplated when it mandated disclosure.

### C.    Individual Plaintiffs are harmed by the deprivation of their right to comment on and influence decisions made about USDA's handling of their data.

Plaintiffs Pallek, Samson, Hollingsworth, and Ramos have further been denied the right to comment on the Data Collection. Under both the Privacy Act and the PRA, Congress provided individuals with a substantive right to comment about proposed systems of records and collections. 5 U.S.C. § 552a(e)(11) (Privacy Act comment requirement for SORNs); *id.* § 552a(e)(12) (Privacy Act comment requirement for interagency matching); 44 U.S.C. §

3506(c)(2) (PRA comment requirement); *id.* §3507(a)(1)(A) (PRA requirement commanding consideration of comments). Plaintiffs asserting a deprivation of a procedural right must also show "some concrete interest that is affected by the deprivation." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Individual Plaintiffs were deprived of their procedural right to comment, causing them concrete harm. *See id.* As SNAP recipients who have submitted sensitive personal information to their states, they have interests in keeping their data safe and preventing Defendants from misusing their sensitive personal information. Those interests would be harmed if the collection proceeds without incorporation of the ideas Individual Plaintiffs would have suggested if Defendants provided them an opportunity to comment. *See id.*; Hollingsworth Decl. ¶ 9; Pallek Decl. ¶ 5; Samson Decl. ¶ 6; Ramos Decl. ¶ 10. This injury is nearly identical to the individual member in *Summers*, whose historical and continued visits to federal lands—coupled with the deprivation of an opportunity to provide comments with suggestions to cure the threatened injury—gave rise to uncontested Article III standing. *Summers*, 555 U.S. at 494. Plaintiffs properly assert both a denial of their procedural right to comment and a "concrete interest" affected by the denial.

**D.    MAZON has suffered a distinct injury to its anti-hunger mission.**

An organization has standing to sue on its own behalf where it can "satisfy the usual standards" of injury in fact, causation, and redressability. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024). Although an organization "can have standing to challenge [federal agency] practices that directly interfere with their core activities, such as direct services programs," organizations must allege more than "harm to its abstract social objectives." *League of United Latin Am. Citizens v. Exec. Off. of the Pres.*, No. CV 25-0946 (CKK), 2025

19

WL 1187730, at *22 (D.D.C. Apr. 24, 2025); *see also Havens Realty Corp. v. Coleman*, 455

U.S. 363, 379 (1982).

      The USDA's unlawful Data Collection Letter directly impairs MAZON's anti-hunger

mission. Among other activities, MAZON partners directly with service providers who guide

individuals through the process of applying for SNAP and receiving benefits. Leibman Decl. ¶ 9.

Together they identify barriers to individuals from distinct demographic groups and create a

strategic approach to counteract those barriers. *Id*. That support is effectively stopped due to the

lack of information surrounding the Data Collection Letter. *Id.* ¶¶ 12-13. Without knowing

exactly what information USDA is collecting, how it will be used, who will have access to it, and

how it will be safeguarded, MAZON is rendered incapable of educating its service providers or

working with them to identify and counteract the enrollment barriers the Data Collection Letter

will pose. *Id.* ¶ 12.

      MAZON has already reallocated resources away from other priorities to respond to these

and other consequences of the Data Collection Letter. Leibman Decl. ¶¶ 14-15. It is revising

materials and altering its internal resource allocation. *Id*. For example, following the release of

—and in direct response to—the Data Collection Letter, MAZON abandoned its plans to

discontinue its "Challah for Hunger" program and is instead continuing to invest resources in

that program to counter the anticipated chilling effect[12] that the Data Collection Letter will have

on college student SNAP enrollment. *Id.* ¶ 14.

---

[12] Other advocates and experts confirm the likely chilling effect and erosion of public trust in
SNAP. *See, e.g.*, Anderson Decl. ¶¶ 7-9 (describing "severe consequences on vulnerable
populations in Tennessee"); Elzinga Decl. ¶¶ 7-11 (describing how mixed-status and refugee
families in Iowa "will lose trust in the Program and forego these often life-saving benefits out of
fear for the security of their data"); Machicote Decl. ¶¶ 5-6 (predicting "significant consequences
for Indiana's immigrant populations who have limited language access").

