## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK, *et al.*

        *Plaintiffs*,

        v.

BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*

        *Defendants*.

**AMENDED AND SUPPLEMENTAL COMPLAINT**

Civil Action No. 1:25-cv-01650-JMC

## INTRODUCTION

1.      For decades, federal law has struck a careful and critical balance between the government's legitimate need to obtain and manage sensitive, highly personal information and the longstanding and growing need to protect individual privacy. Through laws like the Privacy Act of 1974 and the Paperwork Reduction Act of 1980, among others,[1] Congress and the Executive Branch have crafted policies designed to balance these needs and protect the privacy of the American people. This urgent lawsuit challenges the U.S. Department of Agriculture's circumvention of those policies. Specifically, Plaintiffs allege that Defendants acted unlawfully by initiating an unprecedented collection of information of tens of millions of SNAP applicants

---

[1] Other examples include: the Federal Information Security Modernization Act of 2014 (amending the Federal Information Security Management Act of 2022), 44 U.S.C. § 3541, the E-Government Act of 2002, 44 U.S.C. § 3601 *et seq.*, the Trade Secrets Act, 18 U.S.C. § 1905, the Children's Online Privacy Protection Act of 1998, 15 U.S.C. § 6501, the Social Security Number Fraud Prevention Act of 2018, P.L. 115-59, OMB Memoranda M-01-05, M-03-22, M-06-16, M-10,22, M-10-23, M-11-02, M-13-13, M-13-20, M-14-04, M-14-06, M-16-04, M-16-14, M-16-24, 17-06, 17-09, 17-12, 18-02 & 21-04.

and recipients without complying with the requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act.

2.    Privacy risks are especially profound for vulnerable populations, whose participation in social benefit programs requires frequent interactions with local, state, and federal government agencies. The manifestation of those risks as invasions of privacy and the attendant harms are "particularly acute" among poor communities, "in light of the resulting economic and social consequences and the low likelihood that they will be able to bear the costs associated with remedying those harms." Mary Madden, Michele Gilman, Karen Levy, & Alice Marwick, *Privacy, Poverty, and Big Data: A Matrix of Vulnerabilities for Poor Americans*, 54 Wash. U. L. Rev. 53, 55 (2017).

3.    Federal privacy laws contain a common through-line. When any federal agency collects, maintains, uses, or discloses sensitive information, federal law requires it to provide the public with information about, and an opportunity to comment on, the agency's activities, purposes, and safeguards. The goal here is clear: given the inherent risks the use of personal data imposes, individuals have a right (i) to know what information the government maintains or intends to collect; and (ii) to make recommendations on each federal data collection, use, and disclosure.

4.    These are not merely rights to read a data disclosure and to shout into the void. Rather, agencies must meaningfully consider public input on information collections and adjust their proposals to ensure the lawfulness of any collection, use, or disclosure. Here, however, Defendants' *pro forma* notice under the Privacy Act disingenuously obscures their intent to disregard all comments, no matter the risks those comments identify, and start collecting millions of records immediately after the comment period closes.

5.      But public comments submitted here identify critical failings that must be addressed before, not after, millions of records that states are legally obligated to protect fall into Defendants' hands. The opportunity for comment Defendants have purported to provide—on a system of record notice, but not on the information collection that feeds into that system, on a timeline that prevents the government from taking the comment into account—falls far short of the meaningful public participation the law requires. This is worsened by the creation of a system that would enable disclosure of personal information far beyond what the Privacy Act authorizes.

6.      Likewise, rather than comply with the Paperwork Reduction Act's disclosure requirements and opportunity for public comment, Defendants have blown a hole through a limited exception that permits agencies to make "nonsubstantive" changes without adhering to the otherwise required procedures.

7.      This urgent litigation seeks to ensure that the government is not exploiting the most vulnerable beneficiaries of key programs by disregarding longstanding privacy protections, depriving the public of critical information regarding data collection and protections, and eviscerating the public's right to comment on the mass collection and consolidation by the federal government of the sensitive personal data of tens of millions of individuals who rely on federal food assistance benefits.

## **BACKGROUND**

8.      The Supplemental Nutrition Assistance Program ("SNAP") is the nation's largest nutrition assistance program available to low-income households. In March 2025, SNAP served over 42 million people in over 22 million households nationwide.[2] SNAP operates as a federal-

---

[2] *SNAP Data Tables*, U.S. Dep't of Agric, https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (last visited July 12, 2025); *Supplemental Nutrition Assistance Program*

state partnership, where the federal government pays 100% of food benefits and shares administrative costs with the states.

9.      At the federal level, SNAP is administered by the U.S. Department of Agriculture, through its sub-agency, the Food and Nutrition Service ("FNS"). States, meanwhile, are responsible for program administration, including certifying applicant households and issuing benefits. As a result, states—and their vendors—maintain substantial amounts of highly personal financial, medical, housing, tax, and other information regarding SNAP applicants and recipients, and their dependents. *See* 7 U.S.C. § 2014(c)–(e) (detailing the components of income, exclusions to income, and deductions to income that must be documented).

10.     The information maintained by states to administer SNAP is precisely the sort of information that federal privacy laws are designed to protect. But on May 6, 2025, the U.S. Department of Agriculture and the nascent Department of Government Efficiency ("DOGE") initiated a sweeping and unprecedented demand, via the "Initial Data Demand," *see* Dkt. 9-11 at Exh. B, that over five years of state SNAP data be turned over under threat of both legal action and withholding of funds for noncompliance under 7 U.S.C. § 2020(g)—and they did so without following procedures enshrined in federal privacy laws.

11.     On May 22, 2025, Plaintiffs filed their Complaint and shortly thereafter moved for emergency injunctive relief. Seemingly in response, the government abruptly changed course, pledging to "satisfy all necessary legal requirements." But that has not happened; rather, Defendants have issued slipshod and facially inadequate notices, unlawfully cut required corners, and then, on July 9, renewed the Initial Data Demand even when a public comment period was

---

*(SNAP)*, U.S. Dep't of Agric, https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap (last visited July 12, 2025).

still open. The government is scheduled to begin collecting millions of records on July 24—the day after public comments are due—and without regard to the substance of those comments.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under federal law, namely the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 705, 706, the Privacy Act, 5 U.S.C. § 552a, and the Paperwork Reduction Act, 44 U.S.C. §§ 3506–3507.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(e)(1)(A) and 1391(e)(1)(B) because one or more Defendants are officers and agencies of the United States and reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

11.     Plaintiff Namod Pallek is an undergraduate student at the University of California, Berkeley. Since January 2024, he has been enrolled in CalFresh, the California-administered SNAP program. To receive CalFresh benefits, Mr. Pallek submitted sensitive personal information to the California Department of Social Services. Mr. Pallek resides in Berkeley, California.

12.     Plaintiff Julliana Samson is also an undergraduate student at the University of California, Berkeley. She has been enrolled in CalFresh since August 2024. To receive CalFresh benefits, Ms. Samson submitted sensitive personal information to the California Department of Social Services. Ms. Samson resides in Berkeley, California.

