**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NAMOD PALLEK, *et al.*

       *Plaintiffs*,


         *v.*

BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*

       *Defendants.*

Civil Action No. 1:25-cv-01650-JMC


**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RENEWED
MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR FOR
POSTPONEMENT UNDER 5 U.S.C. § 705**

### TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATUTORY FRAMEWORK.................................................................................... 1

The Supplemental Nutrition Assistance Program ("SNAP") .................................. 1

The Privacy Act ...................................................................................................... 3

The Paperwork Reduction Act................................................................................ 5

FACTS ...................................................................................................................... 6

PLAINTIFFS ............................................................................................................ 10

LEGAL STANDARD................................................................................................ 11

ARGUMENT ............................................................................................................ 12

   I.   Plaintiffs Have Standing to Challenge the Renewed Data Demand. ............... 12

     A.   USDA's unlawful collection of Individual Plaintiffs' sensitive private information causes them concrete, cognizable injuries.................................... 13

     B.   Plaintiffs are injured by USDA's denial of the information they are entitled to under the PRA. ................................................................................ 15

     C.   Individual Plaintiffs are harmed by the deprivation of their right to comment on and influence decisions made about USDA's handling of their data.......................... 18

     D.   MAZON has suffered a distinct injury to its anti-hunger mission................................ 19

   II.   Plaintiffs Have a Likelihood of Success on the Merits....................................... 21

     A.   Plaintiffs can bring Privacy Act and PRA claims through the APA............................ 21

     B.   USDA has predetermined the outcome of the comment process and articulated incompatible routine uses, in violation of the Privacy Act. ......................... 24

       i.   USDA has violated the Privacy Act by Failing to Provide a Meaningful Opportunity to Comment. ................................................................................. 24

i

      ii.    The June SORN Violates the Privacy Act Because Routine Uses 8 and 11 are not "compatible" with the SNAP statute. ......................................................................... 26

   C.   USDA is sponsoring a collection without complying with the PRA. ........................... 30

      i.    USDA is conducting a distinct "collection" from distinct "persons" under the PRA. ........................................................................................................................ 31

      ii.    If not a new collection, the instant collection amounts to more than a "nonsubstantive change" to the 2024 collection and requires a separate ICR. ......... 32

   D.   USDA's Data Collection is arbitrary and capricious. .................................................... 34

III.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief. ............................. 36

   A.   The Individual Plaintiffs are irreparably harmed by USDA's unlawful collection and use of their private information. ...................................................................................... 37

   B.   Plaintiffs are irreparably harmed by USDA's denial of information vital to an ongoing debate. ............................................................................................................... 38

   C.   MAZON's anti-hunger mission faces immediate irreparable harm because the unlawful Data Collection will cause distrust in SNAP. ................................................. 40

IV.    The Balance of Equities and Public Interest Favor Granting a Temporary Restraining Order. ........................................................................................................... 40

CONCLUSION ............................................................................................................................... 41

# TABLE OF AUTHORITIES

CASES.........................................................................................PAGE NO(S).

*Action Alliance of Senior Citizens v. Sullivan,*
  930 F.2d 77 (D.C. Cir. 1991) ......................................................................... 32

*AFL-CIO v. Department of Labor,*
  No. 25-cv-339, 2025 WL 1129227 (April 16, 2025) ................................................. 23

*AFSCME v. Social Sec. Admin,*
  2025 WL 1206246 (D. Md. 2025), *stayed pending appeal*, 145 S. Ct. 1626 (2025).................. 22

*\*All. for Retired Ams. v. Bessent,*
  No. 25-cv-0313, 2025 WL 740401 (D.D.C. Mar. 7, 2025) .................................... 14, 15, 37, 38

*Am. Fed. Gov't Emp. v. U.S. Office of Personnel Mgmt.,*
  No. 25-cv-1237, 2025 WL 996542 (S.D.N.Y. April 3, 2025) ................................................. 22

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.,*
  No. 25-cv-339, 2025 WL 1129227 (D.D.C. Apr. 16, 2025)................................................... 15

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
  No. 25-cv-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ................................................. 14

*Am. Fed'n of Tchrs. v. Bessent,*
  772 F. Supp. 3d 608 (D. Md. 2025) ......................................................................... 14

*Am. Soc. For Prevention of Cruelty to Animals v. Entm't Inc.,*
  659 F.3d 13 (D.C. Cir. 2011)................................................................................. 16

*Am. Fed'n of Tchrs. v. Bessent,*
  No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025),...................................................... 23

*\*Ames v. U.S. Dep't of Homeland Sec.,*
  861 F.3d 238 (D.C. Cir. 2017) ......................................................................... 26, 27

*Bennett v. Spear,*
  520 U.S. 154 (1997)......................................................................................... 21

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974)......................................................................................... 34

*Britt v. Naval Investigative Serv.,*
  886 F.2d 544 (3d Cir. 1989)................................................................................. 27

*C.G.B. v. Wolf,*
    464 F. Supp. 3d 174 (D.D.C. 2020) ............................................................. 41

*Center for Biological Diversity v. U.S. Int'l Development Finance Corp.,*
    585 F. Supp. 3d 63 (D.D.C. 2022) ............................................................. 16

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................. 12

*City of New Bedford v. Locke,*
    No. 10-cv-10789, 2011 WL 2636863 (D. Mass. June 30, 2011), *aff'd,* 701 F.3d 5 (1st Cir.
    2012) ............................................................. 24

*Cresote Council v. Johnson,*
    555 F. Supp. 2d 36 (D.D.C. 2008) ............................................................. 41

*D.A.M. v. Barr,*
    474 F. Supp. 3d 45 (D.D.C. 2020) ............................................................. 12

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    591 U.S. 1 (2020) ............................................................. 34

*Doctors for Am. v. Off. of Personnel Mgt.,*
    766 F. Supp. 3d 39 (D.D.C. 2025); ............................................................. 23, 24, 40

*Doe v. Chao,*
    540 U.S. 614 (2004) ............................................................. 4, 22

*Doe v. Stephens,*
    851 F.2d 1457 (D.C. Cir.  1988) ............................................................. 23

*Dole v. United Steelworkers of Am.,*
    494 U.S. 26 (1990) ............................................................. 5

*Elec. Priv. Info. Ctr. v. Dep't of Just.,*
    416 F. Supp. 2d 30 (D.D.C. 2006) ............................................................. 39

*Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity,*
    878 F.3d 371 (D.C. Cir. 2017) ............................................................. 12

*F.C.C. v. Fox TV Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................. 34

*FEC v. Akins,*
    524 U.S. 11 (1998) ............................................................. 16

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ........................................................................................... 20

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016) ........................................................................ 16

*Fund For Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003) .................................................................. 21

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) .......................................................................... 25

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020). ................................................................. 12

*Hall v. Johnson*,
  599 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 12

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 20

*Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*,
  912 F.2d 1525 (D.C. Cir. 1990) ........................................................................ 21

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) ....................................................................... 37

*Hosp. Staffing Sols., LLC v. Reyes*,
  736 F. Supp. 2d 192 (D.D.C. 2010) .................................................................. 37

*Hum. Touch DC, Inc. v. Merriweather*,
  No. 15-cv-00741, 2015 WL 12564166 (D.D.C. May 26, 2015) ....................... 38

*Hyatt v. OMB*,
  908 F.3d 1165 (9th Cir. 2018) .......................................................................... 24

*Jeffries v. Volume Servs. Am., Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) ........................................................................ 15

*League of United Latin Am. Citizens v. Exec. Off. of the Pres.*,
  No. 25-cv-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ........................... 20

*\*League of Women Voters of United States v. Harrington*,
  560 F. Supp. 3d 177 (D.D.C. 2021) ........................................................ 34, 37, 40

*Lugo v. U.S. Dep't of Justice,*
   214 F. Supp. 3d 32 (D.D.C. 2016) ..................................................... 27

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................... 12, 13

*Med Imaging & Tech All. v. Libr. of Cong.,*
   103 F.4th 830 (D.C. Cir. 2024) ...................................................... 21

*Michigan v. EPA,*
   576 U.S. 743 (2015) ................................................................ 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................. 34

*N. Mariana Islands v. United States,*
   686 F. Supp. 2d 7 (D.D.C 2009) .................................................... 41

*Narragansett Indian Tribal Historic Preservation Off. v. FERC,*
   949 F.3d 8 (D.C. Cir. 2020) ........................................................ 13

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
   170 F. Supp. 3d 6 (D.D.C. 2016) ................................................... 13

*Nguyen v. U.S. Dep't of Homeland Sec.,*
   460 F. Supp. 3d 27 (D.D.C. 2020) .................................................. 12

*Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.,*
   564 F. Supp. 3d 605 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May
   19, 2022) ......................................................................... 24

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.,*
   930 F.3d 519 (D.C. Cir. 2019) ...................................................... 37

*Open Cmties. Alliance v. Carson,*
   286 F. Supp. 3d 148 (D.D.C. 2017) ................................................. 41

*Payne Enters., Inc. v. United States,*
   837 F.2d 486 (D.C. Cir. 1988) ...................................................... 39

*Prometheus Radio Project v. F.C.C.,*
   652 F.3d 431 (3d Cir. 2011) ........................................................ 25

*Radack v. Dep't of Justice,*
   402 F. Supp. 2d 99 (D.D.C. 2005) .................................................. 22

*Roberts v. Austin*,
  632 F.2d 1202 (5th Cir. 1980) ............................................................................ 14

*\*Rural Cellular Ass'n v. F.C.C.*,
  588 F.3d 1095 (D.C. Cir. 2009) .......................................................................... 25

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ............................................................................ 25

*Silver v. IRS*,
  531 F. Supp. 3d 346 (D.D.C. 2021) .................................................................... 13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................ 19

*Swenson v. Postal Serv.*,
  890 F.2d 1075 (9th Cir. 1989) ............................................................................ 27

*Townsend v. U.S.*,
  236 F. Supp. 3d 280 (D.D.C. 2017) .................................................................... 27

*Tozzi v. U.S. E.P.A.*,
  No. 98-cv-0169, 1998 WL 1661504 (D.D.C. Apr. 21, 1998) ............................. 33

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................... 13, 14

*Trump v. CASA, Inc.*,
  606 U.S. __, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) .................... 12

*U.S. Postal Service v. National Ass'n of Letter Carriers, AFL-CIO*,
  9 F.3d 138 (D.C. Cir. 1993) .......................................................................... 26, 30

*\*United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*,
  288 F.Supp. 99 (D.D.C. 2017) ...................................................................... 16, 17

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................ 37

**Statutes**

44 U.S.C. § 3501 .................................................................................................... 5

44 U.S.C. § 3502 ................................................................................................ 5, 31

44 U.S.C. § 3506 .................................................................................................... passim

44 U.S.C. § 3507 .................................................................................................... passim

5 U.S.C. § 702 ............................................................................................................... 23

5 U.S.C. § 704 ............................................................................................................... 22

5 U.S.C. § 705 ................................................................................................................. 1

