# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NAMOD PALLEK, *et al.* | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:25-cv-01650-JMC |
| BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.* | |
| *Defendants.* | |

**DECLARATION OF DANIEL A. ZIBEL IN SUPPORT OF**
**PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND/OR FOR POSTPONEMENT UNDER 5 U.S.C. § 705**

I, Daniel A. Zibel, hereby declare as follows:

1.      I am an attorney admitted to practice in this Court. I am the Vice President and

Chief Counsel at the National Student Legal Defense Network ("Student Defense") and one of the

Counsel for Plaintiffs. I am over 18 years of age, of sound mind, and am otherwise competent to

make this Declaration. The evidence set out in this Declaration is based upon my personal

knowledge, and information shared with me by clients and co-counsel in this case, and pursuant

to 28 U.S.C. § 1746.

2.      I submit this Declaration in support of Plaintiffs' Renewed Motion for a Temporary

Restraining Order and/or for Postponement Under 5 U.S.C. § 705.

3.      On July 15, 2025, Plaintiff Namod Pallek submitted a comment via

Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for

USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information

Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit A.

4.      On July 15, 2025, Plaintiff Julliana Samson submitted a comment via Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit B.

5.      On July 15, 2025, Plaintiff Diana Ramos caused to be submitted a comment via Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit C.

6.      On July 15, 2025, Plaintiff Catherine Hollingsworth caused to be submitted a comment via Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit D.

7.      On July 16, 2025, Plaintiff MAZON: A Jewish Response to Hunger submitted a comment via Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture

(USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit E.

8.      On July 16, 2025, Plaintiff Electronic Privacy Information Center ("EPIC") submitted a comment via Regulations.gov (Docket FNS-2025-0024) in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025. A true and correct copy of those comments is attached hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information, and belief.

Dated: July 17, 2025                    _/s/ Daniel A. Zibel_
                                        Daniel A. Zibel

# EXHIBIT A

July 15, 2025

Food & Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place,
Alexandria, VA 22314

To Whom It May Concern:

My name is Namod Pallek and I am writing this because I am a current SNAP recipient in California and have some thoughts on the government's plan. I am a full-time, undergraduate student at the University of California, Berkeley and, honestly, without SNAP, I would not be able to afford nutritious meals. To receive SNAP benefits, I already had to give the California Department of Social Services a lot of really personal information.

The government says it needs all my data to stop fraud in the SNAP program. But don't state agencies already police fraud? California made me submit a ton of personal information and documents, such as scans of my passport, to prove I was eligible. It seems inefficient for the federal government to review all my information, too. Instead of demanding that states hand over unspecified personal information of SNAP applicants, maybe the federal government should just check how the states are doing their fraud prevention to make sure they are on top of things.

Even if the federal government truly needs my data to look for fraud, it really worries me that I do not know exactly what data California will be handing over to the federal government. I know there is always a risk that information can get messed up when it is moved from one place to another. For example, when I first received SNAP benefits I was a minor under my parent's household and now I am receiving SNAP benefits under my own household. What if my data gets corrupted or changed by mistake? What if an Artificial Intelligence (AI) system does not understand my change in circumstances? Could that lead the federal government to wrongly accusing me of fraud? That is a scary thought.

I have also read reports that the federal government is trying to use more automated systems. The federal government's notice and subsequent July 9, 2025, demand letter to states makes it seem like they want to grab a lot of data quickly, and I am worried they might just feed all of it into AI systems. I can imagine these AI systems trying to sift through thousands of documents. The problem is that each state likely has its own rules on how they record information. Because of different state processes, it is likely that AI would not be able to properly figure out who has committed fraud or not.

To avoid all these big problems, which could really hurt me and other SNAP recipients, the government needs to slow down. They should take their time to adequately consider the public's concerns, make sure the data transfer is completely accurate, and should not use AI to review this sensitive data. The federal government should also work closely with state governments to make

sure the data is correct and that they truly understand how to read and interpret the information states have collected.

Thank you for considering my comment.

Sincerely,

Namod Pallek

# EXHIBIT B

July 15, 2025

Food & Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place,
Alexandria, VA 22314

To Whom It May Concern:

My name is Julliana Samson, and I am writing this because I am a SNAP recipient in California and have some thoughts about what the government is proposing. I am a first-generation, college student at the University of California, Berkeley. As a full-time student and recipient of federal work-study, I rely on SNAP to afford nutritious meals. To receive SNAP benefits, I had to give the California Department of Social Services a lot of really personal information.

