# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NAMOD PALLEK, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*,<br><br>　　　　Defendants. | Case No. 1:25-cv-01650-JMC<br><br>Judge Jia M. Cobb |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.      The SNAP Program ............................................................................................... 2

II.     Executive Order 14243 and USDA's May 6, 2025 Letter .................................... 4

III.    USDA's System of Record Notice ........................................................................ 5

IV.     USDA's July 9, 2025 Letter .................................................................................. 7

V.      Procedural History ................................................................................................ 7

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.      Plaintiffs Cannot Demonstrate Irreparable Harm. ............................................. 10

        A.      The Individual Plaintiffs Have Failed To Establish Irreparable Injury
                Resulting From An Alleged Disclosure Of Their Information. ............. 11

        B.      The Organizational Plaintiffs' Alleged Denial Of Information Is Neither
                Harmful Nor Irreparable. ....................................................................... 14

        C.      MAZON Fails To Establish Irreparable Injury Based On Alleged Distrust. ........ 16

II.     Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims. ............... 17

        A.      Plaintiffs Have Failed To Establish A Likelihood Of Article III Standing. ......... 17

                1.      Plaintiffs Have Failed to Establish Injury-in-Fact from the Alleged
                        Disclosure of Their Information ............................................. 17

                2.      Plaintiffs have Failed to Establish Informational and Procedural
                        Injury .......................................................................................... 22

                3.      MAZON Fails to Establish Independent Organizational Injury ............. 23

        B.      Plaintiffs Fail To Establish Likelihood Of Success On The Merits Of Their
                APA Claims. ............................................................................................ 26

                1.      Plaintiffs Cannot Assert Violations Of The Privacy Act Through
                        The APA. ..................................................................................... 26

                2.      Plaintiffs Cannot Establish A Violation Of The Privacy Act. .................. 28

3.      Plaintiffs Cannot Establish A Violation Of The Paperwork
        Reduction Act........................................................................... 32

4.      USDA's Action Is Not Arbitrary And Capricious. ................................... 37

III.    Balance of Equities ............................................................................... 36

IV.     The Court Should Convert the Motion To A Preliminary Injunction. ............................. 38

V.      Plaintiffs Should Be Ordered To Post Substantial Security In Connection With
        Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed
        Pending Any Appeal. ............................................................................... 39

CONCLUSION................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Alegent Health-Immanuel Med. Ctr. v. Sebelius,*
    34 F. Supp. 3d 160 (D.D.C. 2014) ................................................................. 33

*\*All. for Retired Ams. v. Bessent,*
    770 F. Supp. 3d 79 (D.D.C. 2025) ....................................... 10, 12, 13, 16

*\*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.,*
    --- F. Supp. 3d ---, 2025 WL 1129227 (D.D.C. Apr. 16, 2025).................... 17, 21, 26

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
    No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) ...................... 26

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
    No. CV ELH-25-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ......................... 26

*Am. Fed'n of Tchrs. v. Bessent,*
    765 F. Supp. 3d 482 (D. Md. 2025) ......................................................... 26

*Am. Fed'n of Tchrs. v. Bessent,*
    No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ....................... 26

*Ames v. U.S. Dep't of Homeland Sec.,*
    861 F.3d 238 (D.D.C. 2017) ................................................................. 31

*Ashland Oil, Inc. v. FTC,*
    409 F. Supp. 297 (D.D.C. 1976) .......................................................... 13

*Assocs., Inc. v. Nat'l Insts. of Health,*
    579 F.2d 1155 (9th Cir. 1978) ............................................................. 26

*Baker DC v. Nat'l Labor Rels. Bd.,*
    102 F. Supp. 3d 194 (D.D.C. 2015) ....................................................... 13

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ............................................................................ 25

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ............................................................................ 24

*Britt v. Naval Investigative Serv.,*
    886 F.2d 544 (3d Cir. 1989) ........................................................... 30, 31

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................ *passim*

*Chef Time 1520 LLC v. Small Bus. Admin.*,
    646 F. Supp. 3d 101 (D.D.C. 2022) ........................................................ 9

*Chichakli v. Tillerson*,
    882 F.3d 229 (D.C. Cir. 2018) ............................................................... 30

*Chung v. Dep't of Just.*,
    333 F.3d 273 (D.C. Cir. 2003) ............................................................... 25

*City of New Bedford v. Locke, Civ. A.*,
    No. 10-10789, 2011 WL 2636863 (D. Mass. June 30, 2011) .................. 33

*\*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................ 12, 16

*Comm. for a Constructive Tomorrow v. Dep't of the Interior*,
    No. 24-cv-774, 2024 WL 2699895 (D.D.C. May 24, 2024) ............... 10, 12

*Dallas Safari Club v. Bernhardt*,
    453 F. Supp. 3d 391 (D.D.C. 2020) ........................................................ 11

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ..................... 38

*Dew v. United States*,
    192 F.3d 366 (2d Cir. 1999) .................................................................. 25

*Dickson v. Direct Energy, LP*,
    69 F.4th 338 (6th Cir. 2023) .................................................................. 18

*Doctors for America v. Office of Personnel Management*,
    766 F. Supp. 3d 39 (D.D.C. 2025) ......................................................... 35

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ............................................................. 26

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ................................................................. 39

*\*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ........................................................................ 23, 24

*Gadelhak v. AT&T Servs., Inc.*,
    950 F.3d 458 (7th Cir. 2020) ................................................................. 18

*Garey v. James S. Farrin, P.C.*,
    35 F.4th 917 (4th Cir. 2022) .................................................................. 18

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*
  *of Alameda Cnty.*,
  415 U.S. 423 (1974) ................................................................................... 38

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) ................................................................... 9

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) ............................................................... 14

*Hosp. Staffing Sols., LLC v. Reyes*,
  736 F. Supp. 2d 192 (D.D.C. 2010) .......................................................... 14

*Human Touch DC, Inc. v. Merriweather*,
  No. 15-cv-00741 (APM), 2015 U.S. Dist. LEXIS 186805 (D.D.C. May 26, 2015) ............... 14

*Hyatt v. OMB*,
  908 F.3d 1165 (9th Cir. 2018) ............................................................ 33, 34

*Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................................. 16

*Jeffries v. Volume Servs. Am. Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) .......................................................... 20, 21

*Jones v. U.S. Dep't of Hous. & Urban Dev.*,
  No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ................ 25

*Krakauer v. Dish Network*,
  925 F.3d 643 (4th Cir. 2019) ................................................................. 18

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................ 10, 11, 17

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................. 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 9, 16

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) ................................................................. 18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................. 37

*Munaf v. Geren*,
  553 U.S. 674 (2008) ............................................................................. 9

*Muransky v. Godiva Chocolatier, Inc.,*
  922 F.3d 1175 (11*th Cir.), reh'g en banc granted, opinio*n vacated,
  939 F.3d 1278 (11th Cir. 2019), *and on reh'*g en banc, 979 F.3d 917 (11th Cir. 2020)........... 20

*Muransky v. Godiva Chocolatier, Inc.,*
  979 F.3d 917 (11th Cir. 2020) .................................................................................................. 21

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
  No. 1:25-cv-239, 2025 WL 314433 (D.D.C. Jan. 28, 2025)...................................................... 9

*Nat'l Treasury Emps. Union v. Trump,*
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025)..................................................... 39

*Nken v. Holder,*
  556 U.S. 418 (2009).................................................................................................................. 9

*Parks v. IRS,*
  618 F.2d 677 (10th Cir. 1980)................................................................................................. 26

*People for the Ethical Treatment of Animals,*
  130 F. Supp. 3d ....................................................................................................................... 37

*Prometheus Radio Project v. FCC,*
  652 F.3d 431 (3d Cir. 2011) .................................................................................................... 29

*Randolph v. ING Life Ins. & Annuity Co.,*
  973 A.2d 702 (D.C. 2009)....................................................................................................... 19

*Rimmer v. Holder,*
  700 F.3d 246 (6th Cir. 2012)................................................................................................... 25

*Roe v. Dep't of Def.,*
  947 F.3d 207 (4th Cir. 2020)................................................................................................... 37

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) .............................................................................................. 27

*Sampson v. Murray,*
  415 U.S. 61 (1974).................................................................................................................. 10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
  No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025) ............................................................ 37

*Six v. IQ Data Int'l, Inc.,*
  129 F.4th 630 (9th Cir. 2025).................................................................................................. 19

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)........................................................................................................... 21, 23

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................... 23

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ...................................................................... 27

*\*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................. *passim*

*Trump v. CASA, Inc.*,
  606 U.S. ---, 2025 WL 1773631 (2025) .......................................................... 12

*U.S. Dep't of Health & Hum. Servs.*,
  564 F. Supp. 3d 605 (N.D. Ohio 2021), *aff'd*, No. 21-3995,
  2022 WL 1576929 (6th Cir. May 19, 2022) .................................................... 31

