## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK, *et al.*,

      Plaintiffs,

    v.

BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*,

      Defendants.

Case No. 1:25-cv-01650-JMC

Judge Jia M. Cobb

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.      The SNAP Program ......................................................................................... 2

II.     Executive Order 14243 and USDA's May 6 Letter .......................................... 4

III.    USDA's Nonsubstantive Change Request and System of Records Notice ........ 6

IV.     Recent Developments ...................................................................................... 9

V.      Procedural History ......................................................................................... 10

LEGAL STANDARD ................................................................................................ 12

ARGUMENT ............................................................................................................ 14

I.      Plaintiffs Have Failed to Establish Standing .................................................. 14

        A.      Plaintiffs Have Failed to Establish Injury-In-Fact from the Alleged Disclosure
                of Their Information ............................................................................ 15

        B.      Plaintiffs have Failed to Establish Informational and Procedural Injury .......... 20

        C.      MAZON Fails to Establish Independent Organizational Injury .................. 22

II.     USDA's Data Gathering Initiative Complies with the Privacy Act .................. 24

        A.      Plaintiffs Cannot Assert Violations of the Privacy Act Through the APA. ........ 24

        B.      USDA Has Satisfied the Privacy Act's Notice and Comment Requirement for
                Routine Uses. ..................................................................................... 27

        C.      Routine Uses 8 and 11 are Compatible with the Purposes for Which the Data
                Will be Collected. ............................................................................... 29

III.    USDA Has Not Violated the Paperwork Reduction Act .................................. 33

        A.      The PRA Does Not Provide Plaintiffs a Cause of Action. .......................... 33

        B.      USDA Has Satisfied the PRA's Requirements........................................ 35

IV.     USDA's Data Gathering Initiative is Not Arbitrary and Capricious. ............... 38

CONCLUSION ......................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
   34 F. Supp. 3d 160 (D.D.C. 2014) ........................................................................ 33

*Al-Zahrani v. Rodriguez*,
   669 F.3d 315 (D.C. Cir. 2012) .............................................................................. 12

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ............................................................. 15, 20, 26

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
   771 F. Supp. 3d 717 (D. Md. 2025) ..................................................................... 26

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
   No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) .................................. 26

*Am. Fed'n of Tchrs. v. Bessent*,
   --- F.4th ---, 2025 WL 2313244 (4th Cir. Aug. 12, 2025) ......................... 18, 26, 27

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) ........................................................................... 12

*Ames v. U.S. Dep't of Homeland Sec.*,
   861 F.3d 238 (D.D.C. 2017) ................................................................................ 30

*Arabzada v. Donis*,
   725 F. Supp. 3d 1 (D.D.C. 2024) ......................................................................... 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 12, 13

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ............................................................................................. 24

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ............................................................................................. 24

*Britt v. Naval Investigative Serv.*,
   886 F.2d 544 (3d Cir. 1989) .............................................................. 29, 30, 31, 32

*Cell. Assocs., Inc. v. Nat'l Insts. of Health*,
   579 F.2d 1155 (9th Cir. 1978) ............................................................................. 26

*Chichakli v. Tillerson*,
   882 F.3d 229 (D.C. Cir. 2018) ............................................................................ 30

*Chung v. U.S. Dep't of Just.*,
   333 F.3d 273 (D.C. Cir. 2003) ............................................................................ 24

*City of New Bedford v. Locke*,
   No. 10-10789, 2011 WL 2636863 (D. Mass. June 30, 2011) .............................. 34

*City of New Bedford v. Locke*,
  701 F.3d 5 (1st Cir. 2012) ............................................................................... 34

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................ 24

*Daimler Chrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ........................................................................................ 12

*Dew v. United States*,
  192 F.3d 366 (2d Cir. 1999) ............................................................................ 25

*Dickson v. Direct Energy, LP*,
  69 F.4th 338 (6th Cir. 2023) ........................................................................... 16

*Doctors for America v. Office of Personnel Management*,
  766 F. Supp. 3d 39 (D.D.C. 2025) ............................................................ 35, 36

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ................................................................. 26, 27

*Fed. Aviation Admin v. Cooper*,
  566 U.S. 284 (2012) ........................................................................................ 26

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) .................................................................................. 22, 23

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ........................................................................ 12

*Gadelhak v. AT&T Servs., Inc.*,
  950 F.3d 458 (7th Cir. 2020) ........................................................................... 16

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) ........................................................................... 16

*Hyatt v. Office of Management and Budget*,
  908 F.3d 1165 (9th Cir. 2018) ......................................................................... 34

*Iowaska Church of Healing v. Werfel*,
  105 F.4th 402 (D.C. Cir. 2024) ................................................................. 23, 24

*Jeffries v. Volume Servs. Am. Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) ................................................................. 19, 20

*Jenkins v. Howard Univ.*,
  123 F.4th 1343 (D.C. Cir. 2024) ..................................................................... 12

*Jones v. U.S. Dep't of Hous. & Urban Dev.*,
  No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ..................... 25

*Krakauer v. Dish Network*,
  925 F.3d 643 (4th Cir. 2019) ........................................................................... 16

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................................................. 24

*Leopold v. Manger*,
  630 F. Supp. 3d 71 (D.D.C. 2022) ........................................................................ 12

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................................... 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................. 14

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) ............................................................................... 17

*Marshall v. Honeywell Tech. Sols. Inc.*,
  536 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................ 14

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 ........................................................................................................ 13

*Micei Int'l v. Dep't of Com.*,
  613 F.3d 1147 (D.C. Cir. 2010) ............................................................................ 12

*Mori v. Dep't of the Navy*,
  731 F. Supp. 2d 43 (D.D.C. 2010) ........................................................................ 14

*Mori v. Dep't of the Navy*,
  No. 10–5344, 2010 WL 5371504 (D.C. Cir. Dec. 28, 2010) ................................ 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................... 38

*Muransky v. Godiva Chocolatier, Inc.*,
  922 F.3d 1175 (11th Cir. 2019) ............................................................................ 19

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) .............................................................................. 19

*Parks v. IRS*,
  618 F.2d 677 (10th Cir. 1980) .............................................................................. 26

*People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*,
  130 F. Supp. 3d 999 (E.D. Va. 2015) ................................................................... 38

*Pro-Football, Inc. v. Harjo*,
  284 F. Supp. 2d 96 (D.D.C. 2003) ........................................................................ 14

*Prometheus Radio Project v. FCC*,
  652 F.3d 431 (3d Cir. 2011) ................................................................................. 29

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) .................................................................................... 17

*Rimmer v. Holder*,
  700 F.3d 246 (6th Cir. 2012) ............................................................................... 25

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ............................................................................... 38

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) ........................................................................ 27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    145 S. Ct. 1497 (2025) .................................................................................... 38

*Six v. IQ Data Int'l, Inc.,*
    129 F.4th 630 (9th Cir. 2025) ......................................................................... 17

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................................. 19, 22

*Steele v. United States,*
    144 F.4th 316 (D.C. Cir. 2025) .................................................................. 34, 35

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................................... 22

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) ...................................................................... 25

*Thomas v. Principi,*
    394 F.3d 970 (D.C. Cir. 2005) ........................................................................ 12

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................................. *passim*

*Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.,*
    564 F. Supp. 3d 605 (N.D. Ohio 2021) ........................................................... 34

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    9 F.3d 138 (D.C. Cir. 1993) ...................................................................... 30, 31

*United Presbyterian Church in the U.S.A. v. Reagan,*
    738 F.2d 1375 (D.C. Cir. 1984) ...................................................................... 24

*Vanover v. Hantman,*
    77 F. Supp. 2d 91 (D.D.C. 1999) .................................................................... 13

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) ........................................................................ 24

*Wolf v. Regardie,*
    553 A.2d 1213 (D.C. 1989) ............................................................................. 16

*Young v. U.S. Dep't of Just.,*
    882 F.2d 633 (2d Cir. 1989) ........................................................................... 20

**Statutes**

5 U.S.C. § 552a ......................................................................................................... 1

5 U.S.C. § 552a(a) ............................................................................................. 11, 25

5 U.S.C. § 552a(b) ................................................................................................... 15

5 U.S.C. § 552a(e) ............................................................................................ *passim*

5 U.S.C. § 552a(g) ............................................................................................. 25, 26

5 U.S.C. § 553 ......................................................................................................... 27

5 U.S.C. § 702 ......................................................................................................... 34

5 U.S.C. § 704 ................................................................................................... 24, 27

5 U.S.C. § 705 ......................................................................................................... 15

5 U.S.C. § 706 ...................................................................................................... 2, 11

7 U.S.C. § 2011 ...................................................................................................... 2, 3

7 U.S.C. § 2013(a) ..................................................................................................... 3

7 U.S.C. § 2015(e) ..................................................................................................... 3

7 U.S.C. § 2020(a) ........................................................................................... passim

7 U.S.C. § 2020(d) ..................................................................................................... 3

