# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK, *et al.*

       *Plaintiffs*,


       *v.*

BROOKE L. ROLLINS, in her official
capacity as U.S. Secretary of Agriculture, *et al.*

       *Defendants.*

Civil Action No. 1:25-cv-01650-JMC

# MEMORANDUM IN SUPPORT OF PLAINTIFFS'
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

LEGAL STANDARD .........................................................................................................12

ARGUMENT ......................................................................................................................12

I.    No Preliminary Issues Prevent the Court from Reaching the Merits of Plaintiffs'
      Claims. ......................................................................................................................12

   A.    Plaintiffs have standing. .....................................................................................12

         i.    USDA's unlawful collection of Individual Plaintiffs' sensitive information
               caused them concrete, cognizable injuries. ........................................14

         ii.   Plaintiffs are injured by USDA's denial of the information they are
               entitled to receive under the PRA. ....................................................18

         iii.  Individual Plaintiffs have been deprived of their right to comment on and
               influence decisions made about USDA's handling of their data. ....................21

         iv.   MAZON has suffered a distinct injury to its anti-hunger mission....................22

   B.    Plaintiffs have no adequate alternative remedy under the Privacy Act or the
         Paperwork Reduction Act and can therefore proceed under the APA to halt
         USDA's actions contrary to those laws. ..........................................................23

   C.    The data demand is a final agency action which must be "set aside" if found
         unlawful. ............................................................................................................26

II.   As the Barren Administrative Record Confirms, the Data Collection is Arbitrary and
      Capricious...................................................................................................................27

III.  USDA Violated the Paperwork Reduction Act by Failing to Complete an Information
      Collection Review. .....................................................................................................33

IV.   USDA Violated the Privacy Act Because Routine Uses 8 and 11 Are Not "Compatible"
      with the Purpose for Which the Information Was Collected. ...........................................36

   A.    The Privacy Act requires a "meaningful degree of convergence" between the proposed
         uses and the purpose underlying the initial collection......................................36

i

B.    Routine uses 8 and 11 are not compatible with the SNAP-administration purpose for
which the data was initially collected.............................................................................38

C.    Disclosures pursuant to routine uses 8 and 11 are unconstrained by the SNAP Act. ....42

CONCLUSION .................................................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**CASES** ............................................................................................................ **Page No(s).**

*AFL-CIO v. Department of Labor,*
   778 F. Supp. 3d 56 (D.D.C. 2025).............................................................................25

*AFSCME v. Social Sec. Admin,*
   778 F. Supp. 3d 685 Md. 2025).................................................................................25

*Ahmed v. Noem,*
   No. 25-cv-1351 (RBW), 2025 WL 2299447 (D.D.C. Aug. 8, 2025).......................25

*All. for Retired Ams. v. Bessent,*
   770 F. Supp. 3d 79 (D.D.C. 2025)..............................................................14, 15, 16

*Am. Fed'n of Gov't Employees, AFL-CIO vs U.S. Off. Of Personnel Mgt.,*
   777 F. Supp. 3d 253 (S.D.N.Y 2025) .................................................................15, 25

*\*Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.,*
   No. 25-cv-339 (JDB), 2025 WL 1783899 (D.D.C. June 27, 2025) ............14, 15, 17

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
   771 F. Supp. 3d 717 (D. Md. 2025)...........................................................................14

*Am. Gateways v. U.S. Dep't of Just.,*
   No. 25-cv-01370 (AHA), 2025 WL 2029764 (D.D.C. July 21, 2025) ....................27

*Am. Soc. For Prevention of Cruelty to Animals v. Fed'l Entm't Inc.,*
   659 F.3d 13 (D.C. Cir. 2011)....................................................................................18

*Ames v. Dep't of Homeland Sec.,*
   861 F.3d 238 (D.C. Cir. 2017)..................................................................................36

*Ashtari v. Pompeo,*
   496 F. Supp. 3d 462 (D.D.C. 2020)..........................................................................12

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................................26

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ...........................................................................................24, 25

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,*
   419 U.S. 281 (1974) .................................................................................................28

*Swenson v. U.S. Postal Serv.,*
   890 F.2d 1075 (9th Cir. 1989) ..................................................................................36

*Britt v. Naval Investigative Serv.,
    886 F.2d 544 (3d Cir. 1989) ..........................................................................passim

Califano v. Sanders,
    430 U.S. 99 (1977) ................................................................................................28

California v. U.S. Dep't of Health & Hum. Servs.,
    No. 25-cv-05536, 2025 WL 2356224 (N.D. Cal. Aug. 12, 2025)...................27, 31

Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,
    846 F.3d 1235 (D.C. Cir. 2017)..........................................................................24

Citizens to Pres. Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) ..............................................................................................28

Covert v. Herrington,
    667 F. Supp. 730 (E.D. Wash. 1987)....................................................................38

Ctr. For Biological Diversity v. Env't Protec. Agency,
    141 F.4th 153 (D.C. Cir. 2025) ............................................................................29

Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,
    585 F. Supp. 3d 63 (D.D.C. 2022)........................................................................18

Dep't of Homeland Sec. v. Regents of the Univ. of California,
    591 U.S. 1 (2020) ...........................................................................................27, 28

Doe 1 v. Apple Inc.,
    96 F.4th 403 (D.C. Cir. 2024) ..............................................................................13

*Doe v. Chao,
    540 U.S. 614 (2004) ..............................................................................................25

Doe v. Stephens,
    F.2d 1457 (D.C. Cir. 1988)...................................................................................38

Drs. for Am. v. Off. of Pers. Mgmt.,
    766 F. Supp. 3d 39 (D.D.C. 2025)..................................................................26, 27

F.C.C. v. Fox TV Stations, Inc.,
    556 U.S. 502 (2009) ..............................................................................................27

FEC v. Akins,
    524 U.S. 11 (1998) ................................................................................................18

Food & Drug Admin. v. All. for Hippocratic Med.,
    602 U.S. 367 (2024) ..............................................................................................22

*Friends of Animals v. Jewell,*
   824 F.3d 1033 (D.C. Cir. 2016)................................................................18

*Gadelhak v. AT&T Servs., Inc.,*
   950 F.3d 458 (7th Cir. 2020) ..................................................................14

*Garcia v. Vilsack,*
   563 F.3d 519 (D.C. Cir. 2009)................................................................24

*Gomez v. Trump,*
   485 F. Supp. 3d 145 (D.D.C. 2020)..................................................29, 32

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363, 379 (1982) .......................................................................22

*Hyatt v. OMB,*
   908 F.3d 1165 (9th Cir. 2018) ................................................................26

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env't Prot.,*
   482 F.3d 79 (2d Cir. 2006) .....................................................................29

*Jeffries v. Volume Servs. Am., Inc.,*
   928 F.3d 1059, 1064–1065 (D.C. Cir. 2019)..........................................17

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
   780 F. Supp. 3d 135 (D.D.C. Apr. 24, 2025) .........................................22

*League of Women Voters of United States v. Harrington,*
   560 F. Supp. 3d 177 (D.D.C. 2021).........................................................28

*Loma Linda Univ. Med. Ctr. v. Sebelius,*
   684 F. Supp. 2d 42 (D.D.C.)....................................................................28

*Lugo v. U.S. Dep't of Just.,*
   214 F. Supp. 3d 32 (D.D.C. 2016)...........................................................37

*Lujan v. Defs. of Wildlife,*
   504 U.S. 560 (1992) ................................................................................13

*Michigan v. E.P.A.,*
   576 U.S. 743 (2015) ................................................................................32

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ............................................................................28, 30

*Narragansett Indian Tribal Historic Pres. Off. v. FERC,*
   949 F.3d 8 (D.C. Cir. 2020).....................................................................14

*Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs,*
   170 F. Supp. 3d 6 (D.D.C. 2016) .................................................................................. 13

*National Fuel Gas Supply Corp. v. FERC,*
   468 F.3d 831 (D.C. Cir. 2006) ..................................................................................... 27

*Occidental Eng'g Co. v. I.N.S.,*
   753 F.2d 766 (9th Cir. 1985) ....................................................................................... 28

*Pharm. Rsch. and Manufacturers of Am. v. U.S. Dep't of Health and Hum. Servs,*
   43 F. Supp. 3d 28 (D.D.C. 2014) ................................................................................... 2

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.,*
   313 F. Supp. 3d 62 (D.D.C. 2018) ......................................................................... 29, 30

*Radack v. Dep't of Just.,*
   402 F. Supp. 2d 99 (D.D.C. 2005) ......................................................................... 24, 25

*Randolph v. ING Life Ins. & Annuity Co.*
   973 A.2d 702 (D.C. 2009) ............................................................................................ 15

*Roberts v. Austin,*
   632 F.2d 1202 (5th Cir. 1980) ..................................................................................... 15

*Rural Cellular Ass'n v. F.C.C.,*
   588 F.3d 1095 (D.C. Cir. 2009) ................................................................................... 32

*Sec. & Exch. Comm'n v. Chenery Corp.,*
   332 U.S. 194 (1947) ..................................................................................................... 28

*Sierra Club v. E.P.A.,*
   292 F.3d 895 (D.C. Cir. 2002) ................................................................................. 2, 13

*Silver v. IRS,*
   531 F. Supp. 3d 346 (D.D.C. 2021) .............................................................................. 13

*Steele v. United States,*
   144 F.4th 316 (D.C. Cir. 2025) .................................................................................... 26

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ..................................................................................................... 22

*Townsend v. U.S.,*
   236 F. Supp. 3d 280 (D.D.C. 2017) .............................................................................. 37

*Tozzi v. U.S. E.P.A.,*
   No. 98-cv-0169 (TFH), 1998 WL 1661504 (D.D.C. Apr. 21, 1998) ........................... 34

vi

*TransUnion LLC v. Ramirez*,
　　594 U.S. 413 (2021) ......................................................................................13, 14, 15

*Trump v. CASA, Inc.*,
　　145 S. Ct. 2540 (2025) ........................................................................................27

*U.S. Postal Service v. National Ass'n of Letter Carriers, AFL-CIO*,
　　9 F.3d 138 (D.C. Cir. 1993)..................................................................................36

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*,
　　592 U.S. 261 (2021) ............................................................................................29

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n*,
　　825 F.3d 674 (D.C. Cir. 2016)..............................................................................32

*United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*,
　　288 F. Supp. 3d 99 (D.D.C. 2017)........................................................................19

*Verizon v. F.C.C.*,
　　740 F.3d 623 (D.C. Cir. 2014)..............................................................................27

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　　429 U.S. 252 (1977) ............................................................................................13

*Wolf v. Regardie*,
　　553 A.2d 1213 (D.C. 1989) ..................................................................................15

## STATUTES

44 U.S.C. § 3501 .......................................................................................................21

44 U.S.C. § 3506 ................................................................................19, 21, 33, 34

44 U.S.C. § 3507 ....................................................................................19, 33, 34

5 U.S.C. § 552a...................................................................................................24, 36

5 U.S.C. § 704 ...........................................................................................................26

5 U.S.C. § 706(2).........................................................................................2, 12, 24, 26

7 U.S.C. § 2011 .........................................................................................................32

7 U.S.C. § 2020 ...............................................................................................*passim*

7 U.S.C. § 2025 .........................................................................................................30

8 U.S.C. § 1373 ..............................................................................................................41

