**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NAMOD PALLEK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-01650-JMC <br><br> Judge Jia M. Cobb |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY**
**JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ........................................................................................................................ 3

I.       Plaintiffs Lack Standing ........................................................................................... 3

         A.    Plaintiffs Fail to Establish Concrete, Cognizable Injury ............................. 4

         B.    Plaintiffs Fail to Establish Informational Injury ......................................... 6

         C.    The Individual Plaintiffs Have Not Been Denied an Opportunity to Comment ......... 7

         D.    MAZON Fails to Establish Distinct Injury ................................................. 8

II.      USDA's Data Gathering Initiative is Not Arbitrary and Capricious ................................. 10

III.     USDA Has Complied with the Paperwork Reduction Act .................................................. 13

         A.    The Paperwork Reduction Act Does Not Provide a Cause of Action ...................... 13

         B.    USDA Has Satisfied the PRA's Requirements ........................................... 15

IV.      USDA Has Complied with the Privacy Act .................................................................. 17

         A.    Plaintiffs Cannot Assert Violations of the Privacy Act Through the APA ................ 17

         B.    Routine Uses 8 and 11 are Consistent with the Privacy Act ..................... 17

CONCLUSION .................................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004) ................................................................................................ 10

*Alegent Health-Immanuel Med. Ctr. v. Sebelius,*
    34 F. Supp. 3d 160 (D.D.C. 2014) ......................................................................... 14

*Am. Fed'n of Tchrs. v. Bessent,*
    --- F.4th ---, 2025 WL 2313244 (4th Cir. Aug. 12, 2025) ................................. 5, 17

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) .................................................................................................. 10

*Britt v. Naval Investigative Serv.,*
    886 F.2d 544 (3d Cir. 1989) ................................................................................... 18

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ........................................................................................... 11, 12

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,*
    846 F.3d 1235 (D.C. Cir. 2017) ............................................................................. 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .............................................................................................. 4, 9

*Ctr. for L. & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ............................................................................... 7

*Diamond Alternative Energy, LLC v. EPA,*
    606 U.S. ---, 145 S. Ct. 2121 (2025) ....................................................................... 3

*Doctors for America v. Office of Personnel Management,*
    766 F. Supp. 3d 39 (D.D.C. 2025) .......................................................................... 15

*FCC v. Fox Television Stations,*
    556 U.S. 502 (2009) ................................................................................................ 10

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024), *on remand to* 117 F.4th 336 (5th Cir. 2024) ....................... 3, 9

*Fla. Audubon Soc'y. v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ................................................................................... 7

*Gadelhak v. AT&T Servs., Inc.*,
    950 F.3d 458 (7th Cir. 2020) ........................................................................... 6

*Hyatt v. Office of Management & Budget*,
    908 F.3d 1165 (9th Cir. 2018) ....................................................................... 15

*Iowaska Church of Healing v. Werfel*,
    105 F.4th 402 (2024),
    *reh'g en banc denied by*, No. 23-5122, 2024 WL 4794996 (D.C. Cir. Nov. 13, 2024) ............. 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................... 3

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................... 10, 11

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) ........................................................................ 6

*Silver v. IRS*,
    531 F. Supp. 3d 346 (D.D.C. 2021) ................................................................ 7

*Sinclair Wyo. Refin. Co. v. EPA*,
    114 F.4th 693 (D.C. Cir. 2024) ...................................................................... 9

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .................................................................................... 5, 7

*Steele v. United States*,
    144 F.4th 316 (D.C. Cir. 2025) ................................................................. 14, 15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................................... 7

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................ 3, 5, 7

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    9 F.3d 138 (D.C. Cir. 1993) ......................................................................... 18

*United Transp. Union v. Interstate Comm.*,
    *Comm'n*, 891 F.2d 908 (D.C. Cir.1989) ........................................................ 4

*Wolf v. Regardie*,
    553 A.2d 1213 (D.C. 1989) ............................................................................ 5

**STATUTES**

5 U.S.C. § 552a ................................................................................................ 1, 18

5 U.S.C. § 702 .................................................................................................... 14

7 U.S.C. § 2020 .................................................................................... 4, 12, 18, 19

44 U.S.C. § 3501 .................................................................................................. 1

44 U.S.C. § 3502 ................................................................................................ 16

44 U.S.C. § 3506 ................................................................................................ 16

44 U.S.C § 3507 ........................................................................................... 14, 15

44 U.S.C. § 3512 ................................................................................................ 14

**REGULATIONS**

5 C.F.R. § 1320.3 ............................................................................................... 16

7 C.F.R. § 271.4 ................................................................................................. 18

7 C.F.R. § 272.1 ................................................................................................. 12

7 C.F.R. § 273.2 ................................................................................................. 18

E.O. 14,218, Ending Taxpayer Subsidization of Open Borders,
    90 Fed. Reg. 10,581 (Feb. 19, 2025) ............................................................ 21

