# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NAMOD PALLEK, *et al.* | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 1:25-cv-01650-JMC |
| BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.* | |
| *Defendants.* | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

    I.    Plaintiffs have standing. ........................................................................................... 1

        A.    Individual Plaintiffs are harmed by USDA's unlawful possession of their personal information and USDA's impending redisclosure outside of the agency. ................................................................................................. 2

        B.    Plaintiffs are harmed by the absence of a full Information Collection Review process. ................................................................................. 7

        C.    The data collection impairs MAZON's core organizational activities. ...... 9

    II.    A government-wide Executive Order, standing alone, does not absolve USDA of its "reasoned decisionmaking" obligation. ........................................................... 11

    III.    The APA empowers this Court to set aside USDA actions that violate the Privacy Act and PRA. ........................................................................................................ 13

        A.    The APA provides equitable relief unavailable under the Privacy Act. ... 13

        B.    The APA provides equitable relief unavailable under the PRA. .............. 16

    IV.    USDA has violated the PRA. ................................................................................. 17

    V.    Routine uses 8 and 11 are not compatible with the purposes for which information was collected from individual SNAP applicants. ................................................. 20

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES** ................................................................................................ Page No(s).

*AFL-CIO v. Department of Labor*,
    778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................ 15, 16

*Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.*,
    No. 25- cv-339-JDB, 2025 WL 1783899 (D.D.C. June 27, 2025) ........................... 2

*Am. Pub. Health Assn. v. Natl. Institutes of Health*,
    No. 25-cv-10787-WGY, 2025 WL 1822487 (D. Mass. July 2, 2025) ..................... 12

*Am. Fed'n of Teachers v. Bessent*,
    -- F.4th --, 2025 WL 2313244 (4th Cir. Aug. 12, 2025) .................................... 6, 15

*Block v. Cmty. Nutrition Inst.*,
    476 U.S. 340 (1984) ........................................................................ 14

*Cal.  v. U.S. Dep't of Agric.*,
    No. 3:25-cv-6310 (N.D. Cal.) ............................................................... 4

*City of New Bedford v. Locke*,
    No. 10-cv-10789, 2011 WL 2636863 (D. Mass. June 30, 2011) ........................ 16

*Covert v. Herrington*,
    667 F. Supp. 730 (E.D. Wash. 1987) ..................................................... 21

*Drs. for Am. v. Office of Pers. Mgmt.*,
    766 F. Supp. 3d 39 (D.D.C. 2025) ......................................................... 17

*Doe v. Chao*,
    540 U.S. 614 (2004) .................................................................... 13, 15

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1998) ......................................................... 15, 16

*Egbert v. Boule*,
    596 U.S. 482 (2022) ........................................................................ 14

*Elec. Priv. Info. Ctr. v. IRS*,
    910 F.3d 1232 (D.C. Cir. 2018) ........................................................... 15

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012) ........................................................................ 21

*FEC v. Akins*,
  524 U.S. 11 (1998) .................................................................................................. 8

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................... 9, 10, 11

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016) .............................................................................. 8

*Goldey v. Fields*,
  606 U.S. 942 (2025) ............................................................................................... 14

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C.) .............................................................................. 12

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  105 F.4th 1324 (11th Cir. 2024) ........................................................................... 3

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ....................................................................................... 10, 11

*Hyatt v. OMB*,
  908 F.3d 1165 (9th Cir. 2018) ............................................................................ 16

*Jeffries v. Volume Servs. Am., Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) ............................................................................ 6

*Kingdom v. Trump*,
  No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ............................ 12

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. Apr. 24, 2025) ................................................. 10, 11

*La. v. Biden*,
  622 F. Supp. 3d 267 (E.D. La. 2022) .................................................................. 12

*Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*,
  564 F. Supp. 3d 605 (N.D. Ohio 2021) ............................................................... 16

*Parks v. IRS*,
  618 F.2d 677 (10th Cir. 1980) ............................................................................. 15

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) ...................................................................................... 5

iii

*Refugee and Immigr. Ctr. for Educ. & Legal Servs. v. Noem,*
  -- F. Supp. 3d --, No. 25-cv-306-RDM, 2025 WL 1825431 (D.D.C., July 2, 2025) ............... 10

*Nebraska v. Su,*
  121 F.4th 1 (9th Cir. 2024) .................................................................................................. 12

*Steele v. United States,*
  144 F.4th 316 (D.C. Cir. 2025) ........................................................................................... 16

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................................................... 9

*Tex. v. United States,*
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................................................. 12

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ................................................................................................................ 2

*United States v. Brooks,*
  681 F.3d 678 (5th Cir. 2012) ............................................................................................... 19

*United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity,*
  288 F. Supp. 3d 99 (D.D.C. 2017) ........................................................................................ 8

*Walters v. Metro. Educ. Enters., Inc.,*
  519 U.S. 202 (1997) .............................................................................................................. 19

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .............................................................................................................. 18

*Wilson v. Libby,*
  535 F.3d 697, 703 (D.C. Cir. 2008) .................................................................................... 14

*Wolf v. Regardie,*
  553 A.2d 1213 (D.C. 1989) .................................................................................................... 5

**STATUTES**

44 U.S.C. § 3501(11) ................................................................................................................. 8

44 U.S.C. § 3502 ...................................................................................................................... 19

44 U.S.C. § 3506 ........................................................................................................................ 8

44 U.S.C. § 3507 .......................................................................................................... 16, 17, 18

5 U.S.C. § 406(a)(1)(a) .................................................................................................... 4

5 U.S.C. § 552a ...................................................................................................... 14, 15

5 U.S.C. § 704 ........................................................................................................ 13, 14

5 U.S.C. § 706(2) .............................................................................................................. 13

7 U.S.C. § 2020 ............................................................................................... 3, 4, 19, 22

88 Stat. 1896 ...................................................................................................................... 21

## OTHER AUTHORITIES

DevX, Database Report (last updated Mar. 9, 2025) .................................................. 19

*Inspection (1a), Inspecting (1), and "Audit (n.)*, Oxford English Dictionary ............................. 3

