# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NAMOD PALLEK, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>BROOKE L. ROLLINS, in her official capacity as U.S. Secretary of Agriculture, *et al.*<br><br>*Defendants.* | Civil Action No. 1:25-cv-01650-JMC |

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

USDA fundamentally misunderstands its obligation to engage in "reasoned decisionmaking." Instead of considering evidence or analyzing a perceived problem before deciding to collect SNAP data from states, USDA reflexively acted to "heed the President's call." USDA's briefing does nothing to dispel the only conclusion available from a review of the Administrative Record: This data collection was a foregone conclusion, motivated solely by President Trump's government-wide policy preference, without regard to the privacy protections Congress established in the relevant statutes. Instead of citing any evidence, analysis, or reasoning in its brief, USDA describes "steps" it took, which "show that USDA acted reasonably." The cited steps—every one of which postdates USDA's May 6 announcement of its decision—include identifying the agencies and processors with SNAP data, sending them "numerous letters" with citations to authority, and following certain applicable procedures. But none of these steps satisfy the agency's burden to engage in reasoned decisionmaking. It's no

1

wonder that, acting without reason, USDA trampled the important procedural protections of the Privacy Act and the Paperwork Reduction Act.

The harms from this data collection are ongoing and only stand to worsen as USDA receives more data and has more time to unlawfully redisclose it. No preliminary issues prevent the Court from deciding this case on the merits. Plaintiffs respectfully ask the Court to grant summary judgment in their favor and move expeditiously to set aside this unlawful collection.

## ARGUMENT

After two rounds of briefing, USDA has said little to advance its defense of this data collection. Below Plaintiffs address standing and the merits of the three causes of action at issue[1] before briefly turning to the temporary restraining order issued late last night in the parallel *California v. USDA* litigation, including a new argument USDA raised for the first time at a September 16 hearing in that case, in the expectation it may appear in its concurrently filed reply. *See California v. U.S. Dep't of Agric.*, No. 3:25-cv-6310, ECF 83 (N.D. Cal. Sept. 18, 2025) ("*California* TRO").

### I.  Plaintiffs Have Standing on Each Cause of Action.

USDA's opposition brief makes key concessions that confirm Plaintiffs have standing to press all three claims in dispute.

#### A.  Individual Plaintiffs have a reasonable expectation of privacy in their SNAP records.

As USDA concedes, Congress created a reasonable expectation of privacy in the SNAP records Plaintiffs submitted to their state agencies. USDA Opp'n, Dkt. 39, at 4. And so the standing and merits inquiries merge: USDA's argument against Individual Plaintiffs' standing

---

[1] Plaintiffs have voluntarily dismissed Count I.

2

hinges on a finding that the collection complies with applicable law. It does not. This collection falls outside of USDA's statutory authority in the SNAP statute because it is not an "inspection" or an "audit," and it is occurring without agreed security protocols;[2] it violates the APA because USDA failed to engage in reasoned decisionmaking; it violates the Paperwork Reduction Act because USDA has not conducted an Information Collection Review; and it violates the Privacy Act because routine uses 8 and 11 fail the compatibility requirement. When Individual Plaintiffs submitted their personal information to apply for SNAP, they reasonably understood these laws to limit USDA's access to and use of their data. Pls.' Opp'n, Dkt. 40, at 2–6. The collection by USDA violates their reasonable expectations of privacy and is closely analogous to an intrusion on seclusion. USDA's only manner of distinguishing the elements of intrusion on seclusion is to again claim that its actions are lawful and, in essence, that Plaintiffs should have known to expect this collection would occur. USDA Opp'n at 5. Neither is true.

USDA makes a similar argument regarding USDA's imminent unlawful redisclosure of information pursuant to routine uses 8 and 11. USDA Opp'n at 4. USDA asserts that such redisclosures do not violate Individual Plaintiffs' reasonable expectation of privacy because those routine uses are consistent with the SNAP Act. Standing again merges with the merits: If the Court finds these routine uses unlawful, the redisclosure harm Individual Plaintiffs assert is a violation of their reasonable expectation of privacy.