**II.      Plaintiffs Have Established a Likelihood of Success on the Merits.**

"Agencies must operate within the legal authority conferred by Congress," and "courts have

the responsibility to determine whether 'individual rights' have been infringed 'by the exertion

of unauthorized administrative power." *Med Imaging & Tech All. v. Libr. of Cong.*, 103 F.4th

830, 838 (D.C. Cir. 2024). The APA provides a cause of action for a "final agency action for

which there is no other adequate remedy in a court," 5 U.S.C. § 704, and federal courts have a

duty to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, . . . or

otherwise not in accordance with law." 5 U.S.C. § 706(2). Plaintiffs are likely to prevail on their

claims that Defendants actions are contrary to law (both the Privacy Act and PRA) and arbitrary

and capricious. *Id.*

**A.      The Data Collection Letter constitutes a final agency action.**

Plaintiffs have experienced, and will continue to experience, several concrete harms

recognized at both common law and by binding precedent, because of Defendants' final act—set

forth in the Data Collection Letter—of requiring states and their vendors to turn over

individualized SNAP data to USDA and DOGE-affiliated individuals.

To be "final," an agency action must satisfy two criteria: "First, the action must mark the

consummation of the agency's decisionmaking process—it must not be of a merely tentative or

interlocutory nature. And second, the action must be one by which rights or obligations have

been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154,

177–78 (1997) (cleaned up). "[T]he finality inquiry is a pragmatic and flexible one." *Nat'l Ass'n*

*of Home Builders v. U.S. Army Corps of* Eng'rs, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (internal

quotations omitted); *see also U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590,

598–599 (2016). "In characterizing the inquiry as pragmatic," courts are to focus on the

"concrete consequences an agency action has or does not have." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019). Both criteria are satisfied here.

First, the Data Collection Letter marks the "consummation" of the Department's decisionmaking process, imposing on states the requirement that they share SNAP data with the federal government. An agency's decisionmaking process is consummated when its position is "definitive." *Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). There is nothing "tentative" or "interlocutory" about the Letter, which requires states to "work through their processors" to submit "at least" the data described going back to January 1, 2020. Data Collection Letter at 2. However vague its "Program integrity" rationale, the letter makes clear USDA's position that it has "statutory authority" to collect SNAP data and that non-compliant states will face sanctions. USDA's position is not in flux. The first *Bennett* prong is satisfied.

Second, the Data Collection Letter is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. Courts have found the second *Bennett* prong satisfied when failure to comply with agency guidance would result in such consequences as enforcement actions, fines, and penalties. *See, e.g.*, *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("enforcement action and fines"); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("significant criminal and civil penalties"); *Ciba-Geigy Corp. v. U.S.E.P.A.,* 801 F.2d 430, 436–39, 438 n.9 (D.C. Cir. 1986) (threat of enforcement action); *Sackett v. EPA*, 566 U.S. 120, 126 (2012) ("double penalties in a future enforcement proceeding").[13] The message in the Letter is clear:

---

[13] Legal consequences also flow to the Individual Plaintiffs. Where federal agency defendants have made determinations "about the plaintiffs' rights to protect their personal information and the agencies' legal obligations under the Privacy Act," courts have found them to be final agency

comply or else. It clearly admonishes states that their failure to comply—specifically, to "grant processor authorizations or to take the steps necessary to provide SNAP data"—"may trigger noncompliance" procedures, citing 7 U.S.C. § 2020(g). Letter at 2. Those noncompliance procedures contemplate a corrective action plan followed by (1) the option of the Secretary referring noncompliant states to the Attorney General "with a request that injunctive relief be sought to require compliance forthwith" and (2) the *requirement* that the Secretary "proceed to withhold" funds "as the Secretary determines to be appropriate." 7 U.S.C. § 2020(g).