13.     Plaintiff Diana Ramos receives, and has been receiving, SNAP benefits through New York since March 2020. From 2013 until January 2020, she was enrolled in and received

benefits through Florida's SNAP program. To receive these benefits, Ms. Ramos submitted sensitive personal information to both the Florida Department of Children and Families and the New York Office of Temporary and Disability Assistance. Ms. Ramos resides in New York, New York.

14.      Plaintiff Catherine Hollingsworth receives, and has been receiving, SNAP benefits in Alaska since 2002. To receive these benefits, Ms. Hollingsworth has submitted sensitive personal information to Alaska's Division of Public Assistance. Ms. Hollingsworth currently resides in Wasilla, Alaska.

15.      The term "Individual Plaintiffs" shall hereinafter refer to Plaintiffs Pallek, Samson, Ramos, and Hollingsworth.

16.      Plaintiff MAZON, Inc.: A Jewish Response to Hunger ("MAZON") is a faith-based nonprofit organization incorporated in Massachusetts, and headquartered in Los Angeles, California, dedicated to fighting hunger among people of all faiths and backgrounds across the country. SNAP plays a critical role in MAZON's anti-hunger advocacy, which prioritizes educating the anti-hunger community and service providers who directly interface with SNAP applicants and recipients.

17.      Plaintiff Electronic Privacy Information Center ("EPIC") is a public interest research center incorporated in Washington, D.C. devoted to securing the right to privacy in the digital age. Among its activities, EPIC engages in advocacy, research, and public education about the collection, use, retention, and transfer of personal information by federal agencies, including large-scale databases and mass surveillance programs. EPIC also engages in research, advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP.

18.     Defendant U.S. Department of Agriculture is a cabinet-level agency within the executive branch of the United States that manages and regulates food, agricultural production, and natural resources. The U.S. Department of Agriculture oversees and houses other agencies, including the Food and Nutrition Service, and is headquartered in Washington, D.C.

19.     Defendant Brooke L. Rollins is the Secretary of Agriculture, the highest-ranking official of the USDA. Rollins is the Secretary of Agriculture, the highest-ranking official of the U.S. Department of Agriculture. *See* 7 U.S.C. § 2202. Secretary Rollins is sued in her official capacity.

20.     Defendant Food and Nutrition Service is an agency established by, and housed within, the USDA. It is headquartered in Alexandria, Virginia. FNS administers SNAP, a federally funded program to provide food benefits to low-income households.

21.     Defendant James C. Miller is the Administrator of FNS. Administrator Miller has the authority to administer FNS, including SNAP. *See* 7 U.S.C. § 2013; 7 C.F.R. § 2.57. Administrator Miller is sued in his official capacity.

22.     Defendants U.S. Department of Agriculture, Secretary Rollins, FNS, and Administrator Miller are collectively referred to herein as "USDA."

## LEGAL FRAMEWORK

I.  **Federal Law Creates Numerous Safeguards to Protect Personal Data.**

    A.  **Privacy Act**

23.     The Privacy Act governs the federal government's handling of personal information and aims to balance two competing needs: the government's need, in some circumstances, for sensitive, personal information and the risks associated with the government collecting and maintaining this information. Accordingly, the Act broadly both "regulates the

collection, maintenance, use, and dissemination of information by" federal agencies, Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, and gives agencies "detailed instructions for managing their records." *Doe v. Chao*, 540 U.S. 614, 618 (2004).

24.    Among these instructions, and as is relevant here, the Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. §§ 552a(a)(3), (e)–(f).

25.    When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records").

26.    This notice, commonly referred to as a System of Records Notice ("SORN"), must identify, *inter alia*, the name and location of the system; the categories of individuals on whom records are maintained in the system; the purpose for which information about an individual is collected; the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of records; and the procedures by which individuals can request notification of and access to information pertaining to them. *Id.* § 552a(e)(4).

27.    Each SORN provides the public with information regarding the relevant system of records, which is a necessary precondition for an individual to exercise their right to "gain access" to records that are "contained in the system." 5 U.S.C. § 552a(d)(1).

28.    Data maintained in a system of records may only be disclosed "to any person, or to another agency" pursuant to one of a limited number of expressly permitted uses. *Id.* § 552a(b). In addition to permitting disclosure for purposes expressly articulated in the Privacy Act, a SORN may permit disclosure for a "routine use," *id.* § 552a(b)(3), namely "for a purpose

which is compatible with the purpose for which it [the record] was collected," *id.* § 552a(a)(7). At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system," including all routine uses, and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id.* § 552a(e)(3)(C), (e)(11).

29.    The Privacy Act establishes a similar notice and comment requirement for the establishment or revision of a data match with other federal, state, or local government entities. 5 U.S.C. § 552a(e)(12).

30.    Once comments on a SORN are received, the agency must meaningfully consider them and, if appropriate, amend the SORN. Hence the SORN "should be published sufficiently in advance of the proposed effective date of the use to permit time for the public to comment and for the agency to review those comments, but in no case may a new 'routine use' be used as the basis for a disclosure less than 30 days after the publication of the 'routine use' notice in the *Federal Register*." Office of Management and Budget, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,966 (July 9, 1975).[3]

31.    As evidence of the importance of the SORN and the need to safeguard individual privacy, the Privacy Act also requires that agencies proposing to establish or significantly change a system of records must also provide "advance notice" to specified Congressional committees and the Office of Management and Budget "in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." *Id.* § 552a(r).

---

[3] Available at https://www.justice.gov/paoverview_omb-75/dl; *see also* U.S. Dep't of Justice, Overview of the Privacy Act of 1974, 2020 Ed. at 200 (reaffirming the 1974 interpretation of § 552a(e)(11)), https://www.justice.gov/Overview_2020/dl?inline.

32.     Finally, to protect the security of individuals, the Privacy Act requires agencies to implement both human (*i.e.*, conduct and training provisions) and technical (*i.e.*, administrative and physical) safeguards regarding any systems of records. *Id.* § 552a(e)(9)–(10). Such requirements, including "penalties for noncompliance," *id.* § 552a(e)(9), are designed to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552a(e)(10).

### B.     Paperwork Reduction Act

33.     Whereas the Privacy Act aims to protect individual privacy by governing how agencies maintain, collect, use, or disseminate personal information, a separate federal law—the Paperwork Reduction Act ("PRA")—governs how agencies collect information from the public and to "ensure the greatest possible public benefit" from the collection and use of such information. 44 U.S.C. § 3501(2); *see also*, *e.g.*, *id.* § 3501(4) (referencing the goal of improving the quality and use of information to strengthen accountability and openness in government); *id.* § 3504(11) (noting the goal of improving the responsibility and accountability of federal agencies to the public for implementing the information collection review process and other policies and guidelines set forth by law).

34.     In enumerating the PRA's purposes, Congress specifically cited the need to ensure that both "privacy and confidentiality" and the "security of information" were being managed "consistent with applicable laws, . . . including, [the Privacy Act]." 44 U.S.C. § 3501(8).