5 U.S.C. § 706 ................................................................................................... 21, 22, 23

7 U.S.C. § 2011 .............................................................................................................. 1

7 U.S.C. § 2013 .............................................................................................................. 2

7 U.S.C. § 2015 .............................................................................................................. 3

7 U.S.C. § 2016 ......................................................................................................... 3, 35

7 U.S.C. § 2020 .................................................................................................... passim

Pub. L. No. 93-579 ..................................................................................................... 3, 4

**Regulations**

40 Fed. Reg. 28,948, 28,968 (July 9, 1975) .......................................................... 5, 22

5 C.F.R. § 1320 ....................................................................................................... 31, 32

5 C.F.R. § 1320.5 .......................................................................................................... 33

5 C.F.R. § 1320.8 .......................................................................................................... 30

5 C.F.R. § 1320.9 .......................................................................................................... 32

7 C.F.R. § 271.3 .............................................................................................................. 2

7 C.F.R. § 271.4 .............................................................................................................. 2

7 C.F.R. § 273.2 .............................................................................................................. 2

7 C.F.R. § 275.12 .......................................................................................................... 14

7 C.F.R. § Part 275 ................................................................................................. 35, 36

86 Fed. Reg. 44,575 (Aug. 13, 2021) ............................................................................ 36

87 Fed. Reg. 59,633 (Oct. 3, 2022) .............................................................................. 32

90 Fed. Reg. 26,521 (June 23, 2025) ............................................................... 9, 28, 29, 38

**Other**

Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal* government, ........ 7

Center for Budget and Policy Priorities, *The Supplemental Nutrition Assistance Program (SNAP)* ...................................................................................................................... 2

Dan Carden, *Indiana to share personal information of SNAP recipients with federal government* ...................................................................................................................... 8

Frenkel, Sheera and Krolik, Aaron, *Trump Taps Palantir to Compile Data on Americans* ......... 39

James Brooks, *Alaska gives food stamp recipients' personal information to federal officials* ...... 7

Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report* .................................................................................................... 2

Jude Joffe-Block & Stephen Fowler, *Lawsuit challenges USDA demand for food stamp data as some states prepare to comply*, ........................................................................................ 8

Jude Joffe-Block, *USDA, DOGE demand states hand over personal data about food stamp recipients* ............................................................................................................... 39

Letter from Brooke L. Rollins, Secretary, U.S. Dep't of Agric., to SNAP State Agencies (July 9, 2025) .................................................................................................................. 10

Letter from Melissa D. Wolf, Missouri Department of Social Services, to Prashant Gupta, Fidelity Information Services, *Re: Consent to Disclosure of SNAP Information to USDA*, (May 12, 2025) ................................................................................................................. 8

Mem. To Brenda Aguilar From Shiela Corley, Nonsubstantive Change Request – Supplemental Nutrition Assistance Program (SNAP) Forms: Applications, Periodic Reporting, and Notices (OMB #0584-0064) .................................................................................................... 8

Memorandum from Cass R. Sunstein, Information Collection under the Paperwork Reduction Act (April 7, 2010) ..................................................................................................... 33

Memorandum from Howard Shelanski, Flexibilities under the Paperwork Reduction Act for Compliance with Information Collection Requirements (July 22, 2016) ................................ 33

Office of Information and Regulatory Affairs, ICR Documents: 0584-0064 ................................ 8

Office of Information and Regulatory Affairs, View ICR – OIRA Conclusion ............................ 9

Oxford English Dictionary, "report (n.)," def. I.1.c ..................................................... 34

S. Rep. No. 104-8 .......................................................................................... 17

U.S. Dep't of Justice, Overview of the Privacy Act of 1974 ........................................ 25

Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government* ................. 7

## INTRODUCTION

For a second time, Plaintiffs are asking this Court to temporarily halt the unlawful collection and use of information collected by states through the Supplemental Nutrition Assistance Program ("SNAP"). Despite its earlier pledge to "satisf[y] all necessary legal requirements" before requiring states to turn over the data at issue, Defendants' (collectively "USDA") unlawful conduct continues. Dkt. 11-1 at ¶ 13; *see also* Dkt. 13 (withdrawing TRO).

On July 9, 2025, USDA made a second, more definitive demand that states turn over their SNAP data, to commence on July 24, with only one week for compliance. But far from satisfying the requirements of either the Privacy Act or Paperwork Reduction Act before reinstituting the data request, USDA has cut corners and eviscerated the critical public notice and comment procedures in both statutes. Moreover, USDA's actions are more arbitrary and capricious than before: it proposes to grant itself the authority to further disclose the collected records well beyond the boundaries set by federal privacy law.

The data disclosure is imminent; immediate relief is necessary to freeze the status quo. Accordingly, in the wake of filing their Amended/Supplemental Complaint ("FAC"), Dkts. 26-1, 27, Plaintiffs ask this Court to issue a Temporary Restraining Order that "postpone[s] the effective date" of USDA's demand. *See* 5 U.S.C. § 705.

## STATUTORY FRAMEWORK

**The Supplemental Nutrition Assistance Program ("SNAP")**

Enacted to "alleviate . . . hunger and malnutrition," 7 U.S.C. § 2011, SNAP enables tens of millions of low-income households nationwide to increase their food purchasing power each year. The Program is authorized by the Food and Nutrition Act of 2008, codified at 7 U.S.C. § 2011 *et seq.*, and the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246,

§ 4001(a), 122 Stat. 1853, formerly the Food Stamp Act (referred to herein as the "SNAP statute").[1] SNAP is available to those who meet income and asset restrictions, subject to criteria such as work and immigration status. Eligible people receive monthly benefits that can be used to buy food at authorized retailers via Electronic Benefits Transfer ("EBT").[2]

SNAP functions as a federal-state partnership. USDA establishes nationwide eligibility standards, benefit levels, and administrative rules. 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3(a). States are responsible for day-to-day administration, including determining eligibility, issuing benefits, and ensuring program integrity. 7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4. States contract with vendors ("EBT Vendors") to issue benefits through debit cards that allow recipients to buy food at authorized locations. USDA is responsible for overseeing state SNAP administration, including reviewing and approving each state's plan of operations, addressing state noncompliance, and ensuring quality control. *See id.* §§ 2020(a)(4), (d)-(e), (g), 2025(c).

Because states certify eligibility and issue benefits, they collect and maintain sensitive personal information of SNAP applicants and recipients including their Social Security numbers, dates of birth, addresses, employment status, citizenship status, income, resources, and more. 7 C.F.R. § 273.2(f). For some individuals, states also collect and maintain their health, educational status, history of substance abuse treatment, paternity, and history of child support payments. 7

---

[1] According to the nonpartisan Center for Budget and Policy Priorities: "Nearly 62 percent of SNAP participants are in families with children, and nearly 37 percent are in households with older adults or people with disabilities. After unemployment insurance, SNAP is the most responsive federal program that provides additional assistance during and after economic downturns." Center for Budget and Policy Priorities, *The Supplemental Nutrition Assistance Program (SNAP)* (June 2022), https://www.cbpp.org/sites/default/files/policybasics-SNAP-6-9-22.pdf.

[2] Jordan W. Jones & Saied Toossi, *The Food and Nutrition Assistance Landscape: Fiscal Year 2023 Annual Report*, U.S. Dep't of Agric. 6 (June 2024), https://ers.usda.gov/sites/default/files/_laserfiche/publications/109314/EIB-274.pdf?v=1308.

U.S.C. § 2015(e), (l)-(o). States are required to establish "safeguards which prohibit the use or disclosure" of the information they obtain. Exceptions to the default posture of nondisclosure are explicitly set forth in statute. *See, e.g.*, 7 U.S.C. §§ 2020(a)(3), (e)(8). But even the broadest of those exceptions are subject to strict limitations; for example, the exception granting USDA authority to "inspect[] and audit" state records may only be done "subject to data and security protocols agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a). Nowhere does the statute contemplate wholesale, involuntary data collection by the federal government.

In addition, the SNAP statute and regulations make states responsible for preventing and punishing fraud, providing that each agency "shall" proceed against individuals alleged to have engaged in fraud. 7 U.S.C. § 2015(b)(2). It further requires state agencies of a certain size establish and operate "a unit for the detection of fraud" in SNAP, "including the investigation, and assistance in the prosecution, of such fraud." 7 U.S.C. § 2020(e)(20). Federal funds cover 50% of state administration costs, including fraud investigations and prosecutions. 7 U.S.C. § 2025(a)(7). States are financially responsible for overissuances and fraud in SNAP and face fiscal penalties for excessive errors. 7 U.S.C. § 2025(c)(1)(C). States are strictly liable for losses in the handling of SNAP benefits, 7 U.S.C. § 2016(e), and are liable to the federal government for all losses resulting from negligent or fraudulent program administration, 7 U.S.C. § 2020(h).

**The Privacy Act**

Recognizing that "the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies," Congress enacted the Privacy Act to "regulate the collection, maintenance, use, and dissemination of information by such agencies." Pub. L. No. 93-579, § 2(a)(1), (5), 88 Stat. 1896, 1896 (1974). The Privacy Act provides "safeguards for an individual against an invasion of personal privacy

by requiring Federal agencies . . . to . . . collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose [and] that adequate safeguards are provided to prevent misuse of such information." *Id.* § 2(b)(4); *see also Doe v. Chao*, 540 U.S. 614, 618 (2004) (noting that the Privacy Act gives agencies "detailed instructions for managing their records").

Among those safeguards, the Privacy Act requires agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. §§ 552a(a)(3), (e)–(f). When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records"). This "System of Records Notice" ("SORN") must provide, among other information, the categories of individuals whose records are maintained in the system and the purpose for which information about an individual is collected. *Id.* § 552a(e)(4).

Data maintained in a system of records may only be disclosed "to any person, or to another agency" pursuant to one of a limited number of expressly permitted uses. *Id.* § 552a(b). In addition to permitting disclosure for purposes expressly articulated in the Privacy Act, a SORN may permit disclosure for a "routine use," *id.* § 552a(b)(3), namely "for a purpose which is compatible with the purpose for which [the record] was collected," *id.* § 552a(a)(7). At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Agencies are obligated to consider the comments they receive and demonstrate that they have done so before publishing the SORN. *See* Office of Management and Budget, Privacy Act

4

Implementation Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,966 (July 9, 1975) (noting that "agencies should furnish as complete an explanation of the routine uses and any changes made or not made as a result of the public comment" and that the § 552a(e)(11) notice "should be published sufficiently in advance of the proposed effective date of the use to permit time for public comment *and for the agency to review those comments*" (emphasis added)).

**The Paperwork Reduction Act**

The Paperwork Reduction Act ("PRA") sets standards for federal agencies collecting information from the public, including states and corporations. 44 U.S.C. §§ 3501 *et seq.*; *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990) ("[The PRA] was enacted in response to one of the less auspicious aspects of the enormous growth of our federal bureaucracy: its seemingly insatiable appetite for data."). A "collection" includes "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public" of information "regardless of form or format, calling for . . . identical reporting or recordkeeping requirements imposed on ten or more persons." *Id.* §§ 3506(a), 3502(3), (10). The PRA is designed to "strengthen decisionmaking, accountability, and openness in Government," to ensure the "collection, maintenance, [and] use" of information complies with laws like the Privacy Act, and to "improve the responsibility and accountability" of agencies to the public. 44 U.S.C. §§ 3501(4), (8), (11).