I don't understand why the federal government says it needs all my data to stop fraud in the SNAP program when state agencies already police fraud. There are so many different documents and information required to apply for SNAP, and it seems inefficient for the federal government to review all of that information when states already do it. Instead of demanding that states hand over all our personal information, the federal government should check how states are monitoring their program to make sure they are doing their job right.

If the federal government must get some information, they should only ask for the bare minimum they need to do their job, nothing more. But their plan asks states for a huge list of data over a long period of time, and I'm confused about what data is even included. It sounds like the federal government hasn't decided either, and they may ask for more data later without SNAP recipients like me even knowing about it. For example, I submitted copies of my identification, will California be required to turn that over? Do they really need so much data to detect fraud? It doesn't seem fair that the federal government can make a demand for my data but never clearly tell me what data they are going to have.

I shared my sensitive information with California with a clear understanding that it was only to determine my eligibility for SNAP and make sure I didn't break any of the rules of being on SNAP. Now, this notice from the federal government says they plan to share my data with other federal agencies for reasons that have nothing to do with finding errors and fraud in the SNAP program. I never agreed to that, and it scares me. I also do not know what data they will have on me because the notice does not specify. I am worried my personal information will be used for things I never intended or consented to. I am also worried that the data will be used to remove benefits access from student activists who have views the administration does not agree with. Before the Department of Agriculture shares my data, or anyone else's, they should get our permission.

Thank you for considering my comment.

Sincerely,

Julliana Samson

# EXHIBIT C

July 15, 2025

Food & Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place,
Alexandria, VA 22314

To Whom It May Concern:

My name is Diana Ramos. I receive SNAP in New York and I am writing this comment because I am concerned about what the federal government is trying to do. I rely on SNAP to live. I have Type II Diabetes and SNAP is the only way I can afford to buy the food that I need to manage my disease.

I don't understand why the federal government needs my data. I have submitted a lot of personal information to my state agency to receive benefits and it has reviewed my information to determine whether I am eligible for benefits. I don't understand why the federal government is going to repeat this work. It seems like it will be inefficient for the federal government to be redoing work that the state has already done. I don't think USDA should be creating this system at all.

My state has found me to be eligible for benefits and I am concerned that USDA will incorrectly find that I am ineligible for benefits. What happens to my case if USDA reviews my data and thinks I'm not eligible even though I am? I was previously receiving SNAP in Florida and I am now receiving SNAP in New York. I know different states have different waivers and requirements to be eligible for SNAP. How will the federal government keep track of all of these different policies and accurately review so many cases? Will USDA wrongly accuse me of committing fraud if it makes a mistake in the review of my data?

I am also very concerned about my data potentially being shared with even more agencies. The more my data is shared, the more insecure I feel about how protected my data will be. With each additional transfer, there is a risk that my information will become corrupted and messed up in the system. And there's more opportunity for a breach so that someone who shouldn't have access can see my data. Even if USDA creates this system, it shouldn't share the data in the system with other agencies.

I am also concerned because I don't know exactly what data USDA is going to receive from my states. For example, will it have my passport number or an actual copy of my passport? I think USDA needs to be clear about what data is actually part of this system. My identity was stolen in 2004 and it was a horrible experience. It was extremely stressful to try to fix all of the problems that my identity theft caused. It was time consuming and very expensive, and since then I have been very vigilant about protecting my data and personal information. I am worried that since USDA is rushing through this process, they are not thinking everything through and may compromise the safety of my data.

Thank you for considering my comment.

Sincerely,

Diana Ramos

# EXHIBIT D

July 15, 2025

Food & Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place,
Alexandria, VA 22314

To Whom It May Concern:

My name is Catherine Hollingsworth. I receive SNAP in Alaska. I am submitting a comment because I am extremely concerned about what the federal government is trying to do. I am a disabled senior woman, and I am almost 76 years old. I live on my own and depend on public safety net programs, including SNAP, to support my small Social Security income. My many health conditions restrict what I am able to eat, so without SNAP, I would not be able to afford food for an entire month. When I first learned that my state would be giving away the personal information of SNAP recipients, I felt violated and shocked. I am so concerned about the potential ways my data can be compromised, that if I could, I would not provide any more information to my state agency. But I know that I cannot do that because I would not be able to survive without SNAP.