*U.S. Dep't of Lab. v. Wolf Run Mining Co.*,
  452 F.3d 275 (4th Cir. 2006) .......................................................................... 36

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
  9 F.3d 138 (D.C. Cir. 1993) ............................................................................ 29

*Univ. of Cal. Student Ass'n v. Carter*,
  766 F. Supp. 3d 114 (D.D.C. 2025) ...................................................... 10, 12, 13

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) ........................................................................ 25

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................. 9, 15, 22, 23

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 10

*Wolf v. Regardie*,
  553 A.2d 1213 (D.C. 1989) ........................................................................ 18, 19

*Young v. U.S. Dep't of Justice*,
  882 F.2d 633 (2d Cir. 1989) ............................................................................ 21

## **Statutes**

5 U.S.C. § 552a ..................................................................................... *passim*

5 U.S.C. § 553 ............................................................................................ 27

5 U.S.C. § 702 ....................................................................................... 31, 32

5 U.S.C. § 704 ............................................................................................ 24

5 U.S.C. § 706 ....................................................................................................... 1, 9

7 U.S.C. § 2011 ...................................................................................................... 2, 3

7 U.S.C. § 2013 ......................................................................................................... 3

7 U.S.C. § 2015 ......................................................................................................... 3

7 U.S.C. § 2020 .................................................................................................. *passim*

44 U.S.C. § 3501 ....................................................................................................... 1

44 U.S.C. § 3502 ..................................................................................................... 31

44 U.S.C. § 3506(c) ................................................................................................ 33

44 U.S.C. § 3507 ............................................................................................... *passim*

44 U.S.C. § 3512 ..................................................................................................... 31

**Rules**

Federal Rule of Civil Procedure 65(c) .................................................................... 37

**Regulations**

7 C.F.R. Part 272 .................................................................................................... 33

7 C.F.R. § 271.3 ........................................................................................................ 3

7 C.F.R. § 271.4 ........................................................................................................ 3

7 C.F.R. § 272.1 ................................................................................................ *passim*

7 C.F.R. § 273.2 ........................................................................................................ 3

**Other Authorities**

40 Fed. Reg. 28,948, 28,966 (July 9, 1975).......................................................... 27

88 Fed. Reg. 62,527 (Sept. 12, 2023). .................................................................. 33

89 Fed. Reg. 13,679 (Feb. 23, 2024). .................................................................... 33

90 Fed. Reg. 13,681 (Mar. 20, 2025). ...................................................................... 5

Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, (1974),
   120 Cong. Rec. 40,405, 40,406.................................................................... 30

Ending Taxpayer Subsidization of Open Borders (Feb. 2025),
Executive Orders 14218 ............................................................................ 6

FNS Data Sharing Guidance, U.S. Dep't of Agric. (May 2025),
https:perma.cc/3GDH-THAK .................................................................... 4

OMB, Off. of Info & Regulatory Affs. (June 2024),
https:perma.cc/C79G-SRAH .................................................................... 34

Stopping Waste, Fraud, and Abuse by Eliminating Information Silos (Mar. 2025),
Executive Order 14243 ..................................................................... *passim*

Supplemental Nutrition Assistance Program, U.S. Dep't of Agric. (Updated May 2025)
https:perma.cc/5KYW-MJ56 .................................................................... 2

Supporting Statement – Part A for OMB Control Number 0584-0064 (May, 2024),
https:perma.cc/U48S-DSRE .................................................................... 33

## INTRODUCTION

Administration of the Supplemental Nutrition Assistance Program ("SNAP") is split between the Federal government, which oversees broad aspects of the Program, and the individual States, which certify households as eligible for SNAP and contract with EBT processors to administer the day-to-day distribution of benefits. Because of this federal-state partnership, critical information necessary to uncover fraud and determine payment accuracy in SNAP is spread across the fifty-three states and territories as well as several private contractors. In order to break down those informational barriers, the U.S. Department of Agriculture ("USDA") informed State Agencies that it intends to gather SNAP participant data.

Plaintiffs in this case are SNAP recipients and two organizations devoted to SNAP and privacy-related policy issues. They allege that the USDA's intended gathering of SNAP data violates the Privacy Act, 5 U.S.C. § 552a, the Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), and seek the extraordinary relief of a temporary restraining order ("TRO").

Plaintiffs' claims fail for several reasons. To start, Plaintiffs have established nothing approaching the "great" and "certain" harm required by the D.C. Circuit for a TRO. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This Court also lacks jurisdiction because Plaintiffs fail to allege an injury sufficient for Article III standing. Federal law permits USDA to inspect the information in question and further governs the dissemination of that information consistent with the Privacy Act. The gathering and circumscribed dissemination of SNAP applicant data bears no resemblance to the harms traditionally cognizable under Article III, and it is entirely speculative that any of the individual plaintiffs' data will be further disclosed under USDA's proposed routine uses. The organizational plaintiffs, moreover, fail to establish any

1

plausible informational injury, nor can plaintiff MAZON create standing by alleging that it has diverted its resources in response to USDA's proposed data gathering.

Plaintiffs also fail to show they are likely to succeed on the merits of their claims. Plaintiffs are precluded from bringing their Privacy Act claim through the APA. And even if Plaintiffs could surmount that threshold issue, USDA's proposed routine uses easily pass the Privacy Act's compatibility requirement. Plaintiffs' Paperwork Reduction Act claim fails, too, because that statute impliedly prohibits private causes of action, and Plaintiffs cannot side-step that prohibition through the APA. In any event, USDA has satisfied the Paperwork Reduction Act's procedural requirements, and Plaintiffs' contrary arguments are unavailing. Finally, the data gathering and inspection announced by USDA is not arbitrary and capricious. Instead, it effectuates USDA's statutory authority and fulfills a vital need to enforce SNAP requirements, ensure payment accuracy, and tamp down on fraud, which saps vital resources from this critical program.

For these reasons, and for the additional reasons elaborated below, the Court should deny Plaintiffs' Motion for a TRO.

## BACKGROUND

### I.     The SNAP Program

The Supplemental Nutrition Assistance Program, also known as "SNAP" (the successor to Food Stamps), is the nation's largest nutrition assistance program. *See* Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"); *see also* Supplemental Nutrition Assistance Program ("SNAP"), U.S. Dep't of Agric., https://perma.cc/5KYW-MJ56; Decl. of Shiela Corley, ECF No. 11-1 ¶¶ 4–10 ("Corley Decl."). Through SNAP, Congress sought to "alleviate . . . hunger and malnutrition," and to "permit low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011.

To do so, SNAP established a system through which eligible individuals and households receive monthly benefits on an electronic benefit transfer ("EBT") card, which can be used at authorized retail food stores to purchase food.  *See* Declaration of Shiela Corley ¶ 8 ("Corley Decl."), ECF No. 11-1.

SNAP is run as a partnership between the Federal government and the States.  At the federal level, the USDA through the Food and Nutrition Service ("FNS") is responsible for, in part, administering SNAP for retail food stores and issuing administrative rules.  *See* 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3.  Additionally, FNS is charged with overseeing the States' administration of SNAP, including reviewing the States' submitted Plans of Operations and their payment accuracy. 7 U.S.C. § 2020(d); Corley Decl. ¶ 10.

The States, in turn, are responsible for the day-to-day operation of the Program through their designated agencies.  *See* 7 U.S.C. § 2020(a).  This includes determining eligibility and benefit amounts, issuing benefits to eligible households, and ensuring Program integrity with respect to SNAP recipients.  *Id.* § 2020(a)(1); 7 C.F.R. § 271.4.  To operationalize the issuance of benefits to eligible households, State Agencies contract with vendors referred to as "EBT Processors" to issue electronic benefits through the EBT system.  Corley Decl. ¶ 9.

To confirm eligibility and determine benefit amounts, State Agencies must collect certain information from applicants and recipients.  *See* 7 C.F.R. § 273.2(f); *see also* 7 U.S.C. § 2015(e), (*l*)–(o).  State Agencies are required to safeguard the information they collect.  This includes a prohibition on disclosing such information except in certain circumstances, one of which being that disclosure is expressly authorized to "persons directly connected with the administration or enforcement" of SNAP, as well as other "Federal assistance programs, or federally-assisted State programs," as long as the information is subsequently used only for such administration and

enforcement. 7 U.S.C. § 2020(e)(8)(A); *see also* 7 C.F.R. § 272.1(c)(1). Additionally, the FNA requires State Agencies to keep records "as may be necessary to determine whether the program is being conducted in compliance" with SNAP requirements. 7 U.S.C. § 2020(a)(3)(A). Pursuant to the FNA, "[a]ll records, and the entire information systems in which records are contained" must be made available to the USDA. *Id.* § 2020(a)(3)(B); 7 C.F.R. § 272.1(e).