7 U.S.C. § 2020(e) ........................................................................................... passim

44 U.S.C. § 3501 ........................................................................................................ 1

44 U.S.C. § 3502(3) ................................................................................................. 33

44 U.S.C. § 3506 ................................................................................................... 6, 36

44 U.S.C. § 3507 ........................................................................................... 33, 34, 35

44 U.S.C. § 3512(b) ........................................................................................... 34, 35

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 14

Fed. R. Civ. P.  12(b)(1) ....................................................................................... 1, 12

**Regulations**

7 C.F.R. Part 272 ..................................................................................................... 37

7 C.F.R. § 271.3 ......................................................................................................... 3

7 C.F.R. § 271.4 ......................................................................................................... 3

7 C.F.R. § 272.1(c) .......................................................................................... passim

7 C.F.R. § 272.1(e) .......................................................................................... passim

7 C.F.R. § 273.2(f) ..................................................................................................... 3

Agency Info. Coll. Activities: SNAP Forms: Applications, Periodic Reporting, and Notices,
    88 Fed. Reg. 62,527-01 (Sept. 12, 2023) .......................................................... 36

Off. of Mgmt. & Budget, Exec. Off. of the President, Privacy Act Implementation,
    40 Fed. Reg. 28,948 (July 9, 1975) ................................................................... 28

Privacy Act of 1974; System of Records Revision,
    86 Fed. Reg. 48,975 (Sept. 1, 2021) ................................................................. 31

Privacy Act of 1974; System of Records,
90 Fed. Reg. 26,521 (June 23, 2025) .................................................................... *passim*

Privacy Act; Proposed New System of Records,
88 Fed. Reg. 11,403 (Feb. 23, 2023) ..................................................................... 31

Stopping Waste, Fraud, and Abuse by Eliminating Info. Silos, Exec. Order No. 14,243,
90 Fed. Reg. 13,681 (Mar. 20,2025) ............................................................... 4, 5, 39

Submission for OMB Review; Comment Request,
89 Fed. Reg. 13,679-02 (Feb. 23, 2024) ................................................................ 37

**Other Authorities**

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.).... 14

Analysis of House and Senate Compromise Amendments to the Federal Privacy Act,
120 Cong. Rec. 40,405 (1974) .............................................................................. 30

OMB, Off. of Info & Regul. Affs., *View ICR - OIRA Conclusion* (July 1, 2025),
https://perma.cc/4HK3-7FUG

OMB, Off. of Info & Regul. Affs., *View ICR – OIRA Conclusions* (June 13, 2024),
https://perma.cc/C79G-SRAH ................................................................................ 6

Supporting Statement – Part A for OMB Control Number 0584-0064,
https://perma.cc/U48S-DSRE ............................................................................... 37

U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program* (updated May 27,2025),
https://perma.cc/5KYW-MJ56 ................................................................................ 2

U.S. Dep't of Agric., *FNS Data Sharing Guidance* (May 6, 2025),
https://perma.cc/3GDHTHAK ................................................................................ 5

## INTRODUCTION

Plaintiffs' claims in this matter center around alleged procedural deficiencies in the U.S. Department of Agriculture's ("USDA") efforts to gather information regarding the Supplemental Nutrition Assistance Program ("SNAP"). The review of SNAP information held by States is necessary to cut down on the waste, fraud, and abuse that saps the program of resources. Prior to gathering the data, USDA meticulously followed the procedures required by the Privacy Act, 5 U.S.C. § 552a, and the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq*. including publishing a Systems of Record Notice ("SORN") for a system to house the data, and applying for approval for minor changes in the underlying SNAP data collection from the Office of Management and Budget ("OMB"). As the Administrative Record in this matter shows, USDA has provided required public notice and comment and considered the responses. Unsurprisingly then, Plaintiffs have twice moved this Court for emergency relief, and twice failed to obtain it, as USDA completed the administrative steps to ensure safe storage and orderly transfer of data from the State Agencies and private companies who currently hold the requested data.

Based both on threshold deficiencies in Plaintiffs' claims and on the merits of USDA's actions, Defendants hereby move the Court to dismiss Plaintiffs' Amended and Supplemental Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56. First, both the Individual and Organizational Plaintiffs fail to establish injury-in-fact and thus lack Article III standing to maintain this suit. Federal law, including the Privacy Act, permits USDA to inspect the information in question and further governs the dissemination of that information. Nor does the gathering and circumscribed dissemination of SNAP data resemble the harm traditionally cognizable under Article III, and it is entirely speculative that any of the individual Plaintiffs' data will be further disclosed under USDA's routine uses. Moreover, the Organizational Plaintiffs fail

to establish any plausible informational injury, nor can plaintiff MAZON create standing by alleging that it has diverted its resources in response to USDA's proposed data gathering.

Second, Plaintiffs' claims that USDA has violated the Privacy Act lack merit. Plaintiffs cannot bring their Privacy Act claims through the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). And even if Plaintiffs could surmount that threshold issue, USDA has considered public comments on the proposed routine uses related to its new system of records and those routine uses easily pass the Privacy Act's compatibility requirement.

Third, Plaintiffs' PRA claim fails, too, because that statute impliedly prohibits private causes of action, and Plaintiffs cannot side-step that prohibition through the APA. In any event, USDA has satisfied the PRA's procedural requirements, and Plaintiffs' contrary arguments are unavailing.

Finally, the data gathering initiative announced by USDA is neither arbitrary nor capricious. Instead, it effectuates USDA's statutory authority and fulfills an important need to enforce SNAP requirements, ensure payment accuracy, and tamp down on fraud. For all these reasons, and as explained further below, the Court should grant Defendants' motion.

## BACKGROUND

### I.    The SNAP Program

The Supplemental Nutrition Assistance Program, also known as "SNAP," is the successor to the Food Stamp Program and is the nation's largest nutrition assistance program. *See* Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"); *see also* U.S. Dep't of Agric., Supplemental Nutrition Assistance Program ("SNAP") (updated May 27, 2025), https://perma.cc/5KYW-MJ56; Decl. of Shiela Corley ¶¶ 4–10, ECF No. 11-1 ("Corley Decl."). Through SNAP, Congress sought to "alleviate . . . hunger and malnutrition," and to "permit low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011. Once enrolled in the

program, eligible individuals and households receive monthly benefits on an electronic benefit transfer ("EBT") card, which can be used like a debit card at authorized retail food stores to purchase food.  Corley Decl. ¶ 8.

The Program is run as a partnership between the federal government and the States, a term which includes the District of Columbia, Guam, and the United States Virgin Island.  At the federal level, USDA's Food and Nutrition Service ("FNS") is responsible for administering SNAP for retail food stores and issuing administrative rules.  *See* 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3.  FNS also oversees the States' administration of SNAP, including reviewing the States' Plans of Operations and their payment accuracy.  7 U.S.C. § 2020(d); Corley Decl. ¶ 10.

Day-to-day operation of the Program is left to the States to administer through their designated agencies.  *See* 7 U.S.C. § 2020(a).  This includes determining eligibility and benefit amounts, issuing benefits to eligible households, and ensuring Program integrity with respect to SNAP recipients.  *Id.* § 2020(a)(1); 7 C.F.R. § 271.4.  To issue benefits and funds to eligible households, State Agencies contract with vendors referred to as "EBT Processors" who issue electronic benefits through the EBT system.  Corley Decl. ¶ 9.

State Agencies confirm eligibility by collecting certain information from applicant households, as authorized by statute and regulation.  *See* 7 C.F.R. § 273.2(f); *see also* 7 U.S.C. § 2015(e), (l)–(o).  The SNAP statute requires State Agencies to safeguard this information by, for example, prohibiting disclosure except in certain circumstances.  7 U.S.C. § 2020(e)(8).  One such circumstance, however, provides that States "shall permit" transmission to "persons directly connected with the administration or enforcement" of SNAP, as well as other "Federal assistance programs, or federally-assisted State programs," if the information is subsequently used only for such administration and enforcement.  *Id.* § 2020(e)(8)(A); *see also* 7 C.F.R. § 272.1(c)(1).

3

Additionally, the FNA requires State Agencies to keep records "as may be necessary to determine whether the program is being conducted in compliance" with SNAP requirements. 7 U.S.C. § 2020(a)(3)(A). Pursuant to the FNA, "[a]ll records, and the entire information systems in which records are contained" must be made available to the USDA. *Id.* § 2020(a)(3)(B); 7 C.F.R. § 272.1(e).

## II.    Executive Order 14,243 and USDA's May 6 Letter

Household information necessary to oversee the program is spread across—and siloed within—three separate actors: the federal government, the 53 States and territories, and several private companies in the form of the EBT Processors. On March 20, 2025, President Trump issued Executive Order 14,243, aimed at combatting waste, fraud, and abuse across the federal government by eliminating such information silos. Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ("EO 14243"); *see also* AR PALLEK-000542–43. As the Executive Order explained, "unnecessary barriers to Federal employees accessing Government data" creates information silos, which generate "bureaucratic duplication and inefficiency" impinging on the "Government's ability to detect overpayments and fraud." EO 14,243 § 1. Based on such inefficiencies, the Executive Order directed agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure Federal officials have access to unclassified information "for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse." *Id.* § 3(a). Noted specifically in the Executive Order are initiatives to provide "access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." *Id.* § 3(c).