**OTHER AUTHORITIES**

Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal government*, Arkansas Advocate (May 22, 2025) ...............................................................................6

*Application for CalFresh, Cash Aid, and/or Medi-Cal/Health Care Programs* ...........................18

Daniel J. Solove & Neil M. Richards, *Privacy's Other Path: Rediscovering the Law of Confidentiality*, 96 Geo. L.J. 123, 125 (2007) ...........................................................17

Jahd Khalil, *Virginia is sharing SNAP recipients' personal info with the federal government*, Virginia Public Media (Aug. 8, 2025) .......................................................................6

James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, Alaska Beacon (May 15, 2025) ..................................................................................6

Jude Joffe-Block, *Privacy Advocates Urge States Not to Comply with USDA Requests for Food Stamp Data*, NPR (May 13, 2025) ..........................................................................3

Letter from Deputy Under Secretary Patrick A. Penn to Kansas Governor Laura Kelly (Aug. 12, 2025) .......................................................................................................................7

Memorandum from Cass R. Sunstein, Information Collection under the Paperwork Reduction Act (Apr. 7, 2010) ......................................................................................................34

Memorandum from Howard Shelanski, Flexibilities under the Paperwork Reduction Act for Compliance with Information Collection Requirements (July 22, 2016) ................................34

Olivia Richardson, *NH complies with Trump admin request for SNAP recipients' personal data*, New Hampshire Public Radio (Aug. 7, 2025) ..........................................................6

OMB, Privacy Act Implementation: Guidelines and Responsibilities ..........................................25

Peter Hirschfield, *The Trump administration demanded SNAP recipients' personal data. Vermont has complied*, Vermont Public (Aug. 4, 2025*)* ...........................................6

Restatement (Second) of Torts § 652B ...............................................................................15

S. Rep. No. 104-8, at 14 (1995) ...........................................................................................20

*SNAP Quality Control*, USDA ............................................................................................31

Thomas M. Cooley, *The Law of Torts* 595 (2d ed. 1888) ...............................................17

U.S. Dep't of Just., *Overview of the Privacy Act of 1974*, 2020 Ed. ...............................33

USDA, *Secretary Rollins Prevents Illegal Aliens from Receiving Taxpayer-Funded SNAP Benefits* (July 10, 2025) ................................................................................5

Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, Iowa Starting Line (May 16, 2025) ................................................................................6

## RULES

Fed. R. Civ. P. 56(a) ................................................................................12

Fed. R. Evid. 201(b) ................................................................................2

## REGULATIONS

5 C.F.R. § 1320.3 ................................................................................34

5 C.F.R. § 1320.5 ................................................................................34

5 C.F.R. § 1320.9(b) ................................................................................35, 36

7 C.F.R. § 272.18 ................................................................................39

7 C.F.R. § 274.5(a)(1) ................................................................................32

7 C.F.R. § 275.12 ................................................................................16

7 C.F.R. § 275.3(d) ................................................................................31

7 C.F.R. Part 275 ................................................................................30, 31

7 CFR § 272.1 ................................................................................42

40 Fed. Reg. 28948 ................................................................................25

40 Fed. Reg. at 28966 ................................................................................33

86 Fed. Reg. 44575 (Aug. 13, 2021) ................................................................................30

87 Fed. Reg. 59633 (Oct. 3, 2022) ................................................................................35

89 Fed. Reg. 13679 ................................................................................39

90 Fed. Reg. 13,681 (Mar. 20, 2025) ................................................................................2

90 Fed. Reg. 26521 (June 23, 2025) ................................................................................4, 5, 6

90 Fed. Reg. 26522 ............................................................................................................40, 42

## INTRODUCTION

The facts of this case are simple. In March, President Trump signed an Executive Order requiring federal agencies to ensure "unfettered access to comprehensive data" throughout the federal government and from "all state programs receiving federal funding" to fulfill the Administration's goal of "eliminating waste, fraud, and abuse." Six weeks later, the United States Department of Agriculture (USDA)[1] publicly demanded that state agencies administering the Supplemental Nutrition Assistance Program (SNAP) turn over data on applicants and recipients of food benefits going back to January 2020.

The Administrative Record in this case does not contain a single document supporting USDA's reflexive compliance with the Executive Order. It contains no evidence that USDA considered how to apply the government-wide Executive Order to the SNAP program, including with respect to SNAP's unique statutory data protections and existing fraud prevention structures (or evidence supporting a need to change those protections and systems). It contains no evidence that USDA analyzed why SNAP data should be shared with unrelated federal, state, local, or foreign agencies performing unrelated law enforcement functions. It contains no evidence that USDA considered the chilling effect the data collection will have on program participation, thus increasing (not reducing) hunger in the United States. Instead, USDA complied with the Executive Order without analysis, evidence, or any consideration of the scheme Congress created when it designed SNAP. And until this lawsuit was filed, USDA gave little regard to the procedures required by the Paperwork Reduction Act or the limitations the Privacy Act places on federal agencies' use of data; indeed, it continues to violate those requirements.

USDA's actions display the height of contempt for the Administrative Procedure Act's

---

[1] As used herein, "USDA" refers to all Defendants.

(APA) requirement that agencies engage in reasoned decisionmaking and follow statutorily mandated procedures. Plaintiffs respectfully ask that the Court grant summary judgment in their favor, set aside USDA's unlawful actions pursuant to 5 U.S.C. § 706(2), and grant the relief detailed in the accompanying motion. Such an order will not preclude USDA from fulfilling its statutory obligations to administer SNAP, as it has for decades, nor from working to avoid the payment of duplicate or improper benefits.

## STATEMENT OF FACTS[2]

On March 20, 2025, President Trump signed Executive Order 14243 (the "Eliminating Information Silos Executive Order"), seeking "unfettered access to comprehensive data from all State programs." AR 542-43; 90 Fed. Reg. 13,681 (Mar. 20, 2025).

Less than six weeks later, on May 5, 2025, Fidelity Information Services (FIS), an EBT vendor used by over 20 states, sent a letter to its state clients informing them that FIS had been contacted by both USDA and its "DOGE team" regarding the Executive Order and FIS's role as a processor of EBT transactions. Declaration of Nicole Schneidman, Ex. A, Dkt. 9-11.

On May 6, Gina Brand, Senior Policy Advisor at FNS, issued a letter to all SNAP State Agency Directors invoking the Eliminating Information Silos Executive Order and noting that the agency was "taking steps to require all States" to provide sensitive data to USDA. AR 544-45

---

[2] Citations to the Administrative Record are designated with an "AR" cite, which correspond to the PALLEK Bates numbering provided by Defendants. With the exception of the declarations from Plaintiffs, evidentiary citations outside of the Administrative Record are either immaterial for purposes of summary judgment (and provided for context only) or are appropriately considered by judicial notice. *See* Fed. R. Evid. 201(b); *Pharm. Rsch. and Manufacturers of Am. v. U.S. Dep't of Health and Hum. Servs*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."). Declarations from Plaintiff are appropriately submitted as evidence to establish standing. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 900-01 (D.C. Cir. 2002).

(the "May 6 letter"). The letter noted that failure to comply "may trigger noncompliance

procedures codified at 7 U.S.C. [§] 2020(g)," which include the withholding of federal funds.

AR 545. The letter also threatened sanctions against states for non-compliance. *Id.*

Within a week, FIS and another payment processor publicly stated that they either

understood themselves to be "required to disclose" the requested data, or that they were

communicating directly with clients regarding USDA's demand.[3] Press reports indicated that at

least six states quickly moved to comply with USDA's demand.[4]

Plaintiffs initiated this case on May 22, 2025. In response to Plaintiffs' first motion for

preliminary relief, USDA indicated that it would be remedying numerous procedural deficiencies

(under both the Paperwork Reduction Act and Privacy Act) and would not collect data without

satisfying all necessary legal requirements. Dkt. 11-1 at ¶ 13. Relying on that pledge, Plaintiffs

withdrew their motion. Dkt. 13.

On June 11, 2025, with respect to the Paperwork Reduction Act, USDA submitted

several documents to the Office of Management and Budget's (OMB) Office of Information and

Regulatory Affairs (OIRA) to make a "nonsubstantive change" to a collection approved in 2024,

*i.e.*, the states' collection of information from individuals applying for SNAP benefits (or seeking

recertification of SNAP eligibility). *See* AR 546-48; AR 549. In the June change request, USDA

described this new collection as "limited to reporting" to USDA the data previously collected by

states. AR 548. On June 24, 2025, USDA submitted another revision to OIRA of the same

request to "correct the OMB inventory" by "adding the original baseline burden estimates" that

---

[3] Jude Joffe-Block, *Privacy Advocates Urge States Not to Comply with USDA Requests for Food Stamp Data*, NPR (May 13, 2025), https://www.npr.org/2025/05/13/nx-s1-5397208/doge-snap-usda-privacy.
[4] Dkt. 28-1 at 7 n.5.

had been "erroneously removed." AR 553. The second request was approved on July 1. OMB,

Off. of Info & Regulatory Affs.,

https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202506-0584-002 (last visited Aug.

29, 2025); then follow "Retrieve Notice of Action."

 With respect to the Privacy Act requirements, on June 23, 2025, USDA published in the

*Federal Register* a system of records notice (hereinafter "the SORN") for a new system of

records titled USDA/FNS-15, National SNAP Information Database. AR 550-52 (90 Fed. Reg.

26521 (June 23, 2025)). The SORN stated that it was effective upon publication except for

routine uses, which were to become effective at the close of the comment period on July 23,

2025, unless changed. *Id.* The SORN lists eleven "permitted routine uses" which could form the

basis of a disclosure of the collected data by USDA, "to the extent such uses are authorized by,

among other authorities," two provisions of the Food and Nutrition Act, two regulatory

provisions implementing that statute, and two executive orders. *Id.* Two of the routine uses are

challenged here.

 Routine use 8 permits disclosure of a record to an "appropriate agency, whether Federal,

foreign, State, local, or tribal, or other public authority" when that record, "on its face, or in

conjunction with other records, indicates a violation or potential violation of law, whether civil,

criminal, or regulatory in nature" and "if the information disclosed is relevant to any

enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity." AR

551 (90 Fed. Reg. 26521, 26522).

 Routine use 11 permits disclosure "[t]o support another Federal agency or to an

instrumentality of any governmental jurisdiction within or under the control of the United

States (including any State or local government agency) that administers, or that has the

authority to investigate or assist USDA to investigate or assist USDA to investigate potential fraud, waste, or abuse" in a benefits program "funded in whole or in part by Federal funds" when "disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs." AR 552 (90 Fed. Reg. 26521, 26523).

On July 9, 2025, two weeks before the deadline to comment on the SORN routine uses, Secretary of Agriculture Brooke Rollins issued a letter to SNAP state agencies, citing the May 6 letter, and renewing USDA's data demand. AR 555. That letter expressed USDA's "commit[ment] to effectuating" the Eliminating Information Silos Executive Order and ensuring "appropriate and lawful participation in SNAP." *Id.* The next day, USDA issued a press release, which (beyond its headline) was not specific to SNAP, titled "Secretary Rollins Prevents Illegal Aliens from Receiving Taxpayer-Funded SNAP Benefits."[5] That press release again touted the SNAP data collection as part of the agency's compliance with the Executive Order.[6]

USDA received 458 public comments on the SORN, including from each of the Plaintiffs in this case. *See* AR 556 (chart detailing all comments); AR 557-64, 565-68, 665-66, 666-68; 669-70; 687-88 (comments from plaintiffs). According to the unauthored, single-page "Analysis of SORN comments" provided as part of the Administrative Record, USDA determined that 433 opposed the proposed system, 1 was in favor, and 23 were "not germane."[7] AR 657.