E.O. 14,243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos,
    90 Fed. Reg. 13,681 (Mar. 20, 2025), ................................................. 2, 10, 20, 21

Privacy Act of 1974; System of Records (SORN),
    90 Fed. Reg. 26,521 (June 23, 2025) .................................................... *passim*

## INTRODUCTION

As established in Defendants' cross-motion, the U.S. Department of Agriculture ("USDA")—and its subcomponent the Food and Nutrition Service ("FNS")—has taken lawful and reasonable steps to heed the President's call to eliminate information silos that choke critical resources from the Supplemental Nutrition Assistance Program ("SNAP"). USDA has the statutory and regulatory authority to gather SNAP participant data that is currently spread across 53 States and EBT Processors, has consistently informed State Agencies, EBT Processors, and the general public of its actions, and has taken all necessary steps to house and safeguard the data it collects. Indeed, a preliminary review of data submitted by States that complied with USDA's call for data has identified significant evidence—potentially half a billion dollars' worth—of previously undetected fraud, waste, and abuse. *See* Decl. of Shiela Corley ¶ 30, ECF No. 72-1, *California v. USDA*, 3:25-cv-06310 (N.D. Cal.).

The Administrative Record in this matter confirms that USDA has fulfilled all its statutory obligations, explained its reasons and purposes, and provided the information and opportunity to comment that the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq*., and the Privacy Act, 5 U.S.C. § 552a require. Plaintiffs' attempts to second-guess USDA's actions does not change the fact that USDA has fulfilled its responsibilities under the PRA, Privacy Act, and the Administrative Procedure Act ("APA"), under which Plaintiffs bring their claims.

Accordingly, Plaintiffs' arguments for summary judgment fail. As a threshold matter, Plaintiffs fail to establish Article III standing. This is true of the Individual Plaintiffs, who fail to establish harm traditionally recognized as providing a basis for lawsuits in American courts, as well as all Plaintiffs who fail to show they have been denied information or opportunity to comment to which they are entitled. MAZON, for its part, fails to establish injury to its organization or mission.

1

On the merits, Plaintiffs cannot establish that USDA violated either the PRA or the Privacy Act. First, they have failed to establish that they can bring their PRA and Privacy Act claims through the APA, as both the PRA and Privacy Act bar such relief, and, therefore, Plaintiffs cannot make an end run around Congress's statutorily imposed limitations by bringing their claims through the APA. In any event, USDA has not violated the PRA because it was not required to conduct a new information collection process based on its gathering initiative and it has not violated the Privacy Act because Routine Uses 8 and 11—as provided in its recently published SORN—are compatible with the purposes for which the information was obtained under SNAP's governing statute.

Based on the foregoing, the Court should deny Plaintiffs' motion, grant Defendants' motion, and dismiss this action.

## BACKGROUND

The background of this matter is outlined in Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment and supporting memo. *See* Mem. in Supp. of Defs.' Mot to Dismiss or, in the alternative, Mot. for Summ. J. at 2–11, ECF No. 36-1 ("USDA Mem."). In brief, USDA, through FNS, administers the federal elements of the SNAP Program, which is the nation's largest nutrition assistance program. Consistent with the Presidential policy initiative outlined in Executive Order No. 14,243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, 90 Fed. Reg. 13,681 (Mar. 20, 2025), USDA is gathering information regarding SNAP participants to combat waste, fraud, and abuse that saps critical resources from the program. SNAP is run as a Federal-State partnership, with information regarding day-to-day administration spread across 53 States and territories, as well as several companies that contract with State Agencies to run the program. Plaintiffs in this suit are several individual SNAP participants who object to USDA's

attempt to gather SNAP data, as well as two organizational plaintiffs focused on SNAP and data privacy issues.

Pursuant to this Court's order, *see* Min. Order (July 29, 2025), both parties submitted cross-motions to dismiss or, in the alternative, for summary judgment, *see* Defs.' Mot to Dismiss or, in the alternative, Mot. for Summ. J., ECF No. 36; Pls.' Mot. for Summ. J, ECF No. 37; Mem. in support of Pls.' Mot. for Summ. J., ECF No. 37-1 ("Pls.' Mem."). Defendants here adopt all defined terms in their Motion. *See generally* USDA Mem.

## ARGUMENT

### I.    Plaintiffs Lack Standing

At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because "standing is not dispensed in gross . . ., plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Plaintiffs' advance four forms of alleged injuries. Recognized Article III injuries are those which are "'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. ---, 145 S. Ct. 2121, 2133 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to* 117 F.4th 336 (5th Cir. 2024)). For all the reasons elaborated in USDA's Motion, *see* USDA Mem. at 15–24, and outlined below, Plaintiffs have failed to establish cognizable Article III injury.

### A.     Plaintiffs Fail to Establish Concrete, Cognizable Injury

Plaintiffs first argue that the Individual Plaintiffs are injured by the passing of their information from the States to USDA, and the potential redisclosure of that information pursuant to Routine Uses 8 and 11 established by the SORN.  *See* Pls.' Mem. at 14–18.  As outlined in USDA's Motion, however, this argument fails for several reasons.  *See* USDA Mem. at 15–20.