*Report* (n.), def. I.1.c, Oxford English Dictionary ........................................................ 19

*Report* (noun), def. 2.a, Merriam-Webster ...................................................................... 19

*Report*, def. 7, Dictionary.com .......................................................................................... 19

U.S. Dep't of Justice, *Overview of the Privacy Act of 1974* (2020 ed.) ........................ 13

USDA, *How States Safeguard Supplemental Nutrition Assistance Program Participants' Personally Identifiable Information* (Apr. 2023) ........................................... 6

## REGULATIONS

40 Fed. Reg. 28,948 ........................................................................................................ 13

5 C.F.R. § 1320.3 .............................................................................................................. 19

7 C.F.R. § 272.1 ................................................................................................................ 19

90 Fed. Reg. 26,521 ........................................................................................................ 22

## INTRODUCTION

By framing this case as nothing more than a procedural challenge—and claiming that its procedural compliance has been "meticulous"—USDA attempts to bury the most glaring failure attendant to its collection of nationwide SNAP data from states: There is not even a hint of reasoned decisionmaking in the Administrative Record. USDA's motion confirms that it reflexively acted, without analysis, to collect SNAP data from states in the wake of President Trump's government-wide Executive Order directive to "eliminate information silos." But the Administrative Procedure Act (APA) requires agencies to do more than mechanically act in response to executive orders: It requires analysis of statutory authority and limitations, accompanied by a careful examination of facts, and reliance on evidence to justify assertions. USDA did none of that. On this ground alone, this Court should rule in Plaintiffs' favor.

As to the remaining issues, nothing in USDA's submission entitles it to dismissal or judgment in its favor. On the undisputed record, the Court should deny USDA's motion and grant summary judgment in Plaintiffs' favor.[1]

## ARGUMENT

### I.        Plaintiffs have standing.

Both the individual and organizational plaintiffs here readily establish the necessary standing to invoke the Court's jurisdiction. As set forth in Plaintiffs' cross-motion, their injuries are sufficiently concrete and analogous to common-law privacy torts, and they align with the

---

[1] Plaintiffs' cross-motion did not seek summary judgment with respect to Count I. *See* Pls.' Mem., Dkt. 37-1, at 12 n.10. In response to USDA's motion and in light of the Administrative Record, Plaintiffs voluntarily dismiss Count I without conceding that the comment period provided by USDA complied with the Privacy Act.

purpose and scope of the legislation Congress enacted to ensure public participation in precisely these sorts of critical Executive Branch decisions.

### A. Individual Plaintiffs are harmed by USDA's unlawful possession of their personal information and USDA's impending redisclosure outside of the agency.

Two historically rooted torts demonstrate that Individual Plaintiffs' privacy injuries are sufficiently concrete under *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021) to establish Article III standing: intrusion upon seclusion and breach of confidence. Pls.' Mem. at 12–18. With respect to both, USDA overlooks the Supreme Court's clear instruction that the privacy harm asserted need not be "an exact duplicate" of a common-law tort for standing purposes. *Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.*, No. 25- cv-339-JDB, 2025 WL 1783899, at *6 (D.D.C. June 27, 2025) (quoting *TransUnion*, 594 U.S. at 433). Rather, the harms need only bear a "close relationship" to one or more of those torts. *TransUnion*, 594 U.S. at 433. The harms Individual Plaintiffs experience from USDA's unlawful collection and possession of their data—without legally required data and security protocols in place and beyond the bounds of the SNAP Act—provide more than enough basis for standing.

**1. Intrusion on seclusion.** Individual Plaintiffs are injured by USDA's possession of their SNAP data because it violates their reasonable expectation of privacy in that data. Plaintiffs submitted information to state agencies for the limited purpose of applying for benefits to buy food, and in reliance on the statutes and regulations that strictly limit both USDA's access to that data and the data's uses beyond administration and enforcement of SNAP, federal assistance programs, and federally-assisted state programs. USDA's actions cause them two injuries, each of which provides a sufficient basis for standing. First, Individual Plaintiffs are injured by USDA's collection and possession, which USDA has undertaken without following legally

mandated procedures, without required security protocols in place, and without engaging in reasoned decisionmaking. Plaintiffs submitted their information to their state agencies with the reasonable expectation that any access by USDA would occur only subject to these requirements, and within the bounds of the SNAP Act. Second, Individual Plaintiffs face imminent injury from USDA's redisclosure of their data. That redisclosure is substantially likely to occur because USDA has undertaken this effort for the express purpose of making SNAP data broadly available across the federal government and beyond (including to entities with no independent obligation to keep that data safe). *See* AR 542–43 (Eliminating Information Silos Executive Order).

USDA brushes these injuries aside, asserting that there can be no reasonable expectation of privacy, nor any invasion, because it has a "statutory right" to seek Plaintiffs' SNAP information. USDA. Mem., Dkt. 36-1, at 15; *see also id.* at 17 (citing regulations). But USDA ignores the express limitations in the provisions it cites: 7 U.S.C. § 2020(a)(3) and § 2020(e)(8)(a). Section (a)(3) requires state agencies to make SNAP records available to USDA "for inspection and audit . . . subject to data and security protocols agreed to" by USDA and the state agency. USDA is not conducting an "inspection" or an "audit"; neither term's plain meaning encompasses taking permanent custody of an entire database.[2] Rather, USDA is seeking to collect data, on an ongoing basis, and to possess that data for an indeterminate length of time. Inspection, moreover, is different from copying, and means viewing records in situ—not receiving an equivalent version for independent possession. *See Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024) (considering a statutory

---

[2] "Inspection" is "the act of inspecting… close or critical examination," while "inspecting" is "to examine (something) with a view to find out its character or condition"; "audit" is an "[o]fficial examination of accounts. . . ." *Inspection (1a), Inspecting (1), and "Audit (n.)*, Oxford English Dictionary, www.oed.com (last visited September 11, 2025).