USDA repeats these arguments for breach of confidence, a historically rooted tort that provides an independent basis for the Court to find Plaintiffs' injuries sufficiently concrete to

---

[2] USDA claims, without citation, that it "has taken all necessary steps to house and safeguard the data it collects"—despite its admission in *California v. USDA* that it has not reached agreement on data security protocols with the state plaintiffs in that case. *See* USDA Opp'n at 1; Pls.' Opp'n at 4 n.4; *California* TRO at 10 n.8 ("The USDA acknowledges no such [protocol] agreements exist.").

establish standing. USDA Opp'n at 6. Plaintiffs voluntarily submitted their information only subject to statutory protections that USDA has violated. Pls.' Mem. at 17–18, n.12; *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) ("History tilts toward concreteness.").

Both of these torts are sufficiently analogous to Individual Plaintiffs' injuries to establish their standing on all three counts.

### B. Plaintiffs have clearly articulated the defects in the PRA process.

USDA all but concedes Plaintiffs' informational injury, arguing only that Plaintiffs have failed to name specific information they lack from the failure to conduct a new Information Collection Review.[3] USDA Opp'n at 6–7. To the contrary, Plaintiffs have articulated examples of missing information: an analysis of "whether the collection is 'necessary for the proper performance of the functions of the agency,' whether the information 'shall have practical utility,' and whether the agency's burden estimate is accurate." Pls.' Mem. at 19 (quoting 44 U.S.C. § 3506(c)(2)(A)); *see Friends of Animals v. Jewell*, 824 F.3d 1033, 1042 (D.C. Cir. 2016). Plaintiffs have also explained that the relevant information "could not have been" provided through other documents because USDA's analysis must be based on a record that includes public comments. Pls.' Opp'n at 8. Finally, the 2023/2024 ICR process regarding the states' collection could not have provided the information Plaintiffs are entitled to because it addressed a collection by a different agency, from different "persons," with different burdens. Pls.' Mem. at 19. Plaintiffs have standing on Count III.

---

[3] USDA does not contest that Plaintiffs suffer the type of harm Congress sought to prevent when requiring the government to provide this information. *See United to Protect Democracy v. Presidential Advisory Comm'n of Election Integrity*, 288 F. Supp. 3d 99, 105 (D.D.C. 2017).

4

### C. USDA impliedly concedes that Individual Plaintiffs have an interest in commenting on the collection.

USDA concedes that Individual Plaintiffs have a concrete interest under *Summers* but asserts that they have "failed to show cognizable injury" because they did not submit comments during the 2023/2024 ICR process. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). That comment opportunity was distinct from the one required here for all of the same reasons that the 2025 collection by USDA is distinct from the 2024 collection by states. The 2023/2024 comment process is no substitute for the one the PRA requires USDA to provide on the 2025 collection, which amounts to a sea change in the way SNAP data has been handled.

USDA concludes by arguing that comments the Individual Plaintiffs later submitted on the System of Records Notice (SORN) cure the harm from the absence of an ICR comment opportunity. USDA Opp'n at 8. This suggestion puts the cart before the horse, since one purpose of the PRA is to ensure compliance with the Privacy Act, 44 U.S.C. § 3501(8)(A), and it overlooks USDA's obligation under the PRA not only to take comments, but to "evaluate[] the public comments received" "*in advance* of the adoption or revision of the collection of information . . . ," *id.* § 3507(a)(1)(B), (a) (emphasis added). The only way for USDA to cure its failure to evaluate comments received on the information collection from the states is therefore to set aside its action.

### D. MAZON's organizational harm meets the reaffirmed *Havens* standard.

USDA misunderstands the organizational harm MAZON is experiencing as a result of the data collection—which falls comfortably within the standard articulated in *Havens* and reaffirmed in *Hippocratic Medicine*. Pls.' Opp'n at 9–12 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)). The collection harms MAZON's core counseling business,

5

erodes trust it has worked to build for decades, and imperils its funding—harms that amount to far more than the policy disagreement at issue in *Hippocratic Medicine*. *See* 602 U.S. at 394–95. These injuries provide MAZON a distinct form of standing for Counts II, III, and IV.