**B.    USDA failed to publish or revise a SORN as required by the Privacy Act.**

USDA's authority to collect data from states is constrained by the Privacy Act. There is no question that the records at issue here are covered by that Act. If states comply—as some apparently have already—USDA is "maintaining" (defined to include "collect[ing]") sensitive, individualized "record[s]" about SNAP recipients in an individually retrievable manner. 5 U.S.C. § 552a(a) (defining "maintain," "record," and "system of records"). USDA has not followed the statutory, pre-collection procedures to notify the public "upon the establishment or revision" of the "existence and character of a system of records." 5 U.S.C. § 552a(e)(4). Because, in a case like this one, the law requires USDA to publish a SORN, and USDA has not done so, Plaintiffs are likely to succeed on the merits of Count 1.

---

actions. *Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 497 (D. Md. 2025); *see also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *13 (D.D.C. Apr. 16, 2025) (finding final agency action where "plaintiffs allege that agency defendants have policies of unlawfully disclosing information without consent" and where the policies "determine the rights of those whose information is being disclosed and the obligations of the agency defendants"); *see generally Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'").

**C.    USDA sponsored a collection without complying with the PRA.**

Compliance with the PRA is not optional. Because USDA is an "agency" for purposes of the PRA, 44 U.S.C. § 3502(1), it must comply with the statute's detailed procedural framework, including the unambiguous language that it "shall not" sponsor a collection of information without adhering to the statute's procedural requirements. 44 U.S.C. § 3507(a). *E.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (noting that "shall" is "mandatory" and "creates an obligation impervious to judicial discretion").

Despite this clear command, USDA is conducting a collection of information without complying with the processes set forth in the statute. *See supra* at 6-7. As a result, USDA has violated the law and will remain in violation of the law as long as its collection continues, and as long as it continues to possess information unlawfully collected. Plaintiffs are likely to succeed on the merits of Count 2.

**D.    The Data Collection Letter is arbitrary and capricious because USDA failed to consider the scheme set up by Congress or explain its authority.**

Individual Plaintiffs and MAZON are also likely to succeed on their claim that the Data Collection Letter is arbitrary and capricious under the APA. Among that law's substantive and procedural requirements, agencies must "engage[]in 'reasoned decisionmaking'" and provide a "reasoned explanation" for their actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)); *F.C.C. v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). "[C]ourts may not make up for agency deficiencies by supplying a reasoned basis for the disputed action where the agency has failed to supply one." *League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185 (D.D.C. 2021) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

24

The Data Collection Letter constitutes neither reasoned decisionmaking nor a reasoned explanation. Notably, the Letter's reliance on "ensur[ing] Program integrity" to justify the collection wholly ignores the federal-state partnership established by Congress, as well as USDA's own regulations implementing that partnership. It fails to explain how the existing scheme—which gives states primary responsibility for policing fraud and overpayment—is insufficient to "ensure Program integrity." *Id.*; *see also* 7 U.S.C. § 2020(e)(2). It further fails to explain how upending the program integrity scheme set up by Congress could possibly fit within the limited authorities cited by the Secretary in the Data Collection Letter. Nor does the Letter explain how the information sought is "necessary for the proper performance" of USDA's functions and has "practical utility." 44 U.S.C. §§ 3506(c)(2)(A)(i), (c)(3)(A). Nor does the letter explain why it is seeking to collect records back to January 1, 2020, when the statute creates a three-year record retention period. 7 U.S.C. § 2020(a)(3)(B)(iii).