35.     The PRA applies when federal agencies obtain facts or opinions from more than ten non-federal actors, including individuals, corporations, and state and local governments. *See*

10

44 U.S.C. § 3502; *see also* 5 C.F.R. § 1320.3(c). The PRA covers mandatory and voluntary collections of information.

36.     Like the Privacy Act, the PRA establishes standards to ensure that agencies are meeting the letter and spirit of the law. For instance, prior to initiating a covered information collection, the PRA requires that an agency's Chief Information Officer conduct an "independent" review—using statutorily delineated steps—to "evaluate fairly" whether the proposed collection should proceed. 44 U.S.C. §§ 3506(c)(1), 3507(a).

37.     Further, as with the Privacy Act, the PRA also requires the agency to publish information regarding the collection, including a "description of the need for the information," the "proposed use of the information," "a description of the likely respondents and proposed frequency of response" to the information collection, "an estimate of the burden that shall result" from the information collection, and "notice that comments may be submitted" regarding the collection. 44 U.S.C. § 3507(a)(1)(D).

38.     In addition, prior to conducting a covered collection, an agency must provide both a 60-day notice in the Federal Register seeking public comment and, separately, "consult with members of the public and affected agencies" about the collection. *Id.* § 3506(c)(2)(A). The agency may not conduct or sponsor the collection of information without "evaluat[ing] the public comments received" in response to the 60-day notice and consultation requirements. *Id.* § 3507(a)(1)(B).

39.     Before conducting a covered collection, the agency must also certify to the Director of the Office of Management and Budget ("OMB") that the collection is, *inter alia*, "necessary for the proper performance" of the agency's functions. *Id.* § 3506(c)(3). An agency may proceed with the data collection only after the Director of OMB has approved the proposed

collection and issued a control number to be displayed on the collection of information. *Id*. § 3506(c). The Director may only issue such an approval after providing another 30 days for the public to comment on the proposed collection (with limited exceptions). *Id.* § 3507(b).

40.    Under OMB's PRA regulations and guidance, only certain small changes to existing information collections are exempt from advance notice and comment. These include "*de minimis*" cosmetic changes that "affect the look and feel of a collection, but do not change the nature or type of information collected," which do not require OMB approval or public comment; and "non-substantive changes" such as "changing the wording of a question in an already approved collection [that] would result in more accurate and complete responses," which require OMB review but do not require public comment. OMB, Office of Information and Regulatory Affairs, Flexibilities under the Paperwork Reduction Act for Compliance with Information Collection Requirements (July 22, 2016), at 4.[4] Any other "substantive or material" change to an information collection requires a fresh round of OMB review, including an opportunity for public comment. 44 U.S.C. § 3507(h)(3); 5 C.F.R. § 1320.5(g).

## II.    The Supplemental Nutrition Assistance Program: A Federal-State Collaboration

41.    SNAP is the nation's largest nutrition assistance program available to low-income households. In March 2025, SNAP served over 42 million people in over 22 million households nationwide.[5]

42.    SNAP applicants and recipients are among our most economically vulnerable citizens, with income and resources so limited as to restrict their ability to buy food and meet

---

[4] Available at https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/pra_flexibilities_memo_7_22_16_finalI.pdf.
[5] *SNAP Data Tables*, *supra* note 2; Supplemental Nutrition Assistance Program (SNAP), *supra* note 2.

their other most basic needs. "Households turn to SNAP when they are in distress."[6] For example, in 2024 the Government Accountability Office ("GAO") estimated that approximately 23% of college students experienced food insecurity in 2020. In the context of postsecondary education, food insecurity among college students may lead to decreased academic performance, symptoms of depression and anxiety, and other negative mental health indicators. Food insecurity also has been found to have an inverse relationship on college completion.[7]

43.    Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet" and "increasing [their] food purchasing power." 7 U.S.C. § 2011. The Program is authorized by the Food and Nutrition Act of 2008, codified at 7 U.S.C. § 2011 *et seq.*, and the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 4001(a), 122 Stat. 1853, formerly the Food Stamp Act.

44.    SNAP is available to all persons who fall within income and asset restrictions, subject to additional non-financial criteria related to factors such as work and immigration status. Prior to the One Big Beautiful Bill Act ("OBBBA"), a significant number of lawfully present non-citizens qualified for SNAP, including refugees and asylees, who were immediately eligible; adult lawful permanent residents, who were eligible after living in the United States for at least five years; and lawful permanent residents under age 18.[8] Following the passage of the OBBBA,

---

[6] Elizabeth Cox, et al., *Beyond hunger: The role of SNAP in alleviating financial strain for low-income households*, Brookings (June 20, 2024), https://www.brookings.edu/articles/beyond-hunger-the-role-of-snap-in-alleviating-financial-strain-for-low-income-households/.

[7] Julia A. Wolfson, Noura Insolera, Alicia Cohen & Cindy W. Leung, *The Effect of Food Insecurity During College on Graduation and Type of Degree Attained: Evidence from a Nationally Representative Longitudinal Survey*, 25(2) Pub. Health Nutrition 389, 394-96 (July, 29, 2021), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/4048E0A71FB2CB5B6B7C984AC1AE5F9E/S1368980021003104a.pdf/the-effect-of-food-insecurity-during-college-on-graduation-and-type-of-degree-attained-evidence-from-a-nationally-representative-longitudinal-survey.pdf.

[8] *See generally* 7 C.F.R. § 273.4(a)(2)–(7); USDA, SNAP Eligibility for Non-Citizens, https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen (last visited July 11, 2025).

certain non-citizens continue to qualify for SNAP, including lawful permanent residents, certain

Cuban and Haitian nationals, and people residing in the US under a Compact of Free Association

with Palau, Micronesia, and the Marshall Islands. Pub. L. 119-21, Sec. 10108 (July 4, 2025)

(amending 7 U.S.C. § 2015(f)). Neither Congress nor USDA have outlined standards for how, or

when, this eligibility change will be implemented.

45.    Individuals receive monthly SNAP benefits that can be used to buy food at

authorized retailers via electronic benefit transfer ("EBT").[9]

46.    SNAP operates through a federal/state partnership. At the federal level, SNAP is

administered by the U.S. Department of Agriculture, through FNS, which is responsible for

establishing nationwide eligibility processes, benefit levels, and administrative rules. 7 U.S.C.

§ 2013(a), (c); 7 C.F.R. § 271.3(a). USDA, in turn, is responsible for overseeing each state's

administration of the Program, including, among other things, reviewing and approving each

state's plan of operations, reviewing any major changes in Program design, and taking action to

address state noncompliance. *Id.* § 2020(a)(4), (d)-(e), (g).

47.    States, meanwhile, are responsible for day-to-day administration, including

determining eligibility issuing benefits, and ensuring program integrity in the issuance of

benefits. 7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4. States contract with vendors ("EBT

Vendors") to issue benefits through EBT systems that allow SNAP recipients to use debit cards

to buy food at grocery stores and other authorized retailers.

48.    Because states certify eligibility and issue benefits, they retain sensitive personal

data on SNAP applicants and recipients including their Social Security number, date of birth,

---

[9] Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report*, U.S. Dep't of Agric. at 6 (June 2024), https://ers.usda.gov/sites/default/files/_laserfiche/publications/109314/EIB-274.pdf?v=1308.

address, employment status, citizenship status, income, resources, and more. 7 C.F.R. § 273.2(f).