Like the Privacy Act, the PRA contains numerous requirements that agencies must follow prior to collecting information. *Id.* § 3507(a). Among its requirements, the PRA obligates agencies to: (1) provide a 60-day notice in the Federal Register seeking public comment, (2) submit the proposed collection to the Director of the Office of Management and Budget ("OMB") with a certification that the collection is, among other things, "necessary for the proper

5

performance" of the agency's functions, and (3) proceed with the collection only after receiving

OMB approval and a control number to display (with limited exceptions). *Id.* § 3506(c). The

Director of OMB may only approve a collection after providing another 30 days for the public to

comment on the proposed collection (with limited exceptions). *Id.* § 3507(b). Any "substantive

or material modification[]" to an existing approval requires resubmission to the Director of OMB

for approval (using the same procedures outlined in the law). *Id.* § 3507(h)(3).

## FACTS

On March 20, 2025, President Trump signed an Executive Order titled "Stopping Waste,

Fraud, and Abuse by Eliminating Information Silos." Executive Order 14243, 90 Fed. Reg.

13,681 (Mar. 20, 2025). It calls on agencies to "remov[e] unnecessary barriers" to ensure

"unfettered access to comprehensive data from all State programs" in furtherance of the

Administration's goals but constrains them to only those steps that are "consistent with law." *Id.*

On May 6, 2025, USDA sent a letter to state agency directors ("Initial Data Demand"),

invoking the Executive Order and asserting that USDA "must retain 'unfettered access to

comprehensive data' from federally funded programs like SNAP."[3] Initial Data Demand at 1.

According to the letter, providing USDA "unfettered access" is the "only way" to "eliminate

'bureaucratic duplication and inefficiency'" and ferret out "overpayments and fraud." *Id.*

The Initial Data Demand stated that USDA was legally authorized to obtain SNAP data

and would be working with EBT Vendors to "consolidate" that data. *Id.* The letter listed

information to be turned over[4] and ended with a warning: "Failure to grant processor

authorizations or to take the steps necessary to provide SNAP data to FNS may trigger

---

[3] Dkt. 9-11 at Exh. B, *available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/fns-data-sharing-guidance5.6-V6-050625.pdf.
[4] The letter noted that its demand was "not limited to" those fields.

noncompliance procedures codified at 7 U.S.C. [§] 2020(g)." *Id.*

On May 22, 2025, Plaintiffs filed this Administrative Procedure Act ("APA") challenge, asserting USDA had violated the informational and procedural requirements of both the Privacy Act (Count I) and the Paperwork Reduction Act (Count II) and that its actions were arbitrary and capricious under the APA. *See* Compl. ¶¶ 97–102; *id.* ¶¶ 103–109; *id.* ¶¶ 110–115. Plaintiffs then filed a Motion for a Temporary Restraining Order seeking to enjoin the data collection. Dkt. 9.

USDA opposed the Motion but declared in its filing that it had instructed EBT Processors to refrain from sending data until USDA completed procedural steps to ensure compliance with "all necessary legal requirements." *See* Decl. of Shiela Corley, Dkt 11-1 ¶ 13. USDA announced it was preparing a SORN. *Id.* ¶ 24. It further took the position that the Initial Data Demand complied with the PRA because of a 2024 OMB approval for states to collect information from SNAP recipients. *See* Mem. in Opp. to TRO, Dkt. 11 at 25–26 (citing OMB Approval 0584-0064). USDA also argued that Privacy Act and PRA claims cannot be brought via the APA. *Id.* at 22, 25. As to the arbitrary and capricious claim, USDA cited the Executive Order (*i.e.*, "Presidential prerogative") and asserted that the data collection was a "complementary tool" to existing mechanisms to detect waste, fraud, and abuse in the SNAP program. *Id.* at 27–28.

By early June, public reporting indicated that Alaska, Arkansas, Indiana, Iowa, Missouri, and Ohio had already stated their intent to comply.[5] On June 2, in consideration of the USDA's

---

[5] James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, ALASKA BEACON (May 15, 2025), https://alaskabeacon.com/2025/05/15/alaska-gives-food-stamp-recipients-personal-information-to-federal-officials/; Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal* government, ARKANSAS ADVOCATE (May 22, 2025), https://arkansasadvocate.com/2025/05/22/arkansas-shares-certain-snap-applicant-numbers-with-federal-government; Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, IOWA STARTING LINE (May 16, 2025), https://iowastartingline.com/2025/05/16/iowa-hands-over-personal-data-trump-federal-governmentto-deliver-snap-recipient-data-to-the-federal-government/; Jude Joffe-Block &

representations that it had received no data and instructed processors not to send any, Plaintiffs

withdrew their motion without prejudice to renewing it at a later stage. Dkt. 13.

### Subsequent Developments

Since pausing the Initial Data Demand, USDA has taken three steps relevant here:

*First*, on June 11, 2025, Ms. Corley submitted a "nonsubstantive change request" to

OMB regarding the 2024 OMB approval of the PRA collection. Mem. To Brenda Aguilar From

Shiela Corley, Nonsubstantive Change Request – Supplemental Nutrition Assistance Program

(SNAP) Forms: Applications, Periodic Reporting, and Notices (OMB #0584-0064) (June 11,

2025) ("PRA Change Request").[6] The stated "purpose" of the change was to "add requirements

to report to USDA a number of currently collected [by states] data elements related to SNAP

certification and benefits issuance." *Id.* at 1. For the first time, USDA stated the purposes of the

data share included "verifying eligibility based on immigration status." PRA Change Request at

2. The memo also detailed categories of personally identifiable information to be collected,

including participant name, SSN, date of birth, residential address, case record number, EBT

card number, and issuance amounts and benefit available dates for each participating household.

---

Stephen Fowler, *Lawsuit challenges USDA demand for food stamp data as some states prepare to comply*, NATIONAL PUBLIC RADIO (May 22, 2025), https://www.npr.org/2025/05/22/nx-s1-5407994/usda-doge-snap-nutrition-privacy; Letter from Melissa D. Wolf, Missouri Department of Social Services, to Prashant Gupta, Fidelity Information Services, *Re: Consent to Disclosure of SNAP Information to USDA*, (May 12, 2025), https://www.documentcloud.org/documents/25955569-notification-of-usda-request-for-snap-information2025/; Carden, Dan, *Indiana to share personal information of SNAP recipients with federal government* (May 30, 2025), https://indianaeconomicdigest.net/Content/Default/Major-Indiana-News/Article/Indiana-to-share-personal-information-of-SNAP-recipients-with-federal-government/-3/5308/119129.
[6] Available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=158778701; *see generally* Office of Information and Regulatory Affairs, ICR Documents: 0584-0064, https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202506-0584-001 (complete ICR package) (last visited July 13, 2025).

*Id.* The memo did not articulate a theory as to why the change was "non-substantive" such that it was exempt from the full review and approval process under the PRA. *See* 44 U.S.C. § 3507(h)(3) (ascribing procedures for "substantive or material modifications" to existing collections). OMB approved the change request that same day.[7]

*Second*, on June 23, 2025, USDA published in the Federal Register a Notice of a New System of Records (the "June SORN"), announcing the proposal to create the "National Supplemental Nutrition Assistance Program (SNAP) Information Database." 90 Fed. Reg. 26,521 (June 23, 2025). The June SORN provided a non-exhaustive list of records to be collected under it—a set of fields "including but not limited to" name, Social Security number, etc., and "including but not limited to" dollar value information for SNAP benefits. 90 Fed. Reg. at 26,552. It also stated that it took effect upon publication, "**except** for the routine uses, which will become effective on July 23, 2025, unless USDA determines they must be changed as a result of public comment." *Id.* (emphasis added). USDA created a mechanism for the public to submit comments for consideration, noting also that it would "publish any changes to the system of records notice resulting from the public comment." *Id.*; *see* 5 U.S.C. § 552a(e)(11).

*Third*, on July 9, 2025 USDA issued a letter to state SNAP agencies (the "Renewed Data Demand," attached as Exhibit 1) announcing that it was "requiring collection of SNAP data from EBT processors or state agencies beginning on July 24, 2025, with submissions to USDA no later than the close of business on July 30, 2025."[8] The letter did not specify the data to be

---

[7] Office of Information and Regulatory Affairs, View ICR – OIRA Conclusion, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202506-0584-001&utm_source=dataindex.us&utm_medium=email&utm_campaign=uncovering-changes-to-federal-data-06072025# (last visited July 17, 2025).

[8] Letter from Brooke L. Rollins, Secretary, U.S. Dep't of Agric., to SNAP State Agencies (July 9, 2025) https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-database-letter.pdf.

transmitted, but referred to the "categories of records" listed in the June SORN. The letter also

reaffirmed USDA's commitment to complying with the Executive Order, *i.e.*, to "ensure the

Federal Government has unfettered access to comprehensive data" about SNAP. *Id.*

## PLAINTIFFS

The four individual plaintiffs are directly affected by USDA's actions. Plaintiff Catherine

Hollingsworth is a SNAP recipient in Alaska, a state that immediately agreed to turn over its data

after the Initial Data Demand. Declaration of Catherine Hollingsworth ("Hollingsworth Decl."),

Dkt. 9-5, ¶ 2; *see supra* n.5. Plaintiffs Namod Pallek and Julliana Samson are SNAP recipients

and students at the University of California, Berkeley. Declaration of Namod Pallek ("Pallek

Decl."**),** Dkt. 9-2, ¶¶ 2-3; Declaration of Jullianna Samson ("Samson Decl."), Dkt. 9-3, ¶¶ 2-3.

Plaintiff Diana Ramos is a SNAP recipient in New York, New York, and also received SNAP

benefits in Florida, during a period subject to the time period covered in the Initial Data Demand.

Declaration of Diana Ramos ("Ramos Decl."), Dkt. 9-4, ¶¶ 2-3.[9] Each of the Individual Plaintiffs

rely on SNAP benefits to purchase healthy food that they otherwise cannot afford. Hollingsworth

Decl. ¶¶ 5, 7-8; Pallek Decl. ¶ 4; Samson Decl. ¶ 4; Ramos Decl. ¶¶ 8-9.