As a long-term recipient of SNAP, I know that if a person needs to participate in social safety net programs they must be "means tested." This is a lengthy process, requiring that I submit a lot of paperwork, including my bank information, scans of IDs, leases, copies of medical information including prescriptions, and even names and addresses of others to verify that all the information I submitted was true. I also must submit receipts for any prescriptions I purchased and use a credit card even if the copay is a quarter to prove that I was the one that paid for my prescriptions. I also have to show that the receipts match the label of the medicine, and have provided all of this information to my state agency. This means the state has information about my pharmacy address, my credit card, the prescriptions I am taking, and more. Is the federal government going to have all of this documentation, including the scans of my IDs? I am confused about what data my state will be providing the federal government; but given all the information my state possesses to verify my and others' eligibility, the federal government should not be creating the SNAP data system.

I am very concerned about the data sharing process. My personal information is critical to my sense of safety. I am single and live alone, all of which present increasingly difficult moments for a disabled senior woman. Pharmacies and doctors have HIPPA policies in place. Because of these protections, I feel protected when I share my information. Data this sensitive is not to be taken lightly and without consideration of the public's concerns. Just in the last few months, I have had multiple security issues. My computer was hacked, requiring me to spend over $250 dollars to sort things out and purchase safety software. I have had increasing numbers of phishing attempts over the phone and online. When I first heard that my state was going to be transferring my data after the May 6 letter from USDA to state SNAP directors, I immediately put a fraud alert on my bank account and froze my credit. All of this has put me on a stress filled path, which could cause me to have an Addison's attack that could take my life. I am very worried that with each additional data

transfer data, it will be less secure and that my information will be severely compromised. If the federal government must create a new SNAP data system, it should not rush the data transfer and instead needs to prioritize protecting the data.

I think the government is rushing through this process to the detriment of me and my fellow Alaskans. The government is not considering the public's concerns or taking any steps to try to address them.  I have no confidence that my data will be secure in light of how flippantly the government is treating my personal information. The level of disregard that I feel from the federal government is an unconscionable and egregious harm, and in the case of senior citizens who rely on this program for survival, it is elder abuse.

Sincerely,

Catherine Hollingsworth

# EXHIBIT E

**MAZON** | A Jewish Response
To Hunger

15303 Ventura Blvd
Suite 1100
Sherman Oaks, CA 91403
*t* (310) 442-0020
*f* (310) 442-0030
mazon.org

1101 14th Street, NW
Suite 930
Washington, DC 20005
*t* (202) 830-0730
*f* (202) 830-0649

July 16, 2025

FNS Privacy Officer, Information Management Branch
Food and Nutrition Service, USDA
1320 Braddock Pl, Alexandria, Virginia 22314

**Re: United States Department of Agriculture (USDA) System of Records Notice
(SOR) entitled USDA/FNS-15, "National Supplemental Nutrition Assistance
Program (SNAP) Information Database"**

MAZON: A Jewish Response to Hunger provides these comments in response to
the System of Records Notice for the Food and Nutrition Service (FNS):
"National Supplemental Nutrition Assistance Program (SNAP) Information
Database."[1] MAZON has grave concerns regarding both the proposed new
Database and the accompanying Notice.

Inspired by Jewish values and ideals, MAZON is a national advocacy organization
working to end hunger among people of all faiths and backgrounds in the
United States and Israel. For 40 years, MAZON has been committed to ensuring
that people have access to the resources they need to be able to put food on
the table. MAZON is a leading voice on anti-hunger issues and on issues that
have been previously overlooked or under-addressed—this mission includes
protecting SNAP for all families and individuals who rely on the Program to
nourish themselves.

As an organization with decades of experience as a partner of and grant maker
to hunger fighting organizations across the country, MAZON knows that the
incomplete, inconsistent, and rushed request for such sensitive data has created
and will continue to cause confusion for State agencies, SNAP applicants and
beneficiaries, and organizations who work as vital connectors between those
two groups.