## II.    Executive Order 14243 and USDA's May 6, 2025 Letter

On March 20, 2025, President Trump issued Executive Order 14243 aimed at stopping waste, fraud, and abuse through the elimination of information silos. Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ("EO 14243"). As the Executive Order explains, "unnecessary barriers to Federal employees accessing Government data" creates information silos, which create "bureaucratic duplication and inefficiency" impinging on the "Government's ability to detect overpayments and fraud." *Id.* § 1. To eliminate these barriers, the President instructed agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure Federal officials have access to unclassified information "for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse." *Id.* § 3(a). These efforts are to include access to "comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." *Id.* § 3(c).

Consistent with this directive, USDA published a letter to all SNAP State Agency directors on May 6, 2025. *See* FNS Data Sharing Guidance, U.S. Dep't of Agric., https://perma.cc/3GDH-THAK ("May 6 Letter"); *see also* Corley Decl. ¶¶ 11–12. The Letter begins by informing State directors of Executive Order 14,243 and that USDA is "committed to effectuating this Executive Order with respect to all programs in its purview." May 6 Letter at 1. This includes SNAP. As the Letter explains, the Federal-State partnership administering of SNAP "takes advantage of our

4

federal system to enable states to meet the needs of their residents" but that "[a]t present, each state, district, territory, and payment processor is a SNAP information silo." *Id.*

To eliminate these silos, and "to ensure Program integrity," the Letter invokes the USDA's authority to gather and inspect information under 7 U.S.C. § 2020(a)(3) & (e)(8)(A); 7 C.F.R. § 272.1(c)(1); and 7 C.F.R. § 272.1(e). *Id.* at 1–2. The Letter explains that USDA will be gathering information directly from EBT Processors, who hold the information already collected from SNAP applicants. Corley Decl. ¶ 11. But, because some of the contracts between EBT Processors and State Agencies require State approval before information can be disclosed, the Letter explains to State Agencies that their consent to disclosure would not violate statutory requirements to safeguard SNAP applicant data. *Id.* ¶¶ 9, 12. The Letter also outlines specific records FNS is seeking from the EBT Processors, including "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits," and "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time." May 6 Letter at 2. The Letter sets a date range of January 1, 2020 through the present for such information. *Id.*

### III.    USDA's System of Record Notice

On June 23, 2025, USDA published in the Federal Register a System of Records Notice related to the creation of a new system of records entitled USDA/FNS-15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database." ("SORN"). 90 Fed. Reg. 26,521, 26,521. Information in the new system is to be provided by the 53 State agencies that administer SNAP and their designated vendors and/or contracts, as well as by other agencies with which USDA partners on program integrity issues. *Id.* at 26,252. As explained in the SORN, USDA and FNS will use the data in the system "to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying and

eliminating duplicate enrollments, and performing additional eligibility and program integrity checks" as specified in the SORN.  *Id.* at 26,251.

The SORN includes eleven proposed routine uses that allow for disclosure, but only "to the extent such uses are authorized by, among other authorities, 7 U.S.C. § 2020(a)(3) and (e)(8), 7 CFR 272.1(c)(1) and (e), and Executive Orders 14218 and 14243."  90 Fed. Reg. at 26,522.  As relevant to Plaintiffs' claims, proposed Routine Use 8 allows for the disclosure of records as follows:

> (8) When a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule, or order issued pursuant thereto, USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation, or order issued pursuant thereto, if the information disclosed is relevant to any enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity.

*Id.* at 26,522.  Proposed Routine Use 11, which Plaintiffs also challenge, provides for the disclosure of records as follows:

> (11) To support another Federal agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States (including any State or local governmental agency), that administers, or that has the authority to investigate or assist USDA to investigate potential fraud, waste, or abuse in, a Federal benefits program funded in whole or in part by Federal funds, when disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs.

*Id.* at 26,523.

The SORN became effective immediately, "except for the routine uses, which will become effective on July 23, 2025, unless USDA determines they must be changed as a result of public comment."  *Id.* at 25,522.  As of the morning of July 21, USDA has received a total of 291

comments on the SORN.  *See* Declaration of Gina Brand ¶ 6 ("Brand Decl.") (attached as Ex. A).

Of those, 1 comment was submitted in support, 270 opposed, and 21 were not germane.  *Id.* ¶ 7.

Among the comments opposing USDA's proposed routine uses, approximately 190 stated that the

database was a waste of money and/or was unnecessary—either because instances of fraud are

overstated or because it was duplicative of State actions.  *Id.* ¶ 8.  Approximately 49 comments

expressed concern that the data would be shared outside of USDA, that the data would be used for

unlawful purposes, such as discrimination, and/or that the database itself was illegal.  *Id.*

Approximately 48 stated that the database was a violation of privacy or otherwise expressed

privacy concerns.  *Id.*  Approximately 23 comments stated that the proposed database was

government overreach, and another approximately 6 indicated that more information than what

was included in the SORN was needed.  *Id.*  Approximately 4 comments expressed concerns of

data mishandling, and approximately 2 comments expressed general opposition but did not provide

a reasons.  *Id.*  USDA will continue to review, analyze, and consider all timely submitted

comments.  *Id.* ¶ 9.

## IV.    USDA's July 9, 2025 Letter

On July 9, 2025, Secretary of Agriculture Rollins sent SNAP State agencies a second letter

outlining the requirements of Executive Order 14243 and underscoring USDA's commitment "to

effectuating this Executive Order with respect to all programs in its purview."  July 9 Letter at 1.

The letter explained USDA's publication of the SORN in the Federal Register and explained that

the system "is owned, administered, and secured by FNS, and [that] the system's primary purpose

is to strengthen SNAP and government program integrity."  *Id.*  "To ensure efficient

implementation of [the] system, and to ensure USDA has a complete and accurate database,"

USDA is requiring submission of SNAP data from EBT processors and State agencies "beginning

on July 24, 2025, with submissions due to USDA no later than the close of business on July 30, 2025." *Id.*

## V.    Procedural History

Plaintiffs filed suit on May 22, 2025.  Compl., ECF No. 1.  Plaintiffs consist of four individuals who are recipients of SNAP benefits ("Individual Plaintiffs"); MAZON, Inc., a NGO focused on policy advocacy on SNAP issues; and Electronic Privacy Information Center, a public interest research center focusing on privacy issues.  *See* Am. Compl. ¶¶ 11–17, ECF No. 27.

Based on the claims contained in their initial complaint, Plaintiffs moved for a temporary restraining order on May 27, 2025 that sought to prevent USDA from collecting SNAP data.  *See* Mot for a TRO, ECF No. 9; Mem. in Supp. of Pls.' Mot. for TRO, ECF No. 9-1.  USDA opposed the TRO, explaining, among other things, that it had told information holders not to provide the requested data until USDA had satisfied all necessary legal requirements and had completed the procedural steps necessary to ensure that the data received will be appropriately safeguarded. *See* Defs.' TRO Opp'n, ECF No. 11; Corley Decl. ¶¶ 13–14.

On June 2, 2025, considering Defendants' response and the accompanying declaration, the Court ordered Plaintiffs to notify the Court whether Plaintiffs intend to withdraw their motion and, if not, to briefly indicate their reason.  Minute Order (June 2, 2025).  Plaintiffs withdrew their motion.  *See* Notice of Withdrawal of Motion, ECF No. 13.

Plaintiffs then sought leave to file a four-count amended complaint on July 16.  Count I asserts a violation of the Administrative Procedure Act ("APA") through a violation of the Privacy Act.  Am. Compl ¶¶ 118–25.  Specifically, Plaintiffs contend that, by requiring data submission to begin shortly after the end of the comment period required by the Privacy Act, USDA has "render[ed] meaningless Plaintiffs' information and participation rights."  *Id*. ¶¶ 124.  Count II is an APA challenge to Routine Use 8 and Routine Use 11 of the SORN, which Plaintiffs contend are

not "compatible with the purpose for which such data was collected."  5 U.S.C. § 552a(a)(7); *see also* Am. Compl. ¶¶ 126–32.  Count III, also brought through the APA, alleges a procedural violation of the Paperwork Reduction Act.  Am. Compl. ¶¶ 133–40.  Finally, in Count IV, Plaintiffs allege that that Defendants issued the July 9 Letter arbitrarily and capriciously, contrary to the requirements of the APA, 5 U.S.C. § 706(2)(A).  *Id.* ¶¶ 141–46.

On July 17, 2025, Plaintiffs filed the present Motion for a Temporary Restraining Order. Mot. for a TRO, ECF No. 28.  Plaintiffs seek an injunction preventing the Government from gathering the SNAP data requested pursuant to the July 9 Letter.  *See* TRO Mot. at 2–3.