USDA, in turn, recognized that Executive Order 14,243 implicated household data generated by SNAP, as a federally funded but jointly administered benefits program whose

information is maintained by both States Agencies and third parties.  Consistent with Executive Order 14,243's directive, USDA published a letter to all SNAP State Agency directors on May 6, 2025, announcing an initiative to gather together SNAP information.  *See* U.S. Dep't of Agric., FNS Data Sharing Guidance (May 6, 2025), https://perma.cc/3GDHTHAK ("May 6 Letter"); *see also* Corley Decl. ¶¶ 11–12; AR PALLEK-000544–45.  The May 6 Letter begins by informing State directors of Executive Order 14,243 and that USDA is "committed to effectuating [] Executive Order [14243] with respect to all programs in its purview[,]" including SNAP.  May 6 Letter at 1.  As the Letter explains, the Federal-State partnership administering of SNAP "takes advantage of our federal system to enable States to meet the needs of their residents" but that "[a]t present, each State, district, territory, and payment processor is a SNAP information silo."  *Id.*

To eliminate SNAP information silos, the May 6 Letter invokes the USDA's authority to gather and inspect information under 7 U.S.C. § 2020(a)(3) & (e)(8)(A); 7 C.F.R. § 272.1(c)(1); and 7 C.F.R. § 272.1(e).  May 6 Letter at 1–2.  The May 6 Letter explains that USDA will be gathering information directly from EBT Processors, who hold the information already collected from SNAP households.  Corley Decl. ¶ 11.  But, because some of the contracts between EBT Processors and State Agencies require State approval before information can be disclosed, the Letter explains to State Agencies that their consent to disclosure would not violate statutory requirements to safeguard SNAP household data.  *Id.* ¶¶ 9, 12.

The May 6 Letter is explicit about the purpose in gathering such information.  As it explains, USDA "will use the data it receives from processors to ensure Program integrity, including by verifying the eligibility of benefit recipients."  May 6 Letter at 2.  "This[,]" the May 6 Letter explains, "is consistent with FNS's statutory authority and the President's Executive Order

and will ensure Americans in need receive assistance, while at the same time safeguarding taxpayer dollars from abuse." *Id.*

Finally, the May 6 Letter is also clear on the type of information to be collected, which includes: "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits," and "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time." *Id.* The May 6 Letter sets a date range of January 1, 2020 through the present for such information. *Id.*

### III.    USDA's Nonsubstantive Change Request and System of Records Notice

To facilitate the gathering of SNAP information from State Agencies and EBT Processors, USDA completed two administrative processes. First, it submitted a Nonsubstantive Change Request to the OMB. *See* ECF No. 29-2 ("Nonsubstantive Change Request"); *see also* AR PALLEK-000546–48. In brief, the Paperwork Reduction Act requires Federal agencies to obtain approval from OMB before collecting information from the public. 44 U.S.C. § 3506(c). USDA last submitted an information collection request for SNAP—and was approved by OMB—in 2024 for a three-year period expiring in June of 2027. *See* OMB, Off. of Info & Regul. Affs., *View ICR – OIRA* Conclusions, https://perma.cc/C79G-SRAH (June 13, 2024) ("Initial Approval"). To reflect the incremental additional burden of reporting the already collected program information from States Agencies and EBT Processors to USDA, USDA submitted the Nonsubstantive Change Request.

As the Request explained, "[t]he purpose of the change[] is to add requirements to report to USDA a number of currently collected data elements related to SNAP certification and benefit issuance." Nonsubstantive Change Request at 1. "The collection of this data[,]" the Request noted, "will be used to ensure program integrity, including by verifying the eligibility of benefit recipients." *Id.* Like the May 6 Letter, the Request explained what information will be reported

to USDA.  *Id.* at 2.  Finally, the request estimated an additional 20,410 annual burden hours for States Agencies and EBT Processors to comply with USDA's data gathering initiative over what was previously approved.  *Id.* at 3.  As the Initial Approval estimated 142,800,634 burden hours, this represented only a .014 percent increase.  *Id.*  OMB approved the Change Request on July 1, 2025.  *See* OMB, Off. of Info & Regul. Affs., *View ICR - OIRA Conclusion*, https://perma.cc/4HK3-7FUG (July 1, 2025) ("Change Approval").

Second, USDA created a new system of records to house the information it would be gathering.  To do so, and to comply with the Privacy Act, *see* 5 U.S.C. § 552a(e) (4), (11), USDA published a System of Records Notice in the Federal Register, USDA/FNS–15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database."  Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521 (June 23, 2025); *see also* AR PALLEK-000550–52.  As explained in the SORN, USDA and FNS will use the data in the system "to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying and eliminating duplicate enrollments, and performing additional eligibility and program integrity checks" as specified in the SORN.  SORN at 26,251.

The SORN includes eleven routine uses that allow for disclosure, but only "to the extent such uses are authorized by, among other authorities, 7 U.S.C. § 2020(a)(3) and (e)(8), 7 CFR 272.1(c)(1) and (e), and Executive Orders 14218 and 14243."  SORN at 26,522.  As relevant to Plaintiffs' claims, Routine Use 8 allows for the disclosure of records as follows:

> (8) When a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule, or order issued pursuant thereto, USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation, or order issued pursuant thereto, if the information disclosed is relevant to any

enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity.

*Id.* at 26,522.  Routine Use 11, which Plaintiffs also challenge, provides for the disclosure of records as follows:

> (11) To support another Federal agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States (including any State or local governmental agency), that administers, or that has the authority to investigate or assist USDA to investigate potential fraud, waste, or abuse in, a Federal benefits program funded in whole or in part by Federal funds, when disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs.

*Id.* at 26,523.

The SORN became effective immediately, "except for the routine uses, which [would] become effective on July 23, 2025, unless USDA determines they must be changed as a result of public comment." *Id.* at 25,521.  USDA received 457 comments.  *See* AR PALLEK-000556; *see also* AR PALLEK-000557–624, PALLEK-000658–983 (Documents submitted as Public Comments on Notice of a new system of records).

USDA sorted the comments it received into three categories and determined that one comment was submitted in support of the new system of records; 433 opposed; and 23 were not germane.  AR PALLEK-000657.[1]  Of the comments opposing USDA's proposed routine uses, USDA determined the following:

- Approximately 225 comments stated that the database was a waste of money and/or was unnecessary—either because instances of fraud are overstated or because it was duplicative of State actions.  This category includes comments that expressed a preference for States to handle fraud detection and prevention.

---

[1] While AR PALLEK-000556 contains 458 rows of comments, lines 82 and 83 are duplicates.  As such, the content of this comment was considered, but it was not considered a unique comment for purposes of USDA's overall count.

- Approximately 60 comments expressed concern that the data would be shared outside of USDA, that the data would be used for unlawful purposes, such as discrimination, and/or that the database itself was illegal.

- Approximately 67 comments stated that the database was a violation of privacy or otherwise expressed privacy concerns.

- Approximately 29 comments expressed a concern that the database would place an additional burden on SNAP households or discourage them from participating in SNAP.

- Approximately 34 comments stated that the database was government overreach.

- Approximately 6 comments indicated that more information than what was published was needed.

- Approximately 5 comments expressed disbelief that public comments would be considered or stated that public engagement was lacking.

- Approximately 5 comments expressed concern that the data would be mishandled.

- Approximately 3 comments expressed general opposition but did not provide a reason.

AR PALLEK-000657.

USDA determined that most of the comments were unpersuasive and raised concerns already addressed by the SORN. *Id.* For example, USDA committed to "follow[ing] the law, including both the FNA and the Privacy Act," and noted that "the provision of this data to USDA will place no additional burdens or requirements on SNAP households." *Id.* "While the language in Routine Use 8 is standard . . . and is expressly limited to the extent authorized by the FNA," USDA did "agree[] with the three commenters who suggested removing the reference to 'foreign' governments from the language on when and where to disclose records when a potential violation has been identified." *Id.* USDA is currently implementing that amendment. *See id.*

## IV.    Recent Developments

USDA has sent three subsequent letters to State Agencies. First, on July 9, 2025, USDA informed State Agencies that, "[t]o ensure efficient implementation of th[e] system, and to ensure

USDA has a complete and accurate database," it would be requiring State Agencies and EBT Processors to begin transferring data by July 24, 2025 with a target completion date of July 30, 2025.  ECF No. 28-2 ("July 9 Letter"); *see also* AR PALLEK-000555.