---

[5] USDA, *Secretary Rollins Prevents Illegal Aliens from Receiving Taxpayer-Funded SNAP Benefits* (July 10, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/07/10/secretary-rollins-prevents-illegal-aliens-receiving-taxpayer-funded-snap-benefits.
[6] *Id.*
[7] These numbers total 457, not 458.

USDA also noted in that "analysis" that it "agrees" with commenters who suggested, with respect to routine use 8, "removing the reference to 'foreign' governments from the language on when and where to disclose records when a potential violation has been identified." AR 657; *see* AR 551 (90 Fed. Reg. 26521, 26522) (Routine use 8). Despite that acknowledgment, USDA has not, to date, published any changes to the SORN in the *Federal Register*.

The routine uses in the SORN took effect on July 23, 2025. *See* AR 550-52. That day, Ms. Brand issued a letter to SNAP State Agency Directors describing, for the first time, the platform for data transmission and reiterated the July 30 deadline. AR 625-26. That communication again described the data demand as the agency's "intent to implement" the Executive Order. *Id.* On July 25, 2025, USDA issued a fourth letter to SNAP Agency Directors, in which the Agency once again reiterated the purpose of the data demand as strengthening program integrity, "as directed by Executive Order 14243." AR 656.

Press reports indicate that several states have provided USDA with their SNAP data.[8] On August 12, 2025, USDA sent letters to states that had not submitted SNAP recipient data by the

---

[8] *See, e.g.*, James Brooks, *Alaska gives food stamp recipients' personal information to federal officials*, Alaska Beacon (May 15, 2025), https://alaskabeacon.com/2025/05/15/alaska-gives-food-stamp-recipients-personal-information-to-federal-officials/; Peter Hirschfield, *The Trump administration demanded SNAP recipients' personal data. Vermont has complied*, Vermont Public (Aug. 4, 2025*)*, https://www.vermontpublic.org/local-news/2025-08-04/trump-administration-demanded-snap-recipients-personal-data-vermont-complied; Ainsley Platt, *Arkansas shares certain SNAP applicant numbers with federal government*, Arkansas Advocate (May 22, 2025), https://arkansasadvocate.com/2025/05/22/arkansas-shares-certain-snap-applicant-numbers-with-federal-government/; Olivia Richardson, *NH complies with Trump admin request for SNAP recipients' personal data*, New Hampshire Public Radio (Aug. 7, 2025), https://www.nhpr.org/nh-news/2025-08-07/nh-complies-with-trump-admin-request-for-snap-recipients-personal-data; Jahd Khalil, *Virginia is sharing SNAP recipients' personal info with the federal government*, Virginia Public Media (Aug. 8, 2025), https://www.vpm.org/news/2025-08-08/virginia-vdss-snap-usda-pii-data-food-benefits; Zachary Oren Smith, *Iowa to deliver SNAP recipient data to the federal government*, Iowa Starting Line (May 16, 2025),

July 30, 2025 deadline, noting they were out of compliance and demanding the data by a new deadline of August 15, 2025.[9]

**Facts Pertaining to Plaintiffs**

Plaintiff Namod Pallek receives SNAP in California, where the program is known as "CalFresh." Declaration of Namod Pallek, Dkt. 9-2, ¶ 3. Pallek started receiving SNAP benefits as an individual in January 2024, which required him to submit highly sensitive information to the California Department of Social Services, including his Social Security number, a photo of his passport, W-2 forms, federal tax forms, detailed school financial aid forms, and a lease. *Id.* He consented to sharing his data with his state solely for SNAP eligibility and benefit distribution. *Id.* ¶ 5. Plaintiff Pallek's ability to afford nutritious meals as a full-time student receiving federal work-study is entirely dependent on CalFresh. *Id.* ¶ 4. Without SNAP, Pallek would either endure food insecurity or divert crucial time from his studies to secure and work an additional job. *Id.*

Plaintiff Julliana Samson applied for and began receiving CalFresh in August 2024, which required her to submit highly sensitive personal information to the California Department of Social Services, including her Social Security number, a photo of her driver's license, federal tax returns, detailed school financial aid award information, and her lease. Declaration of Julliana Samson, Dkt. 9-3, ¶ 3; Plaintiff Samson's SNAP benefits are a critical support as she works toward her life-long dream of receiving a college degree. *Id.* ¶ 4. USDA's demand for Plaintiff

---

https://iowastartingline.com/2025/05/16/iowa-hands-over-personal-data-trump-federal-governmentto-deliver-snap-recipient-data-to-the-federal-government/.
[9] Letter from Deputy Under Secretary Patrick A. Penn to Kansas Governor Laura Kelly (Aug. 12, 2025),
https://content.govdelivery.com/attachments/KSOG/2025/08/18/file_attachments/3359294/KS_USDA%20SNAP%20Data%20Sharing%20Warning%20Letter-A.pdf.

Samson's personal information, which she submitted solely for SNAP eligibility and benefit distribution, diminishes her trust in the SNAP system. *Id.* ¶ 5.

Plaintiff Diana Ramos has been enrolled in SNAP continuously since 2013. Declaration of Diana Ramos, Dkt. 9-4, ¶ 2. During the time period covered by USDA's data demand, she submitted personal information and copies of sensitive documents to both Florida and New York. *Id.* ¶¶ 2-3. Plaintiff Ramos has type II diabetes and relies on SNAP to be able to afford the more expensive low-sugar, high-protein foods needed to manage her disease. *Id.* ¶ 8. Due to her past experience with identity theft and her awareness that benefits can be stolen when EBT numbers are compromised, Plaintiff Ramos is vigilant about the security of her personal information. *Id.* ¶¶ 6-7. In applying for SNAP at various times in different states, Plaintiff Ramos submitted copies of sensitive documents including a state-issued ID, Social Security number, bank account number, bank statements, utility bills, and rental receipts. *Id.* ¶ 4

Plaintiff Ramos is also very aware of the practice of "skimming" SNAP benefits, in which people use card readers to steal EBT numbers and then spend people's benefits. *Id.* ¶ 7. To avoid risking her EBT number, Ramos is very careful about where she swipes her card and tries to limit purchases to large grocery stores or trusted retailers. *Id.* Now that the USDA is demanding access to her data, Ramos fears that her EBT could become more vulnerable to hacking and skimming schemes that may threaten her benefits. *Id.* She is extremely concerned about how USDA will use her information. *Id.*

Plaintiff Catherine Hollingsworth has received SNAP benefits in Alaska since around 2002, which has required her to submit sensitive personal information, including her birth certificate, driver's license, bank statements, lease, and medical records to Alaska's Division of Public Assistance. Declaration of Catherine Hollingsworth, Dkt. 9-5, ¶ 4. On May 15, 2025,

Plaintiff Hollingsworth read a news article indicating that Alaska had shared SNAP recipient information with the federal government. *Id.* ¶ 6. She immediately became concerned about the security of her information and put a fraud alert on her bank accounts and froze her credit. *Id.* Ms. Hollingsworth feels that USDA's demand for her data from Alaska is a violation of her privacy and a denial of her dignity and agency to be in charge of her own information and affairs. *Id.* ¶ 10.

Plaintiff MAZON, Inc.: A Jewish Response to Hunger is a faith-based nonprofit organization dedicated to fighting hunger across the country. Supplemental Declaration of Abby Leibman ¶ 4. SNAP plays a critical role in MAZON's anti-hunger advocacy, which prioritizes educating the anti-hunger community and service providers who directly interface with SNAP applicants and recipients. *Id.* ¶ 7.

The data collection has directly impacted MAZON's core activities in at least four ways. First, MAZON's inability to learn from and participate in the ICR process prevents the organization from carrying out its mission. *Id.* ¶ 11. MAZON routinely tracks the Federal Register to gather information and submit comments. *Id.* ¶ 8. MAZON's Board of Directors has established this participation in public processes as a key priority of the organization's anti-hunger work. *Id.* ¶ 11. Without an ICR, MAZON has been shut out of USDA's decision-making process and prevented from meeting its obligation to carry out that priority. *Id.*

Second, MAZON's inability to participate in the ICR process poses a threat to its very existence because it jeopardizes donor trust. *Id.* ¶ 13. MAZON expressly commits to donors that their contributions will support its national advocacy and policy work. *Id.* Because of USDA's failure to go through the ICR process, MAZON is unable to fulfill that commitment with respect to USDA's collection of SNAP data. *Id.* This exclusion directly prevents MAZON from

fulfilling its commitment to its supporters, undermining the trust that is critical to solicit continued donations. *Id.*

Third, the data collection undermines years of trust-building work that MAZON and its partners have done with vulnerable communities who are hesitant to share their private information for purposes of applying for SNAP. *Id.* ¶ 14. Those groups include elderly individuals, people fleeing domestic violence, and immigrant communities, whom MAZON and its partners have worked for years to persuade that it is safe to apply for SNAP. *Id.* The data collection immediately undermines that work, eroding trust not only in SNAP but in MAZON. *Id.*

Fourth, MAZON has shifted resources from other priorities in response to the data collection. For example, despite plans to sunset the on-campus "Challah for Hunger" program, MAZON has determined that it is necessary to counteract the chilling effect of the data collection. *Id.* ¶ 16. As a result, several staff members spent substantial time on that program this summer—including one who dedicated a third of her time to the "Challah for Hunger" program alone—preventing them from engaging with other priority areas. *Id.* ¶¶ 16-20. Due to the program's continuation, MAZON also had to allocate resources to transfer Challah for Hunger to its new software platforms, which it otherwise would not have done. *Id.* ¶ 19.

Plaintiff Electronic Privacy Information Center (EPIC) is a public interest research center devoted to securing the right to privacy in the digital age. Declaration of Alan Butler, Dkt. 9-7, ¶ 4. Among its activities, EPIC engages in advocacy, research, and public education about the collection, use, retention, and transfer of personal information by federal agencies, including large-scale databases and mass surveillance programs. *Id.* ¶ 6. EPIC also engages in research,

advocacy, and public education concerning the systems and databases used in the provision of public benefits, including SNAP. *Id.* ¶ 7.

In 2018, EPIC provided testimony to the U.S. House Committee on Oversight and Government Reform warning lawmakers about the acute privacy and security consequences of establishing even a limited-purpose federal database of SNAP recipients. *Id.* ¶ 8. These include the dramatically enhanced risk of data breach resulting from the centralization of information; the heightened risk of identity theft and fraud, which can interfere with an individual's access to credit, housing, public benefits, and other essentials; the intrusion inherent in the wrongful disclosure of sensitive personal information to people and agencies that are not lawfully entitled to access it; and the increased risk of having one's benefits terminated on the basis of defective matching and consolidation of previously disaggregated datasets. *Id.*

EPIC routinely relies on OMB information collection review (ICR) documentation required by the Paperwork Reduction Act to educate the public, share informed feedback and expertise with agencies and policymakers, and identify unlawful or otherwise objectionable information collection practices. *Id.* ¶ 18. EPIC regularly exercises its right to provide comment on proposed collections of information detailed in ICR documentation. *Id.* ¶ 19.