First, Plaintiffs have failed to show their information has been improperly "disclosed."  At its core, Plaintiffs' claim to standing on these grounds run into the fundamental issue that both USDA and FNS have statutory authority to request the data in question.  *See* 7 U.S.C. § 2020(a)(3); *id.* § 2020(e)(8)(A).  True, as Plaintiffs point out, "[t]hrough the statutes that created SNAP, Congress created a reasonable expectation of privacy" and required States to establish safeguards prohibiting unauthorized disclosure of private information.  Pls.' Mem. at 15.  But those same statutes authorize the data transfers here at issue, and there is no allegation—nor could there be— that USDA will publicly disclose the Plaintiffs' private information.  Further, any claim that USDA will otherwise mishandle the information in its care is speculative conjecture.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–414 (2013); *see also United Transp. Union v. Interstate Comm. Comm'n*, 891 F.2d 908, 912 (D.C. Cir.1989) ("[W]hen considering any chain of allegations for standing purposes," the Court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions[.]").

The same goes for Plaintiffs' claims that USDA's potential sharing of information with other agencies pursuant to Routine Uses 8 and 11 is not consistent with the Privacy Act.  *See* Pls.' Mem. at 17.  As described below, both Routine Use 8 and 11 are consistent with the Privacy Act, so do not constitute their own form of harm.  *See* Section IV.B., *infra*.

Second, the disclosure of information Plaintiffs here allege—whether from States to USDA or USDA to other authorities pursuant to the Routine Uses—does not constitute cognizable Article III injury. Plaintiffs do not allege physical or monetary injury, but, instead, "intangible harms" related to the alleged invasion of their privacy. *See* Pls.' Mem. at 14. While the Supreme Court has recognized that "[v]arious intangible harms can . . . be concrete[,]" cognizable intangible injury must still bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. And, while an "exact duplicate in American history and tradition" is not necessary, Supreme Court precedent is clear that the close relationship test is not an "open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* at 424–25 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

Here, the Individual Plaintiffs liken the actual or imminent transfer of their information to the harms recognized by the torts of intrusion upon seclusion and breach of confidence. Pls.' Mem. at 14–18. But, as explained, the tort of intrusion upon seclusion requires (1) an invasion; (2) into a place of seclusion or into "private or secret concerns;" (3) that would be "highly offensive to an ordinary, reasonable person," *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989), and Plaintiffs have failed to establish (1) an invasion, because USDA is entitled to the information it has requested; (2) a breach of seclusion, as Plaintiffs provided the information in question with full knowledge that USDA and FNS had statutory authority to inspect or audit their records; and (3) that USDA's conduct in collecting records to which it has statutory authority is highly offensive, USDA Mem. at 17–18; *see also Am. Fed'n of Tchrs. v. Bessent*, --- F.4th ---, 2025 WL 2313244, at *5–7 (4th Cir. Aug. 12, 2025).

Simply put, Plaintiffs' claim of injury amounts to a complaint that they provided information to the State Agencies to obtain benefits knowing that USDA and FNS may request their records but, nevertheless, Plaintiffs now fear that USDA and FNS may mishandle or improperly disclose their information. But those alleged injuries do not resemble the "irritating intrusions" the tort of intrusion upon seclusion protects against. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020).

Nor does it resemble the harms associated with the tort of breach of confidence. *See* Pls.' Mem. at 17–18. There are two hurdles to this argument. *See* USDA Mem. at 19–20. First, it is doubtful whether the tort qualifies as a traditionally recognized harm under *TransUnion*. *Id.* (citing *Muransky v. Godiva Chocolatier, Inc.* 979 F.3d 917 (11th Cir. 2020) (en banc)). Second, even assuming that the breach of confidence tort is a permissible analogue for standing purposes, voluntarily sharing information to obtain a government benefit with knowledge that USDA and FNS have full authority to request such data bears little resemblance to the harms felt from a breach of confidence. *See* USDA Mem. at 20.

### B.    Plaintiffs Fail to Establish Informational Injury

Both the Individual and the Organizational Plaintiffs' claim they are harmed by USDA's alleged failure to provide "information" and "participation" pursuant to the PRA. Pls.' Mem. at 18–21. As described in USDA's Motion, and reiterated below, USDA has complied with the procedural requirements of the PRA. *See* USDA Mem. at 20–22, 35–37; *see also* Section III.B., *infra*. But, glaringly absent from Plaintiffs' allegations in this section of their motion is what information they claim is missing. The Administrative Record in this case is replete with statements by USDA on the purpose of the data collection, the supporting legal authority, the intended uses of the data, the safeguards associated with the new system of records, and under what circumstances USDA may utilize Routine Uses to share the data collected for specific

purposes.  *See generally* May 6 Letter, July 9 Letter, July 23 Letter, July 25 Letter, Nonsubstantive Change Request, SORN, and FY2025 Privacy Impact Statement.  In short, there is no specific information Plaintiffs lack, and they are left instead pointing to a statutory requirement within the PRA—which USDA has fulfilled—and claiming that they would have liked USDA to go through a full process, rather than the Change Request USDA justifiably undertook.