requirement to allow for "public inspection" or "photocopying" to exclude providing digital

copies of voter data). *Id.*[3] There is also no indication in the Administrative Record that USDA is

attempting to collect this data "subject to data and security protocols agreed to by the State

agency and Secretary." 7 U.S.C. § 2020(a)(3).[4]

     This abuse of authority violates Individual Plaintiffs' reasonable expectation of privacy in

data they provided to states—grounded in the statutory protections Congress incorporated into

the SNAP program—and has left each Individual Plaintiff deeply distressed about USDA's

intrusion. Pallek Decl., Dkt. 9-2, ¶ 5; Samson Decl., Dkt. 9-3, ¶ 5; Ramos Decl., Dkt. 9-4, ¶¶ 4–

6; Hollingsworth Decl., Dkt. 9-5, ¶¶ 4, 7. For example, Plaintiffs Ramos and Hollingsworth have

expressed that they are careful about their private data due to concerns about identity theft and

skimming, and that USDA's incursion changes their feelings about the security of the

information they shared with their states. *See* Ramos ¶¶ 6–8; Hollingsworth Decl. ¶ 6. USDA,

meanwhile, knew of these concerns and others like it, and decided to proceed with their actions

regardless—and without justification. AR 665–66, 666–68; 669–70; 687–88 (comments from

Individual Plaintiffs); AR 657 (dismissing entirely comments opposing the collection).

     USDA also claims Plaintiffs' expectation of privacy in their SNAP data is unreasonable

because of USDA's authority under 7 U.S.C. § 2020(e)(8). USDA Mem. at 15, 17. That statutory

provision similarly limits information disclosure to "persons directly connected with the

administration or enforcement" of SNAP, federal assistance programs, and federally-assisted

---

[3] By contrast, Congress gave substantially broader power to agency inspectors general, including
the USDA IG, who must "have timely access to all records . . . or other materials." *Compare* 7
U.S.C. § 2020(a)(3)(B) ("inspection and audit") *with* 5 U.S.C. § 406(a)(1)(a).

[4] In related litigation, USDA concedes that "States and USDA have not yet put into place" the
required "data and security protocols agreed to by the State agency and Secretary." Def. Opp. to
Pl. Notice of Mot. & Mot. for Stay or Prelim. Inj., *California v. U.S. Dep't of Agric.*, No. 3:25-
cv-6310 (N.D. Cal.), ECF Dkt. No. 72 (Sept. 2, 2025) at 15.

state programs with use permitted "*only* for such administration and enforcement." That language is consistent with the SORN's routine use 9. *See* AR 551. But USDA has professed that it wants to do more with the data than enforce SNAP and other federal or federally-funded programs, including using and disclosing it for wide-ranging and unrelated purposes encompassed in routine uses 8 and 11. *Id.* No individual applying for SNAP would have understood these disclosures to be permitted by the statutory protections over their data. *See also* Pls.' Mem. at 42 (showing routine uses are unconstrained by the SNAP Act); *infra* at 20 (same).

The cases USDA cites are inapposite. USDA quotes language in *Wolf* for the proposition that there can be no intrusion where Plaintiffs voluntarily participated in SNAP. USDA Mem. at 17 (quoting *Wolf v. Regardie*, 553 A.2d 1213, 1218 (D.C. 1989)). That plaintiff's voluntary phone conversation with a magazine reporter bears no similarity to Plaintiffs' submission of private information to their state agencies, subject to statutory and regulatory protections not followed here, for food benefits. *See Wolf*, 553 A.2d at 1218. And in *Randolph*, individuals lacked standing after a laptop was stolen because they "made no allegations about what happened to" their data housed on the laptop, including whether it was ever even accessed. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711 (D.C. 2009). Here, not only is USDA taking possession of Plaintiffs' data, but it is doing so for the express purpose of redisclosing it in violation of the SNAP Act's protections.

USDA also misses the point by claiming that "[t]here is no serious contention that Plaintiffs' information has been or will be shared outside the government or to those likely to misuse the information." USDA Mem. at 17–18. The entire purpose of USDA's data collection project, as evidenced by the Eliminating Information Silos Executive Order, is to expansively redisclose information. That point is confirmed by routine uses 8 and 11, which permit USDA to

redisclose information to any "appropriate agency," including state, local, tribal, and foreign entities (routine use 8) or "instrumentality of any governmental jurisdiction" (routine use 11) merely because USDA believes it is relevant, and without any additional protections.

USDA's actions amount to far more than a "generalized grant of database access to an additional handful of government employees," USDA Mem. at 18–19, and therefore stand in sharp contrast to cases challenging DOGE's access to data within the federal government. Whereas those cases—like *American Federation of Teachers v. Bessent*, -- F.4th --, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025)—related to cross-federal-agency sharing of federal data, Congress intentionally designed SNAP to entrust individual data to *state* agencies, subject to strict safeguards. USDA's possession of this data, without required procedures and security protocols and for uses beyond those permitted by the SNAP Act, causes harm that is closely analogous to an intrusion on seclusion.

**2. Breach of confidence.** USDA first wrongly suggests that the tort of breach of confidence is not historically rooted enough to serve as an analogue under *TransUnion*. USDA Mem. at 19–20. As noted in Plaintiffs' Motion for Summary Judgment, the tort traces its origins to the 1800s. Pls.' Mem. at 17 n.12; *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). USDA next argues that the circumstances of its collection "bear little resemblance" to a breach of confidence because Plaintiffs "voluntarily shared" their information "to obtain a government benefit."[5] USDA Mem. at 20. Indeed, Plaintiffs voluntarily shared their

---

[5] It is not clear why the fact that Plaintiffs are obtaining a government benefit would differentiate this case from the examples. Until recently, USDA considered it critical that states ensure the "confidentiality" of the personally identifiable information shared with them "to obtain a government benefit." *See, e.g.*, USDA, *How States Safeguard Supplemental Nutrition Assistance Program Participants' Personally Identifiable Information* (Apr. 2023), https://www.fns.usda.gov/research/snap/states-safeguard-participant-pii.

information with *their state agencies*, with the understanding that those agencies were obligated to safeguard it subject to strict limitations on disclosure. That makes this case quite similar to the breaches of confidence USDA calls "typical": physician-patient or bank-customer relationships. In those relationships, individuals provide their private information to physicians to obtain medical care and to banks to obtain banking services, with the expectation that the information will be held in confidence. *See Jeffries*, 928 F.3d at 1064–65 (describing a "relationship of trust"); USDA Mem. at 20. Plaintiffs here had the same expectations. *See* Pallek Decl. ¶ 5; Samson Decl. ¶ 5; Ramos Decl. ¶¶ 4–10; Hollingsworth Decl. ¶¶ 4, 7.