## II. USDA Continues to Rely Exclusively on the Executive Order to Justify its Collection.

As the Administrative Record and USDA's briefs make clear, USDA considered nothing other than President Trump's directive before initiating this data collection. This is not to say that the agency did not consider fraud or duplication, or sprinkle those words throughout its letters to the states—but that is not the question before the Court. The question is, rather, whether the agency acted rationally in seeking its own copy of every state's data to further the Executive Order's policy goals, against the backdrop of all the other anti-fraud and anti-redundancy mechanisms the states and USDA itself use and are already enhancing.

Continuing to proclaim its "consisten[cy]" with the Eliminating Information Silos Executive Order, USDA ignores its APA obligation to engage in reasoned decisionmaking— including when acting pursuant to a presidential directive. USDA Opp'n at 10; *see* Pls. Opp'n at 11–12 (citing cases). Its discussion of Count IV relies not on a record of grappling with statutory language, considering relevant factors, or evaluating evidence—because the Certified Administrative Record contains no indication that any such thing occurred. Instead, USDA merely recites certain procedural steps it followed, actions it took to effectuate the collection, and its conclusion that the collection is within its statutory authority.[4] USDA Opp'n at 10–13.

Addressing the relevant factors Plaintiffs raise, which should have been part of the

---

[4] USDA makes one direct attempt to address what it did *prior to* initiating the collection—but the meaning and significance of its contention is entirely unclear. *See* USDA Opp'n at 11 ("As to whether USDA should have initiated the data gathering effort in the first place, USDA identified both the issue before it and the logical solution starting with the May 6 Letter.").

agency's analysis, USDA's brief misses the point. It claims that the new National SNAP Information Database is a "complementary tool" to the existing National Accuracy Clearinghouse—but there is no evidence in the Administrative Record that USDA assessed the structure or functions of the NAC and concluded that an additional system would complement it. USDA Opp'n at 12–13. USDA claims that chilling effects on SNAP participation are "speculative and objectively unreasonable"—but there is no evidence in the Administrative Record that the agency assessed this issue, considered any evidence, and reached this conclusion. *Id.* at 13. USDA claims that information silos "choke critical resources" from SNAP—with no citation and no support in the Administrative Record. *Id.* at 1. Finally, USDA repeatedly proclaims its statutory entitlement to carry out this collection—with no evidence in the Administrative Record that USDA has meaningfully considered the statutory framework Congress created or the limitations on USDA's right of access. *Id.* at 12.

This *post hoc* reasoning by counsel is nowhere in the Administrative Record. *See Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("It is axiomatic that we may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)).

### III. USDA's Failure to Conduct an Information Collection Review Violates the PRA.

USDA's PRA arguments are repeated from earlier briefs.[5] On the merits of Count III,

---

[5] On the availability of APA relief for Plaintiffs' PRA and Privacy Act claims, Plaintiffs refer the Court to their prior briefs and note only the APA's "central purpose of providing a broad spectrum of judicial review of agency action." *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); Pls.' Mem. at 23–26; Pls. Opp at 13–17; USDA Opp'n at 13–14, 17. While Judge Chesney declined to base the *California* TRO on a PRA-through-APA theory, *California* TRO at 13, the one-sentence treatment of the issue there is squarely at odds with *Steele v. United States*, 144 F.4th 316 (D.C. Cir. 2025). *Steele* is unequivocal that 44 U.S.C. § 3507(d)(6) does not bar judicial review "of the agency's legal authority to demand information," nor of "whether an agency possesses statutory authority to demand particular information." *Id.* at 316, 322. Rather,

USDA repeats its arguments that this collection involves nothing more than a change to burden hours and a requirement that state agencies "report" data already subject to collection—arguments Plaintiffs have previously addressed. USDA Opp'n at 15–17; *see* Pls.' Opp'n at 19. But there is no ignoring that the collection USDA is undertaking is substantively different from the prior collection in meaningful ways: involving a new receiving agency, new responding persons, with new justifications, and new burdens. USDA was required to conduct an ICR before initiating this collection.

### IV. Routine Uses 8 and 11, which Sweep Far More Broadly Than the SNAP Act's Permissible Disclosures, Fail the Compatibility Requirement.