As designed by Congress, the federal-state partnership makes states responsible for certifying households and issuing SNAP benefits. 7 U.S.C. § 2020(a). States are required to have processes to "detect[] fraud" in the program, *id.* § 2020(e)(20), and USDA is authorized to pay a portion of costs borne by states for "investigations and prosecutions," *id.* § 2025(a)(7). Congress instructed USDA to regulate on quality control issues, 7 U.S.C. § 2025(c)(1)(B), and USDA has done so. *See* 7 C.F.R. §§ Part 275; 7 C.F.R. § 275.3; Supplemental Nutrition Assistance Program: Non-Discretionary Quality Control Provisions of the Agriculture Improvement Act of 2018, 86 Fed. Reg. 44,575 (Aug. 13, 2021). These regulations govern how states must conduct reviews of their SNAP administration and how USDA will, in turn, monitor state reviews. *See* 7 C.F.R. §§ Part 275; 7 C.F.R. § 275.3. In adopting these regulations, USDA created a case sampling methodology to validate state error rates—but it does not require, or even contemplate,

states turning over *all* data regarding SNAP recipients. 7 C.F.R. § 275.3(d). Congress has also established an inter-state clearinghouse to ensure that individuals are not receiving benefits from more than one state. 7 U.S.C. § 2020(x)(2)(A). Nowhere has USDA explained why the Data Collection Letter is necessary in addition to these procedures to "ensure program integrity."

A decision is also arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Not only does the Data Collection Letter fail to even identify a problem—apart from a desire to comport with an agency-wide Executive Order—it also fails to consider the privacy laws that govern its actions, the risks attendant to collecting and maintaining such broad swaths of personal data, or the need for safeguards when establishing a system to house data. It also suggests that the USDA failed to consider whether, why, and how the collection demand is "necessary for the proper performance" of USDA functions, and why the information sought has "practical utility." 44 U.S.C. § 3506(c)(2)(A)(i).

### III.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief.

Plaintiffs are suffering, and will continue to suffer, irreparable injury from Defendants' wanton disregard for federal privacy laws. Not only have USDA's actions placed Individual Plaintiffs' sensitive personal information at risk, but they have done so in a way that impairs the missions of the Organizational Plaintiffs. Preliminary relief "requires only a likelihood of irreparable injury." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The injury "must be both certain and great; it must be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,

930 F.3d 519, 529 (D.C. Cir. 2019) (internal quotation marks and formatting omitted). Plaintiffs'
injuries satisfy that standard.

A.     **The Individual Plaintiffs are irreparably harmed by USDA's unauthorized
collection of their private information.**

The harms caused by disclosure of personal information to unknown numbers of people
at USDA and DOGE irreparably harms the Individual Plaintiffs. "There is no doubt that public
dissemination of sensitive, private information is an irreparable harm." *All. for Retired
Americans v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 740401, at *21 (D.D.C. Mar. 7, 2025).
Where information subject to an unlawful disclosure is highly sensitive, courts are likely to find
irreparable harm. *See, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C.
2010) (finding irreparable harm where proprietary business information shared by former
employee to competitor); *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (finding
irreparable harm where psychiatric records disclosed in unsealed court files).

In this analysis, Courts also consider both the breadth of disclosure and the steps taken by
an unlawfully receiving party to "monitor and control" further dissemination. *See, e.g.*, *All. for
Retired Americans v. Bessent*, 2025 WL 740401, at *21 (finding no irreparable harm where
measures were in place to "monitor and control" their access). But even where just one person
has unauthorized access, the resulting harm can be irreparable where the context of the
disclosure is particularly problematic. *See Hum. Touch DC, Inc. v. Merriweather*, No. 15-cv-
00741 (APM), 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (finding an irreparable harm
where a terminated employee gained unauthorized access to patient records and the health
agency's "currency [was] its ability to . . . maintain the confidentiality of its patients' records and
information").

The circumstances of the collection here strongly favor a finding of irreparable harm where the information at issue is both highly sensitive and extensive. USDA's demand covers "at least" names, dates of birth, personal addresses used, Social Security numbers, and "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time." Letter at 2. Plaintiffs and other SNAP applicants and recipients have also submitted copies of their identification, employment information, and detailed breakdowns of their income, resources, and expenses identifying prescriptions. Cite Hollingsworth Decl. ¶ 4; Pallek Decl. ¶ 3; Samson Decl. ¶ 3; Ramos Decl. ¶ 4. Alaska, where Plaintiff Hollingsworth lives, has already turned over data she submitted to apply for SNAP, which includes medical records and receipts for medical expenses, including prescriptions. *See supra* n.6; Hollingsworth Decl. ¶ 4.