States also collect and maintain additional information about some individuals including, but not

limited to, their health, educational status, history of substance abuse treatment, paternity, and

history of child support payments. 7 U.S.C. § 2015(e), (l)–(o).

49.    In recognition of the sensitive nature of the information collected, federal law

requires states to establish "safeguards which prohibit [its] use or disclosure," with limited

statutorily express exceptions. 7 U.S.C. § 2020(e)(8). Nothing in the SNAP statute or its

implementing regulations permits USDA to avoid the requirements of the Privacy Act, the PRA,

or any other federal privacy law.

50.    The "safeguards" that "prohibit" the "use or disclosure of information obtained

from applicant households" allow for disclosure only:

a.    "[F]or inspection and audit by the Secretary, subject to data and security protocols
       agreed to by the State agency and Secretary," and for use in certain lawsuits by
       beneficiaries, *id.* § 2020(a)(3)(B);

b.    "[T]o persons directly connected with the administration or enforcement of" the
       federal SNAP statute "*only* for such administration or enforcement," *id.*
       § 2020(e)(8)(A) (emphasis added);

c.    For use by the Comptroller General of the United States for audits, *id.*
       § 2020(e)(8)(B);

d.    To law enforcement "for the purpose of investigating an alleged violation of" the
       SNAP statute or its regulations—but not any other law enforcement purpose, *id.*
       § 2020(e)(8)(C), except for certain fields that can be released to law enforcement to
       locate a fugitive, *id.* § 2020(e)(8)(E);

e.  To garnish overpayments from the salaries of federal workers, *id.* § 2020(e)(8)(D);

f.  For the state agency (not USDA) to report to the former Immigration and

Naturalization Service (now Immigration and Customs Enforcement) (not USDA)

that members of a household are ineligible to receive SNAP benefits because a person

is in the United States unlawfully, *id.* § 2020(e)(8)(F), (e)(15); or

g.  For the state agency (not USDA) to address benefits paid to prisoners, *id.* §

2020(e)(8)(F), (e)(15).

51.  Congress enacted provisions directed at rooting out fraud or abuse in the SNAP

program. Yet even these provisions are carefully limited to protect data privacy. For instance, in

2018, Congress directed USDA to "establish an interstate data system" called the National

Accuracy Clearinghouse ("NAC") to ensure individuals do not receive SNAP benefits from more

than one state at a time. 7 U.S.C. § 2020(x)(2)(A). Although states may be required to provide

data to the NAC, such information must be narrowly tailored to achieving the goals of the NAC.

7 U.S.C. § 2020(x)(2)(B) (limiting the provision of "such information as is necessary" to achieve

the purposes of the NAC). Moreover, any information provided to the NAC is also subject to

data protection safeguards, including with respect to a retention limit, anonymity for especially

vulnerable individuals, and minimum security standards. *Id.* § 2020(x)(2)(C).

52.  In 2022, USDA promulgated an Interim Final Rule to create the NAC. *See*

Supplemental Nutrition Assistance Program: Requirement for Interstate Data Matching To

Prevent Duplicate Issuances, 87 Fed. Reg. 59,633 (Oct. 3, 2022) ("NAC IFR"). The NAC went

live in 2024. *SNAP National Accuracy Clearinghouse (NAC)*, U.S. Dep't of Agric.,

https://www.fns.usda.gov/snap/nac (last visited May 16, 2025).

53.     In the NAC IFR, USDA repeatedly acknowledged the importance of data privacy and the need to comply with the Privacy Act and the PRA. 87 Fed. Reg. at 59,638 (noting compliance with the Privacy Act); *id.* at 59,639 (noting the expectation that states "take preventative measures to ensure the privacy and protection of vulnerable individuals"); *id.* at 59,642 (discussing the importance of privacy protections and establishing system limitations to "safeguard information submitted" in connection with SNAP administration); *id.* at 59,644 (confirming the applicability of the PRA and establishing an OMB Control Number).

54.     In 2024, USDA obtained renewed OMB approval to require state agencies administering SNAP to obtain certain personal information from applicants and beneficiaries, to be held by the states. Supplemental Nutrition Assistance Program (SNAP) Forms, 88 Fed. Reg. 62,527 (Sept. 12, 2023) (60-day notice); 89 Fed. Reg. 13,679 (Feb. 23, 2024) (30-day notice). Irrespective of the substance of that collection, it sought information *from individuals*, not from states, that would be provided *to states*, not to USDA.

## FACTUAL ALLEGATIONS

**USDA Initiates its Unlawful Data Collection with the Initial Data Demand**

55.     On March 20, 2025, President Trump signed an Executive Order titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," which calls on agencies to "remov[e] unnecessary barriers" to ensure "unfettered access to comprehensive data from all State programs" in furtherance of the Administration's goals. Executive Order 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025). The Executive Order does not—and cannot—excuse agencies from acting "consistent with law." *Id.*

56.     Purportedly in response to the Executive Order, USDA and FNS have taken steps to demand that states and their EBT vendors provide sensitive data regarding SNAP applicants and recipients.

57.     On May 5, 2025, Fidelity Information Services ("FIS"), an EBT Vendor used by over 20 states, sent a letter to its state clients informing them that FIS had been contacted by both USDA and its "DOGE team" regarding the Executive Order and FIS's role as a processor of EBT transactions.

58.     The following day, USDA published a letter addressed to SNAP State Agency Directors ("Initial Data Demand"), invoking the Executive Order, and asserting that USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP." *FNS Data Sharing Guidance*, U.S. Dep't of Agric. at 1 (May 6, 2025), https://www.fns.usda.gov/sites/default/files/resource-files/fns-data-sharing-guidance5.6-V6-050625.pdf. According to the letter, providing USDA "unfettered access" is the "only way" for USDA to "eliminate bureaucratic duplication and inefficiencies" and ferret out "overpayments and fraud." *Id.*

59.     The Initial Data Demand states that USDA and FNS are legally authorized to obtain SNAP data from State agencies and their contractors and will be working with EBT Vendors to "consolidate SNAP data." *Id.* The letter then instructs all states that they are "require[d] . . . to submit at least the following data to FNS," which expressly includes highly sensitive, personal information regarding both SNAP applicants and recipients:

- Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

18

*Id.* at 2.

60.     The Initial Data Demand ends with a warning: "Failure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. [§] 2020(g)."[10] *Id.*

61.     A press release the same day announced that FNS "will require States to make certain all records associated with [SNAP] benefits and allotments are shared with the federal government."[11] Secretary Rollins was quoted as saying that "President Trump is rightfully requiring the federal government to have access to all programs it funds and SNAP is no exception." Finally, the press release noted that FNS would, "for the first time," have access to "the data long only held by States and . . . Electronic Benefits Transfer (EBT) processors."

62.     On May 9, 2025, three days after the Initial Data Demand, FIS contacted its state clients, indicating that it understood itself to be "required to disclose" the requested data, that "FIS intends to fully cooperate with USDA," and providing a date certain by which states must provide consent to disclosure.[12]

---

[10] By statute and regulation, FNS has authority to take action to address noncompliance, including pursuing injunctive relief and withholding funds. *See* 7 U.S.C. § 2020(g); 7 CFR 276.1(a)(4).