Each Individual Plaintiff has submitted detailed information to receive and retain SNAP

benefits, without ever being told the data would be provided *en masse* to the federal government,

and now feels vulnerable and exposed. *See* Hollingsworth Decl. ¶¶ 4, 7, 9-10; Pallek Decl. ¶¶ 3,

5-6; Samson Decl. ¶¶ 3, 5-6; Ramos Decl. ¶¶ 2-4, 10. Each Plaintiff has submitted a comment on

the June SORN, articulating, among other concerns: (1) USDA is duplicating work already done

by states; (2) it is not clear which data fields and records will be included; (3) the large-scale

---

[9] Plaintiffs Hollingsworth, Pallek, Samson, and Ramos are collectively referred to as the
"Individual Plaintiffs." Plaintiffs MAZON: A Jewish Response to Hunger and EPIC are
collectively referred to as the "Organizational Plaintiffs."

transfer could introduce data corruption and errors; and (4) they fear consequences like wrongful accusations of fraud. *See* Decl. of Daniel A. Zibel & Exhs. A–D. To address those concerns, the Plaintiffs commented that USDA should slow down this effort, pursue other avenues to monitor fraud and overpayments in SNAP, and communicate more clearly about its intentions. *Id.*

MAZON: A Jewish Response to Hunger ("MAZON") advocates to end hunger, including by expanding participation in SNAP. Declaration of Abby Leibman ("Leibman Decl."), Dkt. 9-6, ¶¶ 3-7. MAZON monitors federal and state policy changes related to SNAP, regularly submits public comments, and partners with providers who work directly to enroll more people in SNAP. *Id.* ¶¶ 8, 9, 13. As part of its work to reduce barriers to SNAP participation, MAZON has worked to identify and counteract barriers to SNAP enrollment, including for elderly individuals, immigrants, and single mothers, including those fleeing domestic violence. *Id.* ¶¶ 6, 13.

EPIC's mission is to secure the fundamental right to privacy in the digital age. Declaration of Alan Butler ("Butler Decl."), Dkt. 9-7, ¶ 4. Central to its mission is oversight of government activities, including those that impact individual privacy. *Id.* ¶ 6. EPIC relies on information made public by federal agencies to monitor how the government is handling individuals' personal information. *Id.* ¶¶ 9-12. EPIC uses this information to inform policy debates, submit public comments, and educate the public. *Id.* ¶¶ 10, 14.

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see*

*also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions."). Because the pending motion seeks to enjoin government action, "the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020). Requests for preliminary relief under the APA's 5 U.S.C. § 705 are governed by the same standards. *Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020).[10]

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge the Renewed Data Demand.

To obtain a temporary restraining order, a plaintiff must demonstrate a "substantial likelihood of standing." *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020) (quoting *Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). For standing, a plaintiff must show (1) an injury in fact, (2) a "causal connection" between the injury and the defendant's actions, and (3) a likelihood that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "[A]n injury in fact" is "an invasion of a legally protected interest which is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). "[V]arious intangible harms," like the harm from disclosure of private

---

[10] Plaintiffs' requested relief is unaffected by *Trump v. CASA, Inc.*, 606 U.S. __, No. 24A884, 2025 WL 1773631, at *8 (U.S. June 27, 2025). That case expressly declined to resolve the "distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at *8 n. 10. Preliminary relief is routinely granted in APA cases and is particularly appropriate where, as here, Plaintiffs are asking the court to "postpone the effective date of [USDA's] action," a remedy expressly authorized under the APA. 5 U.S.C. § 705. Moreover, setting aside the Renewed Data Demand is necessary "to provide complete relief" to Plaintiffs, since it is the existence of the unlawful system itself—and not only the placement of individual plaintiffs' data in it—that injures all Plaintiffs, but particularly Organizational Plaintiffs. *See CASA*, 2025 WL 1773631, at *15.

information, are concrete where they have a "close historical or common-law analogue."
*TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021). Plaintiffs satisfy that requirement.[11]

As to Plaintiffs' procedural claims, the standing "requirements are modified somewhat."
*Silver v. IRS*, 531 F. Supp. 3d 346, 356 (D.D.C. 2021) (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 11 (D.D.C. 2016)). In such cases, parties must
show both "(1) that their procedural right has been violated, and (2) that the violation of that
right has resulted in an invasion of their concrete and particularized interest." *Id.* at 357. With
procedural claims, courts apply a "relaxed redressability requirement," meaning that instead of
"establishing that compelling the agency to follow the correct procedure *would* lead to a
substantive result that favors the [plaintiff's] concrete interests, the [plaintiff] need only show
that its concrete interests *could* be better protected." *Narragansett Indian Tribal Historic Preservation Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis in original).

### A.    USDA's unlawful collection of Individual Plaintiffs' sensitive private information causes them concrete, cognizable injuries.

The actual or imminent disclosure of Individual Plaintiffs' private information concretely
harms Individual Plaintiffs in a way that is "traditionally recognized as providing a basis for
lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The
Supreme Court has recognized that "[v]arious intangible harms can be . . . concrete." *Id.* at 425.
"Chief among them are injuries with a close relationship to harms traditionally recognized as
providing a basis for lawsuits in American courts"—including "disclosure of private
information." *Id.* Mishandling and improper disclosure of personal data "has a close relationship

---

[11] Plaintiffs only need establish that one Plaintiff has standing with respect to each Defendant for each claim to proceed. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

with the harm asserted in a tort of intrusion upon seclusion." *See, e.g.*, *All. for Retired Ams. v. Bessent*, No. 25-cv-0313, 2025 WL 740401, at *15–17 (D.D.C. Mar. 7, 2025); *Am. Fed'n of Tchrs. v. Bessent*, 772 F. Supp. 3d 608, 628–636 (D. Md. 2025); *Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 771 (D. Md. 2025).

Through the statutes that created SNAP, Congress created a reasonable expectation of privacy in the information and records submitted to obtain benefits. *Cf. Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (concluding that participants in Food Stamps "possess[ed] a legitimate expectation that the[ir] [personal] information [would] be kept confidential"); *see also, e.g.*, 7 C.F.R. § 275.12 ("Personal interviews shall be conducted in a manner that respects the rights, privacy, and dignity of the participants."). States are required to establish "safeguards which prohibit the use or disclosure" of the information they obtain as part of SNAP applications, with exceptions explicitly set forth by statute. *See, e.g.*, 7 U.S.C. § 2020(e)(8), (e)(15). Although there are narrow exceptions related to "inspection and audit" by USDA, *id.* § 2020(a)(3)(B)(i), the statute does not contemplate the wholesale collection of years of individual data by the federal government for purposes incompatible with the Food and Nutrition Act. *See infra* at 26-30.

Individual Plaintiffs provided substantial amounts of information about themselves—in some cases overcoming significant privacy concerns[12]—because they needed help affording food. Individual Plaintiffs never expected their information would be dumped into a federal database without proper procedures and for uses unrelated to SNAP administration or

---

[12] Individual Plaintiffs are not alone in their fears. *See, e.g.*, Leibman Decl. ¶¶ 8, 13 (mixed-status families, elderly people, and single mothers fleeing domestic violence); Anderson Decl., Dkt. 9-9, ¶¶ 9-11 (elderly people and mixed-status families); Elzinga Decl., Dkt. 9-10, ¶¶ 7-9 (mixed-status and refugee families); Machicote Decl., Dkt. 9-9, ¶ 6 (English-language learners).

enforcement. *See* Hollingsworth Decl. ¶¶ 6, 10; Pallek Decl. ¶¶ 5-6; Samson Decl. ¶¶ 5-6; Ramos Decl. ¶¶ 5-6; *All. for Retired Ams. v. Bessent*, 2025 WL 740401, at *16 (finding it "entirely reasonable" for people to rely on "explicit statutory protections"). With the disclosure deadline and threat of noncompliance procedures looming over each of the Individual Plaintiffs' states, they face an imminent harm that their reasonable expectations of privacy will be invaded. *See* Hollingsworth Decl. ¶¶ 2, 4 (data to Alaska); Pallek Decl. ¶ 3 (data to California); Samson Decl. ¶ 3 (data to California); Ramos Decl. ¶¶ 2-4 (data to Florida and New York).

Individual Plaintiffs' injuries are also closely analogous to the tort of breach of confidence. The "unconsented disclosures of personal information in breach of confidence . . . can serve as a common-law analogue for a harm inflicted by a statutory violation," including the Privacy Act. *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-339 (JDB), 2025 WL 1129227, at *9 (D.D.C. Apr. 16, 2025) (quoting *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). The Individual Plaintiffs entrusted their information to their state agencies for purposes of obtaining food benefits, in reliance on the protective scheme set up by Congress through laws like the Privacy Act, the PRA, and the Food and Nutrition Act. The unlawful data collection is therefore closely analogous to a breach of confidence.

**B.    Plaintiffs are injured by USDA's denial of the information they are entitled to under the PRA.**

By circumventing the PRA's disclosure procedures, USDA has deprived Plaintiffs of information that the PRA requires it to disclose, impeding their right to participate in a public process. A plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Am. Soc. For Prevention of Cruelty to Animals v. Fed'l Entm't Inc.*, 659 F.3d 13, 23 (D.C. Cir.

2011). Informational injuries can be predicated on statutes—like the PRA—that require the release of information as part of notice and comment procedures. *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (concluding that the statute "clearly creates a right to information upon which a claim of informational standing may be predicated"); *Center for Biological Diversity v. U.S. Int'l Development Finance Corp.*, 585 F. Supp. 3d 63, 71-72 (D.D.C. 2022) (finding standing where plaintiff alleged a right to information, a denial of that right, and a resulting deprivation of "meaningful participation" in a governmental process). In addition to establishing a statutory right to information, Plaintiffs must also show that the denial of such information causes them to suffer the type of harm Congress sought to prevent by requiring disclosure. *United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*, 288 F. Supp. 3d 99, 105 (D.D.C. 2017).

Plaintiffs have adequately alleged statutory rights to information under the PRA. *See* FAC ¶¶ 33–40, 88-89. The PRA requires an agency to provide public notice in the Federal Register with certain information prior to conducting or sponsoring a collection. 44 U.S.C. § 3507(a)(1)(D). USDA has not done so, instead relying on disclosures made years ago for purposes of carrying out a different "collection" from distinct "persons" within the meaning of the statute. *See* FAC ¶¶ 54, 88; *infra* at 30-34.

This deprivation causes Plaintiffs to suffer harms of the type that Congress sought to prevent when requiring disclosure. The PRA requires information "concerning the government's data collection efforts" be made available in order for the public—including all Plaintiffs—to "hold the government to account." *Protect Democracy*, 288 F. Supp. 3d at 107; *see also id.* at 105-106 & n.3 (holding that organizations can predicate an informational injury on the PRA given its aims of "openness in Government and society" and "improving responsibility and

accountability 'to the public'"). Congress actively sought to increase public participation when it adopted the PRA—noting that "[e]ffective public comment at the front end of decision processes is particularly beneficial." Paperwork Reduction Act of 1995, S. Rep. No. 104-8, at 14 (1995).

Plaintiffs' harms are precisely of this sort, a point USDA did not previously contest. *See* Dkt. 11 at 18. Individual Plaintiffs are recipients of SNAP whose data is being collected and whose rights of participation, access, and inspection are rendered non-existent due to the USDA's failure to disclose. They have had no opportunity to participate in the PRA's mandated public process determining the collection of their data.