Congress established SNAP through the Food Stamps Act of 1964 to "promote
the general welfare… [by] safeguard[ing] the health and well-being of the
Nation's population and raise levels of nutrition among low-income
households."[2] With this goal guiding its operations, SNAP has grown into the
largest food assistance program in the country.[3] As with all measures related to

---

[1] Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521.
[2] Food Stamp Act of 1964, Pub. L. No. 88-525, § 2, 78 Stat. 703, 703 (1964).
[3] U.S. Dep't of Agriculture Economic Research Service, Supplemental Nutrition Assistance
Program, https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-
nutrition-assistance-program-
snap/#:~:text=The%20Supplemental%20Nutrition%20Assistance%20Program,program%2
0for%20low%2Di ncome%20Americans (Jan 8, 2025).

the SNAP Program, the first priority to the implementation of the program must be the overall purpose of SNAP—to alleviate hunger and malnutrition for individuals and families.

When SNAP applicants and recipients give private information to the State agency that administers the Program, they do so with the understanding that their information will be kept private and safe. At no point in the process of this data collection, nor in the SORN published on June 23, 2025, has USDA provided a full and exhaustive list of the data now being sought.[4] An incomplete notice in this case is functionally no notice at all, given that USDA has not limited the private and deeply personal data the agency seeks to collect.

In addition to a lack of clarity on the records that will be collected, the SORN at issue does not make clear the actual reasons for such a wide ranging data collection for which "[t]he primary purposes … are to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity."[5] There are already numerous systems in place to ensure program integrity, and the Notice contains no evidence that those systems are not functioning as intended or leaving a meaningful gap in lawful data collection. Creating duplicative systems seems contrary to Executive Order 14243: Stopping Waste, Fraud, and Abuse by Eliminating Information Silos cited as authorizing this data collection in the Notice.[6]

Since the passage of the most recent Farm Bill, the authorizing legislation for SNAP, there has been a new data collection system implemented for all participating administering agencies called the National Accuracy Clearinghouse (NAC). From 2013 to 2015, five southern states participated in a pilot National Accuracy Clearinghouse program to "curb interstate dual participation in SNAP through a shared database of eligibility information that is updated daily."[7] In May 2014, Mississippi, Louisiana, Florida, Alabama, and Georgia all reported less than one percent of dual participants out of all individuals eligible to participate in SNAP.[8] Following the pilot program, as part of the Agriculture Improvement Act of 2018 ("Farm Bill"), Congress directed the Secretary of Agriculture to establish the NAC nationwide.[9] Congress required that data be maintained only as long as needed to accomplish the Act's purpose, mandated additional privacy

---

[4] Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521. "The system consists of records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients."

[5] Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521.

[6] *Id.*

[7] Pub. Consulting Grp., Inc., *National Accuracy Clearinghouse (NAC) Evaluation Final Report* 5 (2015).

[8] *Id.* at 9 tbl.1.

[9] Agriculture Improvement Act of 2018, Pub. L. 115-334, § 4010, 132 Stat. 4490, (2018).

protections for vulnerable individuals, and directed the Secretary to establish security standards for data transmitted to the NAC.

Pursuant to Congress' direction, on October 3, 2022, and set to take effect on December 6, 2022, FNS issued the interim final rule requiring SNAP state agencies nationwide, over the course of a five-year phase-in, to upload daily information regarding individuals receiving SNAP benefits in their states to the NAC to "ensure they are not already receiving benefits in another state" with the goal of "enhanc[ing] Program integrity by reducing the risk of improper payments."[10] In contrast to the creation of the National Accuracy Clearinghouse, the lack of consideration, specificity, and evidence in this data collection seems both arbitrary and capricious.

Furthermore, the routine uses described in the June 23 SORN are overbroad and inconsistent with the SNAP authorizing statute cited in the SORN itself. Routine Use 8 contemplates unlimited disclosure for law enforcement purposes, granting USDA effectively boundless authority to share SNAP data, which is far broader than the allowable uses of SNAP participant data in the authorizing statute. The statute allows sharing of participant data, but on a much more case-specific, household basis. By contrast, this Notice impermissibly demands a large scale, unlimited data collection and distribution.[11] Routine Use 11 is equally overbroad and unconstrained, allowing USDA to disclose SNAP data to any domestic government that administers or investigates any benefits program supported by federal funds, so long as USDA believes the disclosure is "reasonably necessary . . . to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs."[7] This goes far beyond the relevant disclosures permitted by Congress. As discussed above, the statute already has a provision for such enforcement that is narrowly tailored, and the SORN provides no mention of this process nor evidence that it is inadequate.