## LEGAL STANDARD

A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo.  *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 1:25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025).  It is "an extraordinary and drastic remedy," and "never awarded as of right[.]"  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain this relief, a plaintiff "must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'"  *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20); *see also Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to award a TRO is analyzed using the same factors applicable to preliminary injunctive relief[.]" (cleaned up)).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

### I.    Plaintiffs Cannot Demonstrate Irreparable Harm.

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). To constitute irreparable injury, the harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation and alteration omitted).

Although Plaintiffs' failure to demonstrate concrete injury sufficient to establish Article III standing would also mean they cannot demonstrate irreparable harm, the converse is not necessarily true: that a plaintiff has or will suffer an injury-in-fact does not mean that they have demonstrated irreparable harm for purposes of the TRO inquiry. *See, e.g.*, *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 106–11 (D.D.C. 2025) (finding, in denying injunctive relief, that plaintiff had not demonstrated irreparable harm and thus was not entitled to injunction, despite concluding that plaintiff had Article III standing); *Comm. for a Constructive Tomorrow v. Dep't of the Interior*, No. 24-cv-774, 2024 WL 2699895, at *4 (D.D.C. May 24, 2024) ("While Plaintiffs have shown a substantial likelihood of standing, they have not demonstrated that they will suffer irreparable harm in the absence of a preliminary injunction or administrative stay. That is a sufficient basis to deny their motion.").

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Critically, "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a temporary restraining order or preliminary injunction, even if the other three factors entering the calculus merit such relief." *Id.*; *see also Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025) (denying TRO because plaintiff failed to make a clear showing of irreparable harm and "leav[ing] for another day consideration of whether [the plaintiff] has standing to sue and has stated a claim upon which relief may be granted"); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (explaining that "if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors"). Because Plaintiffs have not established irreparable harm—and because this failure requires denial of their motion—Defendants address this element first.

### A. The Individual Plaintiffs Have Failed To Establish Irreparable Injury Resulting From An Alleged Disclosure Of Their Information.

Plaintiffs first claim that the Individual Plaintiffs are irreparably harmed by the "unlawful disclosure of personal information," and, more specifically, by what Plaintiffs view as the overbreadth of the potential disclosures in proposed Routine Use 8 and proposed Routine Use 11 of the SORN and the potential for what Plaintiffs call "re-disclosure" of the Individual Plaintiffs' data. *See* TRO Mem. at 37–38. This allegation of harm—let alone irreparable harm—fails on multiple levels.

First, any suggestion that USDA will disclose the data of the specific Individual Plaintiffs who joined in the amended complaint is the height of speculation and therefore does not meet the demanding standards for emergency relief in this Circuit. *See League of Women Voters*, 838 F.3d at 7–8. Proposed Routine Use 8 and proposed Routine Use 11 allow for intragovernmental disclosure only in specific circumstances, such as when specific data suggest the presence of

unlawful activity, or when disclosure is necessary to combat fraud in Federal benefits programs, and even then, disclosure is only permitted to the extent it is allowed by the FNA. *See* 90 Fed. Reg. at 26,522–23. Plaintiffs provide nothing—either in their amended complaint or in their motion—to suggest the Individual Plaintiffs' specific data would be subject to disclosure under those circumstances. Speculation that their data *may* at some uncertain point in the future be subject to intragovernmental disclosure cannot support emergency relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Moreover, putting aside Plaintiffs' unbridled speculation that USDA may someday disclose the Individual Plaintiffs' specific data, any actual disclosure under the SORN's proposed routine uses is not a harm that can justify injunctive relief. As two judges in this District have observed in denying injunctive relief in other data access cases, "courts in this District have consistently 'declined to find irreparable injury' from the [intragovernmental] disclosure of private information 'where the challenged disclosure is not public,' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *All. for Retired Ams.*, 770 F. Supp. 3d at 108 (quoting *Univ. of Cal. Student Ass'n*, 766 F. Supp. 3d at 121 (some quotation marks omitted)). Thus, in *Alliance for Retired Americans*, the court denied—for failure to establish a likelihood of irreparable injury—an injunction preventing the Department of the Treasury from sharing information with individuals associated with the U.S. DOGE Service ("USDS"). *See id.* at *1. And in *University of California Student Association*, the court denied on irreparable harm grounds the plaintiff's motion for a temporary restraining order to prevent the Department of Education from disclosing student members' personal information to individuals affiliated with USDS. 766 Supp. 3d at 123. As that court explained, where information is disclosed to an identified group of individuals with an obligation not to disseminate it publicly, "a court can fashion adequate

corrective relief after the fact." *All. for Retired Ams.*, 770 F. Supp. 3d at 108 (cleaned up). "For example, this Court could order the small number of individuals who received the information to return or destroy it." *Id.* "The 'possibility' that adequate relief of that kind 'will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *Id.* (cleaned up).

Other cases in this District similarly reject the notion that mere disclosure of information constitutes irreparable harm, when the recipient of the information is under an obligation not to disseminate the disclosed information to the public or otherwise disclose it more broadly. *See, e.g.*, *Baker DC v. Nat'l Labor Rels. Bd.*, 102 F. Supp. 3d 194, 203 (D.D.C. 2015) (no irreparable harm from disclosure of plaintiffs' personal information to a union because regulations placed "limits" on the union's use of the information); *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 308 (D.D.C. 1976) (disclosure of trade secrets to congressional subcommittee would not cause irreparable harm because it would "not lead inexorably to either public dissemination or disclosure"). Rather, "[c]ourts find dissemination of information to be an irreparable injury where, for example, highly sensitive information will be made *public*, or ends up in the hands of someone with no obligation to keep it confidential." *Univ. of Cal. Student Ass'n*, 766 F. Supp. 3d. at 121 (emphasis in original). Here, there is no public disclosure, nor do Plaintiffs even contend there will be.

Plaintiffs' cited cases (TRO Mem. at 37–38) only serve to illustrate why irreparable harm is lacking. As discussed above, the court in *Alliance for Retired Americans* rejected the plaintiffs' request for a preliminary injunction. *See All. for Retired Ams.*, 770 F. Supp. 3d at 107–08. In *Hospitality Staffing Solutions, LLC v. Reyes*, moreover, the court addressed harm flowing from a specific former employee who had proprietary information of the plaintiff company, and the court

granted the company request for a preliminary injunction where the employee was already using that information to compete with the company, and therefore further disclosure was anything but speculative.  736 F. Supp. 2d at 200.  In *Human Touch DC, Inc. v. Merriweather*, similarly, the court preliminarily enjoined a specific former employee from disclosing confidential business information after the former employee in question had already forwarded company emails containing patient information to her personal email account.  No. 15-cv-741, 2015 WL 12564166, *1, 5 (D.D.C. May 26, 2015); *see also Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (enjoining policy of disclosing confidential information in unsealed court files accessible to the general public).

Finally, as the court noted in *University of California Student Association*, "the remedies provided in the Privacy Act . . . confirm that [Plaintiffs] are not suffering (and will not suffer) an irreparable harm."  766 F. Supp. 3d. at 123.  The Privacy Act provides a private right of action and money damages for intentional or willful unauthorized disclosures.  5 U.S.C. § 552a(g)(4).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted).  Because the Individual Plaintiffs could seek redress under the Privacy Act if any unlawful disclosure ever comes to pass, they are not entitled to prophylactic protection against that speculative eventuality.[1]

---

[1] Even if the Court were to accept that the Individual Plaintiffs had established some non-speculative imminent harm (which they have not), any harm to the Individual Plaintiffs would not justify a sweeping injunction to stop USDA's data collections across the board.  *See, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631, *11 (2025) ("The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*." (citation omitted)).

Because the Individual Plaintiffs cannot show irreparable harm, their application for a TRO should be denied without the need even to consider the merits of their claims at this stage.

**B.    The Organizational Plaintiffs' Alleged Denial Of Information Is Neither Harmful Nor Irreparable.**

Next, Plaintiffs claim they are irreparably harmed by USDA's denial of information "they are entitled to through the [Paperwork Reduction Act's] [Information Collection Review] process" that they claim is "vital to an ongoing debate." TRO Mem. at 38–39. Notably, however, Plaintiffs never explain what specific information they are lacking, or how they are prevented from engaging in debate about USDA's activities. *Id*.