On July 23, 2025, USDA again wrote to the State Agencies providing additional guidance on what data elements should be included and how data should be transmitted.  AR PALLEK-000625–26 ("July 23 Letter").  That same day, USDA published a Privacy Impact Assessment for FY 2025, providing additional details regarding the intended data gathering and new system of records.  AR PALLEK-000627–55 ("FY2025 Privacy Impact Assessment").  Finally, on July 25, 2025, USDA provided another letter to State Agencies reminding them of the July 30, 2025 deadline.  AR PALLEK-000656 ("July 25 Letter").

## V.    Procedural History

Plaintiffs filed suit on May 22, 2025.  Compl., ECF No. 1.  Plaintiffs consist of four individuals who are recipients of SNAP benefits ("Individual Plaintiffs"); MAZON, Inc., a non-governmental organization focused on policy advocacy on SNAP issues; and Electronic Privacy Information Center, a public interest research center focusing on privacy issues (together with MAZON, "Organizational Plaintiffs").  *See* Am. and Suppl. Compl. ¶¶ 11–17, ECF No. 27 ("Am. Compl.").

Based on the claims in their initial Complaint, Plaintiffs moved for a temporary restraining order on May 27, 2025 that sought to prevent USDA from gathering SNAP data.  *See* Pls.' Mot for a TRO, ECF No. 9.  USDA opposed the TRO, explaining, among other things, that it had told information holders not to provide the requested data until USDA had satisfied all necessary legal requirements and had completed the procedural steps necessary to ensure that the data received will be appropriately safeguarded.  *See* Defs.' Mem. in Opp'n to Pls.' Mot. for a TRO, ECF No. 11; Corley Decl. ¶¶ 13–14.  On June 2, 2025,  the Court ordered Plaintiffs to notify the Court

whether Plaintiffs intended to withdraw their motion and, if not, to briefly indicate their reason. Minute Order (June 2, 2025). Plaintiffs withdrew their motion. *See* Pls.' Notice of Withdrawal of Mot. for a TRO, ECF No. 13.

On July 17, 2025, Plaintiffs filed their Amended and Supplemental Complaint. *See generally* Am. Compl. The Amended Complaint contains four counts: Count I asserts a violation of the APA through an alleged violation of the Privacy Act. *Id.* ¶¶ 118–25. Specifically, Plaintiffs contend that, by requiring data submission to begin shortly after the end of the comment period required by the Privacy Act, USDA has "render[ed] meaningless Plaintiffs' information and participation rights." *Id.* ¶ 124. Count II is an APA challenge to Routine Use 8 and Routine Use 11 of the SORN, which Plaintiffs contend are not "compatible with the purpose for which [such data] was collected." 5 U.S.C. § 552a(a)(7); *see also* Am. Compl. ¶¶ 126–32. Count III, also brought through the APA, alleges a procedural violation of the PRA. Am. Compl. ¶¶ 133–40. Finally, in Count IV, Plaintiffs allege that that Defendants issued the July 9 Letter arbitrarily and capriciously, contrary to the requirements of the APA, 5 U.S.C. § 706(2)(A). *Id.* ¶¶ 141–46.

On July 17, 2025, Plaintiffs filed their second motion for a temporary restraining order. Pls.' Mot. for a TRO, ECF No. 28. Defendants again opposed. Defs.' Mem. in Opp'n to Pls.' Mot. for a TRO, ECF No. 29. On July 23, 2025, the Court held a motion hearing and denied Plaintiffs' second TRO motion for failure to establish irreparable injury. *See* Minute Entry (July 23, 2025); Tr. of Mot. Hearing ("Hrg. Tr.") at 29:10–37:14.

The Court ordered Defendants to provide Plaintiffs with the Administrative Record by August 15, 2025, Minute Order (July 29, 2025), which Defendants accomplished on that date, *see* Notice of Filing of Certified Contents of Admin. R., ECF No. 33. Defendants supplemented the

Administrative Record on August 27, 2025. *See* Notice of Filing of Certified List of the Contents of the Suppl. Admin. R, ECF No. 35.

## LEGAL STANDARD

Federal courts are courts of "limited subject-matter jurisdiction" and have the power "to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)). "Absent subject-matter jurisdiction over a case, the court must dismiss it." *Leopold v. Manger*, 630 F. Supp. 3d 71, 76 (D.D.C. 2022), *aff'd*, 102 F.4th 491 (D.C. Cir. 2024).

To survive a Rule 12(b)(1) motion, the party asserting subject matter jurisdiction bears "the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)). In considering assertions of subject matter jurisdiction, courts "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). At the same time, however, courts "need not accept inferences drawn by a plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept a plaintiff's legal conclusions." *Arabzada v. Donis*, 725 F. Supp. 3d 1, 9 (D.D.C. 2024) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under *Iqbal* and *Twombly*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Plausibility" represents something less than "probability," but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted). If the well-pleaded facts of a complaint do not suggest more than the mere possibility of a violation, the complaint has failed to show that the plaintiff is entitled to relief and cannot survive application of Rule 12(b)(6). *Id.*

Likewise, a complaint cannot substitute conclusions of law and other conclusory assertions for well-pleaded allegations of fact and hope to withstand a motion to dismiss. Conclusions of law are not to be accepted as true. *Id.* By the same token, "bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a . . . claim[,] and therefore are not entitled to be assumed true." *Id.* at 698 (citation omitted).

In deciding a motion to dismiss under Rule 12(b)(6), courts may consider not only the well-pleaded allegations of the complaint, but also materials "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.)); *see also Marshall v. Honeywell Tech. Sols. Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008) (document referred to in complaint and central to plaintiff's claim may be considered under Fed. R. Civ. P. 12(b)(6)) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)).

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted). Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010) (citation omitted), *dismissing appeal*, 2010 WL 5371504 (D.C. Cir. 2010). The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.

## ARGUMENT

### I.    Plaintiffs Have Failed to Establish Standing.

At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs have advanced four separate theories regarding their standing to bring this action. *See* Am. Compl. ¶¶ 90–117. Each is unavailing.

A.    **Plaintiffs Have Failed to Establish Injury-In-Fact from the Alleged Disclosure of Their Information.**

First, Plaintiffs have previously argued that they have met Article III's injury-in-fact requirement because their alleged injuries mirror the "close historical or common-law analogue[s]" of the torts of intrusion upon seclusion and breach of confidence required by *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021).  *See* Mem. in Supp. of Pls.' Renewed Mot. for a TRO and/or Postponement Under 5 U.S.C. § 705 at 13–15, ECF No. 28-1 ("TRO Mem. II").  Specifically, they claim that the actual or imminent disclosure of the Individual Plaintiffs' private information constitutes injury-in-fact.  *Id.* at 13; *see also* Am. Compl. ¶ 100.

Plaintiffs fail, however, to show that their information has been or will be improperly "disclosed."  Both USDA and FNS have a statutory right to seek the information in question.  *See* 7 U.S.C. § 2020(a)(3); *id.* § 2020(e)(8)(a).  The Privacy Act and the Food and Nutrition Act also prevent USDA and FNS from publicly disclosing such information.  5 U.S.C. § 552a(b); 7 U.S.C. § 2020(e)(8)(a)(ii).  Indeed, Plaintiffs do not allege that USDA or FNS will publicly disclose their information once obtained from the EBT Processors, nor could they, as such claims would be entirely speculative.  *See, e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 778 F. Supp. 3d 56, 70 n.6 (D.D.C. 2025).

Moreover, the harms Plaintiffs allege do not constitute concrete or particularized injury.  Plaintiffs do not allege physical or monetary injury, but, instead, "intangible harms" related to the alleged invasion of their privacy.  While the Supreme Court has recognized that "[v]arious intangible harms can . . . be concrete[,]" cognizable intangible injury must still bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *TransUnion*, 594 U.S. at 425.  As examples, in *TransUnion*, the Supreme Court provided "reputational harms, disclosure of private information, and intrusion upon seclusion."  *Id.*

15

Plaintiffs themselves have previously offered the tort examples of intrusion upon seclusion and breach of confidence.  *See* TRO Mem. II at 13–15.  But the harms alleged by Plaintiffs bear no resemblance to those torts.

The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989).  The tort has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person."  *Wolf*, 553 A.2d at 1217 (cleaned up).  The D.C. Court of Appeals has explained that the "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, etc.  *See id.* at 1217–18; *see also Krakauer v. Dish Network*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls").  Or, as then-Judge Barrett termed it in a case cited by *TransUnion*, "irritating intrusions."  *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.[2]

---

[2] For additional examples of injury contemplated by the tort of intrusion upon seclusion, which stand in stark contrast with Plaintiffs' alleged injury, *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345–46 (6th Cir. 2023) (concluding that "invasion-of-privacy-

Plaintiffs' asserted harm stems from the alleged provision of their information from State Agencies and EBT Processors to USDA. First, there is no "invasion" because USDA and FNS are entitled by statute to obtain this information. *See* 7 U.S.C. § 2020(a)(3), (e)(8)(A); 7 C.F.R. 272.1(c)(1), (e). And even if that were not the case, USDA and FNS's solicitation of records bears no resemblance to the "irritating" intrusions envisioned by the tort, which necessarily are not legally authorized.