When an agency like OMB fails to publish required ICR documentation, EPIC cannot fully analyze, comment upon, shape advocacy around, or focus public attention on the relevant information collection. *Id.* ¶ 20. This denies EPIC information to which it is entitled and frustrates EPIC's mission. *Id.* ¶ 21. As a result, EPIC must divert its limited resources to more burdensome methods of research and information gathering, including time-intensive FOIA requests and litigation for relevant records. *Id.*

11

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In APA cases, "the summary judgment standard functions slightly differently." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (citation omitted). A district court in an APA case functions as "an appellate court addressing issues of law," with its review limited to the administrative record. *Id.* The "entire case on review is a question of law, and only a question of law." *Id.*

## ARGUMENT

The undisputed record entitles Plaintiffs to summary judgment.[10] First, there are no threshold issues to prevent the Court from reaching the merits of the claims: Plaintiffs have standing to pursue each of their claims for relief, and Congress has provided both a cause of action and a waiver of sovereign immunity. Second, there are no material factual disputes and the record makes clear USDA's actions are arbitrary and capricious and violate both the Paperwork Reduction Act and the Privacy Act. The Court should grant Plaintiffs' motion, set aside USDA's unlawful data collection pursuant to 5 U.S.C. § 706(2), and enter an order granting the relief sought in the accompanying motion.

### I.    No Preliminary Issues Prevent the Court from Reaching the Merits of Plaintiffs' Claims.

#### A.    Plaintiffs have standing.

To establish standing, a plaintiff must show (1) an injury in fact, (2) a "causal connection" between the injury and the defendant's actions, and (3) a likelihood that the injury

---

[10] Plaintiffs are not moving for summary judgment on Count I (regarding USDA's failure to consider comments submitted on the SORN).

"will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 560–61 (1992)

(cleaned up). Plaintiffs only need to establish that one Plaintiff per claim has standing with

respect to each Defendant. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

264 & n.9 (1977). A plaintiff moving for summary judgment "must support each element of its

claim to standing 'by affidavit or other evidence.'" *Sierra Club v. E.P.A.*, 292 F.3d 895, 899

(D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561)).

"[A]n injury in fact" is "an invasion of a legally protected interest which is . . . concrete

and particularized and . . . actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S.

at 560 (cleaned up). "[V]arious intangible harms," like the harm from disclosure of private

information, are concrete where they have a "close historical or common-law analogue."

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021). An "'exact duplicate in American

history and tradition' is unnecessary, and courts 'must afford due respect to Congress's decision

to impose a statutory prohibition or obligation on a defendant.'" *Doe 1 v. Apple Inc.*, 96 F.4th

403, 411 (D.C. Cir. 2024) (quoting *TransUnion*, 595 U.S. at 424). Plaintiffs satisfy these

requirements.

As to Plaintiffs' procedural claim under the Paperwork Reduction Act (*i.e.*, Count III),

the standing "requirements are modified somewhat." *Silver v. IRS*, 531 F. Supp. 3d 346, 356

(D.D.C. 2021) (quoting *Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 11

(D.D.C. 2016)). To have standing to pursue this count, plaintiffs must show both "(1) that their

procedural right has been violated, and (2) that the violation of that right has resulted in an

invasion of their concrete and particularized interest." *Id*. at 357. With procedural claims, courts

apply a "relaxed redressability requirement," meaning that instead of "establishing that

compelling the agency to follow the correct procedure *would* lead to a substantive result that

favors the [plaintiff's] concrete interests, the [plaintiff] need only show that its concrete interests *could* be better protected." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis in original).

USDA's data collection causes each of the four injuries detailed below, and the Court's intervention, as set forth in the accompanying motion, would redress them.

### i. USDA's unlawful collection of Individual Plaintiffs' sensitive information caused them concrete, cognizable injuries.

USDA's unlawful collection of Individual Plaintiffs' information, and its actual or imminent rediscslosure to entities with no legal right to possess it, for incompatible and unexplained purposes, concretely harms them in a way that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. The Supreme Court has recognized that "[v]arious intangible harms can be . . . concrete." *Id*. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"—including "disclosure of private information." *Id*. "An intangible harm needn't be 'an exact duplicate' of the harm needed to prevail on the relevant common-law tort claim." *Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.*, No. 25-cv-339 (JDB), 2025 WL 1783899, at *6 (D.D.C. June 27, 2025) (citing *TransUnion*, 594 U.S. at 433); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.). Rather, "it just needs to 'bear[ ] a sufficiently close relationship' to the harm that permits a plaintiff to sue for that tort." *Id.* (citing *TransUnion*, 594 U.S. at 433).

Mishandling and improper disclosure of personal data "has a close relationship to the harm to privacy vindicated by the common-law tort of intrusion upon seclusion." *See, e.g.*, *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025); *Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 771 (D. Md. 2025); *Am.*

14

*Fed'n of Lab.*, 2025 WL 1783899, at \*4-7; *Am. Fed'n of Gov't Employees, AFL-CIO vs U.S. Off. Of Personnel Mgt.*, 777 F. Supp. 3d 253, 267-69 (S.D.N.Y 2025). The Supreme Court has expressly recognized intrusion upon seclusion as a sufficiently "concrete" harm to form the basis for standing. *TransUnion*, 594 U.S. at 425.

Intrusion upon seclusion is the "intentional[] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. "'[U]nauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information,'" is, by itself, enough to be "'highly offensive to any reasonable person.'" *All. for Retired Ams.*, 770 F. Supp. 3d at 103 (quoting *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009)). Publication of the information is not necessary. Restatement (Second) of Torts § 652B cmt. a; *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). Rather, the injury lies in the intrusion itself into information over which the plaintiff had "a 'reasonable expectation of privacy.'" *All. for Retired Ams.*, 770 F. Supp. 3d at 102. Such intrusions are concrete for standing purposes even in the context of inter-agency sharing of data. *See id.* at 102 (data sharing between Treasury and DOGE); *Am. Fed'n of Lab.*, 2025 WL 1783899, at \*6 ("DOGE Affiliates, much like a window peeper or mail snoop, are peering into members' personal affairs by viewing their confidential records without authorization. Nothing more is needed.").

Through the statutes that created SNAP, Congress created a reasonable expectation of privacy in the information and records submitted to the respective states by Individual Plaintiffs to obtain benefits. *See Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (concluding that participants in Food Stamps "possess[ed] a legitimate expectation that the[ir] [personal]

15

information [would] be kept confidential"); *see also, e.g.*, 7 C.F.R. § 275.12 ("Personal interviews shall be conducted in a manner that respects the rights, privacy, and dignity of the participants."). Nothing in the SNAP Act authorizes or even contemplates USDA's *possession* of years of individual data. Rather, the SNAP Act contemplates that state agencies must make records and data systems "available for inspection and audit" by USDA "subject to data and security protocols agreed to by the State agency and [USDA]." 7 U.S.C. § 2020(a)(3)(B)(i). But fundamentally, inspection "*isn't* . . . copying an item or permanently handing it over." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024). And the state "plan of operation" required by the SNAP Act—cited by USDA to authorize the demand, *see* AR 656, requires states to establish "safeguards which prohibit the use or disclosure" of the information they obtain as part of SNAP applications, with limited exceptions explicitly set forth by statute. *See, e.g.*, 7 U.S.C. § 2020(e)(8), (e)(15).

Individual Plaintiffs provided substantial amounts of information about themselves to their respective states—in some cases overcoming significant privacy concerns[11]—because they needed help affording food. Individual Plaintiffs never expected years of their personal data would be handed over to USDA and dumped into a federal database for uses unrelated to SNAP administration or enforcement and redisclosure beyond the bounds of the SNAP Act's protections. *See* Hollingsworth Decl. ¶¶ 6, 10; Pallek Decl. ¶¶ 5; Samson Decl. ¶¶ 5-6; Ramos Decl. ¶¶ 5-6; *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (finding it "entirely reasonable" for people to rely on "explicit statutory protections"). As their states disclose data to USDA,

---

[11] Individual Plaintiffs are not alone in their fears. *See, e.g.*, Suppl. Leibman Decl. ¶ 14 (mixed-status families, elderly people, and single mothers fleeing domestic violence); Anderson Decl., Dkt. 9-9, ¶¶ 9-11 (elderly people and mixed-status families); Elzinga Decl., Dkt. 9-10, ¶¶ 7-9 (mixed-status and refugee families); Machicote Decl., Dkt. 9-8, ¶ 6 (English-language learners).

Individual Plaintiffs' reasonable expectations of privacy are being actively invaded. *See* Hollingsworth Decl. ¶¶ 2, 4 (data to Alaska); Ramos Decl. ¶¶ 2-4 (data to Florida and New York); Pallek Decl. ¶ 3 (data to California); Samson Decl. ¶ 3 (data to California). Under the SORN's unlawful routine uses, the Individual Plaintiffs face the additional injury of redisclosure of their information by USDA, without notice, to entities with no obligation to safeguard it. *See infra* at 39-43. As USDA's reliance on the Eliminating Information Silos Executive Order makes clear, expansive redisclosure across government agencies at all levels is precisely the point of the collection—making this additional injury imminent and its scope concrete.

Individual Plaintiffs' injuries are also closely analogous to the tort of breach of confidence. The D.C. Circuit has accepted breach of confidence as a harm traditionally recognized as providing a basis for lawsuit in English or American courts, thus "weigh[ing] in favor of concreteness." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064–1065 (D.C. Cir. 2019).[12] As a result, the "unconsented disclosures of personal information in breach of confidence . . . can serve as a common-law analogue for a harm inflicted by a statutory violation," including the Privacy Act. *Am. Fed'n of Lab. & Cong. of Indus. Orgs v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (quoting *Jeffries*, 928 F.3d at 1064). Disclosure of

---

[12] The tort traces its origins back to the 1800s. *See* Daniel J. Solove & Neil M. Richards, *Privacy's Other Path: Rediscovering the Law of Confidentiality*, 96 Geo. L.J. 123, 125 (2007) ("By 1890, a robust body of confidentiality law protecting private information from disclosure existed throughout the Anglo-American common law."). Writing in 1888, Justice Cooley, a justice of the Michigan Supreme Court and author of multiple treatises on constitutional and tort law, devoted a chapter to "Wrongs in Confidential Relations" where "one party trusts his pecuniary or other interests to the fidelity and integrity of another, by whom, either alone, or in conjunction with himself, he expects them to be guarded and protected." Thomas M. Cooley, *The Law of Torts* 595 (2d ed. 1888) (collecting cases). Such relations existed "between agent and principal, between partner and partner, between corporator and officer of the corporation, and between *cestui que trust* and trustee." *Id.* (emphasis in original).

"plaintiffs'. . . personal information to unauthorized individuals," even across government agencies, is itself a "concrete, actual harm." *Id.*

The Individual Plaintiffs entrusted their information to their state agencies for purposes of obtaining food benefits, in reliance on the protective scheme established by Congress through laws like the Privacy Act, the PRA, and the SNAP Act.[13] USDA's unlawful collection, use, and redisclosure of this data—which go well beyond uses and disclosures authorized by the SNAP Act, *see infra* at 39-43—are therefore closely analogous to a breach of confidence.