So much would amount to no more than a bare procedural violation, which does not support Article III standing.  *See, e.g.*, *TransUnion*, 594 U.S. at 441–42; *Spokeo*, 578 U.S. at 341–42; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Nor does Plaintiffs' invocation of the "modified" standing requirements for alleged injury to procedural interests change this conclusion. *See* Pls.' Mem. at 13–14 (quoting *Silver v. IRS*, 531 F. Supp. 3d 346, 356 (D.D.C. 2021)).  Under this standard, plaintiffs must "show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc'y. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996).  This standard "relax[es] the imminence and redressability requirements" of Article III standing, but "procedural-rights plaintiff must still satisfy the general requirements of the constitutional standards of particularized injury and causation." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005).  In other words, Plaintiffs must still "allege injury beyond mere procedural misstep *per se* to satisfy standing in a procedural-rights case." *Id.* at 1160. This they have not, as they can point to no information that the PRA requires to be disclosed that USDA has failed to disclose.

### C.    The Individual Plaintiffs Have Not Been Denied an Opportunity to Comment

Plaintiffs allege they have been denied the opportunity to comment on USDA's data gathering initiative pursuant to the PRA.  But, as described in USDA's Motion, Plaintiffs did have the opportunity to comment on USDA's ability to gather the information it is here seeking, as its

2024 information collection process included assertions that USDA has the authority to gather such information. *See* USDA Mem. at 36. None of the Plaintiffs, however, submitted comments. *See* Off. of Info. and Regul. Affairs, ICR Documents, https://perma.cc/QLG4-KFLQ. Thus, Plaintiffs have failed to show cognizable injury.

Further, it is telling that Plaintiffs have abandoned their similar claim that they lacked an opportunity to comment under the Privacy Act. Pls.' Mem. at 12 n.10. This is because Plaintiffs submitted comments pursuant to USDA's SORN in June. Am. Compl. ¶ 80, ECF No. 27; *see also* PALLEK-000556 at Rows 15 (Namod Pallek), 88 (Julliana Samson), 13 (Diana Ramos), 14 (Catherine Hollingsworth), 11 (MAZON), 12 (EPIC); AR PALLEK-000557–64 (EPIC); AR PALLEK-000565–68. These comments included broad assertions against USDA's data gathering initiative, as well as specific critiques. Plaintiffs, therefore, have had the opportunity to voice their concerns—and have USDA consider those concerns—directly related to the data gathering initiative. Even assuming USDA was required to conduct a new information collection procedure pursuant to the PRA—which it was not—Plaintiffs cannot show injury apart from a bare procedural misstep. This is insufficient to maintain Article III standing. *See* Section I.B, *supra*.

## D. MAZON Fails to Establish Distinct Injury

Finally, MAZON claims it has suffered distinct injury to itself and its organizational mission through three alleged consequences of USDA's actions: (1) it was forced to continue the "Challah for Hunger" program, despite intending to sunset the program, in anticipation that some current SNAP participants would be chilled from continued participation in SNAP and would, therefore, need food resourced from MAZON; (2) mistrust generated by USDA's actions has eroded trust in MAZON based on its previous assurances that it is safe to submit personal information to sign up for SNAP and it must therefore work harder to regain trust; and (3) MAZON's inability to comment on USDA's data collection through the PRA—despite the fact

that it has commented on the SORN, *see* Section I.C*., supra*—risks donors losing faith in MAZON's effectiveness and withdrawing or discontinuing their donations.  *See* Pls.' Mem. at 22–23.

As highlighted in USDA's Motion, arguments that MAZON had to divert resources to combat USDA's data gathering initiative are squarely foreclosed by *Alliance for Hippocratic Medicine*, 602 U.S. 367.  *See* USDA Mem. at 22–23.  Further, MAZON's shift in priorities to continue the Challah for Hunger program does not suffice to establish Article III standing as working incrementally harder at a job it already does cannot constitute the devotion of significant resources required to demonstrate cognizable injury.  *See* USDA Mem. at 23–24 (citing *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412–13 (2024), *reh'g en banc denied by*, No. 23-5122, 2024 WL 4794996 (D.C. Cir. Nov. 13, 2024)).

Most telling about Plaintiffs' claims is the extent to which they rely on the speculative actions by third parties not before this court.  The alleged chilling effect on SNAP recipients is both speculative and objectively unreasonable, as USDA has long had the statutory authority to conduct this data gathering.  Moreover, the speculative chain of events necessary for all three consequences alleged by MAZON to come to fruition is just the sort of "attenuated chain of possibilities" that the Supreme Court has determined "does not satisfy the requirement that threatened injury must be certainly impending."  *Clapper*, 568 U.S. at 410; *see also id.* at 402 (Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."); *see also Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 722 (D.C. Cir. 2024) ("A petitioner must provide reason to believe a government regulation will significantly affect the decisions of the third party. . ..  Speculative and unsupported

assumptions regarding the future actions of third-party market participants are insufficient." (citation modified)).