USDA has ignored procedural requirements and statutory limitations on its access to, and use of, the data Plaintiffs entrusted to their state agencies. Disclosure to USDA itself, under these terms, is a harm sufficiently concrete to confer standing.

### B.    Plaintiffs are harmed by the absence of a full Information Collection Review process.

Because USDA was definitively required to undertake a full Information Collection Review (ICR) process under the Paperwork Reduction Act (PRA) before initiating its data demand, *see infra* at 17–20, the agency's refusal to do so has both denied Plaintiffs valuable information to which they are entitled and shut them out of a process in which the law guarantees their right to participate. Plaintiffs have suffered an informational injury, and Individual Plaintiffs in particular are injured by the wrongful denial of full participation in a public process concerning the disposition of their personal information.

USDA protests that Plaintiffs have suffered no injury because the agency provided certain information about its data demand in other documents issued outside of the PRA process. USDA Mem. at 21. But the agency cannot so easily absolve itself of its PRA obligations. Plaintiffs have standing because they have been denied information the PRA requires USDA to

7

provide. *Friends of Animals v. Jewell*, 824 F.3d 1033, 1042 (D.C. Cir. 2016); *see also FEC v. Akins*, 524 U.S. 11, 21 (1998) (noting injury in fact exists when "plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute"). That information has not been—and could not have been—provided through other documents or processes because, among other requirements, [6] USDA's analysis must be based on a record that includes public comments *solicited through the ICR process*. 44 U.S.C. § 3506(c)(3)(E). The required PRA process would yield valuable information that is key to Plaintiffs' missions and interests, as set forth in their declarations. *See* Supp. Leibman Decl., Dkt. 37-2, ¶¶ 8, 11; Butler Decl., Dkt. 9-7, ¶¶ 10–13, 18–19.

USDA's satisfaction with its own level of transparency in other quarters does not defeat Plaintiffs' standing. If Congress intended the PRA's notice and comment procedures to apply "unless such information is eventually going to be disclosed in a SORN," it could have said so. Instead, USDA's denial of the information required in the ICR process has caused Plaintiffs to suffer exactly "the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 843 F.3d at 992; *see also United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*, 288 F. Supp. 3d 99, 105 (D.D.C. 2017) (noting the PRA evinces Congress's clear intent that government data collection efforts be shared with public so "they might hold government to account"); 44 U.S.C. § 3501(11) (noting one purpose of the PRA to "improve the responsibility and accountability of the Federal Government to the public").

---

[6] This information includes, but is not limited to, whether the collection is "necessary for the proper performance of the functions of the agency," 44 U.S.C. § 3506(c)(2)(A)(i); whether the information "shall have practical utility," § 3506(c)(2)(A)(ii); whether the collection is "unnecessarily duplicative" of other reasonable accessible information, § 3506(c)(3)(B); and whether (based on a record *that includes public comments solicited by the agency*) the collection will be "implemented in ways consistent and compatible . . . with the existing reporting and recordkeeping practices" of those responding, § 3506(c)(3)(E).

USDA also suggests that Individual Plaintiffs cannot establish an injury from the denial of an opportunity to participate in the ICR process without first establishing what they would say in response to a (thus far) nonexistent request for comments. USDA Mem. at 21. Not so. Individual Plaintiffs need only establish that they have a "concrete interest that is affected by the deprivation" of the opportunity to participate in the process, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009), and USDA does not dispute that Individual Plaintiffs have such an interest in the protection of their personal information. All four Individual Plaintiffs have already attested that they would comment on this collection if given the opportunity.[7] Pallek Decl. ¶ 5; Samson Decl. ¶ 6; Ramos Decl. ¶ 10; Hollingsworth Decl. ¶ 9. The denial of the right to participate in the ICR process is sufficient to establish Individual Plaintiffs' standing on Count III.

### C.    The data collection impairs MAZON's core organizational activities.

MAZON has established an independent basis for Article III standing: USDA's actions injure its core business, as substantiated by the declaration of MAZON's CEO Abby Leibman. *See* Suppl. Leibman Decl.; *see also* Pls.' Mem. at 22–23. Contrary to USDA's suggestion that MAZON's theory of standing is "squarely foreclosed" by *Food & Drug Administration v. Alliance for Hippocratic Medicine* ("*Hippocratic Medicine*"), USDA Mem. at 22–23, the injuries to MAZON's core organizational activities meet the standard the Supreme Court has set forth in that case and others. *See* 602 U.S. 367 (2024).

In *Hippocratic Medicine*, the Supreme Court held that medical associations lacked standing to challenge the FDA's regulation of mifepristone because they had done nothing more than "incur[] costs to oppose FDA's actions," including costs associated with "public advocacy

---

[7] Although USDA cites to its perfunctory "Privacy Impact Assessment," *see* USDA Mem. at 21, that document does not, and cannot, cure USDA's failures under the PRA.

and public education." 602 U.S. at 394. Rejecting that theory, the Supreme Court determined that

to hold otherwise would allow all advocacy organizations to manufacture standing "provided

they spend a single dollar opposing those policies [that they dislike]." *Id.* at 395. The Court

distinguished its holding in that case from its holding in *Havens*, where an organization's

housing counseling services were "perceptibly impaired" by the defendant's provision of false

information about apartment availability. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

(1982) ("Such concrete and demonstrable injury to the organization's activities—with the

consequent drain on the organization's resources—constitutes far more than simply a setback to

the organization's abstract social interests."). While affirming that the mere diversion of

resources is insufficient on its own to constitute an Article III injury, *Hippocratic Medicine*

reaffirms that injuries to an organization's "core business activities," including counseling

activities, can give rise to organizational standing. 602 U.S. at 395.[8]

Applying that standard here, MAZON has alleged and set forth ample evidence to

support its standing. USDA's actions directly impede MAZON's core business activity of

providing targeted assistance to service providers working to enroll more people in SNAP, which

MAZON has done for decades in furtherance of its mission to end hunger. Supp. Leibman Decl.