USDA's arguments on the merits of Count II fail to acknowledge that routine uses 8 and 11 swallow up the narrow disclosures permitted by the SNAP Act. Because these routine uses permit disclosures otherwise barred by law, they fail the Privacy Act's compatibility requirement.

While arguing that the compatibility analysis should focus on USDA's purpose for collecting the record (rather than the state's purpose for collecting the record from the individual applicant, as Plaintiffs argue),[6] USDA notes that this is "largely a distinction without a difference." USDA Opp'n at 18 n.1. According to USDA, the states collected records for SNAP administration and enforcement, and USDA is collecting those records "to ensure program integrity." USDA Opp'n at 18 n.1. But when comparing those purposes with the purpose for the

---

while OMB's issuance of a control number under 44 U.S.C. § 3504 is an unreviewable element of PRA compliance, compliance also necessitates an agency discharge its obligations under § 3506.

[6] Considering the Privacy Act's purpose of protecting *individual* privacy from government invasion, the only sensible point of comparison is the point at which an individual parted with her personal information. *See* Pls.' Mem. at 38 (citing *Covert v. Herrington*, 667 F. Supp. 730, 738 (E.D. Wash. 1987), *aff'd on other grounds*, 876 F.2d 751 (9th Cir. 1989)); Pls.' Opp'n at 20–21.

*disclosures* authorized by routine uses 8 and 11, USDA understates their breadth. USDA characterizes routine uses 8 and 11 as "permit[ting] disclosure to entities charged with ensuring program integrity through the enforcement of waste, fraud, and abuse laws and regulations as condoned by the FNA itself." These routine uses sweep far more broadly. *See* Pls.' Mem. at 40–42; Pls.' Opp'n at 20–22.

Routine use 8 permits USDA to make a discretionary determination regarding SNAP records' "relevance" to a potential violation of virtually any law, and then *sua sponte* redisclose those records to "the appropriate agency" (including, as written, foreign law enforcement). AR 551 (90 Fed. Reg. 26521, 26522). This language contrasts with the narrowly drawn law enforcement disclosures states are permitted to make under the SNAP Act, which may occur only "upon request" of law enforcement, or when the state agencies, not USDA, decide to hand over the information.

Routine use 11 similarly permits USDA to redisclose SNAP data if that data, in USDA's judgment, would "support" any government agency or instrumentality in investigating potential waste, fraud, or abuse or if such redisclosure is reasonably necessary to "prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat" such waste, fraud, or abuse. Because this discretionary language allows USDA to disclose SNAP data in circumstances that would be impermissible were the state agency itself to do so, without any limitations on the receiving entity's subsequent use of the data, it violates the SNAP Act for the states to hand over data subject to the routine use.

Routine uses 8 and 11 reverse the SNAP Act's presumption against disclosure of SNAP data and violate the Privacy Act's compatibility requirement.

## V. *California v. USDA* Litigation

In the TRO issued yesterday in *California v. USDA*, the court found 21 state plaintiffs likely to succeed on the merits of their claim that the data demand is contrary to the SNAP Act. *California* TRO at 11–12. The ruling was limited to USDA's claim of authority under 7 U.S.C. § 2020(e)(8) rather than the 7 U.S.C. § 2020(a)(3)(B) arguments USDA raised for the first time at the hearing on the motion (addressed below). *Id.* at 11. The court found the states likely to succeed because "USDA has announced its intent to use [individuals'] SNAP] information in ways well beyond those permitted under § 2020(e)(8)(ii)."[7] *Id.* at 11–12 (as in original; § 2020(e)(8)(A)(ii) likely intended).

Ruling without the benefit of the Administrative Record, the court found the states' arbitrary and capricious claim unlikely to succeed on the merits because the states made an insufficient showing (i) that there was a clear policy change, (ii) that the decision lacked a rational connection between the facts and USDA's choice, (iii) that USDA failed to consider the possibility of hacking and the burden on state agencies, and (iv) that USDA failed to consider SORN comments. *Id.* at 12–13. These preliminary conclusions do not impact the arbitrary and capricious claim Plaintiffs press here, which relies on different arguments and an Administrative Record bereft of reasoning.