Moreover, USDA has publicized no information about any steps it has taken to "monitor and control" access which is *precisely* what the Privacy Act and PRA require. As the Data Collection Letter implicitly acknowledges, USDA has never taken possession of comprehensive SNAP data from across the country. Letter at 1. It is therefore no surprise that there is nothing to suggest that USDA has created a system with the technical and administrative controls that are not only required by law, but also practically necessary to safely collect and maintain this volume of sensitive data. Without these protections, recipients' information is vulnerable to further disclosure.[14]

---

[14] Such disclosures would have devastating consequences. For example, EBT card numbers could be among the unbounded information that USDA is collecting. If those are compromised, stolen benefits will result in recipients going without food. *See* Anderson Decl. ¶ 8 (explaining that "skimming," wherein a bad actor gains access to an EBT card number and spends down benefits, has resulted in over $155 million in lost benefits in Tennessee); Ramos Decl. ¶ 7 (describing extra precautions to avoid skimming).

The harm is actual and not theoretical. At any moment, Ms. Hollingsworth's injury stands to be replicated—if it hasn't already—for Plaintiffs Pallek, Samson, and Ramos and tens of millions of other SNAP applicants and recipients. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))).

**B.    Plaintiffs are irreparably harmed by USDA's denial of information vital to an ongoing debate.**

Whether an informational harm is irreparable depends on both the importance of the information and the relative timing of its denial. For example, a court in this district granted a preliminary injunction to Plaintiff EPIC where, absent an injunction, it would be denied "timely" access to information "vital to the current and ongoing debate" about warrantless surveillance. *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006). Likewise, because "stale information is of little value," *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), providing information to the public about a proposed collection after the collection eviscerates the benefits that Congress saw in obtaining public views *before* a data collection. A delayed disclosure may never redress plaintiffs' injuries, even if information is provided later.

The information the Plaintiffs have been denied is both timely and important. USDA has never had a nationwide database of information on SNAP applicants and recipients; its attempt to

do so has garnered substantial attention.[15] Yet Plaintiffs—who are undeniably interested parties as to their own data, the integrity of the SNAP program, and the importance of electronic privacy—have been denied the information they are entitled to under the Privacy Act and the Paperwork Reduction Act. Only with the information the law requires USDA to provide can Plaintiffs timely and meaningfully participate in the ongoing debate about USDA's Data Collection.

Plaintiffs' informational harms are irreparable. USDA has already started collecting data and may have created a system to house data. Individual Plaintiffs have no means of knowing *any* detail about the records held by the government, and have no assurances that USDA is employing any safeguards to prevent unlawful disclosure of the information. Hollingsworth Decl. ¶ 9; Pallek Decl. ¶ 5; Samson Decl. ¶¶ 5-6; Ramos Decl. ¶ 10. Absent immediate injunctive relief, USDA's unlawful process will continue. It will have created a system, collected Plaintiffs' and others' information, and begun taking whatever undisclosed actions it plans to take with that information—without providing any information or opportunity for Individual Plaintiffs to make their voices heard by submitting comments. As described above, MAZON is unable to give timely or accurate information to its service providers without knowing what USDA is doing and why. *See supra* at 17-18; Leibman Decl. ¶ 12. And EPIC will have been deprived of its ability to "effectively do [its] job to address a time sensitive issue." *Doctors for Am. v. Off. of Personnel Mgt.*, __ F. Supp. 3d __, No. 25-cv-322 (JDB), 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025); *see also* Butler Decl. ¶¶ 13, 17, 21.

---

[15] *See, e.g.*, Jude Joffe-Block, *USDA, DOGE demand states hand over personal data about food stamp recipients*, National Public Radio (May 9, 2025) (story on NPR's on-air Weekend Edition), https://www.npr.org/2025/05/09/nx-s1-5389952/usda-snap-doge-data-immigration.