[11] *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds*, U.S. Dep't of Agric. (May 6, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/05/06/secretary-rollins-requires-states-provide-records-snap-benefits-ensure-lawful-use-federal-funds.

[12] Jude Joffe-Block, *Privacy Advocates Urge States Not to Comply with USDA Requests for Food Stamp Data*, NPR (May 13, 2025), https://www.npr.org/2025/05/13/nx-s1-5397208/doge-snap-usda-privacy.

63.     Another EBT payment processor, Conduent, which is reportedly used by 18 states, indicated in a May 13, 2025 statement to National Public Radio that it was "communicating directly with [its] clients" regarding USDA's request.[13]

64.     Press reports revealed that other states were complying with the Initial Data Demand. For example, Alaska reportedly turned over the personal information of over 70,000 Alaskans.[14] Iowa also announced it would turn over the personal data of roughly 259,300 Iowans to Defendants.[15] To date, public reports indicate that at least four other states—Arkansas, Missouri, Indiana, and Ohio—would comply with the initial demand.

**USDA Pauses Collection Following Motion for a Temporary Restraining Order**

65.     On May 22, 2025, Plaintiffs initiated this case asking the Court to halt USDA's unlawful demand as set forth in the Initial Data Demand. Dkt. 1.

66.     On May 27, 2025, Plaintiffs filed a Motion for a Temporary Restraining Order asking the Court to enjoin Defendants from receiving or collecting data pursuant to the Initial Data Demand and to order Defendants to delete or destroy data already received. Dkt. 9.

67.     In its May 30, 2025 Response to Plaintiffs' Motion, USDA indicated for the first time:

a.   USDA had not collected or obtained data pursuant to the Initial Data Demand, Declaration of Shiela Corley ("Corley Decl."), Dkt. 11-1 at ¶ 13;

b.   USDA intended to publish a new SORN, *id.* ¶ 14; and

---

[13] *Id.*

[14] James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, Alaska Beacon (May 15, 2025), https://alaskabeacon.com/2025/05/15/alaska-gives-food-stamp-recipients-personal-information-to-federal-officials/.

[15] Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, Iowa Starting Line (May 16, 2025), https://iowastartingline.com/2025/05/16/iowa-hands-over-personal-data-trump-federal-governmentto-deliver-snap-recipient-data-to-the-federal-government/.

    c.   USDA had directed EBT processors to refrain from transmitting any data until the agency completed the requisite procedural steps, *id.* ¶ 13.

68.    USDA also indicated its position that it had submitted, in 2023 and 2024, the PRA-required 60- and 30-day notices in the Federal Register, thus giving notice "that the information being collected by States or their contracts in the SNAP applications was at least subject to USDA." Dkt. 11 at 25-26.

69.    In light of USDA's representations that it had paused the data collection, on June 2, 2025, Plaintiffs withdrew their Motion for a Temporary Restraining Order. Dkt. 13.

**USDA Submits Revised Information Collection Request to OMB**

70.    On June 11, 2025, Defendants submitted a request (the "PRA Change Request") to make a "nonsubstantive change to a currently approved collection"—*i.e.*, the one described *supra* at ¶¶ 54, 68, whereby states obtained additional applicant and beneficiary data, but USDA collected no data from the states.

71.    The purpose of the PRA Change Request was to "add requirements to report to USDA a number of currently collected data elements related to SNAP certification and benefit issuance" such as (1) SNAP participant names, (2) Social Security numbers, (3) dates of birth, (4) case record identifier numbers, (5) EBT card numbers, and (6) issuance amounts with dates.[16]

72.    The PRA Change Request describes the proposed uses as follows:

> USDA and FNS will use the SNAP data in this system to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying and eliminating duplicate enrollments, and performing additional eligibility and program integrity checks. This includes but is not limited to verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, assisting States in mitigating identity theft, and performing other

---

[16] Shiela Corley, Food, Nutrition and Consumer Services, U.S. Dep't of Agric., Nonsubstantive Change Request – Supplemental Nutrition Assistance Program (SNAP) Forms: Applications, Periodic Reporting, and Notices (OMB #0584-0064) (June 11, 2025), at 1-2 https://www.reginfo.gov/public/do/DownloadDocument?objectID=158778701.

eligibility and program integrity checks using lawfully shared internal and interagency data.

This also includes sharing, where permitted by law and consistent with this notice, information with State agencies when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions.

73.    The PRA Change Request estimated an additional 20,410 annual burden hours for states and EBT vendors over what was previously approved.[17]

74.    OMB approved the request the same day without changes.

75.    Neither the PRA Change Request nor the approval of that request was published or described in the Federal Register.

**System of Records Notice**

76.    On June 23, 2025, Defendants published notice in the Federal Register of proposal to create a new system of records, "USDA/FNS-15, National SNAP Information Database" (the "June SORN"). The June SORN includes categories describing the purpose of the new system; the system location; the categories of individuals covered by the system; the categories of records in the system; the "routine uses" for which records maintained in the system may be disclosed; the policies and practices for the storage, retrieval, retention, and disposal of records; administrative, technical, and physical safeguards; and the procedure to contest information maintained in the system.

77.    Included among the eleven "routine uses," the June SORN proposes that records may be disclosed:

    (8)    "When a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule, or order issued pursuant thereto, USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or

---

[17] *Id*. At 3.

prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation, or order issued pursuant thereto, if the information disclosed is relevant to any enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity"; *or*

(11)    "To support another Federal agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States (including any State or local governmental agency), that administers, or that has the authority to investigate or assist USDA to investigate potential fraud, waste, or abuse in, a Federal benefits program funded in whole or in part by Federal funds, when disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs."

90 Fed. Reg. at 26,522–23.

78.    The June SORN provides no analysis of how these routine uses involving investigations of a "potential violation of law" or the integrity of non-SNAP benefit programs are compatible with the SNAP statute.

79.    The deadline to submit comments in response to the June SORN is July 23, 2024, the minimum (30 day) permitted time for comments. 5 U.S.C. § 552a(e)(11).

80.    All Plaintiffs submitted comments in response to the June SORN.

81.    In their comments, Individual Plaintiffs raised numerous substantive concerns with the SORN, including both the reason for the collection and the potential future disclosures. For example, comments questioned the need for USDA to obtain state SNAP data to police fraud, given that states are already tasked with the responsibility of eligibility determination and quality control. Plaintiffs instead propose that USDA better monitor the ways in which states determine eligibility and conduct quality control. The comments also highlighted the lack of clarity regarding the precise information states are being required to turn over, along with similar lack of clarity regarding the potential future disclosure by USDA to other parties. The comments proposed that USDA limit any potential collections and disclosures to specific uses consistent