MAZON's mission is to end hunger through governmental advocacy, grantmaking, educational support, and data analysis, and SNAP is one of its priority advocacy areas. Leibman Decl. ¶¶ 3-7. MAZON regularly tracks the Federal Register, comments on proposed actions that could chill SNAP participation or stigmatize or penalize SNAP recipients, and mobilizes partners to do the same.[13] *Id.* ¶ 8. Its comments have been successful in influencing the scope and impact of regulations. *Id.* ¶ 11. MAZON also offers numerous forms of support to organizations that guide individuals through the SNAP application process and help them secure benefits. *Id.* ¶¶ 3, 9, 13. In addition to providing educational resources and policy updates, MAZON partners with service providers to identify and address obstacles that prevent eligible individuals from applying for and participating in SNAP. *Id.* ¶¶ 9, 13. Without the information that would be made available through a full ICR process, MAZON is unable to provide reliable guidance to its

---

[13] For example, in 2018 MAZON submitted a comment opposing the expansion of the "public charge" rule, acknowledging that families were disenrolling in SNAP out of fear that their participation would negatively affect immigration proceedings for themselves or family members. Leibman Decl. ¶ 8. In December 2022, MAZON submitted a formal comment regarding USDA's interstate data matching effort, raising concerns that it could be used to stigmatize and penalize SNAP recipients. *Id.*

partners and has been forced to divert resources from other pressing priorities. *Id.* ¶¶ 12-15.

For decades, EPIC has made extensive use of public notices and records concerning the collection, use, retention, and transfer of personal information by federal agencies. Butler Decl. ¶¶ 6, 9-12. EPIC routinely monitors, analyzes, comments on, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies, including specifically about SNAP. *Id.* ¶¶ 6-7. Because USDA is engaging in this collection without timely publishing information required by the PRA, EPIC cannot fulfill its mission to ensure that the collection is lawful. *Id.* ¶¶ 9-21. As a result, EPIC must divert its limited resources to more burdensome methods of information gathering. *Id.* ¶¶ 17, 21, 25. And because of USDA's actions, EPIC will be unable to educate the public or inform the policy debates surrounding that collection. *Id.* ¶¶ 9-21. This is particularly important in the context of information privacy—the security of which was an express "purpose" of the PRA. 44 U.S.C. § 3501(8).

### C.    Individual Plaintiffs are harmed by the deprivation of their right to comment on and influence decisions made about USDA's handling of their data.

Individual Plaintiffs Pallek, Samson, Hollingsworth, and Ramos have further been denied the right to meaningfully participate in the public process required under both the Privacy Act and the PRA. Under both statutes, Congress provided individuals with a substantive right to comment about proposed systems of records and collections. 5 U.S.C. § 552a(e)(11) (Privacy Act comment requirement for SORNs); *id.* § 552a(e)(12) (Privacy Act comment requirement for interagency matching); 44 U.S.C. § 3506(c)(2) (PRA comment requirement); *id.* § 3507(a)(1)(A) (PRA requirement commanding consideration of comments).

Plaintiffs have alleged that USDA has infringed their meaningful right to comment under the Privacy Act. *See* FAC ¶¶ 3-5, 7, 11, 87, 118-25. By announcing—in the middle of the comment period—that states would be obligated to turn over the data during a one-week period

immediately following the closure of the comment period, USDA effectively announced that its mind was made up and it would disregard any comments submitted between July 9 and July 23—including those submitted by Plaintiffs. With respect to the PRA, because Plaintiffs have alleged that USDA has unlawfully forgone the comment procedures required by statute, *see* FAC ¶¶ 33-40, 133-40, the Individual Plaintiffs have adequately alleged a procedural deprivation under that statute.

Plaintiffs have also alleged a "concrete interest that is affected by the deprivation." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). As SNAP recipients who have submitted sensitive personal information to their states, Individual Plaintiffs have interests in keeping their data safe and preventing USDA from misusing their sensitive personal information. They have offered comments that could, at least in part, address their concerns about the data collection—including suggestions that USDA (1) dispense with this collection and instead step up its monitoring of states' anti-fraud procedures, (2) slow this collection down rather than rushing it in order to make sure the data is safe, and (3) clarify for SNAP recipients and the public what information is part of this collection. FAC ¶¶ 80-81. Yet USDA has decided to proceed with the data collection without considering the ideas Individual Plaintiffs have submitted. *Id.*; *see Summers*, 555 U.S. at 494 (noting uncontested Article III standing where an individual with historical and continued visits to federal lands was deprived the right to comment with suggestions to cure the threatened injury). Plaintiffs sail past the "concrete interest" prong of the analysis.

### D.    MAZON has suffered a distinct injury to its anti-hunger mission.

An organization has standing to sue on its own behalf where it can "satisfy the usual standards" of injury in fact, causation, and redressability. *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 393 (2024). Although an organization "can have standing to challenge [federal agency] practices that directly interfere with their core activities, such as direct services programs," organizations must allege more than "harm to its abstract social objectives." *League of United Latin Am. Citizens v. Exec. Off. of the Pres.*, No. 25-cv-0946 (CKK), 2025 WL 1187730, at *22 (D.D.C. Apr. 24, 2025); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

The USDA's unlawful data collection directly impairs MAZON's anti-hunger mission, which gives rise to injuries sufficient to establish standing for each cause of action. Among other activities, MAZON partners directly with service providers who guide individuals through the process of applying for SNAP and receiving benefits. Leibman Decl. ¶ 9. Together they identify barriers to individuals from distinct demographic groups and create a strategic approach to counteract those barriers. *Id.* For years, MAZON and its partners have sought to reassure SNAP-eligible individuals from mixed-status families that it is safe to apply for SNAP. Specifically, MAZON and its partners have told potential applicants that submitting their household's information to their state agencies does not increase their risk of immigration enforcement. But the June SORN's routine uses 8 and 11—which, as explained in detail below, are incompatible uses under the Privacy Act—directly imperils those and other efforts, resulting in an immediate setback for MAZON's anti-hunger work.

MAZON has reallocated resources away from other priorities to respond to the data demand, including revising materials and altering internal resource allocation. *See* Leibman Decl. ¶¶ 14-15. For example, following the release of the Initial Data Demand and in direct response to it, MAZON abandoned its plans to discontinue its "Challah for Hunger" program and is instead continuing to invest resources in that program to counter the anticipated chilling

effect[14] the data collection will have on college student SNAP enrollment. *Id.* ¶ 14.

## II.    Plaintiffs Have a Likelihood of Success on the Merits.

"Agencies must operate within the legal authority conferred by Congress," and "courts have the responsibility to determine whether 'individual rights' have been infringed 'by the exertion of unauthorized administrative power.'" *Med Imaging & Tech All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024). The APA provides a cause of action for a "final agency action for which there is no other adequate remedy in a court,"[15] and courts have a duty to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2). Plaintiffs are likely to prevail on their claims that USDA's actions are contrary to law (both the Privacy Act and PRA) and arbitrary and capricious. *Id.* Injunctive relief is therefore appropriate. *See, e.g.*, *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 226 (D.D.C. 2003) (noting that courts often grant injunctive relief based on a likelihood of success on the merits of challenges to lacking public comment procedures and collecting cases).

### A.    Plaintiffs can bring Privacy Act and PRA claims through the APA.

This Court has authority to postpone (pending review) and set aside unlawful agency action inconsistent with the Privacy Act or the PRA pursuant to its APA authority to "hold

---

[14] Other advocates and experts confirm the likely chilling effect and erosion of public trust in SNAP. *See, e.g.*, Anderson Decl. ¶¶ 7-9 (describing "severe consequences on vulnerable populations in Tennessee"); Elzinga Decl. ¶¶ 7-11 (describing how mixed-status and refugee families in Iowa "will lose trust in the Program and forego these often life-saving benefits out of fear for the security of their data"); Machicote Decl. ¶¶ 5-6 (predicting "significant consequences for Indiana's immigrant populations who have limited language access").

[15] 5 U.S.C. § 704; *see generally Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The July 9 letter sets an unequivocal, one-week deadline for states to comply. Obligations have been determined and the agency's decision is definitive. *See Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (noting that a consummated process involves a "definitive" agency position).

unlawful and set aside agency actions found to be . . . not in accordance with law." 5 U.S.C. §§ 705, 706(2). Courts in the D.C. Circuit have concluded that APA relief is available beyond the four narrow "civil remedies" the Privacy Act added to the APA, *id.* § 552a(g), because APA relief is available whenever "there is no other adequate remedy in a court" for unlawful agency action, *id.* § 704. *See, e.g.*, *Radack v. Dep't of Justice*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005); *accord Am. Fed. Gov't Emps. v. U.S. Office of Personnel Mgmt.*, No. 25-cv-11237, 2025 WL 996542 (S.D.N.Y. April 3, 2025), at *16 (holding that because the "complaint adequately alleges a violation of the Privacy Act[, a]ccordingly it adequately alleges that the defendants' actions were 'not in accordance with law' under 5 U.S.C. § 706(2)(A)"); *AFSCME v. Social Sec. Admin*, No. 25-cv-2096, 2025 WL 1206246, at *26 (D. Md. 2025), *stayed pending appeal*, 145 S. Ct. 1626 (2025) (PRA-via-APA cause of action allowable).

OMB's 1975 Privacy Act Guidelines first recognized that "[a]n individual may seek judicial review under other provisions of the Administrative Procedure Act" than the four causes in the Privacy Act's § 552a(g). OMB, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,968 (July 9, 1975). The Supreme Court echoed this recognition in 2004, noting that "[t]he Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA]." *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). The Supreme Court further acknowledged, without questioning, that the courts below had grounded equitable relief under the Privacy Act in the APA. Even before *Chao*, the D.C. Circuit had granted Privacy Act relief via the APA at least once. *Doe v. Stephens*, 851 F.2d 1457, 1466-67 (D.C. Cir. 1988).

Relying on such authority, Judge Bates recently allowed a comparable Privacy Act-via-

APA claim. *AFL-CIO v. Department of Labor*, No. 25-cv-339, 2025 WL 1129227 at \*14-16 (April 16, 2025). There, as here, the plaintiffs sought injunctive relief that was not available under the Privacy Act's equitable civil remedies in § 552a(g). *Id.* at \*15. Judge Bates concluded that injunctive relief was available under the APA precisely because it was *not* available under the Privacy Act.[16] *Id.* Judge Bates distinguished cases from this District precluding relief under the APA's generic cause of action because those cases involved "a different situation entirely, one where plaintiffs sought injunctive relief under the APA despite its availability under the Privacy Act." *Id.* In this case, setting aside an invalid SORN is not relief available under § 552a(g); therefore, it *is* available under the APA.