Since the initial letter on May 6 requiring provision—for the first time in Program history—of essentially unlimited data, confusion has been widespread and profound. In response to litigation, USDA paused their request and stated that no data had been collected.[13] On June 23, USDA published the SORN for the request – addressing only one concern raised by the litigation. Halfway through the public comment period, USDA sent another letter setting a new and fast approaching deadline of July 24 for the same data that had already been requested and paused once. July 24 is notably the day immediately following the close of the SORN public comment period. This timeline leaves no time to consider, let alone meaningfully address, any comments including questions from State agencies seeking to responsibly comply without running afoul of

---

[10] 87 Fed. Reg. at 59,633.
[11] 7 U.S.C. § 2020(e)(8) & (15)
[7] 90 Fed. Reg. 26,523.
[13] *Pallek et al. v. Rollins et al.*, 25-cv-01650-JMC (D.D.C.), Dkt. 11.

federal privacy laws or similar laws in their own States.[12] For example, the Georgia Department of Human Services submitted a comment on July 11, 2025—two days after the renewed demand letter—seeking clarification on what data to submit and how.[8]

The vital importance of the Supplemental Nutrition Assistance Program and the highly sensitive data being requested warrant a more thoughtful and thorough approach than the one exhibited here. Leaving aside for a moment the procedural issues, the breadth of the data request is staggering. The May 6 letter requested data for both participants AND applicants from the beginning of 2020 to the present. This includes a pandemic era time period where the unemployment rate was as high as 14.8%[13] and SNAP application rates soared. This illustrates the wide swaths of American families who will have their data swept up in this improper and unlawful request – families who did not consent to such a wholesale exposure of their data in exchange for lifesaving assistance to put food on the table with dignity, and nor should they be required to.

In sum, SNAP is the nation's most integral resource in the defense against hunger. Ensuring systems are in place to advance program integrity and combat fraud are an important component of an effective SNAP Program, but this request for data and the accompanying SORN do not accomplish this purpose, nor have the potentially negative and unlawful effects been considered adequately. For these reasons, MAZON respectfully requests that the System of Records Notice for the Food and Nutrition Service (FNS): "National Supplemental Nutrition Assistance Program (SNAP) Information Database be withdrawn, and that USDS abandon its proposal to establish a data system and halt all data collection related to the Notice. If you have any questions, please contact Sarah Pratter, Director of Legal Advocacy at MAZON: A Jewish Response to Hunger, at spratter@mazon.org.

Sincerely,

Sarah Pratter
Director of Legal Advocacy
MAZON: A Jewish Response to Hunger

---

[12] FNS-2025-0024-0005, available at https://www.regulations.gov/comment/FNS-2025-0024-0005
[8] *Id.*
[13] https://www.bls.gov/charts/employment-situation/civilian-unemployment-rate.htm

# EXHIBIT F



**Electronic Privacy Information Center**
1519 New Hampshire Avenue NW
Washington, DC 20036, USA



+1 202 483 1140
+1 202 483 1248
@epic.org
https://epic.org

COMMENTS OF THE ELECTRONIC PRIVACY INFORMATION CENTER

to the

U.S. DEPARTMENT OF AGRICULTURE

System of Records Notice, USDA/FNS-15: National Supplemental
Nutrition Assistance Program (SNAP) Information Database

90 Fed. Reg. 26,521 | FNS-2025-0024

July 16, 2025

---

The Electronic Privacy Information Center (EPIC) submits these comments in response to the System of Records Notice for USDA/FNS-15: "National Supplemental Nutrition Assistance Program (SNAP) Information Database," published in the Federal Register by the U.S. Department of Agriculture (USDA) on June 23, 2025.[1] EPIC is a public interest research center in Washington, D.C., established in 1994 to protect privacy, freedom of expression, and democratic values in the information age.