Even assuming additional procedural steps were required under the Paperwork Reduction Act, which Defendants dispute, USDA has explained the details and purpose of the data gathering in multiple places: The May 6 Letter and July 9 Letter explain the purpose of USDA's data gathering at length, which is consistent with Executive Order 14,243's directive to "take all necessary steps, to the maximum extent consistent with law, to ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." May 6 Letter at 1; July 9 Letter at 1. The SORN, too, published on June 23, explains what information USDA is gathering, the relevant authority, and the potential uses of the information. *See* 90 Fed. Reg. at 26,521–22. Indeed, the information contained in the SORN overlaps considerably with the information required by the Paperwork Reduction Act. *See* 44 U.S.C. § 3507(a)(1)(D). And Plaintiffs have had an opportunity to comment on USDA's data gathering in response to publication of the SORN, and in fact, have done so. *See id.* at 26,521; Brand Decl. ¶¶ 5–9. USDA also submitted a Nonsubstantive Change Request to the Office of Management and Budget ("OMB") related to the previously approved collection of SNAP

applicant data required by the FNA. *See generally* Shiela Corley, Food, Nutrition and Consumer Services, U.S. Dep't of Agric., Nonsubstantive Change Request – Supplemental Nutrition Assistance Program (SNAP) Forms: Applications, Periodic Reporting, and Notices (OMB #0584-0064) (June 11, 2025) (attached as Ex. B). That Nonsubstantive Change Request explains the purpose of the data gathering, the type of data being gathered, how the data will be stored, how USDA will use the data, and the minor additional burden the data gathering will impose. *Id.*[2]

On these facts, it is perhaps unsurprising that Plaintiffs never specify what information they purport to require, or how their ability to engage in public debate is limited—because it is not. Plaintiffs thus fail to establish the "great" and "imminent" harm required for a TRO. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98.

### C.    MAZON Fails To Establish Irreparable Injury Based On Alleged Distrust.

MAZON claims further irreparable injury to its organizational mission, alleging that USDA's actions have caused some to become mistrustful of SNAP and thus unlikely to register, causing those individuals to go hungry. TRO Mem. at 40. Such conjecture about the potential actions and feelings of third parties is the height of speculation which cannot constitute irreparable harm. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see also Clapper*, 568 U.S. at 414 (Article III standing cannot be establish based on the unfettered choices made by independent actors not before the court); *All. for Ret. Ams.*, 2025 WL 740401, at *23. Moreover, even if the data gathering foreshadowed by the USDA letter caused applicants to mistrust SNAP, that mistrust would itself be irrational. USDA has always had the statutory authority to inspect and disseminate

---

[2] As discussed further below, the Nonsubstantive Change Request does not pertain to the additional collection of any additional data by State Agencies. *See* Part II.B.3, *infra*. The purpose of the Nonsubstantive Change Request is to document the minor incremental burden of USDA's gathering of that data, which amounts to an increase of approximately 0.02 percent in total estimated hours.

data from States for programmatic purposes, and applicants have always been on notice that USDA

can monitor payment data to prevent fraud and to protect the integrity of SNAP. *See* 7 U.S.C.

§ 2020(e)(8)(A), (a)(3)(B); 7 C.F.R. § 272.1(c)(1), (e).

## II.    Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims.

### A.    Plaintiffs Have Failed To Establish A Likelihood Of Article III Standing.

At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff,

as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and

particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury

and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed

by a favorable decision. *Lujan*, 504 U.S. at 560. To be entitled to a TRO or preliminary injunction,

Plaintiffs must demonstrate a "substantial likelihood of standing." *Elec. Priv. Info. Ctr. v.*

*Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).

Plaintiffs advance four separate theories regarding their standing to bring this action. *See*

TRO Mem. at 13–21. Each is unavailing.

### 1.    Plaintiffs Have Failed to Establish Injury-in-Fact from the Alleged Disclosure of Their Information

First, Plaintiffs argue that they have met Article III's injury-in-fact requirement because

their alleged injuries mirror the "close historical or common-law analogue[s]" of the torts of

intrusion upon seclusion and breach of confidence required by *TransUnion LLC v. Ramirez*, 594

U.S. 413, 414 (2021). *See* TRO Mem. at 13–15. Specifically, they claim that the actual or

imminent disclosure of the Individual Plaintiffs' private information constitutes injury-in-fact. *Id.*

at 13.

Plaintiffs fail, however, to show that their information has been or will be improperly

"disclosed." Both USDA and FNS have a statutory right to seek the information in question. *See*

17

7 U.S.C. § 2020(a)(3); *id.* § 2020(e)(8)(a).  As noted above, the Privacy Act and the Food and Nutrition Act also prevent USDA and FNS from publicly disclosing such information.  5 U.S.C. § 552a(b); 7 U.S.C. § 2020(e)(8)(a)(ii).  Indeed, Plaintiffs do not allege that USDA or FNS will publicly disclose their information once obtained from the EBT Processors, nor could they, as such claims would be entirely speculative.  *See, e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, --- F. Supp. 3d ---, 2025 WL 1129227, at *6 n.6 (D.D.C. Apr. 16, 2025).

Moreover, the harms alleged by Plaintiffs do not constitute concrete or particularized injury.  Plaintiffs do not allege physical or monetary injury, but, instead, "intangible harms" related to the alleged invasion of their privacy.  While the Supreme Court has recognized that "[v]arious intangible harms can . . . be concrete[,]" cognizable intangible injury must still bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *TransUnion*, 594 U.S. at 425.  As examples, in *TransUnion*, the Supreme Court provided "reputational harms, disclosure of private information, and intrusion upon seclusion."  *Id.* Plaintiffs themselves offer the tort examples of intrusion upon seclusion, breach of confidence, and emotional distress.  But the harms alleged by plaintiffs bear no resemblance to those recognized by these common law examples.

The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989).  The tort has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would

be highly offensive to an ordinary, reasonable person." *Wolf*, 553 A.2d at 1217 (cleaned up, citations omitted). The D.C. Court of Appeals has explained that the "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, etc. *See id.* at 1217–18; *see also Krakauer v. Dish Network*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a case cited by *TransUnion*, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.[3]

Plaintiffs' asserted harm stems from the alleged provision of their information from EBT Processors to USDA. First, there is no "invasion" because USDA and FNS are entitled by statute to obtain this information. *See* 7 U.S.C. § 2020(a)(3), (e)(8)(A); 7 C.F.R. 272.1(c)(1), (e). As such, USDA and FNS's solicitation of these records bears no resemblance to the "irritating" intrusions envisioned by the tort, which necessarily are not legally authorized.

Second, Plaintiffs voluntarily provided the information in question to the State Agencies with full knowledge that USDA and FNS have the statutory authority to inspect and audit their records. Thus, Plaintiffs cannot maintain an expectation of privacy for these records. *See*

---

[3] For additional examples of injury contemplated by the tort of intrusion upon seclusion, *compare Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345–46 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harm flow[s] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion" (emphasis added)).

19

*Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711–12 (D.C. 2009) ("Without an allegation that the data involved here were disclosed to and viewed by someone unauthorized to do so, appellants have failed to state a claim[.]"); *Wolf*, 553 A.2d at 1218 ("[A] colloquy in which [plaintiff] voluntarily participated, could hardly be considered intrusive.").

Finally, even if Plaintiffs could show that USDA and FNS employees obtaining their records could be analogized to an "invasion or interference" that has traditionally been actionable, the access is not analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. There is no serious contention that Plaintiffs' information has been or will be shared outside the government to those likely to misuse the information. Essentially then, Plaintiffs' claim of injury amounts to the following: they provided information to the State Agencies to obtain benefits knowing that USDA and FNS may request their records. Nevertheless, Plaintiffs now fear that USDA and FNS may mishandle or improperly disclose their data. Under no circumstance, though, could the agency's conduct in seeking data it has every right to inspect be considered highly offensive, tortious conduct. Indeed, as in *TransUnion*, Plaintiffs would have no reason to know that a USDA or FNS employee has accessed their specific information. *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even *knew*" their files contained inaccurate information (emphasis in original)).[4]

---

[4] Plaintiffs reference the Individual Plaintiffs' subjective expectation of privacy and distress that their information may be shared with USDA. *See, e.g.*, TRO Mot. at 14 & n.12. But subjective emotional reactions—without more—do not constitute a concrete injury. *See Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the reality of the threat of repeated *injury* that is relevant to the standing inquiry" not a plaintiff's "fear" and "subjective apprehensions." (emphasis added)). The Supreme Court in *TransUnion* found that to support standing, purely emotional harm must be tied to a traditionally recognized tort, such as the intentional infliction of emotional distress. 594 U.S. at 424 & n.7. Plaintiff makes no such showing here.

The same is true for breach of confidence, which "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (quotation omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action. *See TransUnion*, 594 U.S. at 427 (starting that "lawsuit may not proceed because that plaintiff has not suffered any . . . harm *traditionally* recognized as providing a basis for a lawsuit in American courts" (emphasis added)). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*, does not address whether the tort has a sufficient historical origin, and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir.), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)). In that en banc decision, which came out after *Jeffries*, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (cleaned up). The Second Circuit has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. U.S. Dep't of Justice*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether this tort can serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action.

Even assuming that the breach of confidence tort is a permissible analogue for standing purposes, the facts here bear little resemblance to the typical circumstances where it applies—the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. In *Jeffries*, the D.C. Circuit analogized it to a situation involving unauthorized disclosure of credit card information, which would be similar to the bank-customer framework. 928 F.3d at 1064. This case, by contrast, involves information voluntarily shared to obtain a government benefit. And this case is most certainly not analogous to the physician-patient relationship.