Second, Plaintiffs voluntarily provided the information in question to the State Agencies with full knowledge that USDA and FNS have the statutory authority to inspect and audit their records. Thus, Plaintiffs cannot maintain an expectation of privacy for these records. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711–12 (D.C. 2009) ("Without an allegation that the data involved here were disclosed to and viewed by someone unauthorized to do so, appellants have failed to state a claim[.]"); *Wolf*, 553 A.2d at 1218 ("[A] colloquy in which [plaintiff] voluntarily participated, could hardly be considered intrusive.").

Finally, even if Plaintiffs could show that USDA and FNS employees obtaining their records could be analogized to an "invasion or interference" that has traditionally been actionable, the access is not analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. There is no serious contention that Plaintiffs' information has been or will be shared outside the government or to those likely to misuse the

---

like harms flow[] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion" (emphasis added)), *petition for cert. filed*, No. 24-1326 (Jun. 30, 2025).

information.  Essentially then, Plaintiffs' claim of injury amounts to the following: they provided information to the State Agencies to obtain benefits knowing that USDA and FNS may request their records; nevertheless, Plaintiffs now fear that USDA and FNS may mishandle or improperly disclose their data.  Under no circumstances, however, could the agency's conduct in seeking data it has every right to inspect be considered highly offensive, tortious conduct.  Indeed, as in *TransUnion*, Plaintiffs would have no reason even to know that a USDA or FNS employee has accessed their specific information.  *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even *knew*" their files contained inaccurate information (emphasis in original)).[3]

The Fourth Circuit, in the preliminary injunction context, recently affirmed that alleged unauthorized access by government employees to individual data is likely not closely related to the tort of intrusion upon seclusion in an analogous case regarding DOGE team access to data at the Treasury Department, the Office of Personnel Management, and the Department of Education.  *See Am. Fed'n of Tchrs. v. Bessent*, --- F.4th ---, 2025 WL 2313244, at *5–7 (4th Cir. Aug. 12, 2025).  As the Fourth Circuit explained, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace."  *Id.* at *5 (citing Restatement (Second) of Torts § 652B cmt. a).  On the other hand, as the court explained, the alleged "harm that might come from

---

[3] Plaintiffs reference the Individual Plaintiffs' subjective expectation of privacy and distress that their information may be shared with USDA.  *See, e.g.*, TRO Mem. II at 14 & n.12.  But subjective emotional reactions—without more—do not constitute a concrete injury.  *See Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the reality of the threat of repeated *injury* that is relevant to the standing inquiry" not a plaintiff's "fear" and "subjective apprehensions." (emphasis added)).  The Supreme Court in *TransUnion* found that, to support standing, purely emotional harm must be tied to a traditionally recognized tort, such as the intentional infliction of emotional distress.  594 U.S. at 424 & n.7.  Plaintiff makes no such showing here.

[a] generalized grant of database access to an additional handful of government employees . . .
seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and
paparazzi" traditionally recognized by the tort.  *Id.*

Plaintiffs' reliance on the tort of "breach of confidence" is also misplaced.  That tort "lies
where a person offers private information to a third party in confidence and the third party reveals
that information to another."  *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir.
2019) (quotation omitted).

To start, it is doubtful whether this tort qualifies as a traditional cause of action.  *See
TransUnion*, 594 U.S. at 427 (starting that "lawsuit may not proceed because that plaintiff has not
suffered any . . . harm *traditionally* recognized as providing a basis for a lawsuit in American
courts" (emphasis added)).  While the D.C. Circuit in *Jeffries* invoked the tort to find standing,
that decision predates *TransUnion*; does not address whether the tort has a sufficient historical
origin; and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the
Eleventh Circuit sitting *en banc*.  *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva
Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939
F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that *en banc* decision, decided after *Jeffries*, the Eleventh Circuit questioned—without
deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded
as providing a basis for a lawsuit in English or American courts'" for standing purposes.  *Muransky
v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v.
Robins*, 578 U.S. 330, 341 (2016)).  The Eleventh Circuit found that the tort has been "emerging"
only since the 1980s in a "rudimentary form after initially dying out in its infancy."  *Id.* (cleaned
up).  The Second Circuit, moreover, has described it as "a relative newcomer to the tort family"

and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether this tort can serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action. 594 U.S. at 414.

Even assuming that the breach of confidence tort is a permissible analogue for standing purposes, the facts here bear little resemblance to the typical circumstances where it applies—*e.g.*, the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. In *Jeffries*, the D.C. Circuit analogized it to a situation involving unauthorized disclosure of credit card information, which would be similar to the bank-customer framework. 928 F.3d at 1064. This case, by contrast, involves information voluntarily shared to obtain a government benefit. And this case is most certainly not analogous to the physician-patient relationship.

Yet, even if the Court were to go a step further and apply the elements of the tort, the analogy still falls flat. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *Am. Fed'n of Lab.*, 778 F. Supp. 3d at 73 (quoting *Jeffries*, 928 F.3d at 1064). Here, by contrast, the information was provided with the knowledge that the USDA and FNS have full authority to request and inspect it. And again, Plaintiffs do not allege that USDA or FNS will publicly disclose their information once they obtain it. Nor could they, as such claims would be entirely speculative. Thus, Plaintiffs' reliance on the tort of breach of confidence necessarily fails.

For all of these reasons, Plaintiffs have failed to demonstrate an injury-in-fact based on the alleged disclosure of their information sufficient to maintain standing in this Court.

### B.    Plaintiffs have Failed to Establish Informational and Procedural Injury.

Plaintiffs' second and third alleged injuries similarly fail to establish standing. Specifically, Plaintiffs claim they have been denied information required by the PRA. *See* Am. Compl. ¶¶ 101,

117.  Plaintiffs also claim they were deprived of the opportunity to comment on USDA and FNS's data collection, arguing that both the Privacy Act and the PRA require public notice and comment regarding the actions alleged.  *See id.* ¶¶ 101–02, 108, 116.

These allegations do not give rise to a cognizable injury largely for the same reasons described above.  *See* Argument, Section I.A., *supra*.  Plaintiffs complain that USDA did not go through the full PRA process.  *See* Am. Compl. ¶¶ 88(c)–(d).  Even assuming, counterfactually, that the USDA was required to go through a new PRA process—which, as explained below, it was not, *see* Argument, Section III.B., *infra*—there would still be no actual injury separate from a bare procedural violation insufficient to confer standing.  Plaintiffs are fully aware of USDA's plans for the data, as elaborated in the May 6, July 9, July 23, and July 25 Letters, as well as the Nonsubstantive Change Request, SORN, and FY2025 Privacy Impact Assessment, all of which explain the basis for the collection, the authority, the data to be collected, the purposes for which the data will be used, the safeguards in place, and the terms under which USDA may share the data with other entities responsible for overseeing the program or detecting and prosecuting violations of law.  Moreover, Plaintiffs had the opportunity to comment on USDA's use of the data following public notice of the SORN.  *See* SORN at 26,521.  It is also now established, both by the Administrative Record and the record before the Court that USDA is reviewed, analyzed, and considered all timely submitted comments.  AR PALLEK-000657.

Indeed, Plaintiffs fail to explain what specific additional information they believe they would need to better participate in the public debate about USDA's use of the relevant data; nor do they explain what additional information they would provide if given additional opportunity to comment.  Thus, Plaintiffs are left with, at best, a bare procedural violation that does not cause any independent harm.  That is insufficient for the exercise of jurisdiction under Article III.  *See, e.g.*,

*TransUnion*, 594 U.S. at 441–42; *Spokeo*, 578 U.S. at 341–42; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

### C.     MAZON Fails to Establish Independent Organizational Injury.

MAZON asserts two distinct injuries to its anti-hunger mission.  *See* Am. Compl. ¶¶ 109–12.  First, MAZON partners with direct service providers to assist individuals through SNAP applications by providing "educational resources and timely updates on state and federal SNAP policy changes[.]"  Decl. of Abby J. Leibman ¶ 9, ECF No. 9-6; Am. Compl. ¶ 106.  MAZON claims that it has been forced to alter these educational materials and shift its work priorities "to address the significant uncertainties surrounding" USDA's data gathering initiative based on an alleged failure by USDA to "address the significant uncertainties surrounding" the collection and to "articulate only lawful purposes" for USDA's data gathering initiative.  Am. Compl ¶ 109.  Second, Mazon claims that it has decided to continue its "Challah for Hunger" program, even though it intended to sunset the program, in anticipation that college students may hesitate to enroll in SNAP based on USDA's data gathering initiative.  *Id.* ¶ 111.  Both these alleged injuries, however, fail to establish Article III injury-in-fact for numerous reasons.