### ii. Plaintiffs are injured by USDA's denial of the information they are entitled to receive under the PRA.

By circumventing the PRA's procedures, USDA has deprived Plaintiffs of information that the PRA requires it to provide and impeded their right to participate in a public process. A plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Am. Soc. For Prevention of Cruelty to Animals v. Fed'l Entm't Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011). Informational injuries can be predicated on statutes—like the PRA—that require the release of information as part of notice and comment procedures. *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (concluding that the statute "clearly creates a right to information upon which a claim of informational standing may be predicated"); *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 71-72 (D.D.C. 2022) (finding standing where plaintiff alleged a right to information, a denial of that right, and a

---

[13] In California, for example, where Plaintiffs Pallek and Samson receive SNAP, applicants are explicitly told that "[g]etting food benefits will not affect [them] or [their] family's immigration status" and that "[i]mmigration information is private and confidential." California Department of Social Services, *Application for CalFresh, Cash Aid, and/or Medi-Cal/Health Care Programs* (last visited Aug. 29, 2025), https://www.cdss.ca.gov/cdssweb/entres/forms/English/SAWS2_PLUS.pdf.

resulting deprivation of "meaningful participation" in a governmental process). In addition to establishing a statutory right to information, Plaintiffs must also show that the denial of such information causes them to suffer the type of harm Congress sought to prevent by requiring the release of information. *United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*, 288 F. Supp. 3d 99, 105 (D.D.C. 2017).

Plaintiffs have a statutory right to information under the PRA. *See* 44 U.S.C. § 3507(a)(1)(D)(ii); *Protect Democracy*, 288 F. Supp. 3d at 102. Prior to conducting or sponsoring a collection, the PRA requires an agency to provide information in a public notice in the Federal Register and solicit comment to evaluate, among other things, whether the collection is "necessary for the proper performance of the functions of the agency," whether the information "shall have practical utility," and whether the agency's burden estimate is accurate. 44 U.S.C. § 3506(c)(2)(A); *see id.* § 3507(a)(1)(D)(ii); *Protect Democracy*, 288 F. Supp. 3d at 102. USDA has not done so, instead relying on disclosures made years ago for purposes of carrying out a different "collection" from distinct "persons" within the meaning of the statute. *See infra* at 33-36.

This deprivation causes Plaintiffs to suffer harms of the type that Congress sought to prevent when requiring government transparency. The PRA requires information "concerning the government's data collection efforts" be made available in order for the public—including all Plaintiffs—to "hold the government to account." *Protect Democracy*, 288 F. Supp. 3d at 107, 105-106 & n.3 (holding that organizations can predicate an informational injury on the PRA given its aims of "openness in Government and society" and "improving responsibility and accountability 'to the public'"). Congress actively sought to increase public participation when it

adopted the PRA—noting that "[e]ffective public comment at the front end of decision processes is particularly beneficial." Paperwork Reduction Act of 1995, S. Rep. No. 104-8, at 14 (1995).

Plaintiffs' harms are precisely of this sort, a point USDA did not previously contest. *See* Dkt. 11 at 18. Individual Plaintiffs are recipients of SNAP whose data is being collected and whose rights of participation, access, and inspection are rendered non-existent due to the USDA's failure to disclose. They have had no opportunity to participate in the PRA's mandated public process regarding the collection of their data.

MAZON's mission is to end hunger through governmental advocacy, grantmaking, educational support, and data analysis, and SNAP is one of its priority advocacy areas. Suppl. Leibman Decl. ¶¶ 3. MAZON regularly tracks the Federal Register, comments on proposed actions that could chill SNAP participation or stigmatize or penalize SNAP recipients, and mobilizes partners to do the same.[14] *Id*. ¶¶ 8, 11. MAZON also offers support to organizations that guide individuals through the SNAP application process. *Id*. ¶¶ 3, 9. In addition to providing educational resources and policy updates, MAZON partners with service providers to identify and address obstacles that prevent eligible individuals from applying for and participating in SNAP. *Id*. ¶¶ 9. By failing to provide the required notice and comment opportunity under the ICR process, USDA denied MAZON the chance to understand the data collection's justification, voice its concerns, and effectively educate its partners. *Id*. ¶ 11. MAZON has been "shut out of a

---

[14] For example, in 2018, MAZON submitted a comment opposing the expansion of the "public charge" rule, explaining that families were disenrolling from SNAP for fear that their participation would negatively affect immigration proceedings for themselves or family members. Suppl. Leibman Decl. ¶ 8. In December 2022, MAZON submitted a formal comment regarding USDA's interstate data matching effort, raising concerns that it could be used to stigmatize and penalize SNAP recipients. *Id.*

vital policy conversation" central to its mission, which prevents it from meeting commitments to its Board of Directors and donors—jeopardizing the organization's future. *Id.* ¶¶ 11, 13.

For decades, EPIC has made extensive use of public notices and records concerning the collection, use, retention, and transfer of personal information by federal agencies. Butler Decl. ¶¶ 6, 9-12. EPIC routinely monitors, analyzes, comments on, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies, including specifically about SNAP. *Id.* ¶¶ 6-7. Because USDA is engaging in this collection without timely publishing information required by the PRA, EPIC cannot fulfill its mission of monitoring and ensuring that the collection is lawful. *Id.* ¶¶ 9-21. As a result, EPIC must divert its limited resources to more burdensome methods of information gathering. *Id.* ¶¶ 17, 21, 25. And because of USDA's actions, EPIC will be unable to educate the public or inform the policy debates surrounding that collection. *Id.* ¶¶ 9-21. This is particularly important in the context of information privacy—the security of which was an express "purpose" of the PRA. 44 U.S.C. § 3501(8).

### iii. Individual Plaintiffs have been deprived of their right to comment on and influence decisions made about USDA's handling of their data.

Individual Plaintiffs Pallek, Samson, Hollingsworth, and Ramos have been denied the right to meaningfully participate in the public process required by the PRA. Congress provided individuals with a substantive right to comment about proposed collections, 44 U.S.C. § 3506(c)(2), and required agencies to consider them, *id.* § 3507(a)(1)(A).

The Individual Plaintiffs are experiencing a procedural deprivation of their comment rights under the PRA because USDA has unlawfully forgone the comment procedures required by statute. First Amended Complaint, Dkt. 27 (FAC) ¶¶ 3-5, 7, 11, 87, 118-25, ¶¶ 33-40, 133-40. Plaintiffs have a "concrete interest that is affected by the deprivation." *Summers v. Earth Island*

*Inst.*, 555 U.S. 488, 496 (2009). As SNAP recipients who have submitted sensitive personal information to their states, Individual Plaintiffs have interests in keeping their data safe and preventing USDA from misusing their sensitive personal information. If given the opportunity to comment on the 60- and 30-day notices through the ICR process, Plaintiffs would offer comments that could address their concerns about the data collection.[15] Pallek Decl. ¶ 5; Samson Decl. ¶ 6; Ramos Decl. ¶ 10; Hollingsworth Decl. ¶ 9; Suppl. Leibman Decl. ¶ 11; Butler Decl. ¶¶ 19–20. Yet USDA has decided to proceed with the data collection without giving Individual Plaintiffs that opportunity. *See Summers*, 555 U.S. at 494 (noting uncontested Article III standing where an individual with historical and continued visits to federal lands was deprived the right to comment with suggestions to cure the threatened injury).

### iv.  MAZON has suffered a distinct injury to its anti-hunger mission.

An organization has standing to sue on its own behalf where it can "satisfy the usual standards" of injury in fact, causation, and redressability. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024). Although an organization "can have standing to challenge [federal agency] practices that directly interfere with their core activities, such as direct services programs," organizations must allege more than "harm to its abstract social objectives." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 179 (D.D.C. Apr. 24, 2025); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). So long as an organization has a "perceptibl[e] impair[ment] . . . there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379.

---

[15] For example, in their comments on the SORN, Plaintiffs suggested suggestions that USDA (1) dispense with this collection and instead step up its monitoring of states' anti-fraud procedures, (2) slow this collection down rather than rushing it in order to make sure the data is safe, and (3) clarify for SNAP recipients and the public what information is part of this collection. AR 557-68.

USDA's unlawful data collection directly impairs MAZON's anti-hunger mission. As detailed in the supplemental declaration of Abby Leibman, MAZON has reallocated resources away from other priorities in response: continuing the "Challah for Hunger" program that it intended to sunset, granting emergency funding, and delaying previously planned programmatic work with partners in order to strategize responses to the demand's chilling effect on SNAP participation.[16] Suppl. Leibman Decl. ¶¶ 15-20. In addition, USDA's collection itself and the imminent redisclosures outside of USDA erode trust in MAZON. *See infra* at 39-43. With its partners, MAZON has worked for decades to reassure vulnerable populations that it is safe to submit their personal information to state agencies—that this information will be used only for program-related purposes. *Id.* ¶ 14. USDA's unlawful actions render those reassurances false and undercut the trust and credibility MAZON has worked to earn since its inception. Finally, MAZON's inability to participate in an ICR process under the PRA imperils its funding because it prevents MAZON from fulfilling its promise to donors that their contributions will advance work at the national level. *Id.* ¶¶ 11, 13. The data collection has caused an immediate and urgent setback to MAZON's ability to carry out its mission.

## B. Plaintiffs have no adequate alternative remedy under the Privacy Act or the Paperwork Reduction Act and can therefore proceed under the APA to halt USDA's actions contrary to those laws.

This Court has authority to set aside unlawful agency action inconsistent with the Privacy Act or the PRA pursuant to its APA authority to "hold unlawful and set aside agency actions

---

[16] Other advocates and experts similarly opine on the chilling effect and erosion of public trust in SNAP. *See, e.g.*, Anderson Decl. ¶¶ 7-9 (describing "severe consequences on vulnerable populations in Tennessee"); Elzinga Decl. ¶¶ 7-11 (describing how mixed-status and refugee families in Iowa "will lose trust in the Program and forego these often life-saving benefits out of fear for the security of their data"); Machicote Decl. ¶¶ 5-6 (predicting "significant consequences for Indiana's immigrant populations who have limited language access").

found to be . . . not in accordance with law." 5 U.S.C. § 706(2). Such relief is available where there is "no other adequate remedy in a court." *Id.* § 704. To determine "whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)). Courts assessing the adequacy of an alternative remedy examine the "gap" between the relief available under the alternate scheme and the relief sought by plaintiffs in the case. *See id.* at 1244-46. In *Bowen*, the Supreme Court rejected the argument that monetary relief provided an adequate alternative to the "general equitable powers of a district court." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988); *see also Garcia*, 563 F.3d at 525 (finding the non-APA scheme adequate where it offered "declaratory and injunctive relief against the agency . . . in addition to money damages").

The APA relief that Plaintiffs seek here is an order setting aside the unlawful data collection and barring USDA from collecting and redisclosing Plaintiffs' SNAP data. *See* FAC at 39-40 (Prayer for Relief). Neither the Privacy Act nor the Paperwork Reduction Act offers such relief. *Cf. Bowen*, 487 U.S. at 903 (noting that Congress intended to withhold APA relief where it would "*duplicate* existing procedures for review of agency action" (emphasis added)).