## II.    USDA's Data Gathering Initiative is Not Arbitrary and Capricious

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, Courts should uphold a "decision [of] less than ideal clarity . . . if the agency's path may reasonably be discerned." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citation omitted). Courts, therefore, uphold agency action where the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The ultimate question is whether the agency's action was reasonable. *FCC v. Fox Television Stations*, 556 U.S. 502, 514–15 (2009).

As outlined in USDA's Motion, USDA has not engaged in unreasoned decisionmaking. *See* USDA Mem. at 38–39. Through an Executive Order, the President of the United States directed agencies to eliminate information silos, especially in State benefits programs that receive Federal funding. *See* EO 14,243, §§ 1, 3. Consistent with this Presidential directive, USDA identified SNAP as a federally funded program, administered by the States, whose dispersed storage of information constituted an information silo obfuscating waste, fraud, and abuse. It identified lawful statutory and regulatory authorities to gather the information in question and took the necessary procedural steps in seeking OMB approval for a Nonsubstantive Change Request, establishing a new system of records, and publishing a SORN to accomplish its task. Such reasonable agency action cannot be characterized as arbitrary and capricious.

Plaintiffs challenge the propriety of USDA's decisionmaking at several points. It can hardly be arbitrary and capricious, however, for USDA to obtain information to which it has a

statutory entitlement.  The Administrative Record, moreover, establishes that USDA considered and accounted for their concerns.  For example, Plaintiffs contend that USDA did not sufficiently consider "how—or whether—to apply the" President's directive to eliminate information silos. *See* Pls.' Mem. at 29.  The course of USDA's data gathering initiative contradicts Plaintiffs' assertion that USDA did not sufficiently consider how to break down the information silos that divide SNAP.  USDA identified the State Agencies and EBT Processors who hold the relevant information, sent them numerous letters outlining how USDA intended to gather the information in question, and included the legal authorities that support its request.  *See* May 6 Letter; July 9 Letter; July 23 Letter; July 25 Letter.  USDA also initiated and accomplished the administrative and procedural steps to comply with the relevant statutes and regulations, such as the Privacy Act and PRA.  *See* Nonsubstantive Change Request; SORN.  These steps show that USDA acted reasonably.

As to whether USDA should have initiated the data gathering effort in the first place, USDA identified both the issue before it and the logical solution starting with the May 6 Letter.  *See* May 6 Letter at 1.  As outlined in the Letter, the dual Federal-State administration of SNAP "takes advantage of our federal system to enable States to meet the needs of their residents" but that "[a]t present, each State, district, territory, and payment processor is a SNAP information silo."  *Id.*  To eliminate SNAP information silos, the May 6 Letter invoked USDA's authority to gather and inspect information and explained that it would be using the information "to ensure Program integrity, including by verifying the eligibility of benefit recipients."  *Id.* at 2.  Agencies need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  While doing so,

agencies must avoid "rel[ying] on factors which Congress has not intended it to consider, entirely fail[ing] to consider an important aspect of the problem, offer[ing] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  In initiating its data gathering efforts, USDA identified the problem before it—information silos which diffused important information to detecting waste, fraud, and abuse—and came up with a logical solution—gathering and inspecting the data pursuant to lawful authority.  In doing so, Plaintiffs present no evidence that it examined Congressionally forbidden elements, entirely failed to consider important issues, or articulate a conclusion that was counter to the evidence or implausible.  Again, so much is not unreasoned decisionmaking.

Plaintiffs' remaining arguments are scattered and unconvincing.  Plaintiffs claim that USDA failed to "engag[e] with the SNAP-specific statutory and regulatory scheme," Pls.' Mem. at 30, but USDA identified authority in both the FNA and its regulations to conduct the information gathering initiative.  *See* May 6 Letter (citing 7 U.S.C. § 2020(a)(3) and (e)(8)(A) and 7 C.F.R. § 272.1(c)(1) and (e)).  Plaintiffs contend that USDA failed to consider the "federal-state partnership Congress created" and that "States are [already] required to have processes to 'detect fraud' in the program."  Pls.' Mem. at 30 (quoting 7 U.S.C. § 2020(e)(20)).  But this charge misses the fact that each State and EBT processor "maintain discrete collections of SNAP application, enrollment, recipient, and transaction data, each of which is necessary in ensuring the integrity of the Program."  May 6 Letter at 1.