¶¶ 9, 14; *see also, e.g.*, *Refugee and Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, -- F.

Supp. 3d. --, No. 25-cv-306-RDM, 2025 WL 1825431, at *22 (D.D.C., July 2, 2025) (finding

standing to challenge a presidential proclamation that impeded organization's "core business

activity" of providing legal services to immigrants and refugees). This concrete injury has caused

---

[8] *Hippocratic Medicine* does not alter D.C. Circuit precedent applying *Havens*, a point recently recognized in *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 180 (D.D.C. Apr. 24, 2025) ("*LULAC*") (noting that prior D.C. Circuit "precedent is consistent within the organizational-standing principles articulated in [*Hippocratic Medicine*]").

a "consequent drain on the organization's resources," including, for example, continuation of MAZON's Challah for Hunger program, reallocation of staff time, and provision of emergency grants. *Id.* ¶¶ 16–22.

These injuries stem from more than mere "objections" to USDA's conduct and amount to more than a harm to "abstract social interests" the Supreme Court rejected in *Hippocratic Medicine*. 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379). MAZON's counseling and assistance to service providers need not be prohibited, or rendered impossible, for its injuries to be cognizable; it is enough that MAZON's core activities are "impaired" and "burdened." *See LULAC*, 780 F. Supp. 3d at 190. The impairment of MAZON's core function—and the consequent drain on the limited resources of a small organization with an ambitious mission— give it standing to challenge USDA's actions. *See* Suppl. Leibman Decl. ¶ 23.

## II.        A government-wide Executive Order, standing alone, does not absolve USDA of its "reasoned decisionmaking" obligation.

By couching this case as one that "center[s] around alleged procedural deficiencies," USDA Mem. at 1, USDA obfuscates its failure to comport with the bedrock requirement that federal agencies engage in reasoned decisionmaking before acting. In the scant two paragraphs of argument addressing Plaintiffs' arbitrary and capricious claim, USDA's only defense of its actions is that the data collection is "[c]onsistent with" the Eliminating Information Silos Executive Order and that USDA "identified" legal authorities to support its actions. *Id.* at 38.

These justifications do not suffice. As an initial matter, identifying a legal authority cannot substitute for reasoned decisionmaking; even assuming, *arguendo*, that an agency *can* do something, that doesn't mean it *should*. Thus, USDA's "*only* explanation for its new policies is that the Executive Order required the adoption of those policies, and that the Executive Order itself provided adequate explanations for [its] new policies." *Kingdom v. Trump*, No. 25-cv-691-

RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).[9] "But as numerous courts have held, the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *Id.*; *see also Nebraska v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) ("[An] executive order does not exempt DOL from basic APA requirements of reasoned decisionmaking."); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C.) ("APA review of an Executive Branch official's actions is . . . not precluded merely because the official is carrying out an executive order."), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, No. 20-cv-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order."); *Texas v. United States*, 524 F. Supp. 3d 598, 653–54 (S.D. Tex. 2021) (finding that a memorandum addressing COVID was arbitrary and capricious despite "stem[ming] from" a contemporaneous executive order because it failed to independently demonstrate reasoned decisionmaking).

  The reason for this rule is obvious. To allow this data collection to proceed based on no justification other than an executive order would permit the executive branch to unilaterally override the APA's requirements and "eviscerate the judicial oversight that Congress contemplated in passing" that law. *Kingdom*, 2025 WL 1568238, at *10; *see also Am. Pub. Health Assn. v. Natl. Institutes of Health*, No. 25-cv-10787-WGY, 2025 WL 1822487, at *18 (D. Mass. July 2, 2025). Because the Administrative Record is completely devoid of any evidence of

---

[9] To the extent that USDA claims that consideration of waste, fraud, and abuse constitutes "reasoned decisionmaking," the Administrative Record lacks any evidence about that. *See* Pls.' Mem. at 27–33.

reasoned decisionmaking, USDA cannot prevail on its motion for summary judgment on Count IV, and Plaintiffs' cross-motion should be granted.

### III.    The APA empowers this Court to set aside USDA actions that violate the Privacy Act and PRA.

USDA's jurisdictional arguments—that the Court is unable to exercise its APA authority because of the limited remedies provided within the Privacy Act and PRA—are both erroneous and foreclosed by precedent. 5 U.S.C. § 706(2); USDA Mem. at 24, 33. Because neither of those statutes provides Plaintiffs an "adequate remedy" for their injuries, 5 U.S.C. § 704, and neither provides a comprehensive administrative scheme that ousts *all* alternative remedies, APA relief is available.

### A.    The APA provides equitable relief unavailable under the Privacy Act.

Since OMB published its initial guidance on the Privacy Act, the Executive Branch has recognized that "[a]n individual may seek judicial review under other provisions of the [APA]." OMB, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,968 (July 9, 1975); *see also* U.S. Dep't of Justice, *Overview of the Privacy Act of 1974* (2020 ed.) at 295[10]; Pls.' Mem. at 24–25. As Plaintiffs' briefing has explained, the authority in this Circuit and elsewhere establishes that (a) APA relief is not available where it would be duplicative of relief under the Privacy Act, while (b) the Privacy Act is not a comprehensive remedial scheme that precludes all other causes of action, and so (c) violations of the Privacy Act are susceptible to equitable remediation via the APA when the relief sought is not available under the Act itself. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (noting that equitable relief

---

[10] Available at https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition.

under the Privacy Act may fall under "the general provisions for equitable relief within the [APA]").