At a September 16 TRO hearing in that case, USDA argued for the first time that § 2020(a)(3)(B) and § 2020(e)(8)(a)(1) provide two sources of authority for USDA's data demand, and the requirement of data and security protocols applies only to demands pursuant to

---

[7] The court set a preliminary injunction hearing for October 9. *California* TRO at 18. Even if the TRO is converted to a temporary injunction, it does not stay USDA's unlawful data demand to the non-plaintiff states (to which two Individual Plaintiffs here submitted SNAP data), leaving Plaintiffs' current and prospective injuries unaddressed.

10

the former. The court did not address those arguments in its TRO ruling.[8] *Id.* at 11. USDA has not made that argument here; if it does so for the first time on reply, the argument is waived. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 37 (D.D.C. 2010) ("As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply.").

This argument would also be without merit. "It is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). The canon applies where there is a "general authorization and a more limited, specific authorization." *Id.* For example, where more detailed provisions governed a bankruptcy court's authority to arrest and detain bankrupt individuals, the Supreme Court determined that the court could not rely on its more general authority to avoid the application of those procedures. *Id.* (explaining *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932)). In this context, § 2020(a)(3)(B) specifically governs USDA's authority to inspect state SNAP records and requires such access occur only "subject to data and security protocols agreed to by the State agency and Secretary." USDA cannot avoid that requirement by claiming a different, more general source of authority for its access.

Moreover, paragraph (e)(8)(A) is not a grant of authority to USDA at all, but a requirement that the states have "safeguards" in place that "prohibit the use or disclosure of information obtained from applicant households, except that (A) the safeguards shall permit" certain disclosures. USDA's authority to *seek* the disclosures is in (a)(3)(B); the state's

---

[8] Nor did the court address the question of whether USDA's "inspection and audit" authority encompasses possession. *California* TRO at 11 n.10.

11

obligation to *allow* the disclosures is in (e)(8)(A). Indeed, USDA's limited inspection-and-audit power in (a)(3)(B) is merely a subset of the disclosures states have to allow under (e)(8)(A), which might include a disclosure directly to another state's SNAP agency, or to the same state's Medicaid agency. Any argument that the states' obligation not to preclude certain kinds of access under (e)(8)(A) creates a standalone right of access for USDA, apart from (a)(3)(A), must fail.

## CONCLUSION

For the reasons stated herein and in their prior submissions, Plaintiffs respectfully ask the Court to grant summary judgment in their favor, set aside the data collection, and grant the relief set forth in their motion.

Dated: September 19, 2025

Respectfully Submitted,

*/s/ Daniel A. Zibel*

Deana El-Mallawany*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
deana.elmallawany@protectdemocracy.org

Daniel A. Zibel (D.C. Bar No. 491377)
Madeline Wiseman (D.C. Bar No. 90031948)
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
dan@defendstudents.org
madeline@defendstudents.org

Nicole Schneidman*
PROTECT DEMOCRACY PROJECT
P.O. Box 341423
Los Angeles, CA 90034-9998
(202) 579-4582
nicole.schneidman@protectdemocracy.org

*Counsel for Plaintiffs*

JoAnna Suriani (D.C. Bar No. 1645212)*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org

John L. Davisson (D.C. Bar #1531914)
Sara Geoghegan (D.C. Bar #90007340)
Kabbas Azhar (D.C. Bar #90027866)
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: (202) 483-1140
Fax: (202) 483-1248

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

Saima A. Akhtar (NY Bar No. 4661237)\*  
NATIONAL CENTER FOR LAW AND  
ECONOMIC JUSTICE  
50 Broadway, Suite 1500  
New York, NY 10004  
(212) 633-6967 (telephone)  
(212) 633-6371 (fax)  
akhtar@nclej.org  

*Counsel for Plaintiffs MAZON, EPIC, Ramos & Hollingsworth*

davisson@epic.org  
geoghegan@epic.org  
azhar@epic.org  

*Counsel for EPIC*

\*Admitted *Pro Hac Vice*