    **C.**    **MAZON's anti-hunger mission faces immediate irreparable harm because the unlawful, unexplained Data Collection Letter will cause distrust in SNAP.**

In addition to its irreparable informational harm, MAZON faces an irreparable injury to its mission and programs. As described above, USDA's Data Collection has "perceptibly impaired" MAZON's programs and "directly conflict[s]" with its anti-hunger mission. *See supra* at 19-20 (citing Leibman Decl. ¶¶ 9, 12-13). The D.C. Circuit has found irreparable harm where the circumstances of the case necessitate an immediate injunction because a favorable final judgment is inadequate for reasons particular to the circumstances of the case. *See, e.g.*, *League of Women Voters*, 838 F.3d at 9 (upholding a finding of irreparable harm where a challenged proof-of-citizenship requirement impaired an organization's voter-registration work with an upcoming election).

The Data Collection operates a distinct harm on MAZON's anti-hunger mission. From decades of experience, MAZON knows which individuals are likely not to engage with SNAP as a result of the Data Collection and the vast unknowns surrounding it. Individuals with immigration concerns may not enroll out of fear that their participation would negatively affect immigration proceedings for themselves or family members. Leibman Decl. ¶ 8. Elderly individuals may not enroll out of fear of sharing sensitive personal information. *Id.* ¶ 13. Single mothers fleeing domestic violence may be reluctant to apply out of fear that their information may be used for child support enforcement or revealed to the abusive non-custodial parent. *Id.* The result is predictable and devastating: eligible recipients will forgo benefits and new applicants will not apply. More people will go hungry. *See* Anderson Decl. ¶¶ 7-9; Elzinga Decl. ¶¶ 7-11; Machicote Decl. ¶¶ 5-6.

Food insecurity and hunger cannot be remedied through *post hoc* measures. Judicial intervention to halt the unlawful Data Collection's impact on MAZON's work cannot wait.

**IV.    The Balance of Equities and Public Interest Favor Granting a Temporary Restraining Order.**

As against the certain and irreparable injury that innumerable members of the public— including Plaintiffs—are presently experiencing because of Defendants' unlawful actions, Defendants will suffer no cognizable harm if enjoined from continuing to perpetrate those actions. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Moreover, Defendants would suffer no injury from remaining bound by the same policies and restrictions that bound them as recently as three weeks ago—before the issuance of the May 6 letter. USDA will not suffer injury from being temporarily barred from collecting information during the period in which this Court assesses whether such access is lawful. The balance of equities thus tips decisively in favor of granting temporary relief here.

Meanwhile, a temporary restraining order would serve the public interest. "There is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id*. (citation omitted). There is also a "general public interest in open and accountable agency decision-making." *Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and enter a temporary restraining order enjoining Defendants from enforcing the Data Collection Letter; directing USDA to inform states and EBT processors that data collection pursuant to the Data Collection Letter has been paused; and barring the collection, review, or maintenance of data submitted pursuant to the Data Collection Letter, as described more fully in the accompanying motion.

Dated: May 27, 2025                                        Respectfully Submitted,

Deana El-Mallawany*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org


JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

/s/ Daniel A Zibel
Daniel A. Zibel (D.C. Bar No. 491377)
Madeline Wiseman (D.C. Bar No. 90031948)
Melissa Padilla (D.C. Bar No. 90018065)
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
Email: dan@defendstudents.org
         madeline@defendstudents.org
         melissa@defendstudents.org

*Counsel for Plaintiffs*

John L. Davisson, D.C. Bar #1531914
Sara Geoghegan, D.C. Bar #90007340
Kabbas Azhar, D.C. Bar #90027866
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos
& Hollingsworth*

geoghegan@epic.org
azhar@epic.org

*Counsel for EPIC*

*Motion for Admission for *Pro Hac Vice*
Forthcoming