23

with the law and specifically requested individualized consent before sharing SNAP recipients'

data with other agencies if they must share the data at all. The comments from individual

plaintiffs also highlighted the potential for mishandling, corruption, misuse, and

misinterpretation of data if analyzed by Artificial Intelligence ("AI"). To address some of these

concerns, the comments proposed that USDA work with states to ensure the data in the system is

accurate

82.    Organizational Plaintiffs also submitted comments in response to the SORN,

citing significant errors in the SORN, and the duplicative and overbroad nature of the request

that is inconsistent with the SNAP authorizing statute. Specifically, the comments documented

how the proposed "routine uses" are incompatible with the original purpose for which the data is

being collected and the SNAP authorizing statute by granting the federal government

unconstrained access to and allowing broad disclosures of thousands of Americans' personal data

for law enforcement purposes and to other government agencies for fraud prevention in unrelated

benefit programs, which goes beyond the limited disclosures. The comments described how the

existing National Accuracy Clearinghouse was created to ensure individuals are not receiving

benefits in other states while also including privacy safeguards—something the proposed data

system does not adequately do. The comments also mentioned issues with the SORN. Namely,

the failure to provide complete notice of the information that will be collected, which is creating

confusion for SNAP recipients and states.[18] Additional listed concerns include the failure to

specify a record disposal policy, the lack of demonstrated necessity for creating the database, and

---

[18] MAZON's comment cites specifically to a separate comment submitted by the Georgia Department of Human Services, which raised a host of questions about topics including submission protocols, the start date of the request, the file format, the scope of the request (both in terms of issuance amounts and individuals). *See* Ga. Dep't of Human Servs., Comment on FR Doc # 2025-11463 (July 15, 2025), https://www.regulations.gov/comment/FNS-2025-0024-0005.

the absence of required computer matching agreements. To address all the deficiencies, the comments urged USDA to withdraw its notice, abandon the data system proposal, and halt all data collections related to the notice

**July 9, 2025, Renewed Data Demand**

83.      On July 9, 2025, FNS sent a letter to SNAP State Agencies renewing its data demand ("Renewed Data Demand").[19] This letter characterizes the Initial Data Demand as an "announcement of the Department's plan to request these data"; notes that the June SORN became effective on June 23, 2024, except for the SORN's routine uses, which will become effective on July 23, 2025; and directs that USDA "are requiring collection of SNAP data from EBT processors or state agencies beginning on July 24, 2025, with submission to USDA no later than the close of business on July 30, 2025."

84.      The Renewed Data Demand does not spell out what data fields it is requiring that states divulge, instead pointing to the June SORN's "Categories of Records in the System." But the June SORN provides a non-exhaustive list of the records that will be collected under it—a set of fields "including but not limited to" name, Social Security number, etc., and "including but not limited to" dollar value information for SNAP benefits. 90 Fed. Reg. at 26,552. It is therefore unclear which elements of Plaintiffs' private information must be divulged by States between July 24 and July 30.

***USDA's Actions Violate Numerous Federal Laws***

85.      By transmitting the Renewed Data Demand and creating the new National SNAP Information Database, Defendants have violated numerous federal laws, and threaten to bring about further violations starting July 24, 2025.

---

[19] U.S. Dep't of Agric., *SNAP Database -Letter to State Agencies* (July 9, 2025), https://www.fns.usda.gov/snap/admin/database-letter.

86.    The June SORN is facially defective in at least two ways:

a.    The June SORN fails to specify the actual data fields that states are required to transmit, making it impossible for the public to comment in an informed way about whether transmission or disclosure of those fields is consistent with statutory protections; and

b.    The June SORN contains at least two routine uses that are incompatible with the SNAP statute's restrictions on the circumstances under which states are allowed to disclose beneficiary data. One such use allows sharing of any record that "indicates a violation or potential violation of law," essentially without limit; another for investigation of potential fraud, waste, or abuse in "a Federal benefits program," not only SNAP.

87.    Defendants have further violated the Privacy Act and/or the APA by launching their data collection on July 24, 2025, the day after the public comment period on the routine uses closes, and planning to complete it within a week. This timeline ensures that no matter what comments are received on the June SORN, the agency will have no time to consider them or to make any changes to its program in light of those comments. But the agency's obligation is not only "to permit time for the public to comment," but also for "the agency to review those comments." 40 Fed. Reg. at 28,966.

88.    Defendants have violated the Paperwork Reduction Act by failing to comply with the PRA's procedural and informational requirements:

a.    The collection of applicant and beneficiary SNAP data from state SNAP agencies demanded by the Data Collection Letter and Renewed Data Demand Letter is a new

"collection of information" from ten or more "individuals," *i.e.* states and vendors, under the PRA, 44 U.S.C. § 3502(3).

b.  Alternatively, if not a new collection, it is a substantive and material change from the previously approved collections for applicant and beneficiary data to be held by states. The new collection involves, among other things, (i) a new method of collection (by direct bulk data transfer from state SNAP agencies or their vendors, which has never been done before); (ii) a new use of the information, including enforcement of laws and integrity goals for programs outside of SNAP; (ii) a change in record custodian, from states and their vendors to USDA and its vendor.

c.  As either a new collection or a materially changed collection, the data collection at issue required a full OMB information collection review process, encompassing a 60-day notice in the Federal Register seeking public comment, 44 U.S.C. § 3506(c)(2)(A).

d.  Had Defendants sought a substantive information collection review, they would have needed to address, among other things, whether the new request "[i]s necessary for the proper performance of the functions of the agency, including that the information to be collected will have practical utility" and "[i]s not unnecessarily duplicative of information otherwise reasonably accessible to the agency." 5 C.F.R. § 1320.9. The PRA submission Defendants made addressed neither factor.

e.  Rather than comply with these requirements, Defendants sought and received a pro forma "non-substantive" modification to a previous information collection from 2023-24 wherein the public, including Plaintiffs, had no ability to comment on the 2025 changes.

89.     Defendants have violated numerous components of the Administrative Procedure Act. In addition to the foregoing ways in which their actions are contrary to the Privacy Act, PRA, and the SNAP statute's data protection provisions, they have failed to engage in reasoned decision-making, to adequately explain why existing fraud and benefit duplication systems—including the NAC—were insufficient, or to explain why the new collection of millions of individual records is necessary for the proper performance of USDA's functions in light of the risks it presents.

**USDA's Unlawful Data Collection Harms Plaintiffs**

90.     Defendants' actions and inactions have harmed Plaintiffs.

91.     Mr. Pallek, an incoming senior at the University of California, Berkeley, most recently began receiving CalFresh benefits in January 2024. To receive these benefits, he was required to provide highly sensitive personal information—including his Social Security number, a copy of his passport, W-2 forms, federal tax returns, detailed school financial aid award information, and his housing agreement—to the California Department of Social Services.

92.     Mr. Pallek, a dedicated student, critically depends on SNAP to secure the nutritious meals essential for his academic achievement. Mr. Pallek fears the harms that could be caused by the collection and misuse of his personal data. Mr. Pallek is confused about which of his documents and information might be collected by USDA and how that information may be used.

93.     Ms. Samson, an incoming senior at the University of California, Berkeley, began receiving CalFresh benefits in August 2024. To receive these benefits, she was required to provide highly sensitive personal information—including her Social Security number, a copy of

her California driver's license, W-2 forms, federal tax returns, detailed school financial aid award information, and her housing agreement—to the California Department of Social Services.

94.     Ms. Samson, a dedicated student, critically depends on SNAP to secure the nutritious meals essential for her academic achievement. Ms. Samson fears the harms that could be caused by the collection and misuse of her personal data. Ms. Samson is confused about which of her documents and information might be collected by USDA and how that data may be used.