The APA provides a cause of action for Plaintiffs' PRA claims because the PRA provides no specific civil remedies. 5 U.S.C. §§ 702, 706. In *Doctors for America*, 766 F. Supp. 3d at 51-52, Judge Bates recently permitted a closely analogous PRA claim to proceed under the APA. Granting a TRO, the court found that the plaintiff was likely to succeed on the merits of a PRA-notice claim brought through the APA.[17] *Id.* at 52. The Ninth Circuit has also expressly rejected the argument that the PRA precludes an APA claim. *Hyatt v. OMB*, 908 F.3d 1165, 1171-72 (9th Cir. 2018). The cases previously cited by USDA involve district courts rejecting attempts to

---

[16] In opposing Plaintiffs' initial motion, the government's characterization of Judge Richardson's concurrence in a stay order in *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638 at \*6 (4th Cir. Apr. 7, 2025), is at best questionable. *See* Defs.' Mem. Opp. Plfs.' Mot. TRO (Dkt. 11) at 24 n.3. USDA previously described Judge Richardson's position there as the "Privacy Act likely precludes APA cause of action" (Dkt. 11 at 24 n.3), but what the concurrence actually says is that "whether Congress intended damages to be the exclusive remedy for Privacy Act violations is not a trivial question," as to which there was no binding authority in the Fourth Circuit. But in the D.C. Circuit, *Stephens* is binding. 851 F.2d at 1466–67.

[17]At summary judgment, the PRA claim had become "largely moot," and the court granted relief on other APA claims not invoking the PRA. *See* No. 25-cv-322 (JDB), 2025 WL 1836009, at \*16-17 & n.10 (D.D.C. July 3, 2025). At neither the TRO phrase nor the summary judgment phase did the court question the availability of relief under the APA for a properly pled PRA-via-APA claim.

imply causes of action into the PRA rather than rejecting a claim like the one Plaintiffs bring

here. *See* Dkt. 11 at 25 (citing *City of New Bedford v. Locke*, No. 10-cv-10789, 2011 WL

2636863, at *9 (D. Mass. June 30, 2011), *aff'd*, 701 F.3d 5 (1st Cir. 2012) (denying PRA claim

on unclear cause of action) & *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 564 F.

Supp. 3d 605, 613 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19,

2022) (rejecting implied cause of action)).

> **B.      USDA has predetermined the outcome of the comment process and
> articulated incompatible routine uses, in violation of the Privacy Act.**

USDA's professed compliance with the Privacy Act is insufficient. *First*, by issuing the

Renewed Data Demand on July 9, USDA effectively announced that it has no intention of

considering any comments submitted on the SORN or reassessing any aspects of its system in

light of feedback from interested persons including Plaintiffs. *Second*, routine uses 8 and 11 in

the SORN are incompatible with the purpose for which household data was collected, in

violation of the Privacy Act.

> **i.      USDA has violated the Privacy Act by Failing to Provide a Meaningful
> Opportunity to Comment.**

USDA's authority to collect data from states is constrained by the Privacy Act's

requirement that it "provide an opportunity for interested persons to submit written data, views,

or arguments" at least 30 days prior to publication of routine uses, 5 U.S.C. § 552a(e)(11), and

the concomitant requirement that the agency review and consider those comments. "The

opportunity for comment must be a meaningful opportunity," and "in order to satisfy this

requirement, an agency must also remain sufficiently open minded." *Rural Cellular Ass'n v.

F.C.C.*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). A "meaningful opportunity" by an "open minded"

agency means that there must be both enough to comment and "for the agency to consider

[those] . . . comments." *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 450 (3d Cir. 2011).

This common-sense requirement that a comment period "be meaningful" has, unsurprisingly,

been applied across numerous statutory schemes. *See, e.g.*, *Rural Cellular*, 588 F.3d at 1101

(Administrative Procedure Act); *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002) (noting

that the comment period under § 10(a) of the Endangered Species Act must be "meaningful");

*Sierra Club v. Costle*, 657 F.2d 298, 398 (D.C. Cir. 1981) (same under the Clean Air Act).

Allowing an agency to prejudge the outcome of the § 552a(e)(11) comment period would

render that public participation effectively meaningless and chill future comments. There is no

reason—Plaintiffs are aware of no case suggesting—that the Privacy Act's comment period

should permit this result. Far from it, the government's consistent position for more than fifty

years under the Privacy Act has been for agencies, whenever practicable, to furnish to the public

"as complete an explanation of the routine uses and any changes made or not made as a result of

the comment as possible so that the public will be fully informed of the proposed use" 40 Fed.

Reg. at 28,966.[18] It would be neither meaningful, nor open-minded, for an agency to prejudge an

outcome before a comment period has even closed.

*Prometheus* is instructive. There, two weeks before the § 553 comment period closed—

and before all comments were received—the agency circulated a draft decision, later voting on

that decision "days after" the comment period closed. 652 F.3d at 450, 453. The Third Circuit

held that there was no way that the agency had meaningfully engaged with the comments

received. *Id.* at 453. Here, the facts are worse; the Renewed Data Demand and quick deadline

---

[18] *See also* U.S. Dep't of Justice, Overview of the Privacy Act of 1974, 2020 Ed. at 200
(reaffirming the 1974 interpretation of § 552a(e)(11)),
https://www.justice.gov/Overview_2020/dl?inline

following the comment period are tantamount to an admission that no comments—no matter what they say—will change the agency's mind. According to USDA, decisions have been made, policies have been determined, and states must comply.

>      ii.    **The June SORN Violates the Privacy Act Because Routine Uses 8 and 11 are not "compatible" with the SNAP statute.**

The Privacy Act's "routine use" exception allows agencies to disclose records without the consent otherwise required by 5 U.S.C. § 552a(b)(3). Routine uses are ones "for a purpose which is compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7). To identify the purpose for which the state SNAP agencies collected household records, the Court must look to the statute that provides for the information collection—the SNAP statute, 7 U.S.C. § 2020(e). That law contains significant limitations on the purposes for which the states may disclose SNAP data, with the risk that violations could result in suspension of federal SNAP funds. *See* 7 U.S.C. § 2020(e)(8), (15); *id.* § 2020(g).

Neither the Supreme Court nor the D.C. Circuit has settled on a standard for assessing compatibility. *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 n.1 (D.C. Cir. 2017); *see also U.S. Postal Service v. National Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 144–46 (D.C. Cir. 1993) ("*NALC*"). In *NALC*, Judges Silberman and Williams agreed on the outcome, but took two different approaches to assessing compatibility—neither of which constitutes a holding of the D.C. Circuit. "Judge Silberman, while observing that it was not necessary to define the term 'compatible' for purposes of the case before the Court, cited to the common usage of 'compatible,' and to the tighter definition used in [the Third and Ninth] [C]ircuits requiring "a nexus approaching an identity of purpose." *Ames*, 861 F.3d at 240 n.1 (discussing *NALC*). "Judge Williams, on the other hand, would hold that purposes are compatible so long as there is 'no *conflict*' between them." *Ames*, 861 F.3d at 240 n.1 (same).

In *Ames*, then-Judge Kavanaugh also synthesized the holdings of the Third and Ninth Circuits as requiring "a 'meaningful degree of convergence' between the agency's purpose in collecting the record and the agency's purpose in disclosing the record." *Id.* (citing *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549 (3d Cir. 1989) and *Swenson v. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989)). Despite the lack of clarity in the Circuit, numerous courts in the District have adopted that formulation as sufficient, even if not necessary, to establish compatibility. *See, e.g., Townsend v. U.S.*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017) ("The compatibility requirement is satisfied if a 'concrete relationship or similarity, or some meaningful degree of convergence' exists 'between the disclosing agency's purpose in gathering the information and in its disclosure.'"); *Lugo v. U.S. Dep't of Justice*, 214 F. Supp. 3d 32, 40 (D.D.C. 2016) (same).

Regardless of whether this Court follows *Lugo* and *Townsend* (applying Judge Kavanaugh's articulation of *Britt* and *Swenson*), or Judge Silberman or Judge Williams's looser formulations, routine uses 8 and 11 are incompatible with the purposes for which the records were collected by states. Congress has determined that states' collection of records is subject to safeguards that "prohibit the use or disclosure of information" beyond certain specified standards. 7 U.S.C. § 2020(e)(8). It would be incompatible with this prohibition if USDA could collect that data, only to redisclose in a manner that, if done by the state in the first instance, would have violated § 2020(e).

More specifically, routine use 8 permits USDA to share records that "on its face, or in conjunction with other records, indicates a violation or potential violation of law" of essentially any kind ("civil, criminal, or regulatory"). 90 Fed. Reg. at 26,522. USDA then grants itself authority to divulge these records not just within the federal government, but to any state, local,

tribal, foreign, or other public authority if USDA—on its own—determines that the disclosure is "relevant" to any law enforcement "responsibility" of the receiving entity. *Id.* As an extreme example, under routine use 8, if USDA were to determine that a state SNAP record suggests a foreign civil or regulatory infraction, it would have authority to *sua sponte* disclose that record to any investigative authority in that country, so long as USDA adjudged it "relevant" to that authority. Such disclosure is not limited by any requirement that the receiving entity request it.

But 7 U.S.C. § 2020(e)(8) only allows states to share with law enforcement for four reasons: (i) "for the purpose of investing an alleged violation of this chapter or any regulation issued under this chapter," § 2020(e)(8)(C); (ii) to share address, social security number, and photograph, but no other data, to find fugitives, § 2020(e)(8)(E); (iii) "by the state agency of a determination by personnel responsible for certification or recertification of households" of an ineligible recipient due to unlawful immigration status, § 2020(e)(8)(F) & (e)(15)[19]; and (iv) to avoid paying benefits to prisoners, § 2020(e)(8)(F) & (e)(18). Routine use 8 swallows up the prohibitions in § 2020(e)(8) and effectively renders that section meaningless.

The same is true for routine use 11, which purports to allow disclosure to any government agency that can investigate "potential fraud, waste, or abuse in[] a Federal benefits program

---

[19] Nor is routine use 8 compatible with 7 U.S.C. § 2020(e)(15). That provision establishes the authority—not a responsibility—for state officials, upon finding an immigration violation, to share it with immigration authorities ("for the immediate reporting . . . *by the state agency*" (emphasis added)). It is thus of a piece with 8 U.S.C. § 1373(a), part of the Immigration and Nationality Act, providing that:

> Notwithstanding any other provision of Federal State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Section 2020(e)(15) is narrower. It is one thing for Congress to ensure that states may, in their discretion, undertake communications with ICE, and another for USDA to demand the states' data in order to make that decision for them and widely disclose.

funded in whole or in part by Federal funds." 90 Fed. Reg. at 26,523. That one routine use alone would swallow up the statutory permissible disclosures for (i) "disclosure . . . to persons directly connected with the administration or enforcement" of SNAP "only for such administration or enforcement," 7 U.S.C. § 2020(e)(8)(A); (ii) "to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of" the SNAP statute and regulations (and not anything else), § 2020(e)(8)(C); and arguably (iii) for cooperation with the national school lunch program, § 2020(e)(8)(F) & (u). But routine use 11 permits disclosure far beyond SNAP, *e.g.*, disclosure to the Department of Health and Human Services for Medicaid administration, or to the Department of Housing and Urban Development for public housing. Surely Congress could have provided states broader latitude in disclosing household data than the specific allowances in § 2020(e)(8), and it chose not to do so. USDA cannot override Congress's choice with omnibus routine uses. Routine use 11 is in "discord and disharmony" with the statute. *See NALC*, 9 F.3d at 144 (opinion of Silberman, J.) (quoting *Webster's Third New Int'l Dictionary* at 463 (1971)).