The proposed National SNAP Information Database (NSID) arises from USDA's ongoing efforts to amass the sensitive personal information of tens of millions of SNAP recipients and applicants held by 53 state agencies into a single national database. USDA has claimed that such an unprecedented consolidation of personal data is necessary to eliminate "fraud" and "bureaucratic duplication and inefficiency"[2]—even though establishing such a database would create a singularly

---

[1] Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521.
[2] *FNS Data Sharing Guidance*, U.S. Dep't of Agric. at 1 (May 6, 2025),
https://www.fns.usda.gov/sites/default/files/resource-files/fns-data-sharing-guidance5.6-V6-050625.pdf.

rich target for hackers and fraudsters and duplicate the functions of the Congressionally-established (and far more secure) National Accuracy Clearinghouse.[3] USDA has already been forced to suspend this data demand once before, owing to the agency's failure to disclose key information required by the Privacy Act of 1974 and the Paperwork Reduction Act of 1980 and to solicit public comment thereon.[4] USDA now seeks to cure that failure, in part, by publishing a System of Records Notice (Notice) for a proposed system that would house the sensitive personal data of every SNAP recipient and applicant in the country—data for which USDA recently renewed its demand.[5]

As set out below, the USDA's efforts are unavailing. The System of Records Notice for the proposed NSID exhibits significant errors and omissions; provides for "routine uses" of SNAP data that are incompatible with both the purposes for which it was collected and express Title 7 protections for such data; and reveals numerous other violations of the Privacy Act that threaten to subject SNAP recipients and applicants to significant harm. USDA should withdraw its Notice, abandon its proposal to establish the NSID, and halt its unlawful efforts to compel states and EBT vendors to turn over the confidential personal data of SNAP recipients and applicants.

## I. The Notice exhibits significant errors and omissions.

To begin with, USDA's Notice misstates or fails to include certain key information, a reflection of the haste with which USDA has developed the proposed NSID. For example, the Notice misidentifies the instant proceeding as a "rulemaking" and omits basic information for email and mail submission of comments, leaving "[Insert email contact]" and "[Insert mail contact]"

---

[3] *SNAP National Accuracy Clearinghouse (NAC)*, USDA (June 18, 2025), https://www.fns.usda.gov/snap/nac.
[4] Zach Montague, *Trump Administration Backs Off Effort to Collect Data on Food Stamp Recipients*, N.Y. Times (June 3, 2025), https://www.nytimes.com/2025/06/03/us/politics/trump-administration-personal-data-food-stamp-recipients.html; *see also Pallek v. Rollins*, EPIC (June 2025), https://epic.org/documents/pallek-v-rollins/.
[5] U.S. Dep't of Agric., *SNAP Database -Letter to State Agencies* (July 9, 2025), https://www.fns.usda.gov/snap/admin/database-letter.

placeholders in the published version.[6] The Notice also acknowledges that the NSID would be

"maintained in the FNS Amazon Web Service (AWS) cloud infrastructure environment," yet only

lists address information for Microsoft as the "third-party service provider."[7] Either USDA has failed

to disclose Microsoft's role in the operation of the proposed NSID or has mistakenly used

Microsoft's address information in lieu of Amazon's; either way, the Notice is clearly deficient.

More alarmingly, the Notice fails to identify any "polic[y or] practice[] of the agency

regarding . . . disposal of the records,"[8] proposing instead that "[a]ll records in this system will be

kept indefinitely unless otherwise required by law until NARA has approved a records schedule for

this system."[9] The suggestion that SNAP data might be kept "indefinitely"—that is, *never* disposed

of—is precisely the opposite of a records disposal policy. USDA's approach would expose SNAP

recipients and applicants to a heightened risk of data breach and data misuse far beyond any

colorable operational need for their personal information. Both the Privacy Act and the Code of Fair

Information Practices obligate USDA to give adequate public notice of its disposal policies and

practices, a requirement which cannot be satisfied by relying on a NARA records retention schedule

that does not yet exist.[10]

---

[6] 90 Fed. Reg. 26,521.
[7] *Id.*
[8] 5 U.S.C. § 552a(E)(4)(e).
[9] 90 Fed. Reg. 26,523.
[10] *See* 5 U.S.C. §§ 552a(e)(4)(E), (e)(11); Advisory Comm. on Automated Pers. Data Sys., U.S. Dep't of Health, Educ., & Welfare, *Records, Computers and the Rights of Citizens* (1973), https://www.justice.gov/opcl/docs/rec-com-rights.pdf ("Any organization proposing to establish a new system, or to enlarge an existing system, shall give public notice long enough in advance of the initiation or enlargement of the system to assure individuals who may be affected by its operation a reasonable opportunity to comment. The public notice shall specify: . . . The organization's policies and practices regarding data storage, duration of retention of data, and disposal thereof[.]").