Yet, even if the Court were to go a step further and apply the elements of the tort, the analogy still falls flat. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *American Federation of Labor*, 2025 WL 1129227, at *9 (quoting *Jeffries*, 928 F.3d at 1064). Here, by contrast, the information was provided with the knowledge that the USDA and FNS have full authority to request and inspect it. And, again, Plaintiffs do not allege that USDA or FNS will publicly disclose their information once they obtain it. Nor could they, as such claims would be entirely speculative. Thus, Plaintiffs' reliance on the tort of breach of confidence necessarily fails.

As such, Plaintiffs have failed to demonstrate an injury-in-fact based on the alleged disclosure of their information sufficient to maintain standing in this Court.

### 2. Plaintiffs have Failed to Establish Informational and Procedural Injury

Plaintiffs' second and third alleged injuries similarly fail to establish standing. Specifically, Plaintiffs claim they have been denied information required by the Paperwork Reduction Act. *See* TRO Mem. at 15–18 (citing 5 U.S.C. § 552a(a); *id.* § 552a(e)(4); 44 U.S.C. § 3507(a)(1)(D)). Plaintiffs also claim they were deprived of the opportunity to comment on USDA and FNS's data collection, arguing that both the Privacy Act and the Paperwork Reduction Act require public notice and comment regarding the actions alleged. *See id.* at 18–19.

These allegations do not give rise to a cognizable injury largely for the same reasons described above. *See* Part I.B. Plaintiffs complain that USDA did not go through the full Information Collection Review process. Even assuming, counterfactually, that the Paperwork Reduction Act process was required for USDA to gather data from the SNAP State Agencies, there would still be no actual injury—separate from a bare procedural violation—to confer standing. Plaintiffs are fully aware of USDA's plans for the data, as demonstrated by the May 6 Letter and the July 9 Letter, as well as the SORN published in the Federal Register and USDA's Nonsubstantive Change Request, all of which explain the basis for the collection, the authority, and the purposes for which the data will be used. Moreover, Plaintiffs had the opportunity to comment on USDA's use of the data following public notice of the SORN. *See* 90 Fed. Reg. at 26,521. It is also now established in the record before the Court that USDA is reviewing, analyzing, and considering all timely submitted comments. Brand Decl. ¶ 9.

Indeed, Plaintiffs fail to explain what specific additional information they believe they would need to better participate in the public debate about USDA's use of the relevant data; nor do they explain what additional information they would provide if given additional opportunity to comment. Thus, Plaintiffs are left with, at best, a bare procedural violation that does not cause any independent harm. That is insufficient for the exercise of jurisdiction under Article III. *See, e.g.*, *TransUnion*, 594 U.S. at 441–42; *Spokeo*, 578 U.S. at 341–42; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

### 3. MAZON Fails to Establish Independent Organizational Injury

Finally, MAZON alleges distinct injury to its anti-hunger mission. *See* TRO Mem. at 19–21. MAZON partners with direct service providers to assist individuals through SNAP applications by providing "educational resources and timely updates on state and federal SNAP policy changes[.]" Decl. of Abby J. Leibman, ECF No. 9-6, ¶ 9. MAZON claims that proposed

Routine Use 8 and proposed Routine Use 11 "imperils those and other efforts" by making SNAP-eligible individuals unwilling to provide their personal information.  TRO Mot. at 20.  MAZON asserts that it has "reallocated resources away from other priorities to respond to the data demand," for example by "abandon[ing] its plan to discontinue its 'Challah for Hunger' program and instead is continuing to invest resources in that program to counter the anticipated chilling effect the data collection will have on college student SNAP enrollment."  *Id.* at 20–21 (footnote omitted).

This standing theory is squarely foreclosed by the Supreme Court's decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  In that case, the Court rejected the argument by various medical associations that they had standing by claiming that the FDA had "impaired" their "ability to provide services and achieve their organizational mission" by approving the abortion-inducing drug mifepristone.  *Id.* at 394 (citation omitted).  The plaintiffs claimed that they incurred costs due to the FDA's actions, including a need to perform their own studies on mifepristone to better inform their members and the public about the drug's risks.  *Id.*  The plaintiffs further claimed that they had to spend "time, energy, and resources" drafting citizen petitions to FDA and engaging in public advocacy and public education.  *Id.*  This, the plaintiffs alleged, resulted in them spending "considerable resources" to the detriment of other spending.  *Id.*  The Court rejected this capacious standing theory and explained that, if accepted, it would mean that "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those polices."  *Id.* at 395.

The alleged impairment of MAZON's ability to counsel and educate SNAP recipients, without more, is insufficient as a matter of law to establish Article III standing.  As the Supreme Court put it: An "organization" does not satisfy Article III when it simply "diverts its resources in

response to a defendant's actions." 602 U.S. at 395. But that is precisely what Plaintiff MAZON alleges, and it makes no effort to explain why the Supreme Court's restriction does not apply here.

Even if MAZON's theory of standing were still viable following *Alliance for Hippocratic Medicine*, MAZON already offers the Challah for Hunger program. So, in continuing to offer the program, it has failed to show a significant shift or drain of its resources in response to this alleged agency action. Indeed, MAZON's shift in priorities does not constitute injury as working incrementally harder at a job it already does cannot constitute the devotion of significant resources required to demonstrate injury for purposes of Article III standing. *See Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412–13 (D.C. Cir. 2024) (cleaned up) (requiring organizational plaintiffs to show "concrete and demonstrable injury to the organization's activities" such as a "consequent drain on the organization's resources[]" rather than "simply a setback to the organization's abstract social interests").

Finally, as explained above, assuming that individuals will be chilled from providing information to State Agencies—even though the USDA and FNS have statutory authority to collect the information—is speculative and objectively unreasonable. *See Clapper*, 568 U.S. at 402; *see also United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (cleaned up) ("[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))). As such, MAZON fails to plead independent organizational injury on these grounds.

**B.      Plaintiffs Fail To Establish Likelihood Of Success On The Merits Of Their APA Claims.**

**1.      Plaintiffs Cannot Assert Violations Of The Privacy Act Through The APA.**

Plaintiffs cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek.  The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy."  5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").  The Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Just.*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

This rule holds true where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999).  It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices.  *See Rimmer v. Holder*, 700 F.3d 246, 261–62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency[.]"  *See* 5 U.S.C. § 552a(g)(1).  These

causes of actions are (A) when an agency "makes a determination . . . not to amend an individual's record in accordance with his request," ("Amendment Action"), *id.* § 552a(g)(1)(A); (B) when an agency refuses to comply with an individual's request for access to her records, ("Access Action"), *id.* § 552a(g)(1)(B); (C) when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual" ("Benefits Action"), *id.* § 552a(g)(1)(C); or (D) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," ("Other Action") *id.* § 552a(g)(1)(D).

Plaintiffs' purported action, alleging a violation of 5 U.S.C. § 552a(e), would fall into an "Other Action" category, pursuant to Section 552a(g)(1)(D). *See* Compl. ¶ 101. But the Privacy Act only provides for monetary damages for Other Actions. *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs[.]"). Prospective relief, such as that sought by Plaintiffs, is reserved for Amendment or Access Actions. 5 U.S.C. § 552a(g)(2), (3).

Plaintiffs cannot circumvent the Privacy Act's carefully drawn constraints by raising purported Privacy Act violations through the APA. Denying Plaintiffs' attempt to obtain broader relief than that provided by the Privacy Act is consistent with the bedrock principle that "where [a] statute provides for certain special types of equitable relief but not others, it is not proper to

imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing

*Cell. Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1161–62 (9th Cir. 1978)).[5]

### 2.    Plaintiffs Cannot Establish A Violation Of The Privacy Act.

#### i.    USDA Has Satisfied the Procedural Requirements of 5 U.S.C. § 552a(e)(11).

Even if the Court determined that the APA could expand the specific relief set forth in the

Privacy Act, which it should not, there has been no violation of the Privacy Act.  The Privacy Act

requires agencies to provide 30 days' notice in the Federal Register "of any new use or intended

use of the information in a system of record, and to provide an opportunity for interested persons

to submit written data, views, or arguments to the agency."  5 U.S.C. § 552a(e)(4)(D), (e)(11).

USDA plainly satisfied that requirement.  USDA published the SORN on June 23, 2025, and the

SORN's proposed routine uses go into effect on July 24, "unless USDA determines they must be

changed as a result of public comment."  90 Fed. Reg. at 26,251.

Plaintiffs assert that, by issuing the July 9 Letter to SNAP State Agencies, USDA has

prejudged the decision to put in place the routine uses in the SORN, depriving them of a

meaningful opportunity to comment.  *See* TRO Mem. at 24–25.  That is incorrect.