First, these standing theories are squarely foreclosed by the Supreme Court's decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  In that case, the Court rejected the argument by various medical associations that they had standing by claiming that the FDA had "impaired" their "ability to provide services and achieve their organizational mission" by approving the abortion-inducing drug mifepristone.  *Id.* at 394 (citation omitted).  The plaintiffs claimed that they incurred costs due to the FDA's actions, including a need to perform their own studies on mifepristone to better inform their members and the public about the drug's risks.  *Id.*  The plaintiffs further claimed that they had to spend "time, energy, and resources" drafting citizen petitions to FDA and engaging in public advocacy and public education.

*Id.*  This, the plaintiffs alleged, resulted in them spending "considerable resources" to the detriment of other spending.  *Id.*  The Court rejected this capacious standing theory and explained that, if accepted, it would mean that "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies."  *Id.* at 395.

The alleged impairment of MAZON's ability to counsel and educate SNAP recipients  is insufficient as a matter of law to establish Article III standing.  As the Supreme Court put it: An "organization" does not satisfy Article III when it simply "diverts its resources in response to a defendant's actions."  *Id*.  This is especially true for the present case as MAZON's stated need to spend such resources—to combat USDA's alleged failure to provide specifics about its intended data gathering initiative—is belied by the fact that USDA has repeatedly reiterated the purpose for its collection and the information which State Agencies and EBT Processors will provide.  *See* May 6 Letter; Nonsubstantive Change Request; SORN; July 9 Letter, July 23 Letter, FY2025 Privacy Impact Assessment, and July 25 Letters.  In the face of such ample evidence, Plaintiffs cannot "spend [their] way into standing simply by expending money to gather information and advocate against [USDA]'s action."  *All. for Hippocratic Med.*, 602 U.S. at 394.

Even if MAZON's theory of standing were still viable following *Alliance for Hippocratic Medicine*, MAZON already offers the Challah for Hunger program.  So, in continuing to offer the program, it has failed to show a significant shift or drain of its resources in response to this alleged agency action.  Indeed, MAZON's shift in priorities does not constitute injury, because working incrementally harder at a job it already does cannot constitute the devotion of significant resources required to demonstrate injury for purposes of Article III standing. *See Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412–13 (D.C. Cir. 2024) (cleaned up) (requiring organizational plaintiffs

to show "concrete and demonstrable injury to the organization's activities" such as a "consequent drain on the organization's resources[]" rather than "simply a setback to the organization's abstract social interests").

Finally, any assumption that individuals will be chilled from providing information to State Agencies—despite the USDA and FNS having statutory authority to collect the information—is speculative and objectively unreasonable. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); *see also United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (cleaned up) ("[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))). As such, MAZON fails to plead independent organizational injury on these grounds.

## II.   USDA's Data Gathering Initiative Complies with the Privacy Act.

### A.   Plaintiffs Cannot Assert Violations of the Privacy Act Through the APA.

Plaintiffs cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek. The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). The Privacy Act already provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. U.S. Dep't of Just.*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

This rule holds true where a statutory review scheme provides for review of issues only by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute

provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999).  It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices.  *See Rimmer v. Holder*, 700 F.3d 246, 261–62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency[.]"  *See* 5 U.S.C. § 552a(g)(1).  These causes of actions are (A) when an agency "makes a determination . . . not to amend an individual's record in accordance with his request," ("Amendment Action"), *id.* § 552a(g)(1)(A); (B) when an agency refuses to comply with an individual's request for access to her records, ("Access Action"), *id.* § 552a(g)(1)(B); (C) when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual" ("Benefits Action"), *id.* § 552a(g)(1)(C); or (D) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," ("Other Action") *id.* § 552a(g)(1)(D).

Plaintiffs' purported action, alleging violations of 5 U.S.C. § 552a(e) and 5 U.S.C. § 552a(a)(7), would fall into the "Other Action" category, pursuant to Section 552a(g)(1)(D).  *See* Compl. ¶¶ 121, 129.  But the Privacy Act provides for monetary damages only for Other Actions. *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007)

("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs[.]" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))). Prospective relief, such as that sought by Plaintiffs, is reserved for Amendment or Access Actions. 5 U.S.C. § 552a(g)(2), (3).

Plaintiffs cannot circumvent the Privacy Act's carefully drawn constraints by raising purported Privacy Act violations through the APA. Denying Plaintiffs' attempt to obtain broader relief than that provided by the Privacy Act is consistent with the bedrock principle that, "where [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell. Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1161–62 (9th Cir. 1978)).[4]

Again, the Fourth Circuit's recent decision in *American Federation of Teachers v. Bessent* is instructive. The court questioned whether the plaintiffs were likely to establish that they could bring their Privacy Act claims through the APA. *See Am. Fed'n of Teachers*, 2025 WL 2313244, at *8. Furthermore, there is no binding or persuasive authority to the contrary. The Fourth Circuit acknowledged that "both the Supreme Court and the [Fourth Circuit] have implied in footnotes that the Privacy Act does not preclude suits seeking equitable relief under the APA," but the Fourth Circuit explained that "those footnotes are dicta, and the Supreme Court has more recently reserved the question." *Id.* (citing *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 303 n.12 (2012)).

---

[4] Several courts have recently examined this question in the context of similar, but not precisely analogous, data access cases. *Compare Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *8, *with Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *50–53 (4th Cir. Apr. 30, 2025); *Am. Fed'n of Lab.*, 778 F. Supp. 3d at 80–81; *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 784–85 (D. Md. 2025).

The Fourth Circuit also addressed the D.C. Circuit's decision in *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988), and explained that it "contain[s] little to no reasoning why the Privacy Act fails to provide an 'adequate remedy' under the APA."  *Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *8 n.6.  Indeed, the D.C. Circuit did not address the limitation on the APA's waiver of sovereign immunity in 5 U.S.C. § 704 at all, and therefore this Court is free to conclude that the APA does not authorize the broad relief Plaintiffs seek in the face of the Privacy Act's comprehensive remedial schemes.

### B. USDA Has Satisfied the Privacy Act's Notice and Comment Requirement for Routine Uses.

Even if the Court determined that the APA could expand the specific relief set forth in the Privacy Act, which it should not, USDA has not violated the Privacy Act.  The Privacy Act requires agencies to provide 30 days' notice in the Federal Register "of any new use or intended use of the information in [a system of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency."  5 U.S.C. § 552a(e)(4)(D); *id.* § 552a(e)(11). USDA plainly satisfied this requirement.  USDA published the SORN on June 23, 2025, and the SORN's routine uses were scheduled to go effect on July 24, "unless USDA determines they must be changed as a result of public comment."  SORN at 26,251.

Plaintiffs previously asserted that, by issuing the July 9 Letter to SNAP State Agencies, USDA prejudged the decision to put in place the routine uses in the SORN, depriving them of a meaningful opportunity to comment.  *See* TRO Mem. II at 24–25; *see also* Am. Compl. ¶ 123–24. That is incorrect.

To start, Plaintiffs based their argument on case law regarding the requirements under 5 U.S.C. § 553, which apply when an agency is engaged in a rule making.  *See* TRO Mem. II at 24–25 (citing *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)).  Those cases do

27

not address Section 552a(e)(11) and the promulgation of routine uses, which is not rule making, and the Government is unaware of any case that has interpreted Section 552a(e)(11) to impose a substantive requirement that the agency remain "open minded," as Plaintiffs contend.

In any event, USDA thoughtfully considered the comments received in response to publication of the SORN. First, the short turnaround between the end of comments and the effective date of the routine uses is a sign of USDA's commitment to an efficient process, not of a predetermination. The comment period addressed only the SORN's proposed routine uses, in other words, when USDA may further disclose the information it gathered. SORN at 26,521. This has no effect on the process of gathering the information in the first instance as USDA considered the comments it obtained. Further, as the SORN provides, the routine uses would go into effect July 23, 2024, "unless USDA determines they must be changed as a result of public comment." *Id.* Thus, that USDA committed to working efficiently in gathering the requested information while analyzing comments on the terms of the routine uses, and provided itself flexibility to make changes, is no reason to find that the result of the comments was "predetermined."

Moreover, as detailed above, and as the Administrative Record reflects, USDA considered all comments submitted in response to USDA's proposed routine uses. *See* PALLEK-000657; *see also* Background, Section III, *supra*. That is all that is required by § 552a(e)(11). *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Privacy Act Implementation, 40 Fed. Reg. 28,948, 28,966 (July 9, 1975) ("[The publication requirement] is to give the public an opportunity to comment on the appropriateness of [the routine] uses before they come into effect."). But even more, USDA is in the process of making a change to proposed Routine Use 8 in response to comments the agency received to eliminate the reference to "foreign" governments. *See* PALLEK-000657. That forthcoming change underscores that USDA thoughtfully considered public

comments and adapted its proposals in response to public feedback.  Thus, there has been no procedural violation of the Privacy Act, and Plaintiffs cannot prevail on any claim based on a purported failure to consider public comments.