**1. The Privacy Act.** Numerous courts have held that APA relief is available beyond the Privacy Act's narrow civil remedies, which do not provide for the equitable relief Plaintiffs seek in this case of unlawful disclosure. *See* 5 U.S.C. § 552a(g) (providing for injunctive relief only for agency *in*action); *Radack v. Dep't of Just.*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) ("Because [plaintiff] seeks declaratory and injunctive relief in addition to damages, the Privacy Act does

not provide an 'adequate remedy.'"); *AFL-CIO v. Department of Labor*, 778 F. Supp. 3d 56, 81-82 (D.D.C. 2025) (permitting a closely analogous claim and distinguishing cases involving plaintiffs seeking injunctive relief "*despite* its availability under the Privacy Act" as "a different situation entirely" (emphasis added)); *Ahmed v. Noem*, No. 25-cv-1351 (RBW), 2025 WL 2299447, at *15 (D.D.C. Aug. 8, 2025) ("Congress did not intend for the Privacy Act to be an exclusive source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." (quotation marks omitted)); *Am. Fed'n Gov't Employees v. U.S. Office of Personnel Mgmt.*, 777 F. Supp. 3d 253, 277 (S.D.N.Y. 2025) ("[P]laintiffs may not obtain declaratory or injunctive relief under the Privacy Act for the violations they have alleged here."); *AFSCME v. Social Sec. Admin*, 778 F. Supp. 3d 685, 758 (D. Md. 2025) ("The injunctive relief sought by plaintiffs here is not available under the Privacy Act."), *stayed pending appeal*, 145 S. Ct. 1626 (2025).

As the Supreme Court observed, the Privacy Act's silence on "standards of proof governing equitable relief" may be "explained by the general provisions for equitable relief within the [APA]." *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). And money damages following an unlawful disclosure are not an adequate substitute for "the general equitable powers of a district court" to order injunctive relief that would *prevent* harms caused by unlawful agency action. *See Bowen*, 487 U.S. at 905; *AFL-CIO*, 778 F. Supp. 3d at 80 ("Damages and injunctions belong to different genres: one compensates for harm while the other prevents it."); *see also* OMB, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28948, 28968 (July 9, 1975) (recognizing that "[a]n individual may seek judicial review under other provisions of the Administrative Procedure Act" than the four causes in the Privacy Act's § 552a(g)).

25

**2. The Paperwork Reduction Act.** The availability of APA relief for Plaintiffs' claim rooted in the PRA is even more apparent because the PRA provides no specific civil remedies. The Ninth Circuit has expressly rejected the argument that the PRA precludes an APA claim, holding that the PRA bars review *only* of OMB's decision to approve a collection "contained in an agency rule." *Hyatt v. OMB*, 908 F.3d 1165, 1171-72 (9th Cir. 2018) (calling the PRA's bar on judicial review "demonstratively narrow in scope"). The D.C. Circuit recently applied *Hyatt*'s reasoning and determined that the claim before it was unaffected by the PRA's bar on judicial review. *Steele v. United States*, 144 F.4th 316, 323 (D.C. Cir. 2025). And Judge Bates permitted a closely analogous PRA claim to proceed under the APA. *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 51-52 (D.D.C. 2025).

**C.    The data demand is a final agency action which must be "set aside" if found unlawful.**

As USDA apparently concedes,[17] the data demand is a final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The data demand—as reflected in USDA's letters to state SNAP agencies—is the "consummation of [USDA's] decisionmaking process." *See id.* It determines "rights and obligations"—namely USDA's rights to collect the data, states' obligation to produce it, and the possibility of noncompliance procedures, including the withholding of federal funds, for failures to do so. *See* AR 544-45 (May 6 letter), 555 (July 9 letter), 625-26 (July 23 letter), 656 (July 25 letter). Because the data demand is a final agency action under the APA, this court "shall . . . hold [it] unlawful and set [it] aside" if "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see also* 5 U.S.C. § 704.

---

[17] In the second round of briefing on preliminary relief, USDA did not contest that the data demand is a final agency action. *See* Dkt. 29 at 26-38.

Although USDA has suggested that *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), limits the ultimate relief available in this case, *see* Dkt. 29 at 14 n.1, the opinion in *CASA* is not so broad. In fact, the Supreme Court has expressly declined to resolve the "distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 145 S. Ct. 2540, 2554 n.10 (2025). USDA's argument regarding *CASA* invites this Court to expand that case far beyond its holding, a request that numerous courts in this District and elsewhere have rejected.[18]

## II.    As the Barren Administrative Record Confirms, the Data Collection is Arbitrary and Capricious.

Plaintiffs are entitled to summary judgment on Count IV because the data collection is arbitrary and capricious under the APA. Agencies must "engage[]in 'reasoned decisionmaking'" and provide a "reasoned explanation" for their actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citations omitted); *F.C.C. v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Courts analyzing an arbitrary and capricious challenge "evaluate [the agency's] reasoning to ensure that it has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Verizon v. F.C.C.*, 740 F.3d 623, 643–44 (D.C. Cir. 2014) (quoting *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006)) (internal formatting

---

[18] *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-322 (JDB), 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025) ("And as this is a case involving APA vacatur, not a universal or national injunction, the Supreme Court's recent decision in *Trump v. CASA . . .* does not apply."); *Am. Gateways v. U.S. Dep't of Just.*, No. 25-cv-01370 (AHA), 2025 WL 2029764, at *11 (D.D.C. July 21, 2025) (rejecting defendant arguments to limit injunctive relief) ("[Plaintiffs] are seeking the very relief mandated by Congress in the APA."); *California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536, 2025 WL 2356224, at *3 n.4 (N.D. Cal. Aug. 12, 2025) ("[T]he authority of a district court to issue such relief under the APA is not disturbed by *Trump v. CASA*, 145 S. Ct. 2540, 2554 n.10 (2025).").

omitted). While a court is not to "substitute [its] judgment for that of the agency," "courts may not make up for agency deficiencies by supplying a reasoned basis for the disputed action where the agency has failed to supply one." *League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185 (D.D.C. 2021); *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974); *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("If those grounds [invoked by the agency] are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

"[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C.), *aff'd,* 408 F. App'x 383 (D.C. Cir. 2010) (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). An agency action is "[n]ormally" arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the U. of Cal.*, 591 U.S. 1, 20 (2020). The certified Administrative Record is the "complete copy of the non-privileged documents that were directly or indirectly considered" by USDA. Dkts. 33-1; 35-1.

But that record reveals not a shred of reasoned decision-making by USDA and lacks evidence of *any* analysis or consideration of how—or whether—to apply the Eliminating Information Silos Executive Order to SNAP. *See* Dkts. 33-1 at 2, 35-2; *see also Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) ("The most striking thing about the agency action that Plaintiffs challenge in this case is the fact that HHS provided no explanation whatsoever for its decision . . . ."); *cf. Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env't Prot.*, 482 F.3d 79, 104 (2d Cir. 2006) (noting that the "brevity" of the agency decision was "troubling" and that "the complexity of the matter under consideration did not lend itself easily to brief analysis"). In fact, the only conceivably relevant document USDA claims[19] to support its decision to issue the data demand is the Eliminating Information Silos Executive Order. Dkts. 33-1 at 2, 35-2.

In these circumstances, USDA's data collection is the definition of capricious. The President issued a government-wide Executive Order on topics extending far beyond SNAP, including programs with vastly different statutory and regulatory schemes governing data protection and federal agency access rights. In response, USDA "merely announced the [collection] as a foregone conclusion, an *ipse dixit* if you will." *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83; *see also Ctr. For Biological Diversity v. Env't Protec. Agency*, 141 F.4th 153, 200 (D.C. Cir. 2025) (noting that an agency's "own *ipse dixit* . . . is no substitute for reasoned decision-making."); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 194-95 (D.D.C. 2020) (noting that the Administrative Record "reveal[ed] no justification" and "no rational

---

[19] Although USDA may have withheld privileged documents from the Administrative Record, *see* Dkt. 33-1, such documents cannot form the basis of its decision if withheld. *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) (noting that "documents reflecting a final agency decision and the reasons supporting it . . . are not [privileged]."

explanation"). The "unmistakable and inexplicable silence" by USDA as to its rationale "makes

the . . . analysis of Plaintiffs' APA claims quite easy," as then District Judge Brown Jackson

recognized in *Policy and Research*, 313 F. Supp. 3d at 83. "Under the most elementary aspects

of administrative law, an agency has no choice but to provide a reasoned explanation for its

actions." *Id.* (citing *State Farm*, 463 U.S. at 43).

USDA has failed this "most elementary" test. There is not a hint of evidence in the

Administrative Record detailing SNAP-specific motives, providing SNAP-specific evidence, or

engaging with the SNAP-specific statutory and regulatory scheme. The Administrative Record

reveals no analysis of fraud in SNAP, no reference to the preexisting SNAP program-integrity

statutory scheme, and no accounting of any deficiencies with that scheme. Neither is there any

indication that USDA even considered how duplicating work that states are statutorily *required*

to do—*i.e.*, checking individual eligibility and benefit levels—could further USDA's professed

goal of "eliminat[ing] bureaucratic duplication and inefficiency." AR 555 (July 9 letter noting

the "imperative" to "eliminate[] bureaucratic duplication and inefficiency"); AR 544 (same in

May 6 letter).

In this regard, USDA also failed to consider how its actions comport with the federal-

state partnership Congress created, whereby states are responsible for certifying households and

issuing SNAP benefits. 7 U.S.C. § 2020(a). States are required to have processes to "detect[]

fraud" in the program, *id.* § 2020(e)(20), and USDA is authorized to pay a portion of costs borne

by states for "investigations and prosecutions," *id.* § 2025(a)(7). Congress instructed USDA to

regulate on quality control issues, 7 U.S.C. § 2025(c)(1)(B), which USDA has done. *See* 7 C.F.R.

Part 275; Supplemental Nutrition Assistance Program: Non-Discretionary Quality Control

Provisions of the Agriculture Improvement Act of 2018, 86 Fed. Reg. 44575 (Aug. 13, 2021).

The resulting regulations govern how states must conduct reviews of their SNAP administration and how USDA, in turn, monitors state reviews. *See* 7 C.F.R. Part 275. In adopting these regulations, USDA created a case sampling methodology to validate state error rates—but it does not require, or even contemplate, states turning over *all* data regarding their SNAP applicants and recipients. 7 C.F.R. § 275.3(d). Congress separately established the inter-state "National Accuracy Clearinghouse" (NAC) as an added check to ensure individuals are not receiving benefits from more than one state. 7 U.S.C. § 2020(x). Nowhere has USDA explained why its requisitioning of millions of individuals' data is a necessary addition to "ensure program integrity."