Plaintiffs also contend that States do a good enough job ensuring eligibility, and the National Accuracy Clearinghouse ("NAC")—an interstate data exchange system, 7 U.S.C. § 2020(x)—suffices.  Pls.' Mem. at 31.  Rather than brushing aside other mechanisms for

accomplishing program integrity, as Plaintiffs suggest, USDA's new system of records will provide a complementary tool to ensure that food assistance gets to those in need and is not abused through fraudulent claims or inadequate State oversight. While Plaintiffs may prefer USDA to rely on State audit efforts, it is hardly arbitrary or capricious for USDA to make use of its statutory authority to improve its own capability to ensure taxpayer funds are being used properly.

Plaintiffs claim that USDA failed to consider "the chilling effect the data collection will have on SNAP participation." Pls.' Mem. at 32. But such alleged chilling effects are speculative and objectively unreasonable, as SNAP participants provided the information in question with full knowledge that USDA may gather the data under the authorities it has exercised. Section I.D, *supra*. Even so, USDA did consider these concerns. USDA received numerous comments addressing this concern in various iterations, including potential use for unlawful purposes, violations of privacy, and additional burdens on SNAP households. *See* AR PALLEK-000657. USDA determined that "[t]he majority of the[se] comments are unpersuasive and/or raised points already addressed by the SORN[,]" including that "USDA has and will continue to follow the law, including both the FNA and the Privacy Act." *Id.* It also determined that "the provision of this data to USDA will place no additional burdens or requirements on SNAP households." *Id.* Such considered reasoning cannot constitute an arbitrary or capricious violation of the APA.

## III.    USDA Has Complied with the Paperwork Reduction Act

### A.    The Paperwork Reduction Act Does Not Provide a Cause of Action

As outlined in USDA's Motion, the PRA does not provide a private cause of action and, therefore, the APA does not afford Plaintiffs an avenue to circumvent this barrier to jurisdiction. *See* USDA Mem. at 33–35. Plaintiffs attempt to avoid this conclusion by arguing that the PRA provides them no adequate relief, because it provides no "specific civil remedies[,]" so they may proceed under the APA. Pls.' Mem. at 23–24, 26.

13

The flaw in this argument is that APA review is barred not only where another statute provides a "special, alternative remedy," *id.* at 24 (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017)), but also where a statute "impliedly forbids the relief which is sought[,]" 5 U.S.C. § 702.  In not one, but two separate provisions, the PRA limits or bars private plaintiffs' right to invoke its requirements, providing just the implicit bar to relief that precludes APA review.

First, Section 3512(b) provides that the PRA may only be "raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto."  44 U.S.C. § 3512(b).  Numerous courts have found that the PRA's limitation to an affirmative defense confirms that it does not create a private cause of action.  *See Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014) (collecting cases).  This also confirms that the PRA impliedly bars the affirmative relief Plaintiffs seek here.

Second, the PRA affirmatively bars suits seeking to challenge OMB's decision to "approve or not act upon a collection of information."  44 U.S.C § 3507(d)(6).  Indeed, as the D.C. Circuit recently emphasized, "[t]he PRA imposes requirements on how agencies collect information[,] assigns oversight responsibility to the OMB Director[,]" *Steele v. United States*, 144 F.4th 316, 322 (D.C. Cir. 2025), and "governs the process authorizing *how* any agency collects information that suits its objectives," *id.* at 323.  Thus, "[a] plain language reading [of Section 3507(d)(6)] insulates [OMB's] discretionary judgment to *allow* or *remain silent* on an agency's proposed collection."  *Id.* at 322 (emphasis in original).

That is precisely the action Plaintiffs bring in this suit.  The crux of their PRA claims is that USDA was required to conduct a new information collection process under the PRA, rather than submit the Nonsubstantive Change Request, which would have required republishing notice in the

Federal Record and providing for a new public comment.  But, here, OMB approved not only USDA's 2024 information collection request for SNAP, *see* Initial Approval, but also USDA's subsequent Nonsubstantive Change Request to effectuate USDA's data gathering initiative, *see* Nonsubstantive Change Request; Change Approval.  This is an affirmative approval by OMB for USDA's decision to proceed through a Nonsubstantive Change Request rather than a new information collection process.  It is precisely the procedural claim Section 3507(d)(6) bars.  And, for the reasons outlined in USDA's Motion, reference to *Hyatt v. Office of Management & Budget*, 908 F.3d 1165 (9th Cir. 2018), *Steele v. United States*, 144 F.4th 316 (D.C. Cir. 2015), and *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39 (D.D.C. 2025), does not change this conclusion.  *See* USDA Mem. at 34–35.

As such, the PRA both impliedly and expressly precludes the Plaintiffs' suit, and the APA does not afford an avenue to circumvent this conclusion.

### B.    USDA Has Satisfied the PRA's Requirements

Even were Plaintiffs able to bring their PRA claims through the APA, those claims fail, as USDA has complied with the PRA by completing an information collection process in 2024 and a Nonsubstantive Change Request in June of this year.  *See* USDA Mem. at 35–37.  The crux of Plaintiffs' PRA claims is that these actions were insufficient because USDA should have completed a new information collection process to effectuate the data gathering initiative, rather than relying on the Nonsubstantive Change request.  *See* Pls.' Mem. at 33–36.