USDA's attempts to find authority to the contrary are at best tendentious, and the cases it relies on do not address the Privacy-Act-via-APA context at issue here. For example, *Wilson v. Libby* concerned not the APA, but a *Bivens* claim. 535 F.3d 697, 703 (D.C. Cir. 2008). Setting aside the broader point that *Bivens* has been almost entirely cabined to its facts,[11] the inquiries into remedies under *Bivens* and the APA are entirely different. Under *Bivens*, a court is asked to exercise inherent discretion to create a damages remedy where none was provided; the existence of another remedial scheme is one of many factors. *Libby*, 535 F.3d at 704–05. By contrast, the APA grants courts equitable power to set aside unlawful actions so long as there is "no other *adequate* remedy in a court," whether in law or in equity. 5 U.S.C. § 704 (emphasis added). Conversely, *Block v. Community Nutrition Institute* is an APA case unrelated to the Privacy Act and inapposite here. 476 U.S. 340 (1984). Instead, it involved a milk marketing statute that provided a complete administrative and judicial review scheme that was meant to oust all other forms of review. *Id.* at 348. But, as *Doe* makes clear, that cannot be said with respect to the Privacy Act.[12]

USDA also makes the unavailing suggestion that the Privacy Act's limited allowance for money damages under Section 552a(g)(1)(D)—in cases where the government's noncompliance with "any other provisions of [the Act]" has "an adverse effect on an individual"—is meant to

---

[11] "This Court has repeatedly emphasized that 'recognizing a cause of action under Bivens is a disfavored judicial activity.'" *Goldey v. Fields*, 606 U.S. 942, 944 (2025) (quoting *Egbert v. Boule*, 596 U.S. 482, 491 (2022)).

[12] The Privacy Act is codified *inside of* the APA and thus does not exclude use of APA mechanisms (except insofar as they would be redundant of the relief provided in the Privacy Act itself, *see* 5 U.S.C. § 552a(g)).

exclude equitable relief for violations of "any other provision." USDA Mem. at 25–26. Courts in

this Circuit have, many times, allowed equitable relief where a limited damages remedy is

inadequate. Starting with *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1998), in which the

court gave equitable Privacy Act relief under the APA to avoid a constitutional question, and

continuing through cases like *AFL-CIO v. Department of Labor*, 778 F. Supp. 3d 56 (D.D.C.

2025), judges in this Circuit have allowed the kind of action Plaintiffs bring under Count II. As

Judge Bates explained,

> An alternative remedy is adequate so as to preclude a cause of action under the APA if,
> though not "identical to relief under the APA," it is at least "of the same genre." *See Elec.
> Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018) (citations omitted).
> Damages and injunctions belong to different genres: one compensates for harm while the
> other prevents it. . . . And the D.C. Circuit isn't alone in its view that § 552a(g)(1)(D)'s
> narrow cause of action does not preclude non-monetary relief under the APA. To the
> contrary, the Supreme Court has all but said as much (albeit in dicta). *See Chao*, 540 U.S.
> at 619 n.1 . . . .

*Id.* at 80. USDA also misses the mark in arguing from the principle that a statute providing

"certain special types of equitable relief but not others" cannot be read "to imply a broad right to

injunctive relief." USDA Mem. at 26 (quoting *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980)).

All that principle establishes is that Plaintiffs here *correctly* pled via the APA rather than seeking

to imply a broader equitable cause of action under the Privacy Act.

Finally, USDA spends nearly a page discussing inconclusive dicta in *American

Federation of Teachers v. Bessent*, -- F.4th --, 2025 WL 2313244 (4th Cir. Aug. 12, 2025). But

*Bessent* is not binding, and it does not hold that the Privacy Act's equitable remedies exclude an

APA action. Nor does it seriously grapple with the D.C. Circuit's decision in *Doe v. Stephens*,

which concluded that, despite the absence of a direct cause of action under the Privacy Act, the

plaintiff was "entitled under the Administrative Procedure Act to a declaration." *Doe v. Stephens*,

851 F.2d at 1463; *see also AFL-CIO*, 778 F. Supp. 3d at 80 (discussing *Doe*).

**B.    The APA provides equitable relief unavailable under the PRA.**

The same reasoning defeats USDA's arguments against an APA claim for violation of the PRA, which (unlike the Privacy Act) provides no affirmative cause of action or remedial scheme at all. USDA claims that the open-ended allowance within the PRA to be raised as an affirmative defense, and a narrow limitation on the reviewability of OMB approvals under the PRA, *impliedly* forbids raising it in any other context, despite the absence of any limiting language like "only" or "exclusively" in the statute. USDA Mem. at 33; 44 U.S.C. §§ 3507 (d)(6), 3512(b).

The cases USDA describes as "reject[ing] . . . judicial review outside the PRA's statutory scheme" each have nothing to do with the APA. *City of New Bedford v. Locke* reaffirms that "the PRA does not create a private cause of action" to enforce its requirements, which is exactly why it is actionable under the APA. No. 10-cv-10789, 2011 WL 2636863 at *9 (D. Mass. June 30, 2011). *Ohio Stands Up! v. U.S. Department of Health & Human Services* also rejects an implied cause of action under the PRA, which is not the issue here. 564 F. Supp. 3d 605, 613 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022). Meanwhile, *Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018), and *Steele v. United States*, 144 F.4th 316, 323 (D.C. Cir. 2025), which endorses *Hyatt*, make clear that the PRA does not constitute the kind of comprehensive remedial scheme that ousts other forms of available review. *Steele* further confirms that judicial review still exists "to decide whether the agency acted within the scope of its statutory authority," *Steele*, 144 F.4th at 323, which is the gravamen of Plaintiffs' PRA claim—*i.e.*, that USDA lacked authority to initiate its data demand without fulfilling its own independent obligations under the statute.