95.     Ms. Hollingsworth first enrolled in SNAP in or around 1997 while living in New Mexico. When she moved to Alaska in 2002, she submitted a new application for SNAP benefits. To obtain SNAP benefits, Ms. Hollingsworth has provided sensitive personal information including her birth certificate, driver's license, bank statements, her lease and HUD paperwork, and medical receipts including a list of her prescriptions.

96.     Ms. Ramos first enrolled in SNAP twenty years ago in Tennessee. After relocating to Florida and experiencing job loss and homelessness, she reapplied for SNAP, remaining in Florida's SNAP program from 2013 to January 2020. When she moved to New York in 2020, she submitted another application for SNAP benefits.

97.     To obtain SNAP benefits, Ms. Ramos provided sensitive personal information, including at least her Social Security number and a copy of her state-issued ID. To recertify for SNAP benefits, she also shared her bank account number with the Florida Department of Children and Families.

98.     Ms. Ramos has also been victimized by identity theft, which has made her vigilant about the security of her personal information. For example, she is well-aware of the practice of "skimming" SNAP benefits—a form of theft involving data stolen from EBT cards.

As a result, Ms. Ramos meticulously protects her EBT card use, limiting purchases to large grocery stores or trusted retailers to safeguard her information.

99.    As a community leader committed to addressing food insecurity in New York City, Ms. Ramos relies on publicly available information to educate her community and increase SNAP participation.

100.    Individual Plaintiffs have suffered immediate and ongoing harms by virtue of USDA's violations of the Privacy Act. For instance, Individual Plaintiffs do not know which parts of the sensitive documents and data they revealed to their states that will be collected and included in the National SNAP Information Database, and so cannot assess what risks they face from inadvertent or unlawful disclosure; and they are at risk of unlawful sharing of that data for general law enforcement and non-SNAP benefits integrity investigations pursuant to routine uses that are incompatible with the data use limitations in the SNAP statute and regulations.

101.    Individual Plaintiffs also suffer immediate and ongoing harms by virtue of being deprived of the information that USDA is required to disclose under the Paperwork Reduction Act, and further, by being deprived of the opportunity to comment on the information collection pursuant to the Paperwork Reduction Act.

102.    While all Individual Plaintiffs provided comments to USDA on the June SORN, they have been deprived of the right to have those comments meaningfully considered by USDA as part of its collection and maintenance of information, since USDA has already decided that it is plowing ahead with data ingestion the day after comments are due no matter what the comments say.

103.    MAZON is a national nonprofit organization incorporated in Massachusetts and headquartered in Los Angeles, California. MAZON's mission is to end hunger and its causes

through advocacy, providing grants and educational support to other organizations, analyzing

data to advance policy solutions, and educating service providers, the anti-hunger community,

and the Jewish community.

104.    MAZON is a small organization with only 25 employees. Because hunger is both

pervasive and persistent in the United States, and because it impacts different communities

differently, to meet its mission, MAZON must carefully determine how to allocate its finite

human and financial resources.

105.    SNAP is a critical component of MAZON's advocacy work. MAZON closely

follows programmatic developments at the federal and state levels, regularly comments on

regulations proposed by USDA, and mobilizes partners to submit comments in rulemaking

proceedings.

106.    For years, one of MAZON's top priorities has been to ensure all eligible SNAP

recipients obtain SNAP benefits. To do so, MAZON directly supports service providers who

work to increase SNAP enrollment, providing educational materials and regular updates on state

and federal changes to SNAP. MAZON also works with these providers to identify and combat

barriers to enrollment for populations experiencing hunger. The service providers in MAZON's

network include providers that directly work to assist in applying for and receiving SNAP.

107.    The Initial Data Demand, PRA Change Request, publication of the June SORN,

and Renewed Data Demand Letter have directly impacted MAZON's core activities.

108.    First, while MAZON filed a comment explaining why collecting raw and

unspecified SNAP data is unnecessarily duplicative, contrary to the authorizing statute, and will

have a chilling effect on Program participation, USDA has committed to collecting the data

without even considering public comments.

109.    Second, MAZON has been forced to alter educational materials and shift priorities in its work with other organizations. These shifts are necessary to address the significant uncertainties surrounding the Initial and Renewed Data Demands, including USDA's failure to specify (i) precisely what data it is collecting or (ii) articulate only lawful purposes for collecting that data.

110.    For example, for years MAZON partnered with service providers who work with elderly individuals, including veterans, who are already reluctant to apply for SNAP due to the need to provide sensitive personal information to the government. MAZON has developed materials to reassure people that the information they provide will be seen only by those reviewing their application and only for purposes of determining their eligibility. As a result of the Data Collection Letter, June SORN, and Renewed Data Demand Letter, MAZON has already begun to alter its educational materials, webinars, and briefings for partners working to enroll individuals, including this community of people, at a cost of time and money.

111.    Third, in the days following the publication of the Initial Data Demand, MAZON decided to continue its "Challah for Hunger" program, which is designed to engage students in anti-hunger work including SNAP enrollment, even though it was previously taking steps to sunset that program. With so many SNAP applicants, including college students, hesitant to share their personal data with the county or state government, MAZON believes that Challah for Hunger will be critical to combatting the chilling effect it expects the Initial Data Demand to have on SNAP enrollment. Although MAZON planned to dedicate its Challah for Hunger staff leader to other projects, she will have to continue spending a significant amount of her time on that program and the program itself will need new materials, training and focus.

112.    Since the Initial Data Demand was released, MAZON has been forced to divert its limited resources away from other priorities to inform partners, update educational materials, and alter its advocacy approach. MAZON will be unable to pursue new initiatives it had planned, like a focus on hunger in the immigrant farmworker community.

113.    EPIC's mission is to secure the fundamental right to privacy in the digital age for all people through advocacy, research, and litigation. Among other activities, EPIC monitors, analyzes, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies. EPIC routinely comments on proposed agency actions related to information databases and mobilizes its partners to do the same.

114.    For decades, EPIC has relied extensively on information provided by agencies through the statutorily required procedures and informational rights set forth in the Privacy Act and the Paperwork Reduction Act. EPIC depends on this public information to inform its research, advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP.

115.    EPIC is harmed by Defendants' unlawful collection of SNAP data—announced via the Initial Data Demand, PRA Change Request, June SORN, and Renewed Data Demand— without providing adequate information about the collection, maintenance, and use of information that is required by statute.

116.    EPIC has been denied statutorily guaranteed opportunities to comment on USDA's proposal, to raise the privacy and security risks attendant to the federal government housing such a large volume of personal information from so many individuals, and to offer potential solutions to safeguard sensitive personal information in a manner that could be constructive to Defendants' policy goals. EPIC is further limited in its ability to educate

stakeholders and contribute to the public debate around USDA's data collection and the broader data collection efforts across the federal government.

117.    Because of Defendants' failure to provide information in the manner required by statute, EPIC must divert resources to more burdensome methods of research and information gathering, including time-intensive FOIA requests, and likely litigation, to obtain timely access to relevant records.