These uses do not come anywhere close to compatibility. There is no "meaningful degree of convergence," under *Britt*, *Swenson*, and *Ames*. And because 7 U.S.C. § 2020(e) *expressly forbids* states—on pain of financial sanction—from disclosing household data for any use not provided in the statute, there is a conflict between the proposed uses and the purposes of the initial collection. What is *forbidden* by statute cannot be compatible, "capable of existing together without discord or disharmony," with what is *permitted* by a SORN. *See id.* Section 2020(e) sends a clear message: this data is to be safeguarded and its uses limited. Routine uses 8 and 11 flip that congressional judgment on its head, permitting USDA near-unrestrained authority to disclose without notice.

Plaintiffs are accordingly likely to succeed in their claim that the SORN is invalid under the Privacy Act and should be delayed or set aside.

### C. USDA is sponsoring a collection without complying with the PRA.

USDA "shall not" sponsor an information collection from ten or more persons without complying with the PRA's procedural requirements. 44 U.S.C. § 3507(a). The usual way to comply with the PRA when collecting hundreds of millions of records from every state and territory would be to conduct a full Information Collection Review (ICR), which would include USDA's "evaluation of the need for the collection of information"; review by OMB; and for USDA to "[i]nform and provide[] reasonable notice to the potential persons to whom the collection of information is addressed of . . . [inter alia t]he way such information is planned to be and/or has been used to further the proper performance of the functions of the agency." 5 C.F.R. § 1320.8(a)(1), (d)(1)(i); *see also* 44 U.S.C. §§ 3507-08.

USDA followed no such procedures here. While conceding that the collection at issue falls under PRA, USDA has sidestepped its obligations by treating states' "reporting" of their complete databases as a "nonsubstantive change" to the collection of the underlying data from households, which received OMB approval in 2024. Dkt. 11 at 25-26. As set forth below, USDA's argument finds no purchase in the statute. The approval it relies on covered a different collection within the meaning of the PRA—with a different method of collection and from different "persons" under the statute. Because the instant collection is distinct, USDA's actions fall far short of compliance with the PRA and a new ICR process is required. Even if the Court concludes that this collection falls under the umbrella of the one that received 2024 OMB approval, it represents a substantive change and therefore similarly requires a full ICR process.

30

**i.    USDA is conducting a distinct "collection" from distinct "persons" under the PRA.**

Obtaining every individual record from every state's SNAP database is a new "collection of information" under the PRA. *See* 5 C.F.R. § 1320(c) (explaining that a collection of information "refers to the act of collecting or disclosing information, to the information to be collected or disclosed, to a plan and/or an instrument calling for the collection or disclosure of information, or any of these, as appropriate"). This collection is through a new method: USDA is "soliciting" and "obtaining" facts in 2025 versus "causing [facts] to be obtained" in 2024. This collection is from a new source: states and EBT vendors in 2025 versus individuals in 2024. 44 U.S.C. § 3502(10) (defining "person" to include an "individual," a "corporation," and "a State, territorial, tribal, or local government or branch thereof"). This collection brings information into a new database: a new National SNAP Information Database versus each state's individual system. And this collection will be held by a new custodian: USDA versus the states. An ICR must precede this collection, including both a substantive OMB review of the need for the information and a public comment process involving both a 60-day and a 30-day notice period, during which time the public can examine USDA's collection from the states and point to its many deficiencies set forth in the amended complaint.[20] 44 U.S.C. § 3506(c), (a).

A substantive revision or new clearance would have required USDA to certify that the collection is not "unnecessarily duplicative of information already reasonably accessible to the

---

[20] Even if the Court agrees with USDA's characterization of this information exchange as mere "reporting" from states, that would not obviate the need for an ICR because reporting is still a collection subject to the PRA's requirements. The OMB's PRA regulations explicitly state that "any requirement or request for persons to obtain, maintain, retain, *report*, or publicly disclose information" can constitute a "collection of information." 5 C.F.R. § 1320(c) (emphasis added); *Action Alliance of Senior Citizens v. Sullivan*, 930 F.2d 77, 79 (D.C. Cir. 1991) (analyzing the breadth of the PRA requirement).

agency." 5 C.F.R. § 1320.9(b). It is unclear how USDA could have so certified, in light of the extensive anti-fraud system that Congress has already authorized, and the USDA already built, to achieve system integrity and duplicate-benefit control without the bulk transfer of sensitive information. *See* 7 U.S.C. § 2020(x)(2) (establishing National Accuracy Clearinghouse (NAC) system); Supplemental Nutrition Assistance Program: Requirement for Interstate Data Matching To Prevent Duplicate Issuances, 87 Fed. Reg. 59,633 (Oct. 3, 2022). And similarly, USDA would have had to certify that the new system is "necessary for the performance of the functions *of the agency*"—not for unrelated agencies performing unrelated law enforcement functions, as contemplated by the SORN. 5 C.F.R. § 1320.9(a) (emphasis added).

### ii. If not a new collection, the instant collection amounts to more than a "nonsubstantive change" to the 2024 collection and requires a separate ICR.

Plaintiffs argue in the alternative that even if USDA can extend the 2024 collection to the instant National SNAP Information Database, that requires a substantive change to that collection and thus a new ICR process. FAC ¶¶ 88-89, 137-40. Instead of following that procedure, USDA sought and received OMB approval for its collection of data from 53 state SNAP agencies by dubbing it a "nonsubstantive change" to the PRA collection approved in 2024.

No OMB regulation defines a "nonsubstantive change, " but the concept appears to arise from the statutory requirement that "[a]n agency may not make a substantive or material modification to a collection of information after such collection has been approved by [OMB], unless the modification has been submitted to [OMB] for review and approval . . . ." 44 U.S.C. § 3507(h)(3); 5 C.F.R. § 1320.5(g) (same). A 2010 OMB memo drew the logical implication that "[f]or insignificant or non-substantive changes, the agency is not required to seek public

comment,"[21] which a 2016 OMB memo illustrated with examples of "changes to the wording of a question in an already approved collection [that] would result in more accurate and complete responses," which "may be considered non-substantive, as long as they do not introduce new concepts or measures that have not received public comment"; or finalization of one among several "options or changes" that were clearly presented "as part of the original approval."[22]

 There is simply no way to square a requirement that every state "report" every record in its database with this concept of a nonsubstantive change. *See* PRA Change Request at 1. If USDA were allowed to evade the PRA in this way, it would become a dead letter, insofar as the PRA could always be defeated by bulk "reporting" a more restrictive system's holdings to a less restrictive system. (Similarly with the Privacy Act.) And no reader of the 2023 information collection could have reasonably understood the requirement that state agencies "submit such reports . . . as required by FNS" to mean that state agencies might be required to upload all their data: A "report" is an "evaluative account or summary"—not raw data.[23]

 Had USDA submitted a new collection or a substantive change, Plaintiffs would have had an opportunity to review the information collection, to provide comment, and, in the case of the

---

[21] Memorandum from Cass R. Sunstein, Information Collection under the Paperwork Reduction Act (April 7, 2010), at 6 n.30, https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/inforeg/PRAPrimer_040720 10.pdf (commonly called the "PRA Primer").

[22] Memorandum from Howard Shelanski, Flexibilities under the Paperwork Reduction Act for Compliance with Information Collection Requirements (July 22, 2016), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/pra_flexibilities_memo_7_ 22_16_finalI.pdf, at 4-5; *cf. Tozzi v. U.S. E.P.A.*, No. 98-cv-0169 (TFH), 1998 WL 1661504, at *3 (D.D.C. Apr. 21, 1998) (citing *OMB Implementing Guidance* (Preliminary Draft, Feb. 3, 1997) at 21–22) (explaining that a "substantive" change, in contrast to a "nonsubstantive" change, "is any revision to the collection of information that . . . significantly changes the uses of the information or otherwise meaningfully alters any aspect of the collection of information from that previously approved by OMB").

[23] Oxford English Dictionary, "report (n.)," def. I.1.c, https://www.oed.com/dictionary/report_n (last visited July 14, 2025).

Individual Plaintiffs, to reconsider whether to continue sharing data with their states in light of the diminished protections attending further data collection. Plaintiffs are likely to prevail on their claims that the PRA required OMB approval, public notice, and an opportunity to comment on the information collection.

> **D.    USDA's Data Collection is arbitrary and capricious.**

Individual Plaintiffs and MAZON are also likely to succeed on their claim that the data collection is arbitrary and capricious under the APA.[24] Among that law's substantive and procedural requirements, agencies must "engage[]in 'reasoned decisionmaking'" and provide a "reasoned explanation" for their actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citations omitted); *F.C.C. v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). "[C]ourts may not make up for agency deficiencies by supplying a reasoned basis for the disputed action where the agency has failed to supply one." *League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185 (D.D.C. 2021) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A decision is also arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The Renewed Data Demand is arbitrary and capricious in at least four respects. *First*, it fails to comply with the Privacy Act and the PRA. By issuing a demand with two weeks left in the comment period, that allows only one week for states to comply, under continued threat of noncompliance procedures, USDA has clearly communicated that it does not intend to consider

---

[24] USDA's lack of care for the June SORN is further evidenced by the document's numerous errors. *See* Zibel Decl. Ex. F, comment of EPIC (citing omission of basic contact information for the agency and listing of Amazon Web services as servicer in one location while Microsoft is listed as sole service provider).

SORN comments.[25] And USDA has violated the PRA with its attempt to shoehorn this new

collection into one with prior approval. USDA has acted arbitrarily and capriciously in its rushed

effort to collect tens of millions of private records and create a new system to house them,

without proper procedures or due consideration of the public's participation rights.

*Second*, USDA's "program integrity" justification for the collection is arbitrary and

capricious because USDA has failed to acknowledge the program-integrity statutory scheme set

up by Congress. That scheme, which is echoed in USDA's own regulations, tasks state agencies

with combatting fraud and abuse in the SNAP system. *See* 7 U.S.C. § 2020(e)(20) (requiring

state processes to "detect[] fraud" in the program); *id.* § 2025(a)(7) (authorizing to pay a portion

of costs borne by states for "investigations and prosecutions"). States are financially liable for

errors, negligence, and fraud in their Programs and can further face fiscal penalties. *See* 7 U.S.C.

§§ 2025(c)(1)(C), 2016(e), 2020(h). Congress instructed USDA, on the other hand, to regulate on

quality control issues, 7 U.S.C. § 2025(c)(1)(B), which USDA has done. *See* 7 C.F.R. §§ Part

275; 7 C.F.R. § 275.3; Supplemental Nutrition Assistance Program: Non-Discretionary Quality

Control Provisions of the Agriculture Improvement Act of 2018, 86 Fed. Reg. 44,575 (Aug. 13,

2021). These regulations govern how states must conduct reviews of their SNAP administration

and how USDA will monitor those state reviews.[26] *See* 7 C.F.R. §§ Part 275; 7 C.F.R. § 275.3.