**II. The Notice proposes 'routine uses' for SNAP data that are incompatible with both the original purpose of collection and Title 7 protections for such data.**

Although USDA seeks to grant itself tremendous latitude to use SNAP data contained in the NSID, several of the so-called "routine uses" set out in the Notice are not "compatible with the purpose for which [the SNAP data] was collected,"[11] and are therefore unlawful.

Because states certify SNAP eligibility and issue SNAP benefits, they have an operational need to collect and retain sensitive personal data on applicants and recipients. This includes an individual's Social Security number, date of birth, address, employment status, citizenship status, income, resources, and more.[12] The purposes for which this data may be disclosed are few. In recognition of the sensitive nature of the information collected, federal law requires states to establish "safeguards which prohibit [its] use or disclosure," with limited exceptions.[13] Disclosure of SNAP data is permitted solely "for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary," and for use in certain lawsuits by beneficiaries;[14] "to persons directly connected with the administration or enforcement of" the federal SNAP statute "*only* for such administration or enforcement";[15] for use by the Comptroller General of the United States for audits;[16] for law enforcement "for the purpose of investigating an alleged violation of" the SNAP statute or its regulations—but no other law enforcement purpose,[17] except for certain fields that can be released to law enforcement to locate a fugitive;[18] to garnish overpayments from the salaries of federal workers;[19] for the state agency (not USDA) to report to the former

---

[11] 5 U.S.C. § 552a(a)(7).
[12] 7 C.F.R. § 273.2(f).
[13] 7 U.S.C. § 2020(e)(8).
[14] 7 U.S.C. § 2020(a)(3)(B).
[15] 7 U.S.C. § 2020(e)(A) (emphasis added).
[16] 7 U.S.C. § 2020(e)(B).
[17] 7 U.S.C. § 2020(e)(C).
[18] 7 U.S.C. § 2020(e)(E).
[19] 7 U.S.C. § 2020(e)(8)(D).

4

Immigration and Naturalization Service (now Immigration and Customs Enforcement) that members of a household are ineligible to receive SNAP benefits because a person is in the United States unlawfully; or to address benefits paid to prisoners.[20]

In setting out permissible purposes for state disclosure of SNAP data, Congress mapped the outer limits of what can be considered "compatible" with the original purposes of collection (i.e., program administration and eligibility determination). But several of the "routine uses" identified by USDA in the Notice would far exceed these limits, rendering them incompatible and invalid under the Privacy Act. For example, routine use (8) would confer effectively boundless authority on USDA to share SNAP data for law enforcement purposes: any record could be disclosed to any agency of any government merely because it "indicates" (in USDA's unreviewable judgment) a "*potential* violation of [any] law, whether civil, criminal, or regulatory in nature."[21] This would impermissibly convert a federal benefit program into an all-purpose piggybank of personal data for use by law enforcement agencies, and it stands it marked contrast to the carefully circumscribed law enforcement disclosures permitted by Congress under 7 U.S.C. § 2020(e).

Routine use (11) is similarly unconstrained, purporting to allow USDA to disclose SNAP data to any domestic government that administers or investigates any benefits program supported by federal funds, so long as USDA believes the disclosure is "reasonably necessary . . . to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs."[22] This is a far cry from the relevant disclosures permitted by Congress under 7 U.S.C. § 2020(e), which are almost entirely tethered to *SNAP administration* and the prevention or investigation of *SNAP violations*.

---

[20] 7 U.S.C. §§ 2020(e)(8)(D), (e)(15), & (e)(18).
[21] 90 Fed. Reg. 26,522 (emphasis added).
[22] 90 Fed. Reg. 26,523.

Because multiple asserted "routine uses" in the Notice fail the Privacy Act's compatibility requirement and pose serious privacy risks to SNAP recipients and applicants, the Notice is fatally defective and should be withdrawn.