To start, Plaintiffs base their argument on case law regarding the requirements under 5

U.S.C. § 553, which apply when an agency is engaged in a rule making.  *See* TRO Mem. at 24–25

---

[5] Several courts have recently examined this question in the context of similar, but not precisely analogous, data access cases.  *Compare Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638, at *6 (4th Cir. Apr. 7, 2025) (J. Richardson, concurring) (Privacy Act may precludes APA cause of action based on "first principles"), *with Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *50–53 (4th Cir. Apr. 30, 2025); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, --- F. Supp. 3d ----, 2025 WL 1129227, at *14–15 (D.D.C. Apr. 16, 2025); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 868953, at *46–47 (D. Md. Mar. 20, 2025); *Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 497–98 (D. Md. 2025) (finding plaintiffs could bring Privacy Act claims through the APA for injunctive relief).

(citing *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)).  Those cases do not address the requirement in § 552a(e)(11), and the Government is unaware of any case that has interpreted § 552a(e)(11) to impose a substantive requirement that the agency remain "open minded," as Plaintiffs contend.

In any event, USDA has thoughtfully considered all of the comments received in response to publication of the SORN.  As of the morning of the date of this filing, USDA has received 291 comments on the proposed routine uses.  *See* Brand Decl. ¶¶ 6–8.  USDA will continue to monitor for additional comments and give them thorough consideration.  *Id.* ¶ 9.  That is all that is required by § 552a(e)(11).  *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Privacy Act Implementation, 40 Fed. Reg. 28,948, 28,966 (July 9, 1975) ("[The publication requirement] is to give the public an opportunity to comment on the appropriateness of [the routine] uses before they come into effect.").  And, if USDA were to receive public comments that warranted a change in the proposed routine uses, USDA could modify the routine uses as appropriate.  Thus, there has been no procedural violation of the Privacy Act, and Plaintiffs may not obtain emergency relief based on the purported failure to consider public comments.

Plaintiffs rely primarily on the Third Circuit's decision in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), to suggest some greater obligation on USDA.  But that case is of no help to them.  *Prometheus* was a challenge to the FCC's complex and long-litigated regulations governing broadcast media ownership, involving technical economic analysis and public hearings.  *See id.* at 450–53.  It also involved FCC action announced through a press release that gave the public significantly less time for comment than the FCC's usual 90 days for notice-and-comment rulemaking.

Here, the issues are significantly less complex, USDA published the proposed routine uses in the Federal Register, and the public has the full 30 days required by statute to comment. The evidence before the Court also establishes that USDA has considered all comments received on the proposed routine uses received thus far, and that USDA will consider any additional comments received during the comment period. Brand Decl. ¶ 9. There is no violation of the Privacy Act's procedural requirements.

ii.    **Proposed Routine Use 8 and Proposed Routine Use 11 Are Compatible With the Purposes for Which the Data Was Collected.**

Plaintiffs also take issue with proposed Routine Use 8 and proposed Routine Use 11, arguing that they are not compatible with the purposes for which SNAP data was collected. But Plaintiffs' argument is based on an incorrect reading of the SORN and construes the FNA too narrowly.

To assess compatibility, courts conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018). This inquiry is independent of, and unaffected by, an agency's published routine uses and is intended to act as a check on the "unnecessary exchange of information to another person or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, *reprinted in* 120 Cong. Rec. 40,405, 40,406 (1974)). Although the D.C. Circuit has yet to "definitely determine[] the precise meaning of 'compatible,'" *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 240 n.1 (D.D.C. 2017), the court has cited approvingly to the test articulated by the Third Circuit: Whether a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *U.S.*

30

*Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (citing

*Britt*, 886 F.2d at 549–50); *see also Ames*, 861 F.3d at 240 n.1.  Under that test, an agency need

only demonstrate a "meaningful degree of convergence" between collection and disclosure.  *Britt*,

886 F.2d at 549.

   Plaintiffs' compatibility argument hinges on their understanding of proposed Routine Use

8 and proposed Routine Use 11 as incompatible with the limitations on the use of data under 44

U.S.C. § 2020(e)(8).  Yet, Plaintiffs ignore the language in the SORN that disclosure is permitted

under the proposed routine uses only "to the extent such uses are authorized by, among other

authorities, 7 U.S.C. 2020(a)(3) and (e)(8)[.]"  90 Fed. Reg. at 26,522.  Any assumption that

disclosure in any specific instance would go beyond the limits established by the FNA is purely

speculative.

   Even more, Plaintiffs misconstrue the broad authorization of data sharing in 44 U.S.C.

§ 2020(e)(8)(A), contending that the paragraph permits "'disclosures . . . to persons directly

connected with the administration or enforcement' of SNAP 'only for such administration or

enforcement[.]'"  TRO Mot. at 29 (quoting 44 U.S.C. § 2020(e)(8)(A).  Plaintiffs' quotation of the

statute omits additional critical language.  The full paragraph provides as follows:

  (A)  the safeguards shall permit—

    **(i)**  the disclosure of such information to persons directly connected with the
      administration or enforcement of the provisions of this chapter, regulations
      issued pursuant to this chapter, *Federal assistance programs*, or *federally-*
      *assisted State programs*; and

    **(ii)**  the subsequent use of the information by persons described in clause (i)
      only for such administration or enforcement[.]

44 U.S.C. § 2020(e)(8)(A) (emphasis added).  The statute therefore does not limit disclosure only

to persons directly connected with the administration or enforcement of SNAP, as Plaintiffs

contend.  Rather, by its plain terms, it authorizes disclosure to any person directly connected with

the administration of any Federal assistance program or federally-assisted State programs. Understood properly, there is a clear statutory authorization for proposed Routine Use 11, and—at a minimum—there is a "meaningful degree of convergence" between the proposed use and the purpose of the data collection in light of § 2020(e)(8)(A). *Britt*, 886 F.2d at 549.

Similarly, as relevant to proposed Routine Use 8, paragraph (e)(8)(C) provides that "notwithstanding any other provision of law, all information obtained under this chapter from an applicant household shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter." 44 U.S.C. § 2020(e)(8)(C); *see also* TRO Mot at 28 (discussing a subset of the FNA's data use limitation). Far from some new, expansive permission for disclosure, as Plaintiffs appear to suggest, proposed Routine Use 8 consists of standard language that already applies across multiple systems of records that USDA administers. *See, e.g.*, 88 Fed. Reg. 11,403, 11,405 (Feb. 23, 2023) (SORN for the National Accuracy Clearinghouse (NAC) System to Detect Duplicate Participation); 86 Fed. Reg. 48,975, 48,977 (Sept. 1, 2021) (SORN for the Child and Adult Care Food Program). To the extent there are any meaningful differences between the explicit statutory authorization paragraph (e)(8)(C) and the text of proposed Routine Use 8 (*e.g.*, proposed Routine Use 8's reference to foreign governments), there remains sufficient overlap to easily satisfy a compatibility analysis. *See* 90 Fed. Reg. at 26,522.

### 3.    Plaintiffs Cannot Establish A Violation Of The Paperwork Reduction Act.

Plaintiffs claim that Defendants violated the Paperwork Reduction Act by engaging in a statutorily defined "collection of information" without abiding by the statute's procedural requirements. TRO Mot. at 30–34; *see also* 44 U.S.C. § 3502(3) (defining "collection of information"); *id.* § 3507(a) (providing that an agency shall not engage in a collection of

information unless it has accomplished tasks, including publishing a notice in the Federal Register).

The Paperwork Reduction Act, however, does not create a private cause of action. *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014).  Seeking to circumvent this barrier, Plaintiffs have instead attempted to plead their Paperwork Reduction Act claim through the APA.  *See* Am. Compl. ¶¶ 133–40.  But APA review is unavailable "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.  Such is the situation here.  The Paperwork Reduction Act impliedly forbids the relief sought because it provides for review of the statute's requirements only when the issue is raised defensively in an enforcement action.  *See* 44 U.S.C. § 3512(b) ("The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.").  For this reason, courts have routinely rejected attempts by plaintiffs seeking judicial review outside the Paperwork Reduction Act's statutory scheme for alleged Paperwork Reduction Act violations related to information collection.  *See, e.g.*, *City of New Bedford v. Locke*, Civ. A. No. 10-10789, 2011 WL 2636863, at *9 (D. Mass. June 30, 2011), *aff'd*, 701 F.3d 5 (1st Cir. 2012); *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 564 F. Supp. 3d 605, 613 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) (collecting cases).  In sum, because the Paperwork Reduction Act forbids review of Plaintiffs' affirmative claim, Plaintiffs may not pursue a Paperwork Reduction Act claim under the APA instead. 5 U.S.C. § 702.