In their Second TRO motion, Plaintiffs relied primarily on the Third Circuit's decision in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), to suggest some greater obligation on USDA, *see* TRO Mem. II.  But that case is of no help to them.  *Prometheus* was a challenge to the FCC's complex and long-litigated regulations governing broadcast media ownership, involving technical economic analysis and public hearings.  *See* 652 F.3d at 450–53.  It also involved FCC action announced through a press release that gave the public significantly less time for comment than the FCC's usual 90 days for notice-and-comment rulemaking.

Here, the issues are significantly less complex.  USDA published the proposed routine uses in the Federal Register, and the public had the full 30 days required by statute to comment.  The evidence before the Court also establishes that USDA considered all comments received on the proposed routine uses.  And, indeed, as discussed above, USDA is in the process of making a change to proposed Routine Use 8 in response to comments the agency received.  *See* PALLEK-000657.  There is no violation of the Privacy Act's procedural requirements.

### C.  Routine Uses 8 and 11 are Compatible with the Purposes for Which the Data Will be Collected.

Plaintiffs also take issue with Routine Use 8 and Routine Use 11, arguing that they are not compatible with the purposes for which SNAP data will be collected and therefore violate the Privacy Act.  *See* Am. Compl. ¶¶ 77, 131.  But Plaintiffs' claim is based on an incorrect reading of the SORN and construes the FNA too narrowly.

To assess compatibility, courts conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure."  *Britt v. Naval Investigative*

*Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018).  Although the D.C. Circuit has yet to "definitely determine[] the precise meaning of 'compatible,'" *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 240 n.1 (D.D.C. 2017), the court has cited approvingly to the test articulated by the Third Circuit:  Whether a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (citing *Britt*, 886 F.2d at 549–50); *see also Ames*, 861 F.3d at 240 n.1.  Under that test, an agency need only demonstrate a "meaningful degree of convergence" between collection and disclosure.  *Britt*, 886 F.2d at 549.

Plaintiffs have previously misconstrued the broad authorization of data sharing in 7 U.S.C. § 2020(e)(8)(A), contending that the paragraph permits "'disclosures . . . to persons directly connected with the administration or enforcement' of SNAP 'only for such administration or enforcement[.]'" TRO Mem. II at 29 (quoting 7 U.S.C. § 2020(e)(8)(A)).  Plaintiffs' quotation of the statute omits additional critical language.  The full paragraph provides as follows:

> (A)    the safeguards shall permit—
>
> > (i)    the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, *Federal assistance programs*, or *federally-assisted State programs*; and
> >
> > (ii)    the subsequent use of the information by persons described in clause (i) only for such administration or enforcement[.]

7 U.S.C. § 2020(e)(8)(A) (emphasis added).

The statute therefore does not limit disclosure only to persons directly connected with the administration or enforcement of SNAP, as Plaintiffs have claimed.  Rather, by its plain terms, it authorizes disclosure to any person directly connected with the administration of any Federal assistance program or federally assisted State programs.  Understood properly, therefore, there is

a clear statutory authorization for proposed Routine Use 11, which restates the language in § 2020(e)(8)(A) in other words.  *See* SORN at 26,523.

Moreover, even if the explicit statutory authorization were not enough (it is), there is a "meaningful degree of convergence" between USDA's purpose in obtaining the information and the uses in Routine Use 11.  *Britt*, 886 F.2d at 549.  As USDA explained in its data requests to the States, USDA's receipt of data is imperative to, among other things, "detect overpayments and fraud."  July 9 Letter.  Disclosing information to other Federal entities or instrumentalities to investigate fraud, waste, or abuse in Federal benefits programs is compatible with that purpose.

Similarly, there is no conflict with Routine Use 8 and uses of data the FNA authorizes.  Far from some new, expansive permission for disclosure, as Plaintiffs have suggested, Routine Use 8 consists of standard language that already applies across multiple systems of records that USDA administers.  *See, e.g.*, Privacy Act; Proposed New System of Records, 88 Fed. Reg. 11,403, 11,405 (Feb. 23, 2023) (SORN for the National Accuracy Clearinghouse (NAC) System to Detect Duplicate Participation); Privacy Act of 1974; System of Records Revision, 86 Fed. Reg. 48,975, 48,977-01 (Sept. 1, 2021) (SORN for the Child and Adult Care Food Program); *see also* PALLEK-000657.  But even putting its historical pedigree aside, Routine Use 8 is a common-sense application of the FNA's authorized use of SNAP data.

In addition to the broad statutory authorization to share data with "persons directly connected with the administration or enforcement" of any Federal assistance programs, or federally-assisted State programs, 7 U.S.C. § 2020(e)(8)(A), the FNA provides that, "all information obtained under this chapter from an applicant household shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter,"  7 U.S.C.

31

§ 2020(e)(8)(C).  Routine Use 8 faithfully interprets those authorizations, allowing for the sharing of records to government authorities "[w]hen a record on its face, or in conjunction with other records, indicates a violation or potential violation of law."  SORN at 26,522.

To the extent there are any meaningful differences between the explicit statutory authorization in paragraph (e)(8)(C) and the text of proposed Routine Use 8, the SORN explicitly limits the disclosure of data to circumstances consistent with the FNA, as discussed above.  *Id*. Further, USDA is in the process of amending Routine Use 8 to eliminate potential disclosure to foreign governments, in response to public comments received on the SORN.  *See* PALLEK-000657.  And even putting all that aside, it should be entirely uncontroversial that USDA would share with other government agencies information that, "on its face, or in conjunction with other records" indicates a potential violation of law.  SORN at 26,522.  That is consistent with USDA's purpose in collecting data from States to identify waste and the misuse of federal funds.  *See* July 9 Letter.  Accordingly, there is a "meaningful degree of convergence," and Routine Use 8 easily satisfies a compatibility analysis.  *Britt*, 886 F.2d at 549–50.

Finally, to the extent that there is any question regarding compatibility, Plaintiffs' arguments ignore the language in the SORN that disclosure is permitted under the proposed routine uses only "to the extent such uses are authorized by, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8)[.]"  SORN at 26,522.  Thus, even if there were some possibility that the routine uses could be interpreted to potentially allow disclosures incompatible with the purposes for which the information was collected, it would be foreclosed by the clear limiting language in the SORN. Any assumption that disclosure in any specific instance would go beyond the limits established by the FNA is purely speculative and inconsistent with the plain language of the SORN.

Defendants are entitled to summary judgment on Plaintiffs' Privacy Act claim for all the reasons discussed above.

## III.    USDA Has Not Violated the Paperwork Reduction Act

### A.    The PRA Does Not Provide Plaintiffs a Cause of Action.

Plaintiffs claim that Defendants violated the PRA by engaging in a "collection of information" without abiding by the statute's procedural requirements.  Am. Compl. ¶¶ 136–39; *see also* 44 U.S.C. § 3502(3) (defining "collection of information"); *id.* § 3507(a) (providing that an agency shall not engage in a collection of information unless it has complied with certain procedures, including publishing a notice in the Federal Register).

The PRA, however, does not create a private cause of action.  *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014).  Seeking to circumvent this barrier, Plaintiffs have instead attempted to plead their PRA claim through the APA.  *See* Am. Compl. ¶¶ 133–40.  But APA review is unavailable "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  Such is the situation here.  The PRA impliedly forbids the relief sought because it provides for review of the statute's requirements only when the issue is raised defensively in an enforcement action.  *See* 44 U.S.C. § 3512(b) ("The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.").  For this reason, courts have routinely rejected attempts by plaintiffs seeking judicial review outside the PRA's statutory scheme for alleged PRA violations related to information collection.  *See, e.g.*, *City of New Bedford v. Locke*, Civ. A. No. 10-10789, 2011 WL 2636863, at *9 (D. Mass. June 30, 2011), *aff'd*, 701 F.3d 5 (1st Cir. 2012); *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 564 F. Supp. 3d 605, 613 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) (collecting cases).  In sum, because the PRA forbids review of

33

Plaintiffs' affirmative claim, Plaintiffs may not pursue a PRA claim under the APA instead. 5 U.S.C. § 702.

Anticipating this defect, Plaintiffs previously pointed the Court to the Ninth Circuit's decision in *Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018). *Hyatt*, however, addressed another provision in the statute, Section 3507, that bars judicial review of "[t]he decision by [OMB] to approve or not act upon a collection of information contained in an agency rule." *See id.* at 1170–71 (quoting 44 U.S.C. § 3507(d)(6)). And the court was clear that the statute precludes judicial review—including actions brought through the APA—where an OMB decision results in the issuance of an OMB control number. *See Id.* at 1172. Here, OMB has approved the relevant collection of SNAP household data and issued a control number. *See* Background, Section III, *supra*; Argument, Section III.B., *infra*. Thus, *Hyatt* confirms that judicial review is precluded under the PRA, both considering § 3512(b), discussed above, and the bar to review in § 3507(d)(6).