The Administrative Record does not even acknowledge that USDA grappled with this statutory scheme. *See California v. U.S. Dep't of Health and Hum. Servs.*, No. 25-cv-05536, 2025 WL 2356224, at *3 n.4 (N.D. Cal. Aug. 12, 2025) (preliminarily enjoining federal agencies from sharing and using Medicaid data where the record suggested that the agencies had failed to engage in any reasoned decisionmaking before changing longstanding data privacy policies). This is even more true when the Administrative Record includes the agency's 2024 recitation of how it "monitors State performance to ensure that the program is being efficiently and economically operated," and that state-level data collection is limited to "what is necessary to comply with statutory SNAP requirements and to protect program integrity." AR 13-14. These existing mechanisms have led USDA to proclaim on its website its position that SNAP has "one of the most rigorous quality control systems in the federal government to measure how accurately states determine a household's eligibility and benefits." *SNAP Quality Control*, USDA (updated June 30, 2025; last visited Aug.29, 2025), https://www.fns.usda.gov/snap/qc. This is squarely at odds with the entire data collection effort. *See United States Telecom Ass'n v.*

*Fed. Commc'ns Comm'n*, 825 F.3d 674, 706–07 (D.C. Cir. 2016) ("An agency may not . . . depart from a prior policy sub silentio.").

Simply put: there is no evidence in the Administrative Record that USDA considered anything other than the Executive Order before initiating this sweeping collection. USDA has also never explained why it is seeking to collect records back to January 1, 2020, *see* AR 545, 625, when the statute and regulations create a three-year record retention period. 7 U.S.C. § 2020(a)(3)(B)(iii); 7 C.F.R. § 274.5(a)(1). There is also no evidence that USDA considered the chilling effect the data collection will have on SNAP participation.[20] *See Michigan v. E.P.A.*, 576 U.S. 743, 750–52 (2015) (setting aside agency action where it "refused to consider whether the costs of its decision [to regulate power plants] outweighed the benefits"); *Gomez*, 485 F. Supp. 3d at 194-95 (noting the agency's failure to "account for the serious consequences the policy would impose"); 7 U.S.C. § 2011 (describing purpose of SNAP to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households").[21] And following USDA's publication of the SORN, it failed to address the most

---

[20] The data collection has stoked justified fear among individuals who participate in SNAP. Pallek Decl. ¶ 5; Samson Decl. ¶ 5; Hollingsworth Decl. ¶¶ 7-10; Ramos Decl. ¶¶ 6, 8-10; Suppl. Leibman Decl. ¶ 14.

[21] Although Plaintiffs are unaware of any case specifically addressing the sufficiency of a comment period under the Privacy Act, the D.C. Circuit has been clear in cases under other administrative schemes that "[t]he opportunity for comment must be a meaningful opportunity," meaning that an agency must "remain sufficiently open minded." *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). USDA's analysis of the Administrative Record suggests anything but. In response to more than four hundred fifty comments—the overwhelming majority of which opposed the data collection—USDA did nothing more than (i) state that it has followed, must follow, and will continue to follow the law (including administering SNAP in compliance with law); (ii) conclusorily state that the comments were "unpersuasive" and/or raised unidentified "points already addressed by the SORN"; and (iii) make the self-evident point that the collection will place no additional burdens onto households. *See* AR 657.

This perfunctory analysis also departs from the government's consistent position for more than fifty years under the Privacy Act, *i.e.*, that agencies, whenever practicable, are to

ministerial of concerns expressed, including the SORN's omission of basic contact information for the agency and its listing of Amazon Web Services as the servicer in one location and Microsoft as the sole service provider elsewhere. *See* AR 557–64 (comment of EPIC raising these issues).

Absent any supporting evidence, analysis, or consideration, the data collection is the height of arbitrary and capriciousness. Plaintiffs are entitled to summary judgment on Count IV.

### III.    USDA Violated the Paperwork Reduction Act by Failing to Complete an Information Collection Review.

Plaintiffs are entitled to summary judgment on Count III because the data collection violates the PRA. Although USDA concedes that the collection is subject to the PRA,[22] it has failed to conduct an ICR—which is required regardless of whether this collection is new or a substantive revision to the collection that received OMB approval in 2024. 44 U.S.C. §§ 3506(c)(1)-(2); 44 U.S.C. § 3507(a). Instead, USDA is treating states' "reporting" of their complete SNAP databases *to USDA* as a "nonsubstantive change" to *states'* collection of the underlying data *from households*, which received OMB approval in 2024. Dkt. 11 at 25-26; AR 546-48; AR 553-54. But these are two, entirely different collections.

Obtaining a complete copy of all 53 SNAP jurisdictions' recipient databases involves a

---

furnish to the public "as complete an explanation of the routine uses and any changes made or not made as a result of the comment as possible so that the public will be fully informed of the proposed use" 40 Fed. Reg. at 28966; *see also* U.S. Dep't of Just., *Overview of the Privacy Act of 1974*, 2020 Ed. at 200 (reaffirming the 1974 interpretation of § 552a(e)(11)), https://www.justice.gov/Overview_2020/dl?inline.

The Agency's analysis has also left plaintiff MAZON questioning whether its comment was meaningfully considered, given inconsistencies in the supposed analysis. Supp. Leibman Decl. ¶ 12.

[22] OMB's PRA regulations explicitly state that "any requirement or request for persons to obtain, maintain, retain, *report*, or publicly disclose information" can constitute a "collection of information." 5 C.F.R. § 1320.3(c) (emphasis added); *Action Alliance of Senior Citizens v. Sullivan*, 930 F.2d 77, 79 (D.C. Cir. 1991) (analyzing the breadth of the PRA requirement).

new method of collection, from new persons, into a new database, with new burdens. *See* 5

C.F.R. § 1320.3(c); 44 U.S.C. § 3502(10). An ICR is required, including both a substantive

OMB review of the need for the information and a public comment process involving both a 60-

day and a 30-day notice period with the opportunity for Plaintiffs and the public to examine and

comment on USDA's collection. 44 U.S.C. § 3506(c), (a).

Instead of following that procedure, USDA sought and received OMB approval for this

collection by dubbing it a "nonsubstantive change" to the PRA collection approved in 2024. AR

546-48; AR 553-54; Dkt. 29-2 (Nonsubstantive Change Request). "Substantive or material

modifications" of an approved collection require OMB review and approval. 44 U.S.C.

§ 3507(h)(3); 5 C.F.R. § 1320.5(g) (same). While an ICR process is not required for

"insignificant or non-substantive changes,"[23] those are limited to such minor modifications as

"changes to the wording of a question . . . [that] would result in more accurate and complete

responses"—with the limitation that those changes may not "introduce new concepts or measures

that have not received public comment"—and finalization of one among several "options or

changes" that were clearly presented "as part of the original approval."[24]

There is simply no way to square the new data collection effort with this concept of a

---

[23] Memorandum from Cass R. Sunstein, Information Collection under the Paperwork Reduction Act, at 6 n.30 (Apr. 7, 2010), https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/inforeg/PRAPrimer_040720 10.pdf (commonly called the "PRA Primer").

[24] Memorandum from Howard Shelanski, Flexibilities under the Paperwork Reduction Act for Compliance with Information Collection Requirements, at 4-5 (July 22, 2016), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/pra_flexibilities_memo_7_ 22_16_finall.pdf; *cf. Tozzi v. U.S. E.P.A.*, No. 98-cv-0169 (TFH), 1998 WL 1661504, at *3 (D.D.C. Apr. 21, 1998) (citing *OMB Implementing Guidance* (Preliminary Draft, Feb. 3, 1997) at 21–22) (explaining that a "substantive" change, in contrast to a "nonsubstantive" change, "is any revision to the collection of information that . . . significantly changes the uses of the information or otherwise meaningfully alters any aspect of the collection of information from that previously approved by OMB").

trivial, non-substantive change. It defies common sense to suggest a matter that is, on the one hand, serious enough to be governed by an executive order is, on the other hand, not "substantive" enough to require an ICR. Moreover, even the most cursory review of how the agency has previously handled changes to information collections regarding SNAP reveal the extent of the analysis undertaken. *See, e.g.*, AR 5 (Lisa Marie Adiaba, USDA Food and Nutrition Service, U.S. Supporting Statement – Part A for OMB Control Number 0584-0064 (May 31, 2024)) (providing a detailed analysis of a change to the burden analysis associated with the National Accuracy Clearinghouse). Regardless, no reader of the prior ICR documentation could have reasonably understood the prior collection by states to encompass the wholesale data production by states to USDA for ongoing retention.

This procedural failure is not without consequence. Had USDA followed the law and conducted an ICR, it would have been required to meaningfully consider, and ultimately certify, whether the collection is not "unnecessarily duplicative of information already reasonably accessible to the agency." 5 C.F.R. § 1320.9(b). Yet USDA is moving forward with a collection while wholly ignoring the extensive anti-fraud system that Congress has already authorized, and USDA already built, to achieve system integrity and duplicate-benefit control without the bulk transfer of sensitive information. *See* 7 U.S.C. § 2020(x)(2) (establishing the National Accuracy Clearinghouse (NAC)) system); Supplemental Nutrition Assistance Program: Requirement for Interstate Data Matching to Prevent Duplicate Issuances, 87 Fed. Reg. 59633 (Oct. 3, 2022). And similarly, USDA would have had to certify that the new system is "necessary for the performance of the functions *of the agency*"—not for unrelated agencies performing unrelated law enforcement functions, as contemplated by the SORN. 5 C.F.R. § 1320.9(a) (emphasis added).

IV.    **USDA Violated the Privacy Act Because Routine Uses 8 and 11 Are Not "Compatible" with the Purpose for Which the Information Was Collected.**

Plaintiffs are entitled to summary judgment on Count II. The Privacy Act's "routine use" exception allows agencies to disclose individuals' records without the consent otherwise required by 5 U.S.C. § 552a(b)(3) only in legitimate, published ways. Routine uses are ones "for a purpose which is compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7). The large-scale disclosures under routine uses 8 and 11 are not compatible with the purposes for which the records were collected from individuals by the states executing their responsibilities under the SNAP Act.

A.    **The Privacy Act requires a "meaningful degree of convergence" between the proposed uses and the purpose underlying the initial collection.**

In prior briefing, the parties largely agreed that the Court should apply the compatibility standard articulated by the Third Circuit in *Britt v. Naval Investigative Serv.*, 886 F.2d 544 (3d Cir. 1989). Dkt. 28-1 at 27; Dkt. 29 at 30-31; *see also Ames v. Dep't of Homeland Sec.*, 861 F.3d 238, 240 n.1 (D.C. Cir. 2017) (Kavanaugh, J.) (synthesizing *Britt* and *Swenson v. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989)). Under that standard, compatibility requires "a dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt*, 886 F.2d at 548–49.[25]

In *Britt*, the Third Circuit found that a disclosure violated the Privacy Act due to a lack of

---

[25] As then-Judge Kavanaugh noted in *Ames*, the D.C. Circuit has not settled on a standard for assessing compatibility. 861 F.3d at 240 n.1 (discussing *U.S. Postal Service v. National Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 144-146 (D.C. Cir. 1993). But numerous courts in this District have aligned with the "meaningful degree of convergence" standard described by then-Judge Kavanaugh and suggested by both parties here. *See Townsend v. U.S.*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017) ("The compatibility requirement is satisfied if a 'concrete relationship or similarity, or some meaningful degree of convergence' exists 'between the disclosing agency's purpose in gathering the information and in its disclosure.'"); *Lugo v. U.S. Dep't of Just.*, 214 F. Supp. 3d 32, 40 (D.D.C. 2016) (same); *see also* Dkt. 29 at 30-31.

compatibility. *Id.* at 550. There, the records at issue were first collected by the Naval

Investigative Service ("NIS") as part of an investigation into Mr. Britt. *Id.* at 546. Specifically,

the information obtained by NIS was aimed toward "decid[ing] whether sufficient evidence

[was] present to proceed with a criminal prosecution" after it was discovered that Mr. Britt had

requisitioned military weapons without authority. *Id.* at 549 ("[T]he investigation was for a

specific instance of possible wrongdoing rather than for a general inquiry into Britt's

background."). Subsequently, the information gathered by NIS was disclosed to the Immigration

and Naturalization Service ("INS")—Mr. Britt's employer—because NIS thought INS may want

information that broadly "suggest[ed] [Britt's] lack of integrity." *Id.* at 549.