But USDA has collected no new information from SNAP participants.  Instead, it is merely gathering the information from the State Agencies to which the information was originally reported.  Indeed, SNAP recipients reported their information to the State Agencies with full knowledge that USDA could request it.  So much is not a new collection of information requiring

a new information collection process; a conclusion confirmed by the PRA, implementing regulations, and the Administrative Record in this action.

The PRA requires Federal agencies to accomplish certain procedural tasks including obtaining approval from OMB before conducting a "collection of information" from the public. 44 U.S.C. § 3506(c). The PRA defines "collection of information" as the "obtaining," "soliciting," "or requiring the disclosure . . . of facts or opinions" obtained through "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more *persons*[.]" *Id.* § 3502(3) (emphasis added). In this context, the information being gathered pertains to the individual SNAP participant, *not* the State Agency that originally collected the information pursuant to the requirements of the SNAP Program. *See* Nonsubstantive Change Request at 2 (outlining data elements USDA is gathering regarding SNAP participants). Indeed, the regulations which implement the definition of "collection of information" provide that "'ten or more persons' refers to the persons to whom a collection of information is addressed . . . and to any independent entities to which the initial addressee may reasonably be expected to transmit the collection of information . . . including independent State[s]." 5 C.F.R. § 1320.3(c)(4). Again, the information which USDA is gathering is about the SNAP recipient, *not* the State Agency to which it was transmitted.

The Nonsubstantive Change Request is clear on this point. As it explains, "[t]he purpose of the changes is to add requirements to report to USDA a number of currently collected data elements related to SNAP certification and benefit issuance." Nonsubstantive Change Request at 1. Thus, "[n]o additional data collection or recordkeeping is sought through this change request. Rather, the change is limited to reporting these data elements to USDA." *Id.* at 3. In other words, the States already have the data elements regarding SNAP participants, they just need to provide

them to USDA.  The only change, therefore, was a revised estimate of the additional burden on States to provide the data elements to USDA.  *Id.*

Buttressing the conclusion that USDA's present efforts are merely an extension of a previously authorized data collection is that the 2024 information collection process included specific notice to the public that the information being collected was subject to reporting to USDA. *See* USDA Mem. at 36.

Stringing these elements together, the picture is clear.  USDA's present efforts do not seek additional information from the public.  Instead, USDA is merely exercising its authority to gather previously collected information, as it previously disclosed it had authority.  Nothing in the PRA dictates that under these circumstances USDA must conduct a new information collection process, rather than merely revising its previous approval through the Nonsubstantive Change Request.

IV.    **USDA Has Complied with the Privacy Act**

A.    **Plaintiffs Cannot Assert Violations of the Privacy Act Through the APA**

Like the PRA, the Privacy Act provides limited circumstances under which a plaintiff may seek injunctive relief, such as the relief Plaintiffs are seeking through this suit.  Plaintiffs may not circumvent the Privacy Act's carefully drawn limitations by instead bringing their claims through the APA.  *See* USDA Mem. at 24–27; *see also Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *8. Plaintiffs' arguments otherwise, *see* Pls.' Mem. at 24–25, are fully addressed by USDA's Motion.

B.    **Routine Uses 8 and 11 are Consistent with the Privacy Act**

Even if Plaintiffs could bring their Privacy Act claims through the APA, those claims fail on their merits.  Plaintiffs claim that Routine Uses 8 and 11, as outlined by the SORN, violate the Privacy Act because they are incompatible with the purpose for which SNAP participant data was collected in the first place.  *See* Pls.' Mem. at 38–42.  In brief, the Privacy Act provides an exception to the general prohibition against disclosure of records for "routine uses," which are

defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected[.]"  5 U.S.C. § 552a(a)(7), (b)(4).  The parties generally agree that determining whether a routine use is "compatible" for the purpose of the Privacy Act involves a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989).[1]  The Privacy Act does not require an exact match, however, only a "concrete relationship or similarity" or "some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Id.* at 549–50.

At the first step, the FNA directs States to collect information from SNAP applicants for the purpose of certifying and verifying eligibility in the program.  *See* 7 U.S.C. § 2020(a)(1); 7 C.F.R. §§ 271.4(a), 273.2(f).  This includes keeping records "as may be necessary to determine whether the program is being conducted in compliance" with the FNA.  7 U.S.C. § 2020(a)(3)(A).  The FNA directs States to safeguard this information but directs certain disclosures to USDA and other entities to ensure program integrity and compliance with the law.  *Id.* § 2020(e)(8).  For