Finally, USDA attempts to dismiss *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39 (D.D.C. 2025), which does involve an APA claim akin to

16

Count III here, because the government failed in that case to make an argument that the PRA impliedly barred an APA action. But whether there is an APA cause of action goes to the court's jurisdiction (insofar as the APA provides the relevant waiver of sovereign immunity), and it seems unreasonable to infer, as USDA does, that Judge Bates simply overlooked a jurisdictional bar at both the preliminary-relief and final-judgment phases of that case.[13]

### IV.    USDA has violated the PRA.

USDA's efforts to square its conduct with the PRA fail. This unprecedented demand that states disclose vast quantities of SNAP data to USDA is either a new collection or a "substantive or material modification" to an existing collection, 44 U.S.C. § 3507 (h)(3), and in either case, USDA has failed to satisfy the attendant ICR requirements. *See* Pls.' Mem. at 33–35. USDA's attempt to characterize its wholesale nationwide data demand as merely a "report" is equally unavailing.

USDA argues, in essence, that it is not required to go through a new ICR process because its prior ICR submissions put the public "on notice" that the information collected by the states would ultimately be collected by USDA. *See* USDA Mem. at 36. But nothing in the prior ICR submissions addresses information relevant to the 2025 collection. This absence is particularly evident when considering the PRA-required topics that would involve entirely distinct analyses depending on the identity of the receiving agency: (1) "the need for the information": state agencies' need for the information (to assess SNAP eligibility) is self-evident; but what of

---

[13] The government also failed to make any such argument in its summary judgment brief, filed after the February 11, 2025, temporary restraining order ruling cited at 766 F. Supp. 3d. 39. *See* Mem. Opp. Pls.' Mot. Prelim. Injunction & Expedited Summary J., *Drs. for Am. v. Off. of Pers. Mgmt*, No. 1:25-cv-322, ECF 47 (March 24, 2025). Judge Bates entered partial summary judgment on the plaintiffs' APA claim that invoked the PRA. *Drs. for Am.*, 2025 WL 1836009 (July 3, 2025). The government did not appeal that decision and has instead filed eight status reports documenting its efforts to comply with Judge Bates's order.

USDA's need? (2) "proposed frequency of response": for state agencies' collection, individual applicants are responding; but what of the frequency of response by state agencies disclosing data to USDA? and (3) "an estimate of the burden that shall result": for state agencies' collection, the burden falls on individuals; but the burdens on state agencies are clearly distinct. *See* 44 U.S.C. § 3507 (a)(1). The references USDA cites from its earlier submissions—to the states' limited authority to disclose SNAP data to USDA, and USDA's limited authority to demand "reports and other information"—also failed to put the public on notice of a nationwide collection USDA would devise for the first time in 2025. Federal agencies, like Congress, do not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

USDA continues to maintain that its collection is merely a "nonsubstantive" change exempt from the agency's ordinary PRA obligations. USDA Mem. at 37. It does so by trivializing or ignoring the ways in which its data demand is dramatically different from the 2024 ICR approval, including 20,410 additional burden hours (that is, 2.33 burden years). Had USDA understood its 2023 OMB submission to cover the 2025 collection from states, it would have factored in the tens of thousands of annual burden hours required of state agencies to comply.[14] USDA further fails to acknowledge that its data demand represents a "new method of collection, from new persons, into a new database, with new burdens." Pls.' Mem. at 34 (citing 5 C.F.R. § 1320.3 (c); 44 U.S.C. § 3502 (10)). Indeed, it is difficult to imagine a *more* substantive change that could still be credibly characterized as an outgrowth of an existing collection of information.

---

[14] In related litigation, states have estimated burdens that dwarf USDA's estimate. California averred that it would take "hundreds" of hours over the course of six months just for specialized contractors to program an initial database extraction; Colorado, "thousands" of hours; Massachusetts, eight to ten full time staff. Plf. Mot. for Stay or Prelim. Inj., ECF 59 (Aug. 18, 2025) at 13–14, *California v. U.S. Dep't of Agric.*, No. 3:25-cv-6310-MMC (N.D. Cal.) (citing ECF 59-7 (California declaration), ECF 59-8 (Colorado declaration), ECF 59-16 (Massachusetts declaration)).

Finally, USDA asks the Court to read the word "report" nonsensically and find that the PRA's requirements do not apply because states are merely "reporting" their own collection to USDA. USDA Mem. at 36–37. USDA's arguments depend on interpreting "report" in the SNAP Act, *see* 7 U.S.C. § 2020(e)(12) or USDA's regulations, *see* 7 C.F.R. § 272.1, to mean that states would furnish complete copies of sensitive databases for USDA to convert to its own. But that is not what the word "report" means.

Words are "assumed to bear their ordinary, contemporary, common meaning," absent indication otherwise. *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (internal quotation marks omitted). A "report" is an "evaluative account or summary of the results of an investigation, or of any matter on which information is required."[15] In the context of data systems, a "database report" specifically means "a document containing data that is *extracted from* a database and presented in an organized manner for specific purposes,"[16] *i.e.*, "output, especially printed, containing organized information,"[17] and is in that way different from a bulk copy, replica, or export of the database. *See, e.g.*, *United States v. Brooks*, 681 F.3d 678, 691 (5th Cir. 2012) (using dictionary definitions of "report" to interpret a different statutory use).

The Court should read "report" in its commonsense way, meaning what the states are being asked to do with Individual Plaintiffs' data is outside their reporting obligation and outside the "reporting" that was part of the prior ICR clearance for the underlying data collection.

---

[15] *Report* (n.), def. I.1.c, Oxford English Dictionary, https://www.oed.com/dictionary/report_n (last visited Sept. 11, 2025); *see also Report* (noun), def. 2.a, Merriam-Webster, "a usually detailed account or statement," https://www.merriam-webster.com/dictionary/report (last visited September 11, 2025).

[16] DevX, Database Report, https://www.devx.com/terms/database-report/ (last updated Mar. 9, 2025) (emphasis added).

[17] *Report*, def. 7, Dictionary.com, https://www.dictionary.com/browse/report (last visited Sept. 11, 2025).