## CLAIMS FOR RELIEF

### Count I – Violation of APA (Privacy Act – Public Comment)
### [By All Plaintiffs]

118.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

119.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

120.    The Renewed Data Demand, along with publication of the June SORN and creation of the National SNAP Information Database, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

121.    As set forth in paragraphs 23-32, *supra*, the Privacy Act establishes a right to information and sets strict procedural requirements before an agency can create or revise a system of records and collect individuals' data. 5 U.S.C. § 552a(e).

122.    The Privacy Act further requires an agency to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11). This provision means that the agency must review the comments and consider changes in response.

123.    By issuing a demand for data beginning the day after the comment period closes, with a six-day deadline to comply, USDA has already decided to obtain millions of records without considering the data, views, or arguments that Plaintiffs or any other interested persons provide.

124.    USDA's actions render meaningless Plaintiffs' information and participation rights. Without a meaningful comment period in advance of the collection, Plaintiffs are unable to use the information submitted via the comment period to inform public debate about this data collection.

125.    USDA's actions violate the Privacy Act and are therefore not in accordance with law in violation of the APA.

### Count II – Violation of APA (Privacy Act – Routine Uses)
### [By All Plaintiffs]

126.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

127.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

128.    The Renewed Data Demand, along with publication of the June SORN and creation of the National SNAP Information Database are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

129.    As set forth in paragraphs 23-32, *supra*, the Privacy Act only permits disclosure of records from a system of records either for a use expressly allowed by the Privacy Act or for a properly noticed routine use, *i.e.*, "for a purpose which is compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7).

130.    Under the SNAP statute, state SNAP agencies must "keep such records as may be necessary to determine whether the program is being conducted in compliance with [that statute]." 7 U.S.C. § 2020(a)(3). State SNAP agencies may only disclose applicant and beneficiary data only for a limited number of express purposes, which relate to the administration or enforcement of the SNAP statute, 7 U.S.C. §§ 2020(e)(8)(A), (C), (D), are to the Comptroller General of the United States (if so authorized), *id.* § 2020(e)(8)(B), upon a specific, individualized request by law enforcement, *id.* § 2020(e)(8)(E), or are for the disclosure to the former Immigration and Naturalization Service upon determination of ineligibility based on unlawful presence in violation of the Immigration and Nationality Act, *id.* § 2020(e)(15).

131.    Two of the routine uses stated in the June SORN pertain to general law enforcement and administration of federal programs other than SNAP, *see supra* ¶ 77, and are therefore incompatible with the purpose for which SNAP applicant and beneficiary information are collected.

132.    Insofar as the June SORN proposes "routine uses" that are not "compatible with the purpose for which [the data and information] was collected," the adoption and finalization of the Routine Uses announced June SORN, and effectuated via the Renewed Data Demand, violates the Privacy Act and is therefore not in accordance with the law in violation of the APA.

### Count III – Violation of APA (Paperwork Reduction Act)
### [By All Plaintiffs]

133.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

134.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

135.    The Renewed Data Demand, along with publication of the June SORN, and creation of the National SNAP Information Database, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

136.    As set forth in paragraphs 33-40, *supra*, the Paperwork Reduction Act establishes a right to information, 44 U.S.C. § 3507(a)(1)(D), and sets strict procedural requirements before an agency may initiate a "collection of information" from non-federal actors, including states and their vendors. *See* 44 U.S.C. § 3501 *et seq*.

137.    The Renewed Data Demand Letter constitutes a "collection of information" because it obtains or solicits answers to identical questions posed to 10 or more persons.

138.    No previously approved information collection encompasses the collection of information from states and vendors required by the Renewed Data Demand. It is substantively and materially different from the collection of applicant and beneficiary data by states that was most recently approved in 2023 and 2024.

139.    By issuing the Renewed Data Demand, and creating an obligation for entities to provide data, without comporting with the procedural and informational requirements contained in 44 U.S.C. §§ 3506–3507, USDA failed to comply with the Paperwork Reduction Act.

140.    As alleged herein, USDA's actions violate the Paperwork Reduction Act and are therefore not in accordance with law in violation of the APA.

### Count IV – Violation of APA (Arbitrary and Capricious)
### [By Individual Plaintiffs and MAZON]

141.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

142.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

143.    The Renewed Data Demand, along with publication of the June SORN, creation of the National SNAP Information Database, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

144.    USDA has failed to consider the privacy implications of consolidating and obtaining state SNAP data; whether, and how, the data they are requesting will allow them to fulfill their intended purpose of stopping waste, fraud, or abuse; and the various ways this unprecedented action departs from the longstanding structure of the SNAP program and language of the statute governing SNAP.

145.    USDA failed to engage in reasoned decision-making before requesting, for the first time, vast swathes of SNAP applicant and participant data from states and their vendors, when states and local SNAP agencies, not USDA, have responsibility to combat over issuances and fraud in SNAP; when Congress provided USDA oversight authorities that do not include the novel demand reflected in the Initial Data Demand and Renewed Data Demand; and when USDA's recent creation of an anti-fraud program (the NAC) did not require states to turn this data over to USDA. USDA has also failed to provide an adequate explanation for why the NAC does not adequately achieve its stated policy goals. USDA has further failed to explain why the collection is "necessary for the proper performance" of its functions, as it is required to certify to the Director of OMB under the PRA. USDA has also failed to adequately explain how the Renewed Data Demand is consistent with the statute governing SNAP.

146.    USDA's actions, as alleged herein, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of § 706 of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a. Declare that USDA acted unlawfully by initiating a collection of information of SNAP applicants and recipients without complying with the requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

b. Declare that USDA's actions were arbitrary and capricious;

c. Hold unlawful and set aside the June SORN and the Renewed Data Demand;

d. Postpone the Renewed Data Demand until the Court issues a final judgment in this matter;

e. Enjoin each Defendant from collecting or receiving information on SNAP applicants and recipients from states, districts, territories, or vendors prior to complying with requirements of the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

f. Enjoin each Defendant such that any future collection of information about SNAP applicants and recipients will occur only in accordance with the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act;

g. Order the impoundment, disgorgement, and destruction of all copies of any personal information that has already been unlawfully collected by or disclosed to USDA pursuant to the Renewed Data Demand;

h. Grant any temporary, preliminary, or permanent injunctive relief necessary to protect the privacy and security of information collected by Defendants pursuant to the Renewed Data Demand;

i. Award Plaintiffs their costs and attorneys' fees for this action; and

j.  Grant any other relief as this Court deems appropriate.

Dated: July 16, 2025

Respectfully Submitted,

Deana El-Mallawany*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org

JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

*/s/ Daniel A Zibel*
Daniel A. Zibel (D.C. Bar No. 491377)
Madeline Wiseman (D.C. Bar No. 90031948)
Melissa Padilla (D.C. Bar No. 90018065)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
Email: dan@defendstudents.org
        madeline@defendstudents.org
        melissa@defendstudents.org

*Counsel for Plaintiffs*

John L. Davisson (D.C. Bar No. 1531914)
Sara Geoghegan (D.C. Bar No. 90007340)
Kabbas Azhar (D.C. Bar No. 90027866)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org
        geoghegan@epic.org
        azhar@epic.org

*Counsel for EPIC*

*Admitted Pro Hac Vice