Congress also established an inter-state clearinghouse to ensure that individuals are not receiving

---

[25] The Renewed Data Demand further reflects an arbitrary change in USDA's position regarding the consideration of comments. While the SORN indicated the routine uses would become effect 30 days after publication of the SORN "unless USDA determine[d] they must be changed as a result of public comment," the Renewed Data Demand Letter clearly indicates that USDA no longer holds open the possibility of changing course in response to comments.

[26] In adopting these regulations, USDA created a case sampling methodology to validate state error rates—but it does not require, or even contemplate, states turning over *all* data regarding SNAP recipients. 7 C.F.R. § 275.3(d).

benefits from more than one state, and that system went live as recently as 2024 after years of work by USDA with input from the public. 7 U.S.C. § 2020(x)(2)(A); *see* Leibman Decl. ¶ 8 (describing comments on NAC). Nowhere has USDA explained why the Renewed Data Demand is necessary in addition to these procedures to "ensure program integrity."

*Third*, the Renewed Data Demand is arbitrary and capricious because it runs counter to the "efficiency" goals USDA purports to further. In both the Initial and the Renewed Data Demands, USDA proclaims its goal of "eliminat[ing] bureaucratic duplication and inefficiency" per the directive in the March 20, 2025 Executive Order "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos." But USDA's data collection *creates* waste and inefficiency by duplicating work already done by states. As described above, states are and will remain statutorily obligated to perform these functions of policing their SNAP programs for fraud and overpayments. Nothing about USDA's effort eliminates legal requirement that states carry out these functions, making USDA's actions duplicative. Where USDA's actions directly contradict its stated goals, they are clearly arbitrary and capricious.

*Fourth*, USDA's data collection arbitrarily lacks explanation in other respects. USDA has failed to say precisely what data fields states and vendors are to turn over, and yet they remain subject to the threat of noncompliance procedures made in the Initial Data Demand. In addition, USDA has failed to explain how the information sought is "necessary for the proper performance" of its functions and why it has "practical utility." 44 U.S.C. §§ 3506(c)(2)(A)(i), (c)(3)(A). Nor has USDA explained why it is seeking to collect records back to January 1, 2020, when the statute creates a three-year record retention period. 7 U.S.C. § 2020(a)(3)(B)(iii).

### III.     Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief.

Plaintiffs are suffering, and will continue to suffer, irreparable injury from USDA's

unlawful actions. Not only have USDA's actions jeopardized Individual Plaintiffs' sensitive personal information, but it has done so in a way that impairs the missions of the Organizational Plaintiffs. Preliminary relief "requires only a likelihood of irreparable injury." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The injury "must be both certain and great; it must be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (internal quotation marks and formatting omitted). Plaintiffs' injuries satisfy that standard.

### A.      The Individual Plaintiffs are irreparably harmed by USDA's unlawful collection and use of their private information.

The harms caused by the unlawful disclosure of personal information irreparably harms the Individual Plaintiffs. "There is no doubt that public dissemination of sensitive, private information is an irreparable harm." *All. for Retired Americans v. Bessent*, No. 25-cv-0313 (CKK), 2025 WL 740401, at *21 (D.D.C. Mar. 7, 2025). Where information subject to an unlawful disclosure is highly sensitive, courts are likely to find irreparable harm even if the disclosure is not public or widely disseminated. *See, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (proprietary business information shared by former employee to competitor); *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (psychiatric records disclosed in unsealed court files).

In this analysis, Courts also consider both the breadth of disclosure and the steps taken by an unlawfully receiving party to "monitor and control" further dissemination. *See, e.g.*, *All. for Retired Americans v. Bessent*, 2025 WL 740401, at *21 (finding no irreparable harm where measures were in place to "monitor and control" their access). But even where just one person has unauthorized access, the resulting harm can be irreparable where the context of the

disclosure is particularly problematic. *See Hum. Touch DC, Inc. v. Merriweather*, No. 15-cv-00741 (APM), 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (finding irreparable harm where terminated employee gained access to patient records and the health agency's "currency [was] its ability to . . . maintain the confidentiality of its patients' records and information").

The circumstances of the collection and use here establish irreparable harm. USDA has granted itself sweeping authority to re-disclose Individual Plaintiffs' sensitive information, as USDA deems appropriate. The information at issue is extensive; the June SORN describes fields "including but not limited to" name, Social Security number, etc., and "including but not limited to" dollar value information for SNAP benefits. 90 Fed. Reg. at 26,552. And as described *supra* at 26-30, routine uses 8 and 11 permit virtually limitless disclosure to any government body, foreign or domestic, based on nothing more than the record's "relevance" as determined by USDA without review or notice. The breadth of the re-disclosure described in the SORN—and the fact that no data disclosure can fully be undone—constitutes irreparable harm.[27]

## B. Plaintiffs are irreparably harmed by USDA's denial of information vital to an ongoing debate.

Whether an informational harm is irreparable depends on both the importance of the information and the relative timing of its denial. For example, a court in this district granted a preliminary relief to Plaintiff EPIC where, absent such relief, it would be denied "timely" access to information "vital to the current and ongoing debate" about warrantless surveillance. *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006). Likewise, because "stale

---

[27] In the SNAP context, disclosure of confidential information can be devastating. For example, USDA is collecting EBT card numbers which, if compromised, can lead to stolen benefits and result in recipients going without food. *See* Anderson Decl. ¶ 8 (explaining that "skimming," wherein a bad actor gains access to an EBT card number and spends down benefits, has resulted in over $155 million in lost benefits in Tennessee); Ramos Decl. ¶ 7 (describing extra precautions to avoid skimming).

information is of little value," *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), providing information to the public about a proposed collection after the collection eviscerates the benefits that Congress saw in obtaining public views *before* a data collection. Under USDA's proposed schedule, states will start transmitting data on July 24, at which time USDA's right to re-disclose pursuant to the routine uses has already taken effect.

The information the Plaintiffs have been denied is both timely and important. USDA has never had a nationwide database of information on SNAP applicants and recipients; its attempt to do so has garnered substantial attention.[28] Yet Plaintiffs—who are undeniably interested parties as to their own data, the integrity of the SNAP program, and the importance of electronic privacy—have been denied the information they are entitled to through the PRA's ICR process. Only with the information the law requires USDA to provide can Plaintiffs timely and meaningfully participate in the ongoing debate about USDA's data collection.

The informational injury causes Plaintiffs irreparable harm by meaningfully curtailing their ability to monitor the government's actions and participate in the ongoing debate not just about SNAP data but about the Trump Administration's broader data collection project.[29] A final judgment would be insufficient to remedy Plaintiffs' harms because by that time, MAZON and EPIC will have been deprived of their ability to "effectively do [their] job to address a time sensitive issue." *Doctors for Am. v. Off. of Personnel Mgt.*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025); *see also* Butler Decl. ¶¶ 13, 17, 21.

---

[28] *See, e.g.*, Jude Joffe-Block, *USDA, DOGE demand states hand over personal data about food stamp recipients*, National Public Radio (May 9, 2025), https://www.npr.org/2025/05/09/nx-s1-5389952/usda-snap-doge-data-immigration.

[29] Frenkel, Sheera and Krolik, Aaron, *Trump Taps Palantir to Compile Data on Americans*, https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html?unlocked_article_code=1.W08.y5KI.JsDmeo88IQnm&smid=nytcore-ios-share&referringSource=articleShare.

**C.    MAZON's anti-hunger mission faces immediate irreparable harm because the unlawful Data Collection will cause distrust in SNAP.**

MAZON faces a second irreparable injury to its mission and programs. USDA's Initial and Renewed Data Demands have "perceptibly impaired" MAZON's programs and directly conflict with its anti-hunger mission. Leibman Decl. ¶¶ 9, 12-13; *see Havens*, 455 U.S. at 379. The D.C. Circuit has found irreparable harm justifying emergency intervention where a favorable final judgment would be inadequate for reasons particular to the case. *See, e.g.*, *League of Women Voters*, 838 F.3d at 9 (upholding a finding of irreparable harm where challenged proof-of-citizenship requirement impaired voter-registration work with an upcoming election).

From decades of experience, MAZON knows which individuals are likely not to engage with SNAP as a result of the data collection. *See* Leibman Decl. ¶¶ 8 (mixed-status families), 13 (elderly individuals and single mothers fleeing domestic violence). The result is predictable and devastating: eligible recipients will forgo benefits and new applicants will not apply. More people will go hungry. *See* Anderson Decl. ¶¶ 7-9; Elzinga Decl. ¶¶ 7-11; Machicote Decl. ¶¶ 5-6. Food insecurity and hunger cannot be remedied through *post hoc* measures. Judicial intervention to postpone the unlawful data collection cannot wait.

**IV.    The Balance of Equities and Public Interest Favor Granting a Temporary Restraining Order.**

As against the certain and irreparable injury that innumerable members of the public—including Plaintiffs—are presently experiencing because of USDA's unlawful actions, USDA will suffer no cognizable harm if enjoined from continuing to perpetrate those actions. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). USDA will suffer no

injury from remaining bound by the same policies and restrictions they agreed to adhere to in their prior filings. *See* Dkt. 11, 11-1.

In contrast, a temporary restraining order will serve the public interest. "There is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted). There is also a "general public interest in open and accountable agency decision-making." *Creosote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and enter a temporary restraining order that "postpone[s] the effective date" of the Renewed Data Demand, as described more fully in the accompanying motion.


Dated: July 17, 2025                                    Respectfully Submitted,


Deana El-Mallawany*                          */s/ Daniel A Zibel*
PROTECT DEMOCRACY PROJECT         Daniel A. Zibel (D.C. Bar No. 491377)
15 Main Street, Suite 312                      Madeline Wiseman (D.C. Bar No. 90031948)
Watertown, MA 02472                          Melissa Padilla (D.C. Bar No. 90018065)
(202) 579-4582                                    NATIONAL STUDENT LEGAL DEFENSE
deana.elmallawany@protectdemocracy.org   NETWORK
                                                      1701 Rhode Island Ave. NW
Nicole Schneidman*                           Washington, DC 20036
PROTECT DEMOCRACY PROJECT         (202) 734-7495
P.O. Box 341423                                Email: dan@defendstudents.org
Los Angeles, CA 90034-9998                          madeline@defendstudents.org
(202) 579-4582                                            melissa@defendstudents.org

41

nicole.schneidman@protectdemocracy.org

JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos
& Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos
& Hollingsworth*

*Counsel for Plaintiffs*

John L. Davisson, D.C. Bar #1531914
Sara Geoghegan, D.C. Bar #90007340
Kabbas Azhar, D.C. Bar #90027866
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org
        geoghegan@epic.org
        azhar@epic.org

*Counsel for EPIC*

*Admitted Pro Hac Vice*