### III. The Notice reveals numerous other Privacy Act violations.

USDA's problems go well beyond its assertion of invalid "routine uses." Both the Notice and the NSID itself appear to violate multiple other provisions of the Privacy Act.

First, neither the Notice nor the established parameters of the NSID indicate that USDA has fulfilled its obligation to "collect information to the greatest extent practicable directly from" SNAP recipients and applicants,[23] even though SNAP data contained in the NSID may "result in adverse determinations about an individual's rights, benefits, and privileges under [a] Federal program[.]"[24] By USDA's own telling, the agency intends to use SNAP data "to identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions" and to "identify[] and eliminat[e] duplicate enrollments[.]"[25] Yet the Notice reflects no evaluation by USDA of whether it can carry out these same functions by collecting information directly from individuals (or by using existing program integrity tools like the National Accuracy Clearinghouse). Instead, USDA asserts without justification that it must undertake across-the-board consolidation of SNAP data from states and state vendors. This falls well short of the showing required by 5 U.S.C. § 552a(E)(2).

Second, although USDA cites generally to 7 U.S.C. § 2020 and two recent executive orders, the agency fails to establish that the creation of a new system of records (and the nationwide collection of SNAP data to populate that system) is "*necessary* to accomplish" any of USDA's lawful obligations under those authorities.[26] Indeed, given that USDA can only legally obtain SNAP

---

[23] 5 U.S.C. § 552a(E)(2).
[24] 5 U.S.C. § 552a(E)(2).
[25] 90 Fed. Reg. 26,522.
[26] 5 U.S.C. § 552a(e)(1) (emphasis added).

data from states under "data and security protocols agreed to by the State agency and Secretary"[27]—and given that USDA identifies no such protocols—it is unlikely that USDA could *ever* make the requisite showing of necessity for the sweeping collection of information described in the Notice. If anything, the proposed NSID threatens to significantly undermine the security of SNAP data that USDA is duty-bound to protect. Combining previously disaggregated datasets of personal information, particularly at the scale of a nationwide benefits program, exposes that data to heightened risk of breach by creating an attractive target and a single point of failure for fraudsters and other third parties to exploit. Nor can the SNAP data protections of Title 7 be superseded by an executive order, no matter how emphatically such an order insists on the consolidation of personal data. Whatever arguments USDA might raise to support the "necessity" of the NSID, USDA has certainly failed to make the showing required by 5 U.S.C. § 552a(E)(1) here.

Third, as noted in Part I, the Notice simply fails to identify a policy for the disposal of records contained in the proposed NSID, citing instead to a NARA records retention schedule that does not exist. This cannot satisfy USDA's disclosure obligation under 5 U.S.C. § 552a(E)(4)(e).

Finally, the Notice states that information in the proposed NSID will be provided both by "the 53 State agencies that administer SNAP and their designated vendors" and by various unspecified "Federal agencies with which USDA partners on program integrity efforts[.]"[28] The consolidation of federal- and state-held personal data in a system used for "identifying and eliminating duplicate [SNAP] enrollments"[29] almost certainly constitutes a "matching program," which includes any "computerized comparison of . . . a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility of . . . beneficiaries of . . . cash or in-

---

[27] 7 U.S.C. § 2020(a)(3)(B)(i).
[28] 90 Fed. Reg. 26,522.
[29] 90 Fed. Reg. 26,522.

7

kind assistance or payments under [a] Federal benefit program[.]"[30] Yet the Notice does not identify any computer matching agreements between USDA and the relevant agencies that would authorize USDA to carry out the proposed consolidation. Absent such agreements, USDA's establishment of a matching program using SNAP data would violate the computer matching restrictions of 5 U.S.C. § 552a(o).[31]

## IV. Conclusion

For the above reasons, USDA should withdraw its Notice, abandon its proposal to establish the NSID, and halt its unlawful efforts to compel states and EBT vendors to turn over the confidential personal data of SNAP recipients and applicants. If you require any additional information about USDA's Privacy Act and related statutory obligations, please contact John Davisson, EPIC Director of Litigation, at davisson@epic.org.

> */s/ John Davisson*
> John Davisson
> Director of Litigation

---

[30] 5 U.S.C. § 552a(a)(8).
[31] 5 U.S.C. § 552a(o).