Anticipating this defect in their Paperwork Reduction Act claim, Plaintiffs point the Court to the Ninth Circuit's decision in *Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018).  *Hyatt*, however, addressed another provision in the statute, § 3507, that bars judicial review of "[t]he decision by

33

[OMB] to approve or not act upon a collection of information contained in an agency rule." *See id.* at 1170–71 (quoting 44 U.S.C. § 3507(d)(6)). And the court was clear that the statute precludes judicial review—including actions brought through the APA—where an OMB decision results in the issuance of an OMB control number. *See Hyatt*, 908 F.3d at 1172. Here, as discussed in detail below, OMB has approved the relevant collection of SNAP applicant data and issued a control number. *See* OMB, Off. of Info & Regulatory Affs., https://perma.cc/C79G-SRAH (June 13, 2024) ("Initial Approval"). OMB subsequently approved USDA's Nonsubstantive Change Request for additional data gathering from the State Agencies under the same control number. *See* OMB, Off. of Info & Regulatory Affs., https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202506-0584-002 (July 1, 2025) ("Change Approval"). Thus, *Hyatt* confirms that judicial review is precluded under the Paperwork Reduction Act, both in light of § 3512(b), discussed above, and the bar to review in § 3507(d)(6).

Plaintiffs also rely on *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39 (D.D.C. 2025), for the proposition that APA review is available to them. Yet, in that case, the court did not address the Paperwork Reduction Act's implied bar on judicial review—nor did the parties in that case raise it. Thus, Judge Bates had no occasion to address the question, and *Doctors for America* does not advance Plaintiffs' argument.

Even assuming Plaintiffs could maintain their Paperwork Reduction Act claim—which they cannot—Plaintiffs cannot establish that USDA violated the statute. As Plaintiffs correctly note, the Paperwork Reduction Act imposes a set of procedural requirements on agencies prior to sponsoring a new collection of information. Specifically, an agency must provide 60-day and 30-day notices in the Federal Register seeking public comment on the collection and await approval from the Office of Management and Budget ("OMB") and a control number for the collection

before collecting the information.  44 U.S.C. § 3506(c), (a).  Here, despite Plaintiffs' protestations, USDA complied with the relevant procedural requirements.

On September 12, 2023, USDA published a 60-day notice in connection with SNAP that stated that USDA would require the submission of "names, social security numbers, and date of births of all household members; addresses; and individual or household income information from households."  88 Fed. Reg. 62,527 (Sept. 12, 2023).  It also noted that State Agencies would disclose "information obtained from SNAP application forms or contained in case files of participating SNAP households to certain persons," including *inter alia*, "those directly connected with: the administration of SNAP" and "the administration of other Federal or Federally assisted means-tested programs."  *Id.*  The 30-day notice, published on February 23, 2024, also described the information to be gathered and noted that "State Agencies must maintain records to ascertain whether the program is administered in compliance with Federal statutes and regulations . . . for a period of three years from the date of origin."  89 Fed. Reg. 13,679 (Feb. 23, 2024); *see also* Supporting Statement – Part A for OMB Control Number 0584-0064, *available at* https://perma.cc/U48S-DSRE ("Information that State Agencies collect is generally not shared with any organization outside of the U.S. Department of Agriculture (USDA).").  The regulations cited by the 60- and 30-day notices include citations to the requirements on States at 7 C.F.R. Part 272, which make clear that "[e]ach State Agency shall keep such records and submit *such reports and other information* as required by FNS," 7 C.F.R. § 272.1(e) (emphasis added).  Thus, the public, including Plaintiffs, were on notice that the information being collected by States or their contractors in the SNAP applications was subject to disclosure to USDA.

Reflecting USDA's compliance with the procedural requirements of the Paperwork Reduction Act, USDA's collection of information was approved and issued a control number on

June 30, 2024, for a period of three years.  *See* Initial Approval.  There is therefore no basis for Plaintiffs' claims that USDA has failed to comply with the statute.  TRO Mem. at 30–34.  The 60- and 30-day notices described above already anticipated collection of precisely the information at issue by State Agencies and reported to USDA.  That USDA now intends to increase the *volume* of previously collected data that is reported to USDA does not create a new collection requiring new notice.[6]

Plaintiffs also take issue with USDA's Nonsubstantive Change Request approved by OMB on July 1, 2025.  *See* TRO Mot. at 32–34; *see also* Change Approval.  But that request was proper for the reasons described above—*i.e.*, the submission of previously collected data to USDA is already contemplated by the 60- and 30-day notices.  Indeed, as OMB explained in its approval of the request from USDA: "No additional data collection or recordkeeping is sought through this change request.  Rather, the change is limited to reporting these data elements to USDA."  Change Approval.  Plaintiffs point out that the Nonsubstantive Change Request estimated an additional 20,410 annual burden hours for states and EBT vendors over what was previously approved.  *See* Am. Compl. ¶ 73.  True enough, but that is out of a total of over 142 *million* previously approved burden hours, underscoring that the requested change is, in fact, nonsubstantive for purposes of the Paperwork Reduction Act.  *See* Nonsubstantive Change Request at 3.

### 4.    USDA's Action Is Not Arbitrary And Capricious.

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

---

[6] Plaintiffs suggest that the creation of the new National SNAP Information Database somehow turns the State Agencies' reporting into a new collection subject to the Paperwork Reduction Act.  *See* TRO Mot. at 31.  A simple example illustrates why that argument is incorrect: Assume someone "collects" baseball cards.  Organizing those baseball cards in a new storage box does not add to that collection.

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025).  Under this standard, the agency is afforded a presumption that its actions are "valid" and need only articulate a "satisfactory explanation" that has a "rational connection between the facts found and the choice made."  *Roe*, 947 F.3d at 220 (quotations omitted).  And courts should be wary of interfering with an agency's "ordinary course of [business]" decisions, even if Plaintiffs identify a "specific allegedly-improper . . . action[]" within such ordinary decisions.  *See People for the Ethical Treatment of Animals*, 130 F. Supp. 3d at 1001–02.

Here, USDA has not engaged in unreasoned decisionmaking.  Through Executive Order, the President of the United States directed agencies to "[r]emov[e] unnecessary barriers to Federal employees accessing Government data" to "eliminat[e] bureaucratic duplication and inefficiency [to] enhance[e] the Government's ability to detect overpayments and fraud."  EO 14243, § 1.  The Executive Order specifically required agencies to seek lawful access to "State programs that receive Federal funding[.]"  *Id.* §3(a), (c).

Consistent with this Presidential directive, USDA identified SNAP as a federally funded program, administered by the States, whose dispersed storage of information constituted an "information silo" potentially creating "bureaucratic duplication and inefficiency" hindering the Government's ability to identify overpayment and fraud.  May 6 Letter at 1; *see also* July 9 Letter at 1.  USDA identified lawful statutory and regulatory authorities to collect the information it sought.  *Id.*  Rather than brushing aside other mechanisms for detecting waste, fraud, and abuse, as Plaintiffs suggest, *see* TRO Mot. at 34–35, USDA's new National SNAP Information Database will provide a new, complementary tool to ensure that food assistance gets to those in need and is not abused through fraudulent claims or inadequate State oversight.  While Plaintiffs may prefer

USDA to rely on State audit efforts, it is hardly arbitrary or capricious for USDA to improve its capability to ensure taxpayer funds are being used properly.

As such, USDA's action is reasonable and certainly not arbitrary and capricious.

## III.    Balance of Equities

While Plaintiffs have failed to demonstrate they are irreparably harmed, the Government would be harmed by an injunction. At its core, Plaintiffs' proposed injunction would limit the President's ability to effectuate the policy choices the American people elected him to pursue, including the President's ability to identify fraud, waste, and abuse in one of the country's largest entitlement programs.

## IV.    The Court Should Convert the Motion To A Preliminary Injunction.

The Court should exercise its discretion to convert Plaintiffs' motion to one for a preliminary injunction because Defendants have "had a fair opportunity to oppose it." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006) ("[A] district court could properly consider a motion for a TRO as a request for a preliminary injunction, . . . focusing not on a specific time period but on whether the opposing party had a fair opportunity to oppose it."). Such an action will conserve judicial and party resources. Nor will additional briefing be required: the standards for preliminary injunctions and TROs are identical. *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025). Here, the Court has allowed for full briefing and a hearing with timely notice. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 432 n.7 (1974) ("The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.").

**V.      Plaintiffs Should Be Ordered To Post Substantial Security In Connection With Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed Pending Any Appeal.**

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should order Plaintiffs to post substantial security with any preliminary injunction, commensurate with the disruption caused by the injunction.   Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."   Fed. R. Civ. P. 65(c).   "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam).  In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed pending appeal, if such appeal is authorized by the Solicitor General and taken by Defendants.  In the alternative, Defendants ask for a stay for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order.

Dated: July 21, 2025                                              Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

 /s/ *Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
BENJAMIN S. KURLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0878
bradley.humphreys@usdoj.gov

*Counsel for Defendants*