Indeed, the case that Plaintiffs provided in their notice of supplemental authority only confirms that judicial review of Plaintiffs' PRA claims is foreclosed. *See* Notice of Suppl. Auth., ECF No. 30. In *Steele v. United States*, the D.C. Circuit examined a claim by two tax preparers that the IRS did not have statutory authority under the Internal Revenue Code to require them to disclose certain information and pay a fee to obtain or renew a Preparer Tax Identification Number. 144 F.4th 316 (D.C. Cir. 2025). The Circuit determined that the plaintiffs' claim was not barred by Section 3507(d)(6) of the PRA, and thus they could maintain an APA suit, because they challenged the agencies' statutory authority, not compliance with the PRA. *Id.* at 321–24. As the Circuit explained, "[t]he PRA imposes requirements on how agencies collect information and assigns oversight responsibility to the OMB Director." *Id.* at 322. Thus, "[a] plain language reading [of Section 3507(d)(6)] insulates [OMB's] discretionary judgment to allow or remain silent

on an agency's proposed collection." *Id.*  In other words, "the PRA does not authorize *what* information an agency may collect, but rather governs the process authorizing *how* any agency collects information that suits its objectives." *Id.* at 323 (emphasis in original).  Thus, because the plaintiffs did not "question the validity of the Director's decision or allege defects in the PRA process" their claim fell within the APA's cause of action.  *Id.*

Not so with Plaintiffs.  Count III of their Amended Complaint squarely calls into question whether USDA complied with the procedures of the PRA.  *See, e.g.*, Am. Compl. ¶ 139 ("By issuing the Renewed Data Demand . . . without comporting with the procedural and informational requirements contained in [the PRA], USDA failed to comply with the Paperwork Reduction Act.").  As such, not only have Plaintiffs failed to plead their way around the precedent holding that the PRA does not provide a private cause of action, but *Steele* also confirms that Section 3507(d)(6) bars their PRA claims.

Finally, Plaintiffs previously relied on *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39 (D.D.C. 2025), for the proposition that APA review is available to them.  Yet, in that case, the court did not address the Paperwork Reduction Act's implied bar on judicial review—nor did the parties in that case raise it.  Thus, Judge Bates had no occasion to address the question, and *Doctors for America* does not advance Plaintiffs' argument.

### B.    USDA Has Satisfied the PRA's Requirements.

Even assuming Plaintiffs could maintain their PRA claim—which they cannot—Plaintiffs cannot establish that USDA violated the statute.  The PRA imposes a set of procedural requirements on agencies prior to sponsoring a new collection of information.  Specifically, an agency must provide 60-day and 30-day notices in the Federal Register seeking public comments on the collection and await approval from the OMB and a control number for the collection before

collecting the information.  44 U.S.C. § 3506(c), (a).  Here, despite Plaintiffs' protestations, USDA complied with the relevant procedural requirements.

On September 12, 2023, USDA published a 60-day notice in connection with SNAP that stated that USDA would require the submission of "names, social security numbers, and date of births of all household members; addresses; and individual or household income information from households."  Agency Information Collection Activities: SNAP Forms: Applications, Periodic Reporting, and Notices, 88 Fed. Reg. 62,527-01, 67,527 (Sept. 12, 2023).  It also noted that State Agencies would disclose "information obtained from SNAP application forms or contained in case files of participating SNAP households to certain persons," including *inter alia*, "those directly connected with: the administration of SNAP" and "the administration of other Federal or Federally assisted means-tested programs."  *Id.*  The 30-day notice, published on February 23, 2024, also described the information to be gathered and noted that "State Agencies must maintain records to ascertain whether the program is administered in compliance with Federal statutes and regulations . . . for a period of three years from the date of origin."  Submission for OMB Review; Comment Request, 89 Fed. Reg. 13,679-02, 13,679 (Feb. 23, 2024); *see also* Supporting Statement – Part A for OMB Control Number 0584-0064, *available at* https://perma.cc/U48S-DSRE ("Information that State Agencies collect is generally not shared with any organization outside of the U.S. Department of Agriculture (USDA).").  The regulations cited by the 60- and 30-day notices include citations to the requirements on States at 7 C.F.R. Part 272, which make clear that "[e]ach State Agency shall keep such records and submit *such reports and other information* as required by FNS," 7 C.F.R. § 272.1(e) (emphasis added).  Thus, the public, including Plaintiffs, were on notice that the information being collected by States or their contractors in the SNAP applications was subject to disclosure to USDA.

Reflecting USDA's compliance with the procedural requirements of the Paperwork Reduction Act, USDA's collection of information was approved and issued a control number on June 30, 2024, for a period of three years. *See* Initial Approval. There is therefore no basis for Plaintiffs' claims that USDA has failed to comply with the statute. TRO Mem. II at 30–34. The 60- and 30-day notices described above already anticipated collection of precisely the information at issue by State Agencies and provision of that information to USDA. That USDA now intends to increase the *volume* of previously collected data that is reported to USDA does not create a new collection requiring new notice.[5]

Plaintiffs also take issue with USDA's Nonsubstantive Change Request approved by OMB on July 1, 2025. *See Id.* at 32–34; *see also* Change Approval. But that request was proper for the reasons described above—*i.e.*, the submission of previously collected data to USDA is already contemplated by the 60- and 30-day notices. Indeed, as OMB explained in its approval of the request from USDA: "No additional data collection or recordkeeping is sought through this change request. Rather, the change is limited to reporting these data elements to USDA." Change Approval. Plaintiffs point out that the Nonsubstantive Change Request estimated an additional 20,410 annual burden hours for states and EBT vendors over what was previously approved. *See* Am. Compl. ¶ 73. True enough, but that is out of a total of over 142 *million* previously approved burden hours, underscoring that the requested change is, in fact, nonsubstantive for purposes of the PRA. *See* Nonsubstantive Change Request at 3.

---

[5] Plaintiffs suggest that the creation of the new National SNAP Information Database somehow turns the State Agencies' reporting into a new collection subject to the PRA. *See* TRO Mem. II at 31; *see also* Am. Compl. ¶ 137. A simple example illustrates why that argument is incorrect: Assume someone "collects" baseball cards. Organizing those baseball cards in a new storage box does not add to that collection.

**IV.     USDA's Data Gathering Initiative is Not Arbitrary and Capricious.**

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025).  Under this standard, the agency is afforded a presumption that its actions are "valid" and need only articulate a "satisfactory explanation" that has a "rational connection between the facts found and the choice made." *Roe*, 947 F.3d at 220 (cleaned up).  And courts should be wary of interfering with an agency's "ordinary course of [business]" decisions, even if Plaintiffs identify a "specific allegedly-improper . . . action[]" within such ordinary decisions.  *See People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*, 130 F. Supp. 3d 999, 1001 (E.D. Va. 2015).

Here, USDA has not engaged in unreasoned decisionmaking.  Through Executive Order, the President of the United States directed agencies to "[r]emov[e] unnecessary barriers to Federal employees accessing Government data" to "eliminat[e] bureaucratic duplication and inefficiency [to] enhance[e] the Government's ability to detect overpayments and fraud."  EO 14243, § 1.  The Executive Order specifically required agencies to seek lawful access to "State programs that receive Federal funding[.]"  *Id.* §3(a), (c).

Consistent with this Presidential directive, USDA identified SNAP as a federally funded program, administered by the States, whose dispersed storage of information constituted an "information silo" potentially creating "bureaucratic duplication and inefficiency" hindering the Government's ability to identify overpayment and fraud.  May 6 Letter at 1; *see also* July 9 Letter at 1.  USDA identified lawful statutory and regulatory authorities to gather together the information.  May 6 Letter at 1; SORN at 26,521; July 25 Letter at 1.  Rather than brushing aside other mechanisms for detecting waste, fraud, and abuse, as Plaintiffs suggest, USDA's new

National SNAP Information Database will provide a new, complementary tool to ensure that food assistance gets to those in need and is not abused through fraudulent claims or inadequate State oversight.  While Plaintiffs may prefer USDA to rely on State audit efforts, it is hardly arbitrary or capricious for USDA to improve its capability to ensure taxpayer funds are being used properly.

As such, USDA's action is reasonable and certainly not arbitrary and capricious.

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' Motion to Dismiss or, in the alternative, for Summary Judgement.


Dated: August 29, 2025                                 Respectfully submitted,

                                                      BRETT A. SHUMATE
                                                      Assistant Attorney General
                                                      Civil Division

                                                      ELIZABETH J. SHAPIRO
                                                      Deputy Branch Director
                                                      Civil Division, Federal Programs Branch

                                                      _____
                                                      BENJAMIN S. KURLAND
                                                      Trial Attorney
                                                      United States Department of Justice
                                                      Civil Division, Federal Programs Branch
                                                      1100 L Street, NW
                                                      Washington, DC 20005
                                                      Tel: (202) 353-0533
                                                      ben.kurland@usdoj.gov

                                                      *Counsel for Defendants*