The court rejected compatibility between the collection and subsequent disclosure. The

information about Mr. Britt was collected by NIS for a specific purpose: to assess whether Mr.

Britt had authority to requisition military weapons and should be subject to criminal prosecution.

*Id.* at 548–49. Although the subsequent disclosure by NIS to a separate federal agency (INS)

may have been relevant to matters within INS's jurisdiction (*i.e.*, Mr. Britt's employment), mere

"[r]elevance . . . is not the standard" governing redisclosures under the Privacy Act, even to other

federal agencies. *Id.* at 548. Instead, compatibility requires "a more concrete relationship or

similarity, some meaningful degree of convergence," between the purpose for which the

information was gathered and the purpose for which it is being disclosed. *Id.* 549–50. An agency

"cannot, by the mere publication of broad routine use purposes, evade the statutory requirement

that disclosure must be compatible with the purpose for which the material was collected." *Id.* at

550; *see also Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988) (holding that a routine use

disclosure in response to a grand jury subpoena was not compatible with Veterans

Administration's collection of mental health records for treatment); *see id.* at 1460 (describing

the Veterans' Records Statute as "the federal law requiring that VA records be kept confidential").

This Court previously asked about the relevant compatibility comparison, namely whether to compare routine use disclosures with the purpose for the collection by the state or the purpose for the subsequent collection by USDA. Transcript of July 23, 2025 Hearing on Plaintiffs' Motion for a Temporary Restraining Order at 22:23. *Britt* is instructive. There, the Third Circuit noted that "[o]ne of the goals of the [Privacy Act] was to prevent the federal government from maintaining in one place so much information about a person that that person could no longer maintain a realistic sense of privacy." *Britt*, 886 F.2d at 550; *see also id.* (quoting a Privacy Act co-sponsor in the U.S. Senate) ("When personal data collected by one organization for a stated purpose is used and traded by another organization for a completely unrelated purpose, individual rights could be seriously threatened."). For the same reasons, if routine use redisclosures by the USDA need only be compatible with the purposes for USDA's collection, without reference to the authority for the initial collection *from the individuals whose information the Privacy Act is designed to protect*, "an agency [could] make an 'end run' around the intent of the [Privacy Act]." *Covert v. Herrington*, 667 F. Supp. 730, 738 (E.D. Wash. 1987), *aff'd on other grounds*, 876 F.2d 751 (9th Cir. 1989). In *Covert*, which examined a "two-fold disclosure" across agencies, the court highlighted that, for purposes of a compatibility analysis, the court must compare the purpose of the disclosure at issue with the purpose for which the information was first compiled. *Id.* at 739.

## B.  Routine uses 8 and 11 are not compatible with the SNAP-administration purpose for which the data was initially collected.

Routine uses 8 and 11 are incompatible with the purpose for which the information at issue was collected from plaintiffs and other SNAP applicants. *See Britt*, 886 F.2d at 549

(requiring a "focus on the case-specific purpose for the collection"). In crafting and authorizing the SNAP program, Congress specifically placed limitations on states' authority to disclose personal information, striking a balance between individual privacy and the need for legitimate program administration and enforcement. *See* 7 U.S.C. § 2020(e)(8), (15); *id.* § 2020(g). Further, when Congress created the NAC—a federal system designed to detect duplicate benefits—it called for a system that works without USDA taking custody of personal information. 7 U.S.C. § 2020(x); 7 C.F.R. § 272.18. USDA cannot erase those legislative judgments by rewriting the rules and seizing authority to redisclose SNAP records as proposed in routine uses 8 and 11.

State SNAP agencies collect applicant information for the purpose of determining SNAP eligibility and benefit amounts. *See* 7 U.S.C. § 2020(e); 89 Fed. Reg. 13679, 13680 (Feb. 23, 2024).[26] Their collection of records is subject to safeguards that "prohibit the use or disclosure of information" beyond certain narrowly specified standards, with the risk that violations could result in suspension of federal SNAP funds. *See* 7 U.S.C. § 2020(e)(8), (15); *id.* § 2020(g).

Routine uses 8 and 11 cannot be compatible with the purpose of state agencies' collection of information where they allow USDA to redisclose data in a manner that, if done by states in the first instance, would have violated § 2020(e). These routine uses permit—in conflict with the statutory safeguards—broad redisclosures for wide-ranging purposes with no "meaningful degree of convergence" with SNAP administration or permissible disclosures under the SNAP

---

[26] As described in the February 2024 PRA notice regarding state agencies' collection of this information: "Need and Use of the Information: To determine initial and continued eligibility for SNAP, applicants must provide, and State agencies must verify, various information on household members, such as age, income, resources, allowable deductions, and Social Security Numbers (SSNs). This information must be collected to ensure households are eligible for SNAP, receive the correct benefit, and maintain eligibility for the program. This information collection is mandatory for State agencies that administer SNAP, as they are responsible for accepting applications from, and determining eligibility for, individuals and households that apply for SNAP."

Act. *See Britt*, 886 F.2d at 549-50.

**1. Routine use 8.** Routine use 8 permits USDA to share any record that "on its face, or in conjunction with other records, indicates a violation or potential violation of law" of essentially any kind ("civil, criminal, or regulatory"). 90 Fed. Reg. 26522. USDA has granted itself authority to *sua sponte* divulge these records not just within the federal government but to any state, local, tribal, foreign, or other public authority if USDA—on its own—determines that the record is "relevant" to any law enforcement "responsibility" of the receiving entity. *Id.* But "[r]elevance is not the standard Congress placed in section 552a(a)(7)." *Britt*, 886 F.2d at 549. Such redisclosure under routine use 8 is not even limited by any requirement that the receiving entity request it, nor is it cabined by any prohibition on further redisclosure.

Moreover, this is well beyond what the original collectors (state agencies) may do with information collected for SNAP administration. Federal law only permits states to disclose information to individuals "directly connected" with the administration and enforcement of SNAP, other federal assistance programs, or federally-assisted state programs, and those individuals may use SNAP data "only for such administration and enforcement" of those programs. 7 U.S.C. § 2020(e)(8)(A)(ii). Disclosures to law enforcement are generally made in the limited circumstances where an enforcing agency seeks information pertaining to a particular person under fact-specific circumstances, for example: (i) for investigating an alleged violation of SNAP from a specific household, 7 U.S.C. § 2020(e)(8)(C); *Id.* (ii) to share address, social security number, and photograph to find fugitives, § 2020(e)(8)(E); (iii) by state agency personnel responsible for certification, after determining ineligibility due to unlawful

immigration status, § 2020(e)(8)(F) & (e)(15)[27]; and (iv) to avoid paying benefits to prisoners, § 2020(e)(8)(F) & (e)(18). Routine use 8 swallows up the carefully crafted, limited permissible disclosures Congress outlined in section 2020(e)(8).

**2. Routine use 11.** The same is true for routine use 11, which purports to allow redisclosure to any government agency or instrumentality to "support" it in investigating "potential fraud, waste, or abuse in[] a Federal benefits program funded in whole or in part by Federal funds." 90 Fed. Reg. at 26523. The routine use also allows the redisclosure of data when USDA determines that disclosure is "reasonably necessary" to "prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat waste, fraud and abuse" in other government benefit programs. This routine use would swallow up the statutory permissible disclosures for (i) "disclosure . . . to persons directly connected with the administration or enforcement" of federal (or federally funded) benefits programs "only for such administration or enforcement," 7 U.S.C. § 2020(e)(8)(A); (ii) "to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of" the SNAP Act and regulations (and not anything else), § 2020(e)(8)(C); and arguably (iii) for cooperation with the national school lunch program, § 2020(e)(8)(F) & (u). Not

---

[27] Nor is routine use 8 compatible with 7 U.S.C. § 2020(e)(15). That provision establishes the authority—not a responsibility—for state officials, upon finding an immigration violation, to share it with immigration authorities ("for the immediate reporting . . . *by the state agency*" (emphasis added)). It is thus of a piece with 8 U.S.C. § 1373(a), part of the Immigration and Nationality Act, providing that:

> Notwithstanding any other provision of Federal State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Section 2020(e)(15) is narrower. It is one thing for Congress to ensure that states may, in their discretion, undertake communications with ICE, and another for USDA to demand the states' data in order to widely disclose it.

only does routine use 11 permit disclosure far beyond persons "directly connected with administration or enforcement" of SNAP, it does so when USDA (not the receiving entity) believes that it is "reasonably necessary" for the receiving entity to "prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat waste, fraud and abuse" in programs beyond USDA's knowledge and expertise. Moreover, nothing about routine use 11 limits the receiving entity's use of information disclosed under that routine use as is required by 7 U.S.C. § 2020(e)(8)(A)(ii).

### C.    Disclosures pursuant to routine uses 8 and 11 are unconstrained by the SNAP Act.

The lack of compatibility is highlighted by the fact that all of the routine uses are unconstrained by the SNAP Act. Rather than providing that routine use disclosures may only occur to the extent they are permitted by the SNAP Act, the SORN lists that statute as one of several authorities purporting to *authorize* disclosure. 90 Fed. Reg. 26522 (citing "among other authorities," 7 U.S.C. § 2020(a)(3) and (e)(8), 7 CFR § 272.1(c)(1) and (e), and Executive Orders 14218[28] and 14243). In other words, under the plain language of the SORN, the SNAP Act places no limit on USDA's disclosures; instead, the SORN functions as an end run around the privacy protections in the SNAP Act by authorizing disclosures pursuant to no authority other than the Administration's policy preferences.

---

[28] Executive Order 14218 is entitled "Ending Taxpayer Subsidization of Open Borders." Apart from its reference in the SORN, AR 551 (90 Fed. Reg. 26522), there is nothing in the Administrative Record about this Order and USDA never explains its relevance to the collection.

## CONCLUSION

Plaintiffs respectfully request that this Court grant summary judgment in their favor, set aside the data collection, and grant the relief set forth in the accompanying motion.

Dated: August 29, 2025

Deana El-Mallawany*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org

JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

Respectfully Submitted,

*/s/ Daniel A. Zibel*
Daniel A. Zibel (D.C. Bar No. 491377)
Madeline Wiseman (D.C. Bar No. 90031948)
Melissa Padilla (D.C. Bar No. 90018065)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
Email: dan@defendstudents.org
        madeline@defendstudents.org
        melissa@defendstudents.org

*Counsel for Plaintiffs*

John L. Davisson (D.C. Bar #1531914)
Sara Geoghegan (D.C. Bar #90007340)
Kabbas Azhar (D.C. Bar #90027866)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org
        geoghegan@epic.org
        azhar@epic.org

*Counsel for EPIC*

*Admitted Pro Hac Vice*

43