---

[1] At oral argument on Plaintiffs' Second TRO motion, the Court asked counsel for the government whether, when considering compatibility, the question is "whether or not routine uses are compatible with the SNAP statute's authorization on how the state collects the data from the beneficiaries[.]"  Hrg. Tr. at 22:15–20.  Counsel for the government did not have a definitive answer at oral argument.  The relevant D.C. Circuit case law, however, clarifies that the proper question is whether the routine use is consistent with "the disclosing agency's purpose in gathering the information."  *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (quoting *Britt*, 886 F.2d at 549–50).  Thus, the Court's compatibility analysis should focus on whether USDA's routine uses are compatible with its purposes in collecting data from the State Agencies.  This, however, is largely a distinction without a difference, as States collect the data in question from participants to administer SNAP and ensure program integrity, USDA is here gathering the previously collected information from States to ensure program integrity, and Routine Uses 8 and 11 permit disclosure to entities charged with ensuring program integrity through the enforcement of waste, fraud, and abuse laws and regulations as condoned by the FNA itself.

example, the FNA requires States to make "[a]ll records, and the entire information systems in which records are contained" available to USDA "for inspection and audit." *Id.* § 2020(a)(3)(B). It also provides that information must be disclosed to "persons directly connected with the administration or enforcement of [the FNA], regulations issued pursuant to [the FNA]," but also to other "Federal assistance programs, or federally-assisted State programs[,]" so long as that information is used "only for such administration or enforcement[.]" *Id.* § 2020(e)(8)(A).

The FNA also provides that SNAP information "shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of [the FNA] or any regulation issued under [the FNA]." *Id.* § 2020(e)(8)(C).  It also requires States to "immediate[ly] report[] to the Immigration and Naturalization Service . . . a determination by personnel responsible for the certification or recertification of households that any member of a household is ineligible to receive [SNAP] benefits because that member is present in the United States in violation of the Immigration and Nationality Act[.]" *Id.* § 2020(e)(15); *see also* § 2020 (e)(8)(F).  All this to say, the FNA requires the collection of the information here in question to confirm eligibility for the Program, and to administer the Program free from waste, fraud, and abuse.  The FNA further permits referral to law enforcement or administrative authorities responsible for prosecuting violations of the statute.

Next, USDA has been clear that, in gathering SNAP data from the States, it is doing so to ensure this very same program integrity.  *See, e.g.*, May 6 Letter at 2 (USDA "will use the data it receives from processors to ensure Program integrity, including by verifying the eligibility of benefit recipients."); SORN at 26,521 ("The primary purposes of this system are to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity.")

19

Finally, Routine Uses 8 and 11 are in line with this purpose.  Routine Use 8 provides that "[w]hen a record on its face, or in conjunction with other records, indicates a violation or potential violation of law . . . FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal . . . responsible for enforcing, investigating, or prosecuting such violation[.]"  *Id.* at 26,522.  As noted in USDA's Motion, Routine Use 8 consists of standard language that already applies across multiple systems, is a commonsense application of the FNA's authorized use of SNAP data, and aligns with several provisions of the FNA which permit referral to law enforcement and administrative authorities tasked with overseeing compliance with various legal regimes.

So too with Routine Use 11, which permits disclosure to support federal or local authorities responsible for administering SNAP or another federally funded benefits program, "when disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs."  *Id.* at 26,523.  Essentially, this routine use is merely a restatement of FNA Section 2020(e)(8)(A).

Further, to the extent there were any question about a difference between the explicit statutory authorizations of the FNA and the reach of Routine Uses 8 and 11 for any particular disclosure, the SORN specifically limits the disclosure of data to circumstances consistent with the FNA.  *See id.* at 26,522.  Plaintiffs take issue with this limitation because it includes reference to Executive Orders 14218 and 14243.  *See Id.* ("Records created or stored in this system may be disclosed pursuant to the permitted routine uses outlined below to the extent such uses are authorized by, among other authorities, 7 U.S.C. [§] 2020(a)(3) and (e)(8), 7 [C.F.R. §] 272.l(c)(l) and (e), and Executive Orders 14218 and 14243.");  Pls.' Mem. at 42.  But neither Executive Order

purports to provide affirmative authority to disclose any records and includes specific instructions that each should be "implemented consistent with applicable law[,]" such as the Privacy Act. *See* Ending Taxpayer Subsidization of Open Borders, Exec. Order No. 14,218, § 3(b), 90 Fed. Reg. 10,581, 10,582 (Feb. 19, 2025); Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, Exec. Order No. 14,243, § 4(b), 90 Fed. Reg. 13,681, 13,682 (Mar. 20, 2025).

Thus, both Routine Uses 8 and 11, and their execution, meet the Privacy Act's compatibility test, defeating Plaintiffs' claims under that Act.

## CONCLUSION

Based on the foregoing, the Court should grant USDA's Motion, deny Plaintiffs' Motion, and dismiss this action in its entirety.

Dated: September 12, 2025                     Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General
                                              Civil Division

                                              ELIZABETH J. SHAPIRO
                                              Deputy Branch Director
                                              Civil Division, Federal Programs Branch

                                              _____
                                              BENJAMIN S. KURLAND
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street, NW
                                              Washington, DC 20005
                                              Tel: (202) 353-0533
                                              ben.kurland@usdoj.gov

                                              *Counsel for Defendants*