**V.      Routine uses 8 and 11 are not compatible with the purposes for which information was collected from individual SNAP applicants.**

USDA continues to assert that routine uses 8 and 11 are constrained to encompass only those disclosures permitted by the SNAP Act, arguing that the SORN "explicitly limits the disclosure of data to circumstances consistent with the FNA." USDA Mem. at 32. But the SORN says exactly the opposite: It says that it is *authorizing* disclosure pursuant to authorities that include, *but are not limited to*, the SNAP Act. This language permits USDA to disclose records under routine uses 8 and 11 as long as they are authorized by any enumerated authority[18] or any unenumerated authority. Far from a limitation on disclosure, the SORN gives USDA carte blanche to redisclose data—consistent with the routine uses—as long as it is pursuant to any other law, regulation, executive order, or other policy, regardless of whether the disclosure is allowed under the SNAP Act.[19]

USDA also incorrectly asserts that routine uses 8 and 11 need only be compatible with its own purpose for collecting SNAP data from states. *See* USDA Mem. at 31–32. As described in Plaintiffs' memorandum, that approach effectively eliminates the compatibility requirement whenever there is a second level of data collection. Pls.' Mem. at 38. Congress passed the Privacy Act to protect individual privacy against governmental intrusion. *F.A.A. v. Cooper*, 566 U.S. 284, 295 (2012) (citing § 2(b), 88 Stat. 1896). USDA's approach would sever the compatibility inquiry from the purpose for which an individual handed over her private

---

[18] The SORN specifically lists the SNAP Act and regulations, the Eliminating Information Silos Executive Order, and a second Executive Order entitled "Ending Taxpayer Subsidization of Open Borders," which USDA does not mention anywhere else in the Administrative Record.
[19] The Administrative Record contains no discussion of this tension; meanwhile, USDA has acknowledged before this Court that "[i]f the statute, itself, explicitly prohibits sharing data in a certain way, we would agree that the agency cannot share data in that way, obviously." July 23, 2025 Hearing Tr. 23:12–14.

information, which is not what Congress intended. *See Covert v. Herrington*, 667 F. Supp. 730, 738 (E.D. Wash. 1987) ("It appears that 'collection' in the statutory context applies to collection from the person providing the information . . . ."), *aff'd on other grounds*, 876 F.2d 751 (9th Cir. 1989).

**Routine use 8.** USDA's own comparison between the SNAP Act's permissible law enforcement disclosures shows how much broader routine use 8's permissible disclosures are. *See* USDA Mem. at 31–32. Despite USDA's claim that routine use 8 "faithfully interprets" the SNAP Act's authorizations, it in fact broadens disclosures: (1) from requiring a request by law enforcement to permitting *sua sponte* disclosure by USDA, if USDA—not the receiving entity— deems information relevant to the receiving entity's functions; (2) from alleged violations of the SNAP Act and regulations, or those of other federal benefit programs, to potential violations of *any* law, domestic or foreign; and (3) from limiting disclosure to local, state, or federal law enforcement to permitting it to foreign[20] law enforcement or "other public authority."

The professed "historical pedigree" of Routine Use 8 also deserves no weight. USDA Mem. at 31. It is irrelevant whether similar language appears in other system of records notices, which may have routine uses that suffer from incompatibility problems themselves.

**Routine use 11.** The SNAP Act's limitation on the persons who may have access to SNAP data, and for what uses, are far narrower than those permitted under routine use 11. While the SNAP Act permits disclosure to *persons* "directly connected with the administration and

---

[20] The Administrative Record reveals USDA's "agree[ment] with the three commenters who suggested removing the reference to 'foreign' governments." AR 657. But despite that assertion—in a document with a title dated August 14, 2025—USDA has not yet published a new SORN omitting foreign disclosures from routine use 8. Moreover, despite representing in its motion that it was "currently implementing" and "in the process of" making that change, those statements are unsupported by any evidence in the record. *See* USDA Mem. at 9, 32 (citing AR 657, which is silent as to future plans to update the SORN).

enforcement" of SNAP, federal benefits programs, or federally-assisted state programs, routine use 11 permits disclosure broadly to "another Federal agency or to an instrumentality of any governmental jurisdiction," whether federal, state, or local, "that administers, or that has the authority to investigate or assist USDA to investigate or assist USDA to investigate potential fraud, waste, or abuse" in a benefits program. *Compare* 7 U.S.C. § 2020(e)(8)(A)(i) *with* AR 552 (90 Fed. Reg. 26,521, 26,523). And while the SNAP Act limits use of that information "*only* for such administration of enforcement" of SNAP or another benefits program, routine use 11 permits information to be used "to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs." *Compare* 7 U.S.C. § 2020(e)(8)(A)(ii) (emphasis added) *with* AR 552 (90 Fed. Reg. 26,521, 26,523). This broadening contradicts USDA's claim that routine use 11 merely "restates" the statutory language.

SNAP information was collected from Plaintiffs and other SNAP applicants for the purposes of assessing their eligibility for food benefits. USDA now seeks to use that information for broad law enforcement purposes and to root out unidentified fraud, waste, and abuse across all pots of federal money. Routine uses 8 and 11 blow the SNAP Act's permissible disclosures out of the water. They fail the Privacy Act's compatibility requirement.

## CONCLUSION

The Court should deny USDA's motion to dismiss or for summary judgment and grant Plaintiffs' motion for summary judgment.

Dated: September 12, 2025                     Respectfully Submitted,

                                              */s/ Daniel A. Zibel*
                                              Daniel A. Zibel (D.C. Bar No. 491377)
Deana El-Mallawany*                           Madeline Wiseman (D.C. Bar No. 90031948)
PROTECT DEMOCRACY PROJECT

15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org

JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos
& Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967 (telephone)
(212) 633-6371 (fax)
Email: akhtar@nclej.org

*Counsel for Plaintiffs MAZON, EPIC, Ramos
& Hollingsworth*

NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
dan@defendstudents.org
madeline@defendstudents.org

*Counsel for Plaintiffs*

John L. Davisson (D.C. Bar No. 1531914)
Sara Geoghegan (D.C. Bar No. 90007340)
Kabbas Azhar (D.C. Bar No. 90027866)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248
Email: davisson@epic.org
          geoghegan@epic.org
          azhar@epic.org

*Counsel for EPIC*

*Admitted Pro Hac Vice